## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| Nelson L. Bruce, | ) | Civil Action No. 2:22-cv-02211-BHH-MGB |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Pentagon Federal Credit Union, *et. al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Nelson L. Bruce, proceeding *pro se* and *in forma pauperis*, filed this civil action on July 12, 2022, asserting claims pursuant to the Fair Credit Reporting Act ("FCRA"), among others.[1] (Dkt. No. 1; 31; 98.) On May 25, 2023, Plaintiff filed a Second Amended Complaint. (Dkt. No. 98.) On June 5, 2023, Defendant Equifax Information Services, LLC ("Equifax") filed a Motion for Judgment on the Pleadings. (Dkt. No. 100.) For the reasons discussed below, the undersigned recommends Equifax's Motion for Judgment on the Pleadings be denied.

## BACKGROUND

This action arises from allegedly inaccurate and misleading information Defendant Pentagon Federal Credit Union[2] ("PENFED" or "PenFed") provided to consumer reporting agencies ("CRA"), which the CRAs published in consumer reports and failed to properly investigate. The Second Amended Complaint ("SAC") brings claims against Defendants PenFed; Equifax; Experian Information Solutions, Inc.; Trans Union, LLC; and LexisNexis Risk Solutions, Inc. (Dkt. No. 98.) Equifax is a CRA within the meaning of the FCRA.[3]

---

[1] All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B) and Local Rule 73.02(B)(2)(e), D.S.C.

[2] Plaintiff refers to Defendant Pentagon Federal Credit Union as both "PENFED" and "PenFed."

[3] "The term 'consumer reporting agency' means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit

The SAC contains the following allegations specific to Defendant Equifax. Plaintiff alleges that Equifax "prepared and issued credit reports concerning the Plaintiff that included inaccurate, incomplete, untrue, incorrect and materially misleading information relating to PENFED, and/or REV accounts being reported." (Dkt. No. 98 at 6.) More specifically, Plaintiff alleges that Equifax inaccurately reported "the balance allegedly owed to PENFED and REV"[4] and failed "to report the [PenFed] accounts as sold, transferred, charged-off with a zero balance and zero amount past due." (Dkt. No. 98 at 8, 16.)

According to Plaintiff, "[a]ccounts are required to be reported to the credit reporting agencies in Metro 2 Format which the bureaus have all adopted. The reported accounts are considered inaccurate, incomplete, incorrect if not in compliance with Metro 2 Standard Format." (*Id.* at 20.) Plaintiff alleges that to comply with "Metro 2 reporting standards," Equifax's policy "require[s] PENFED" to accurately report "balance information, open date, date of first delinquency, [and] whether an account is sold." (*Id.* at 20–21.) Plaintiff alleges that the Metro 2 reporting standards require the reporting of "the accounts as sold, transferred, charged-off with a zero balance and zero amount past due to be accurate." (*Id.* at 16.) The SAC expressly incorporates as an exhibit excerpts from the Metro 2 guidelines, which discuss furnisher reporting duties when accounts are transferred or sold.[5] (Dkt. No. 98 at 5; Dkt. No. 77-1 at 4–5.)

---

information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports." 15 U.S.C. § 1681a(f).

[4] Here, Plaintiff is referring to REV Federal Credit Union. REV is not a named defendant—the record indicates Plaintiff had an account with REV separate from his accounts with PenFed.

[5] The website for the Consumer Data Industry Association ("CDIA") states, "If your company furnishes consumer credit account data on a regular basis to credit reporting agencies, you have duties under the . . . [FCRA] to correct and update that consumer credit history information. To assist data furnishers in this process, the credit reporting industry has adopted a standard electronic data reporting format called the Metro 2® Format." *See* CDIA, https://www.cdiaonline.org/metro-2/ (last visited Sept. 22, 2023).

Plaintiff alleges that the CRAs "have been reporting the . . . PenFed accounts and information through the issuance of false, incomplete, untrue, incorrect and inaccurate credit information and consumer reports that it has disseminated to various third parties, persons and credit grantors." (*Id*. at 9.) Plaintiff alleges he "notified both the [CRAs] and data furnishers that he disputed the accuracy, completeness, correctness of the information the [CRAs] were reporting." (*Id*.) Specifically, Plaintiff alleges that on September 24, 2021, he "sent out disputes . . . [that] pointed out to [Equifax] the improper, inaccurate derogatory tradelines to be reinvestigated and requested that the tradelines be deleted/removed." (*Id*. at 9.) In support, the SAC cites Exhibit A, which is attached to the initial complaint and includes a letter sent by certified mail from Plaintiff to Equifax dated September 24, 2021. (Dkt. No. 1-2 at 2–6.) Plaintiff alleges that "as a result of [Equifax's] reinvestigations," it claimed "the information reported by PENFED has been verified as accurate" and it deleted the disputed REV account. (*Id*. at 12.) Plaintiff alleges Equifax did not provide him "with written results 5 days from completion of the September 2021 reinvestigation," however, in violation of 15 U.S.C. § 1681i(6)(A). (*Id*. at 12–13.)

Plaintiff further alleges, verbatim,

Between December 27, 2021 and April 16, 2022, upon reaching out to PENFED directly which include a call to PenFed, plaintiff discovered the defendants did not do a reasonable reinvestigation, if they did do a reasonable investigation of their own internal records, they would have found that accounts was sold, assigned, and transferred to third parties as PENFED intended not to furnish accurate, complete, correct information related to the current status of the accounts to the reporting agencies because their internal records prior to about January 22, 2018, show that PENFED knew that the credit card account being reported and published on plaintiff's consumer reports . . . allegedly belonging to the Plaintiff was sold and transferred to United Holding Group . . . and PENFED knew the line of credit account being reported and published on plaintiff's consumer reports . . . allegedly belonging to the Plaintiff was assigned and transferred to National Credit Corporation and all were charged off/written off therefore no accounts nor debts existed as an asset of PENFED that could have been validated and/or verified by PENFED.

3

(*Id.* at 15–16.) According to Plaintiff, "PENFED knew that [plaintiff] was not liable to pay them anything after the accounts [were] sold, assigned and/or transferred" based on "their own records" and on a letter dated April 11, 2022, in which PenFed directed Plaintiff "to United Holding Group and National Credit Corporation to make arrangements regarding these alleged accounts." (*Id.* at 17; Dkt. No. 1-4 at 3.)

Plaintiff alleges on April 22, 2022, he received an updated copy of his consumer credit report, which "identifies multiple inaccuracies and inconsistencies." (Dkt. No. 98 at 20.) Based on this report, Plaintiff sent another request for reinvestigation to Equifax on May 2022. (*Id.* at 21.) In support, the SAC cites Exhibit A, which includes a May 3, 2022 letter sent from Plaintiff to Equifax by priority mail in which he summarily asks Equifax to "re-investigate if every piece of information for" the three PenFed accounts is "correct." (Dkt. No. 1-2 at 48.) In this letter, Plaintiff states he is "not 100 percent sure if" PenFed is "reporting right or wrong." (*Id.*)

Plaintiff further alleges that on June 17, 2022, Equifax "received a notice from Plaintiff that clearly notifies them that the PenFed accounts [were] sold, assigned and transferred to third parties . . . and [Equifax] failed to update their records and/or failed to reinvestigate and willfully, negligently continued to report the accounts." (*Id.* at 10.) In support, the SAC cites "Exhibit D," which is attached to the initial complaint. (Dkt. No. 1-5 at 5–6.) Exhibit D includes a "Notice of Intent to Sue" dated June 17, 2022, which is addressed to Equifax and indicates it is being sent "via email" to counsel, who, at the time, was representing Equifax in separate, unrelated litigation involving Plaintiff. (*Id.*; Dkt. No. 100 at 10 n.13.)

Plaintiff alleges that as a result of Equifax's actions, Plaintiff has suffered

a diminished credit score, loss of credit, loss of the ability to purchase and benefit from credit, a chilling effect on credit applications, and the mental and emotional distress and pain, anguish, humiliation and embarrassment caused by the inability to obtain financing for everyday expenses, bank account denials, denials of credit

and credit card applications, [and] higher interest rates on loans and credit cards that otherwise be affordable.

(*Id*. at 26–35.) Specific to Equifax, the SAC alleges claims for violation of the FCRA, defamation, and violation of the South Carolina Financial Identity Fraud and Identity Theft Protection Act. As noted above, the SAC incorporates exhibits that are attached to both the initial complaint and the first amended complaint. (*Id*. at 5.)

On June 5, 2023, Equifax filed a Motion for Judgment on the Pleadings. (Dkt. No. 100.) On June 6, 2023, this Court issued an Order pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the dismissal procedure and the possible consequences if he failed to adequately respond to the motion. (Dkt. No. 101.) Plaintiff filed a response in opposition to the Motion on July 10, 2023. (Dkt. No. 114.) Equifax did not file a reply. The Motion is ready for review.

## STANDARD OF REVIEW

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Rule 12(c), Fed. R. Civ. P. Rule 12(c) motions "dispose of cases in which there is no substantive dispute that warrants the litigants and the court proceeding further." *See Lewis v. Excel Mech., LLC*, 2:13-CV-281-PMD, 2013 WL 4585873, at * 1 (D.S.C. Aug. 28, 2013) (citing 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 1368 (3d ed. 2010)). Courts follow "a fairly restrictive standard" in deciding Rule 12(c) motions, as "hasty or imprudent use of this summary procedure by the courts violates the policy in favor of ensuring to each litigant a full and fair hearing on the merits of his or her claim or defense." *See Fitzhenry v. Indep. Order of Foresters*, No. 2:14-CV-3690-DCN, 2015 WL 3711287 (D.S.C. June 15, 2015) (internal citations omitted).

A motion for judgment on the pleadings is analyzed under the same standard as a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Burbach Broad. Co. of Del. v. Elkins Radio Corp.,* 278 F.3d 401, 405–06 (4th Cir. 2002). Rule 12(b)(6) permits the dismissal of an action if the complaint fails "to state a claim upon which relief can be granted." Rule 12(b)(6), Fed. R. Civ. P. Such a motion tests the "legal sufficiency" of the complaint pursuant to Rule 8 of the Federal Rules of Civil Procedure and "does not resolve contests surrounding the facts, the merits of the claim, or the applicability of defenses." *See Doe 202a v. Cannon*, No. 2:16-CV-00530-RMG, 2018 WL 317818, at *1 (D.S.C. Jan. 8, 2018) (internal citations omitted). Accordingly, the sole question before the court is simply whether the plaintiff's complaint alleges a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007); *see also Doe 202a*, 2018 WL 317818, at *1 (noting that the court's inquiry is limited to whether the allegations constitute a short and plain statement of the claim showing that the pleader is entitled to relief as required under Rule 8). Although the requirement of plausibility does not impose a probability requirement at this stage, the complaint must show more than a "sheer possibility that a defendant has acted unlawfully." *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (noting that while Rule 8 does not require detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation").

Rule 12(c) motions limit the court's review to the pleadings and "any documents and exhibits attached to and incorporated into the pleadings."[6] *See Hughes v. Med. Depot, Inc.*, No. 2:18-CV-2187-RMG, 2019 WL 1772401, at *1 (D.S.C. Apr. 23, 2019) (internal citations omitted). Where a plaintiff attaches an exhibit to a complaint, such exhibits are incorporated into the

---

[6] The court "may also consider documents attached to the complaint . . . as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 179–80 (4th Cir. 2009).

complaint, and "in the event of a conflict between the bare allegations of the complaint and any exhibit attached pursuant to Rule 10(c) . . . the exhibit prevails." *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991); *see also Jeffrey M. Brown Assocs., Inc. v. Rockville Ctr. Inc.*, 7 F. App'x 197, 202 (4th Cir. 2001) ("While construing those facts in a light most favorable to [plaintiff], we need not accept as true "the legal conclusions drawn from the facts . . . . [or] unwarranted inferences, unreasonable conclusions, or arguments," . . . such as conclusory allegations in the complaint that are contradicted by the attachments.").

Because Plaintiff is representing himself, these standards must be applied while liberally construing his filings in this case. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

## DISCUISSION

### A.     Claim for Violations of FCRA

The SAC's First Cause of Action alleges Equifax violated sections 1681i and 1681e(b) of the FCRA by "failing to delete inaccurate information in the Plaintiff's credit file after receiving actual notices of such inaccuracies . . . ," and by "failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit report and credit files [it] publish[ed] . . . ." (Dkt. No. 98 at 25–28.) The undersigned considers these claims below.

#### 1.     Standards

##### a.     § 1681i

The FCRA is "a comprehensive statutory scheme designed to regulate the consumer reporting industry." *Ross v. F.D.I.C.*, 625 F.3d 808, 812 (4th Cir. 2010). "Section 1681i of the FCRA outlines the procedure to be followed in cases in which consumers dispute the completeness or accuracy of information contained in their file." *Spitzer v. Trans Union LLC*, 140 F. Supp. 2d 562, 565 (E.D.N.C. 2000), *aff'd*, 3 F. App'x 54 (4th Cir. 2001). To state a claim for violation of

§ 1681i, a plaintiff must allege "(1) that he disputed the accuracy of an item in his . . . credit file; (2) the CRA failed to conduct a reasonable reinvestigation; and (3) that a reasonable reinvestigation by the CRA could have uncovered the inaccuracy." *Burke v. Experian Info. Sols., Inc*., No. 1:10-CV-1064 AJT/TRJ, 2011 WL 1085874, at *3 (E.D. Va. Mar. 18, 2011) (citing *Cahlin v. Gen Motors Acceptance Corp*., 936 F.2d 1151, 1160 (11th Cir. 1991)).

"The reasonableness of a reinvestigation under these circumstances depends on the facts of each case, . . . but multiple courts have explained that a CRA has no obligation to resolve legal disputes between a consumer and a creditor." *Alston v. Branch Banking & Tr. Co*., No. GJH-15-3100, 2016 WL 4521651, at *10 (D. Md. Aug. 26, 2016) (collecting cases in other circuits); *see also Saunders v. Branch Banking & Tr. Co. of Va*., 526 F.3d 150, 142, (4th Cir. 2008) (noting that claims under both §§ 1681e(b) and 1681i "brought against CRAs based on a legal dispute of an underlying debt raise concerns about 'collateral attacks' because the creditor is not a party to the suit"); *Perry v. Toyota Motor Credit Corp*., No. 1:18-cv-00034, 2019 WL 332813, at *5 (W.D. Va. Jan. 25, 2019) ("A number of courts have found that to make the required showing of inaccurate reporting under FCRA §§ 1681e(b) and 1681i, 'a complaint's allegations must dispute facts underlying a purported inaccuracy, as the presentation of legal defenses to payment will not suffice." (quoting *Mamisay v. Experian Info. Sols., Inc*2017 WL 1065170, at * 3 (N.D. Cal. Mar. 21, 2017)).

Also, "if a consumer later sues a CRA for a violation of its reinvestigation duty under § 1681i(a), he or she may only sue based on alleged violations of which the consumer provided notice to the CRA." *Petty v. Equifax Info. Servs., LLC*, No. CCB-10-694, 2010 WL 4183542, at *3 (D. Md. Oct. 25, 2010). Such notice is required because without it the CRA cannot have been expected to know what information to reinvestigate, how to reinvestigate it, or whether upon

reinvestigation the information is indeed inaccurate or incomplete. *Id.* "If the consumer raises additional alleged violations in his or her lawsuit for which the consumer had not previously provided notice of the dispute to the CRA, those claims must be dismissed." *Id.*

**b.    § 1681e(b)**

Relatedly, section 1681e(b) states that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). "Thus, a [CRA] violates § 1681e(b) if (1) the consumer report contains inaccurate information and (2) the reporting agency did not follow reasonable procedures to assure maximum possible accuracy." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 415 (4th Cir. 2001).

To establish the first prong of a § 1681e(b) violation, "a consumer must present evidence tending to show that a [CRA] prepared a report containing inaccurate information." *Id.* at 415 (citing *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995)). "A report is inaccurate when it is 'patently incorrect' or when it is 'misleading in such a way and to such an extent that it can be expected to [have an] adverse [ ]' effect." *Id.* (alterations in original) (quoting *Sepulvado v. CSC Credit Servs.*, 158 F.3d 890, 895 (5th Cir. 1998)). To establish the second prong, "the plaintiff bears the burden under § 1681e(b) to show that the [CRA] did not follow reasonable procedures." *Dalton*, 257 F.3d at 416. "The issue of whether the agency failed to follow 'reasonable procedures' will be a 'jury question[ ] in the overwhelming majority of cases.'" *Id.* (alteration in original) (quoting *Guimond*, 45 F.3d at 1333).

**2.    Analysis of Claim under § 1681i**

As noted above, the SAC alleges that Plaintiff sent notices to Equifax on September 24, 2021, May 3, 2022, and June 17, 2022, in which he disputed the accuracy of his credit reports.

Here, Equifax argues that Plaintiff's FCRA claim under § 1681i fails because Plaintiff has failed to "plead that he presented Equifax with the claimed inaccuracy he now premises his claims on." (Dkt. No. 100 at 8.) Equifax first asserts that "none of Plaintiff's boilerplate 'Reasons' in" the September 24, 2021 letter alleged that certain "PENFED accounts were inaccurately reporting a balance because PENFED had sold or transferred the accounts elsewhere." (*Id.* at 10.) Equifax further argues the May 3, 2022 letter "made no claim of inaccuracy whatsoever" and therefore cannot provide the requisite notice. (*Id.*) Finally, Equifax asserts that the June 17, 2022 letter cannot serve as sufficient notice to support Plaintiff's claim under § 1681i because: (1) it was not sent directly to Equifax, as required under § 1681i(a)(1)(A); and (2) it does not constitute a dispute requesting a reinvestigation. (*Id.* at 10–12.)

As an initial matter, the undersigned agrees that Plaintiff's May 3, 2022 letter to Equifax cannot serve as the requisite notice to support any claim under § 1681i because it does not allege inaccurate or incomplete reporting by PenFed. In this letter, Plaintiff indicates that the accounts reported by PenFed may be correct, he just is "not 100 percent sure if they are." (Dkt. No. 1-2 at 48.) His request that Equifax "re-investigate if every piece of information" reported for three PenFed accounts "is correct" does not provide Equifax notice of a dispute sufficient to trigger its reinvestigation duty under § 1681i. *See Petty*, 2010 WL 4183542, at *3 ("[A] CRA's liability under § 1681i is triggered only when 'the completeness or accuracy [of the information] . . . is disputed by the consumer and the consumer notifies the agency directly . . . of such dispute." (quoting § 1681i(a)(1)(A)).

Likewise, the June 17, 2022 communication also cannot serve as the requisite notice under § 1681i because it was not sent directly to Equifax, but rather emailed to an attorney who was representing Equifax in separate, unrelated litigation involving Plaintiff. (Dkt. No. 1-5 at 5–6; Dkt.

No. 100 at 10 n.13.); *see* 15 U.S.C. § 1681i(a)(1)(A) (requiring, *inter alia*, that "the consumer notifies the agency *directly* . . . of such dispute") (emphasis added); *Warner v. Experian Info. Sols., Inc.*, 931 F.3d 917, 921 (9th Cir. 2019) ("[T]o notify a consumer reporting agency of a dispute 'directly,' a letter must come *from* the consumer and be sent *to* the agency." (emphasis in original)). As Equifax notes, its website provides clear instruction on the process for disputing inaccuracies on a credit report by mail, phone, or online.[7] (Dkt. No. 100 at 11.) Plaintiff's prior communications with Equifax demonstrate he was familiar with these instructions. Further, the content of this communication convinces the undersigned that this is not an instance where the technical requirements of notice under § 1681i(a)(1)(A) should be ignored.

In his communication titled "Notice of Intent to Sue," Plaintiff states that he has "asked Equifax multiple times to do a proper reasonable investigation" and that "Equifax['s] alleged investigations both now and in the past [were] unreasonable," indicating he believed the time for a reasonable reinvestigation under § 1681i had already passed. (Dkt. No. 1-5 at 5.) Plaintiff states he is sending this notice "prior to filing a lawsuit."[8] (*Id.*) He offers to "settle all matters for $2,000,000 with Equifax" and states his "offer expires 10 calendar days from receipt of my email to your attorney in the pending case." (*Id.*) Based on the foregoing language, the expressed purpose of the communication was to make a settlement demand based on Plaintiff's believe that Equifax had violated the FCRA and the South Carolina Consumer Protection Code.

The speed with which Plaintiff filed the instant lawsuit after sending this letter further belies any claim that Plaintiff sought to trigger a reinvestigation by Equifax via this communication. Under § 1681i(a)(1)(A), within thirty days of receiving notice from the consumer,

---

[7] *See* Equifax, *How do I correct or dispute inaccuracies on my credit reports by mail?*, https://www.equifax.com/personal/help/mail-in-credit-report-dispute/ (last visted Sept. 22, 2023).
[8] Plaintiff filed the instant action less than one month later, on July 12, 2022. (Dkt. No. 1.)

the CRA must "record the current status of the disputed information, or delete the item from the file." Plaintiff filed the instant lawsuit before the expiration of this 30-day deadline. *See Mavilla v. Absolute Collection Serv., Inc.*, 539 F. App'x 202, 208 (4th Cir. 2013) ("Here, the undisputed facts demonstrate that ACS received notification of the disputed debt on September 27, 2010 . . . . It is also uncontested that this action was commenced on October 4, 2010, only five days after ACS's duties arose. Thus, at the time of this suit, ACS had not breached any duty under the FCRA."). In short, there is no basis to find that this communication with Equifax's counsel was intended by Plaintiff to prompt a reasonable reinvestigation by Equifax into whether the disputed information was accurate. Based on the foregoing, the undersigned finds that Plaintiff cannot rely on the June 17, 2022 communication to serve as the notice required to support any claim that Equifax violated § 1681i.

Unlike the other communications, Plaintiff' September 24, 2021 letter disputed directly to Equifax specific alleged inaccuracies in his consumer report. (Dkt. No. 1-2 at 2–6.) Specifically, Plaintiff disputed PenFed's failure to report the "charged-off/written off" accounts with a zero balance and asked "that these alleged accounts be removed/deleted [by Equifax] from [Plaintiff's] credit report immediately." (Dkt. No. 1-2 at 2–6.) Here, Plaintiff stated, *inter alia*, that the "charge-offs/write-offs are to be reported with a '0' balance (zero) as paid in full" because "they apply for and receive tax credits in the year they determine the alleged account is an uncontrollable business bad debt, thereby paying off the remaining balance in full on this alleged account." (*Id.* at 2.)

In this letter, Plaintiff further disputed the accuracy of two PenFed accounts because they were inconsistent with the zero balance reported by Experian. Similarly, he disputed the accuracy of the PenFed accounts because, *inter alia*, (1) "the alleged account number being reported by

Equifax . . . does not match the alleged account number reported to Experian"; and (2) the date of first delinquency reported by Equifax "does not match what is being reported to Experian."[9] (*Id.*)

Here, some discussion of the alleged inaccuracies is required before the notice issue can be properly addressed. Plaintiff alleges that Equifax's reporting of a balance on his charged off PenFed accounts was inaccurate and misleading, especially where the date of first delinquency and balance owed was inconsistent with that reported by other CRAs for the same accounts. He has alleged that this inaccurate reporting "negatively affects plaintiff's credit score, which lenders look at to approve or deny credit to a consumer and is also confusing to a lender who sees a balance on one report and a zero balance on another consumer report." (Dkt. No. 98 at 19.) Plaintiff appears to argue that the failure to report the PenFed accounts with a zero balance was misleading both because the accounts at issue had been sold and/or assigned and because the accounts were listed as charged off. Plaintiff does not allege that these accounts were simultaneously reported by a third party elsewhere in the consumer reports published by Equifax.

As noted above, the Metro 2 excerpts incorporated into the SAC state that accounts that have been sold or transferred should be reported with a zero balance. (Dkt. No. 77-1 at 4–5.) Additionally, the Metro 2 guidelines provide specific duties about the reporting of the date of first delinquency on sold accounts. (*Id.* at 5.) It is unclear if the inconsistencies between the Experian and Equifax accounts highlighted in Plaintiff's September 24, 2021 letter arose from Experian's adherence to these guidelines because PenFed had already sold and/or assigned the accounts—

---

[9] In a footnote, Equifax argues that the "boilerplate 'Reasons' from [Plaintiff's] dispute letter" should not be incorporated into the substance of his complaint. (Dkt. No. 100 at 12 n.14.) As discussed above, the SAC expressly alleges the September 24, 2021 letter "pointed out to [Equifax] the improper, inaccurate derogatory tradelines to be reinvestigated and requested that the tradelines be deleted/removed." (Dkt. No. 98 at 9.) The SAC referenced the specific exhibit where the above account information is disputed by Plaintiff, and this exhibit is attached to the initial complaint. Thus, the undersigned finds Plaintiff has plausibly alleged notice of these inaccuracies in his pleading. *See Hughes*, 2019 WL 1772401, at *1 (Rule 12(c) motions limit the court's review to the pleadings and "any documents and exhibits attached to and incorporated into the pleadings.").

these are facts that would be better addressed at summary judgment. In short, the undersigned cannot find that notice of these additional alleged inaccuracies "would have borne no relationship to the purported inaccuracies underlying Plaintiff's claims here," such that it is clear Equifax did not have sufficient notice of the alleged inaccuracies stemming from the sale/assignment issue as a matter of law. *Herisko v. Bank of Am.*, 367 F. App'x 793, 794 (9th Cir. 2010) (granting summary judgment to defendants Experian and Bank of America because notice of the inaccuracies referred to in the plaintiff's dispute letter "would have borne no relationship to the purported inaccuracies underlying" the plaintiff's claims raised in the lawsuit); *see also Lao v. Green Tree Fin. Corp.*, 2012 WL 12055044, at *4 (C.D. Cal. Oct. 16, 2012) (rejecting argument that inaccuracies raised in underlying dispute letter were not specific enough to establish the requisite notice for the inaccurate statements alleged in the complaint; noting "the facts may show that the alleged inaccuracy is simply part-and-parcel of the same dispute . . . . To the extent this statement represents a continuation of the same disputed inaccuracy, the law should not compel [plaintiff] to send ongoing, never-ending letters with respect to every iteration of [furnisher's] error"); *cf. Petty*, 2010 WL 4183542, at *3–4 (dismissing claim under § 1681i where plaintiff's complaint alleged that certain information in his consumer report was incomplete and he only notified the CRAs that he believed the consumer report was inaccurate).

Further, the undersigned cannot find that Plaintiff has more generally failed to plausibly allege an inaccuracy stemming from Equifax's failure to report the charged off PenFed accounts with a zero balance. Equifax offers no compelling argument on this issue. Rather, in a footnote Equifax argues that Plaintiff's assertion that charge offs are to be reported with a zero balance "is incorrect as a matter of law." (Dkt. No. 100 at 4 n.6 (citing *In re Jones*, 367 B.R. 564, 566 (Bankr. E.D. Va. 2007) (referencing testimony in which credit union employee "explained that a 'charge

off' report is used when a credit union has to write off bad debt for accounting purposes and does not mean that the loan has been forgiven; rather, the balance remains on the member's account"; noting employee "conceded that a 'charge off' report negatively impacts a member's score")). Equifax further argues in a footnote that Plaintiff "did not actually claim that Equifax had it wrong and Experian had it right." (Dkt. No. 100 at 5–6 n.9.)

Notably, courts in this circuit "generally have deemed the question of accuracy, in FCRA cases, ill-suited for pre-discovery resolution." *Newman v. Am. Honda Fin. Corp.*, No. 1:21-cv-3, 2022 WL 657630, at *6 (M.D.N.C. Mar. 4, 2022); *Price v. Equifax Info. Servs.*, No. 5:19-cv-00886, 2020 WL 2514885, at *5 (S.D.W. Va. May 15, 2020) ("[W]hether technically accurate information is sufficiently misleading to qualify as inaccurate for purposes of the FCRA is generally a question to be determined by the trier of fact."). Courts in this circuit have further "rejected, at the motion-to-dismiss stage, arguments by furnishers regarding the accuracy of reporting historical information on closed accounts." *Newman*, 2022 WL 657630, at *6 (collecting cases); *see also Short v. Experian Info. Sys., Inc*., No. 2:16-cv-09294, 2017 WL 2296887, at *4 (S.D.W. Va. May 25, 2017) (denying motion to dismiss where furnisher argued that "it is not an FCRA violation for a creditor to accurately report negative historical information about a paid account"; noting that court "lack[ed] facts necessary to determine whether [furnisher]'s reporting accurately reflected the history of [p]laintiff's account").

While most of those cases involve allegations of reporting a monthly payment on a closed account, the undersigned cannot find Plaintiff's claim here fails merely because it is not specific to that issue. Indeed, the fact that a different CRA reported the charged off accounts with a zero balance indicates it may have been misleading for Equifax to have reported the same accounts with a balance, regardless of whether the debt had been sold and/or assigned. Upon a full development

of the factual record, Equifax's arguments on this issue could prove convincing. However, given the current allegations in the record, the undersigned cannot find that Equifax's argument here compels dismissal of Plaintiff's FCRA claims at this time.

Further, as discussed above, Plaintiff has alleged Equifax's failure to report certain accounts that PenFed had sold or assigned with a zero balance violated Metro 2 standards. Another court in this circuit recently recognized that "inaccuracies . . . which derive from purported deviations from the Metro 2 Guidelines" fall under the "category" of "those inaccuracies that are . . . misleading in such a way and to such an extent that they can be expected to adversely affect credit decisions." *Arriaza v. Experian Info. Sols., Inc*., No. 20-cv-3073, 2021 WL 1019937, at *4 (D. Md. Mar. 17, 2021) (quoting *Dalton*, 257 F.3d at 415 (internal quotations omitted)). Per the Metro 2 Guidelines, the sale or assignment of an account necessarily affects how the credit information of the consumer is reported by the prior owner of the account, including the listing of a zero balance both as the current balance and the amount past due.

Here, Plaintiff has alleged that Equifax's failure to report a zero balance on the charged off PenFed accounts "negatively affects plaintiff's credit score, which lenders look at to approve or deny credit to a consumer and is also confusing to a lender who sees a balance on one report and a zero balance on another consumer report." (Dkt. No. 98 at 19.) In other words, Plaintiff alleges that Equifax's reporting of a balance on the charged off accounts that had been sold and/or assigned may prompt those making credit decisions to draw a more negative inference than if Equifax had reported a zero balance these accounts. Plaintiff alleges he has suffered, *inter alia*, "a diminished credit score, . . . a chilling effect on credit applications, and the mental and emotional distress and pain, anguish, humiliation and embarrassment caused by the inability to obtain financing for everyday expenses." (*Id*. at 26–35.)

Plaintiff's allegations about damage to his credit based on the inaccurate and misleading information in his credit report, which was shared with third parties, sufficiently alleges he suffered concrete harm. *See*, *e.g.*, *Gaillard v. Cap. One Auto Fin*., No. 3:21-cv-02228-SAL, 2022 WL 18495862, at *8 (D.S.C. Sept. 29, 2022) (plaintiff's FCRA claim alleged "qualifying concrete injury under Article III" where she claimed defendant's "report of an adverse charge off" caused her " to lose funds and damage her credit"); *Evans v. Am. Collection Enter.*, 624 F. Supp. 3d 593, 600 (D. Md. 2022) (noting "alleged dissemination [of inaccurate information on credit report] to a third party is enough to constitute a concrete injury"); *Burns v. Trans Union, LLC*, No. 4:18-cv-03120-MGL, 2019 WL 3890833, at *3 (D.S.C. Aug. 19, 2019) (finding allegations that plaintiff "experienced both credit and emotional damages, undue stress, and anxiety" establishes "the injury in fact requirement" because "the threat of harm bad credit imposes is cognizable and does actually exist"); *Phillips v. Trans Union, LLC*, No. 3:16-cv-00088, 2017 WL 3911018, at *3 (W.D. Va. Sept. 6, 2017) (allegation that furnisher falsely reported the date of first delinquency on a loan was a "sufficiently concrete injury because 'ensuring the accuracy of the information inaccurately reported by [furnisher] seems directly and substantially related to the FCRA's goals."); *cf. Arriaza*, 2021 WL 1019937, at *4 (allegation that Experian deviated from Metro 2 Guidelines could not be expected to adversely affect credit decisions because "correcting [alleged inaccuracy of reporting a lower past due balance on a charged-off account] would further harm, not improve, [plaintiff's] creditworthiness").

In sum, the undersigned finds Plaintiff has alleged sufficient facts to support a prima facie showing that Equifax's reporting was inaccurate or misleading when assuming all of Plaintiff's factual allegations are true, and construing them in the light most favorable to him. To prove his case, in addition to supporting his allegations of notice, Plaintiff will need to establish "through

admissible evidence that [updating the status of a charged off account as sold or assigned with a zero balance] is in fact the industry standard, that [Equifax] deviated from it, and that this particular deviation might adversely affect credit decisions ." *Nissou-Rabban v. Cap. One Bank (USA), N.A.*, 2016 WL 4508241, at \*5 (S.D. Cal. June 6, 2016) (finding plaintiff plausibly alleged a claim under the FCRA violation based on furnisher's failure to comply with Metro 2 reporting guidelines). Alternatively, Plaintiff will need to establish through admissible evidence that reporting a charged off account with an unpaid balance, regardless of its status as sold and/or assigned, would mislead lenders and adversely affect credit decisions when those same charged off accounts were reported by other CRAs with a zero balance. Whether Plaintiff's allegations on these issues turn out to be true is a question of proof that is not suited for resolution in a motion to dismiss.

Based on the foregoing, the undersigned finds Plaintiff has alleged sufficient facts to state a claim against Equifax under 15 U.S.C. § 1681i.

### 3.    Analysis of Claim under § 1681e(b)

Equifax similarly argues that Plaintiff's claim under § 1681e(b) should be dismissed because Plaintiff "did not present Equifax with the claimed inaccuracy in his dispute." (Dkt. No. 100 at 13.) Equifax further argues that Plaintiff has failed "to plead factual content sufficient to make a plausible claim that Equifax did not follow reasonable procedures." (*Id*. at 12.) The undersigned finds these arguments are without merit, given the foregoing analysis of the § 1681i claim.

More specifically, Plaintiff has plausibly alleged Equifax had notice of certain alleged inaccuracies in Plaintiff's credit report, including PenFed's failure to report certain accounts as sold or assigned with a zero balance and zero amount past due. The SAC alleges that Equifax "fail[ed] to maintain reasonable procedures with which to filter and verify disputed information in

the Plaintiff's credit file." (Dkt. No. 98 at 25.) It further alleges that Equifax and other CRAs "violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit report and credit files that they publish and maintain concerning the Plaintiff." (*Id.*)

Based on the foregoing, the undersigned recommends Plaintiff has stated facts sufficient to raise above a speculative level his claim that Equifax did not follow reasonable procedures to assure maximum possible accuracy of its reports under § 1681e(b). *See Dalton*, 257 F.3d at 416 (noting that he issue of whether a CRA followed reasonable procedures will be a "jury question in the overwhelming majority of cases") (citation and quotation marks omitted).

## B. Defamation Claim

The SAC's Third Cause of Action alleges Equifax's publishing of inaccurate credit information to third parties constituted defamation under South Carolina common law. (Dkt. No. 98 at 31–33.) Plaintiff's defamation claim is preempted by the FCRA absent an allegation of malice or willful intent to injure Plaintiff. *See* 15 U.S.C. § 1681h(e) ("[N]o consumer may bring any action or proceeding in the nature of defamation . . . with respect to the reporting of information . . . except as to false information furnished with malice or willful intent to injure such consumer."); *Ross*, 625 F.3d at 814 ("The only exception to this bar is a narrow one, requiring proof of 'malice or willful intent to injure [the] consumer.'"). Under South Carolina law, "'[m]alice' is established only if 'the defendant acted with ill will toward the plaintiff or acted recklessly or wantonly, meaning with conscious indifference toward the plaintiff's rights.'" *Beattie v. Nations Credit Fin. Servs. Corp.*, 69 Fed. App'x. 585 (4th Cir. 2003) (citing *Murray v. Holnam, Inc.*, 542 S.E.2d 743, 750 (S.C. 2001)).

19

The SAC alleges that even after Plaintiff told Equifax that he disputed the accuracy of his accounts, Equifax continued to publish the alleged inaccuracies to third parties. (Dkt. No. 98 at 23–24, 31–33.) Plaintiff alleges that Equifax acted "with malice, willful intent to injure the plaintiff." (*Id*. at 32) At this early stage in proceedings, the undersigned recommends these allegations plausibly allege malice or willful intent under Rule 12(b)(6). *See*, *e.g. Hoback v. Synchrony Bank*, No. 6:19-CV-18, 2019 WL 2438794, at *4 (W.D. Va. June 11, 2019) ("Courts assessing defamation claims brought in the context of credit reporting errors and FCRA violations tend to permit such claims to proceed to discovery if plaintiffs assert any allegations beyond 'merely reciting the legal standard.'"); *Potter v. FIA Card Servs., N.A*., No. 2:12-cv-1722-RMG, 2012 WL 13005806, at *2 (D.S.C. Sept. 28, 2012) (denying motion to dismiss defamation claim where plaintiff alleges he "repeatedly told the Defendants he was not an obligor on the account, but they continued to tell [credit reporting agencies] for two years that he was").

### F.    Claim under the South Carolina Financial Identity Fraud And Identity Theft Protection Act

Finally, the SAC's Fourth Cause of Action alleges a claim against Equifax under the South Carolina Financial Identity Fraud and Identity Theft Protection Act (the "Act"), S.C. Code Ann. § 37-20-170.[10] (Dkt. No. 98 at 33–34.) Under this claim, the SAC alleges, *inter alia*, Equifax

---

[10] S.C. Code Ann. § 37-20-170 provides, in part:

(A) If a consumer disputes the accuracy of an item in the consumer's records with a consumer reporting agency, the consumer may give notice in writing to the consumer reporting agency specifying in what manner the report is inaccurate and the consumer reporting agency shall reinvestigate the inaccuracy at no charge to the consumer, provide the consumer with sufficient evidence that the information is true and accurate information as it relates to that consumer, and record the current status of the disputed information. The consumer reporting agency shall provide forms for that notice and shall assist a consumer in preparing the notice when requested.

(B) Within thirty days after receiving a notice of inaccuracy, a consumer reporting agency shall deny or admit the inaccuracy to the consumer in writing. If the consumer reporting agency denies the inaccuracy, the consumer reporting agency shall include the following information with the written results of the reinvestigation:

"failed to correct, delete information found to be inaccurate, unauthorized, unverified, and in a reasonable time [and] instead reinserted the information and failed to reasonably and properly reinvestigate Plaintiff's disputes." (*Id.*)

Here, Equifax argues that this claim fails "for the same reason that [Plaintiff's] § 1681i claim fails: he did not 'give notice in writing to the consumer reporting agency specifying' the alleged inaccuracy that he now claims in his Complaint . . . ." (Dkt. No. 100 at 15 (quoting § 37-20-170(A)).) However, given the undersigned's foregoing recommendations, this argument is without merit. Equifax offers no other argument for dismissal of this claim, and the undersigned recommends Plaintiff has sufficiently alleged a claim against Equifax under the Act.

## **CONCLUSION**

For the foregoing reasons, it is RECOMMENDED that Equifax's Motion to Dismiss (Dkt. No. 100) be DENIED.

**IT IS SO RECOMMENDED**.

September 25, 2023
Charleston, South Carolina

MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE

---

(1) the basis for the denial;

(2) a copy of the consumer's file that is based on the consumer's file as revised as a result of the reinvestigation, including the business name and address of any furnisher of information who was contacted in connection with that information and, if reasonably available, the telephone number of the furnisher;

(3) a notice that, if requested by the consumer, the consumer reporting agency shall provide the consumer with a description of the procedure used by the consumer reporting agency to determine the accuracy and completeness of the information; and

(4) sufficient evidence that the information is true and accurate information as it relates to that consumer.

(C) If the consumer reporting agency admits that the item is inaccurate, it shall correct the item in its records and, on request by the consumer, it shall inform any person who within the last six months has previously received a report containing that inaccurate information.

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).