**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

Nelson L. Bruce,                              )      Civil Action No. 2:22-cv-02211-BHH-MGB
                                             )
                    Plaintiff,               )
                                             )
        v.                                   )      **REPORT AND RECOMMENDATION**
                                             )
Pentagon Federal Credit Union, *et. al*.,    )
                                             )
                    Defendants.              )
_____ )

Nelson L. Bruce, proceeding *pro se* and *in forma pauperis*, filed this civil action on July 12, 2022, asserting claims pursuant to the Fair Credit Reporting Act ("FCRA"), among others.[1] (Dkt. Nos. 1; 31; 98.) On May 25, 2023, Plaintiff filed a Second Amended Complaint. (Dkt. No. 98.) On June 8, 2023, Defendant Pentagon Federal Credit Union[2] ("PENFED" or "PenFed") filed a Motion to Dismiss. (Dkt. No. 106.) For the reasons discussed below, the undersigned recommends PenFed's Motion to Dismiss be granted in part and denied in part.

## BACKGROUND

This action arises from allegedly inaccurate and misleading information Defendant PenFed provided to consumer reporting agencies ("CRA"), which the CRAs published in consumer reports. The Second Amended Complaint ("SAC") brings claims against Defendants PenFed; Equifax Information Services, LLC ("Equifax"); Experian Information Solutions, Inc. ("Experian"); Trans Union, LLC ("Trans Union"); and LexisNexis Risk Solutions, Inc. ("LexisNexis"). (Dkt. No. 98.) The SAC contains the following allegations specific to Defendant PenFed. (Dkt. No. 98.) Plaintiff alleges that as part of its business, PenFed is a furnisher of

---

[1] All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B) and Local Rule 73.02(B)(2)(e), D.S.C.

[2] Plaintiff refers to Defendant Pentagon Federal Credit Union as both "PENFED" and "PenFed."

consumer credit information, and it "furnished information to consumer reporting agencies such as Defendants Trans Union, Equifax, LexisNexis and Experian." (*Id.* at 3.) According to Plaintiff, PenFed reported "inaccurate" and "misleading" information to lenders, giving "the false impression that a debt and/or account balance is owed or still owed to PenFed" and "that the accounts are paid or not paid as the information reported does not match what the other reporting agencies are or were reporting." (*Id.* at 19.)

Plaintiff alleges that "[a]ccounts are required to be reported to the credit reporting agencies in Metro 2 Format which the bureaus have all adopted. The reported accounts are considered inaccurate, incomplete, incorrect if not in compliance with Metro 2 Standard Format." (*Id.* at 20.) Plaintiff alleges that to comply with "Metro 2 reporting standards," PenFed must accurately report "balance information, open date, date of first delinquency, [and] whether an account is sold." (*Id.* at 20–21.) Plaintiff alleges that the Metro 2 reporting standards require that any accounts that have been sold or transferred are reported with a "zero balance." (*Id.* at 21.) The SAC expressly incorporates as an exhibit excerpts from the Metro 2 guidelines, which discuss furnisher reporting duties when accounts are transferred or sold.[3] (Dkt. No. 98 at 5; Dkt. No. 77-1 at 4–5.)

According to Plaintiff, the CRAs "have been reporting the . . . PenFed accounts and information through the issuance of false, incomplete, untrue, incorrect and inaccurate credit information and consumer reports that it has disseminated to various third parties, persons and credit grantors." (*Id.* at 9.) Plaintiff alleges he "notified both the [CRAs] and data furnishers that

---

[3] The website for the Consumer Data Industry Association ("CDIA") states, "If your company furnishes consumer credit account data on a regular basis to credit reporting agencies, you have duties under the . . . [FCRA] to correct and update that consumer credit history information. To assist data furnishers in this process, the credit reporting industry has adopted a standard electronic data reporting format called the Metro 2® Format." *See* CDIA, https://www.cdiaonline.org/metro-2/ (last visited Sept. 22, 2023).

he disputed the accuracy, completeness, correctness of the information the [CRAs] were reporting."[4] (*Id.*)

According to Plaintiff, PenFed "understood the consumer's disputes because" it used a "standardized system for receiving and processing consumer disputes from the CRAs." (Dkt. No. 98 at 14.) Plaintiff alleges that PenFed "ignored the information in the reporting system and 'simply regurgitated the same information it had previously reported to' the CRAs." (*Id.*) Plaintiff further alleges that PenFed

> failed [to] consistently update its reporting to the CRAs, and failed to []permanently and lawfully correct its own internal records to prevent re-reporting of the inaccurate and incomplete information for the disputed accounts. There [] are numerous discrepancies in the reporting across all the CRAs as each credit reporting is inconsistent with the other CRAs, for example, Experian and LexisNexis are reporting the PenFed Auto and Line of Credit accounts with Zero balances but Trans Union and Equifax have been reporting the accounts with a balance. [PenFed has] failed to report an accurate investigative/reinvestigation outcome to the CRAs that notified the parties of [Plaintiff's] disputes.

(*Id.* at 14–15.)

Plaintiff alleges that "PENFED intended not to furnish accurate . . . information related to the current status of the accounts to the reporting agencies because their internal records prior to about January 22, 2018, show that": (1) "PENFED knew that the credit card account being reported and published on [Plaintiff's] consumer reports . . . allegedly belonging to the Plaintiff, was sold and transferred" by PenFed to United Holding Group"; and (2) "PENFED knew the line of credit account being reported and published on [Plaintiff's] consumer reports . . . allegedly belonging to the Plaintiff was assigned and transferred to National Credit Corporation." (*Id.* at 15–16.) According to Plaintiff, these accounts "all were charged off/written off therefore no accounts nor

---

[4] The SAC alleges Plaintiff also disputed to the CRAs the reporting of an account with REV Federal Credit Union. REV is not a named defendant, and the record indicates this account was separate from his PenFed accounts.

debts existed as an asset of PENFED that could have been validated and/or verified by PENFED."

(*Id*. at 16.) He continues, verbatim,

> After January 22, 2018, the date of sale, assignment and or transfer of the credit card and line of credit accounts, PenFed to be in compliance with the FCRA and Metro 2 reporting standard for maximum possible accuracy, they are required to report the accounts as sold, transferred, charged-off with a zero balance and zero amount past due to be accurate, complete, true, correct and not misleading regardless of whether the third party is reporting it or not.

(*Id*.)

Specific to PenFed, the SAC alleges claims for violation of the FCRA; defamation; violation of the Uniform Commercial Code; and violation of the South Carolina Unfair Trade Practices Act ("SCUTPA"). (*Id.* at 28–37.) As noted above, the SAC incorporates exhibits that are attached to both the initial complaint and the first amended complaint. (*Id.* at 5.)

Relevant here, PenFed initially moved to dismiss the claims made against it in the first amended complaint. (Dkt. Nos. 31; 40.) PenFed's motion to dismiss was fully briefed, and on February 7, 2023, the undersigned issued a Report and Recommendation ("R&R") recommending that the motion be granted in part and denied in part because, *inter alia*, Plaintiff failed to sufficiently allege certain claims. (Dkt. No. 66.) However, before the R&R was adopted or rejected by the District Judge, Plaintiff moved to amend his complaint on May 23, 2023. (Dkt. No. 96.) The undersigned granted Plaintiff's motion and vacated the R&R. (Dkt. No. 97.) Because the February 7, 2023 R&R was vacated and pertains to an outdated pleading, it has no precedential value here and does not inform the undersigned's instant recommendation.

PenFed filed the instant Motion to Dismiss on June 8, 2023, in response to Plaintiff's Second Amended Complaint. (Dkt. Nos. 98; 106.) On June 9, 2023, this Court issued an Order pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the dismissal procedure and the possible consequences if he failed to adequately respond to the motion. (Dkt.

No. 109.) Plaintiff filed an initial response in opposition on August 14, 2023, and he filed a 47-page amended response in opposition on August 18, 2023. (Dkt. Nos. 115; 121.) PenFed filed an amended reply on August 24, 2023. (Dkt. No. 124.) Plaintiff thereafter filed a 14-page sur-reply. (Dkt. No. 126-1.) PenFed's Motion to Dismiss has been fully briefed and is ripe for review.

## **STANDARD OF REVIEW**

PenFed seeks dismissal of Plaintiff's claims against it under Rule 12(b)(6) of the Federal Rules of Civil Procedure. On a motion to dismiss pursuant to Rule 12(b)(6), a "complaint must be dismissed if it does not allege 'enough facts to state a claim to relief that is plausible on its face.'" *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "In reviewing a motion to dismiss an action pursuant to Rule 12(b)(6) . . . [a court] must determine whether it is plausible that the factual allegations in the complaint are 'enough to raise a right to relief above the speculative level.'" *Andrew v. Clark*, 561 F.3d 261, 266 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 555). "A plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "In considering a motion to dismiss, [the court] accept[s] the complainant's well-pleaded allegations as true and view[s] the complaint in the light most favorable to the non-moving party." *Stansbury v. McDonald's Corp.*, 36 F. App'x 98, 98-99 (4th Cir. 2002) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)).

"Under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider exhibits, without converting the motion to dismiss to one for summary judgment." *Brennan v. Deluxe Corp.*, 361 F. Supp. 3d 494, 501 (D. Md. 2019) (citing *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015)). "In particular, a court may consider

documents that are 'explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits.'" *Id.* (quoting *Goines v. Valley Cmty. Servs. Bd*., 822 F.3d 159, 166 (4th Cir. 2016)). Where a plaintiff attaches an exhibit to a complaint, such exhibits are incorporated into the complaint, and "in the event of a conflict between the bare allegations of the complaint and any exhibit attached pursuant to Rule 10(c) . . . the exhibit prevails." *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991); *see also Jeffrey M. Brown Assocs., Inc. v. Rockville Ctr. Inc*., 7 F. App'x 197, 202 (4th Cir. 2001) ("While construing those facts in a light most favorable to [plaintiff], we need not accept as true "the legal conclusions drawn from the facts . . . . [or] unwarranted inferences, unreasonable conclusions, or arguments," . . . such as conclusory allegations in the complaint that are contradicted by the attachments.").

Because Plaintiff is representing himself, these standards must be applied while liberally construing his filings in this case. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

## **DISCUSSION**

### A.    **Claim for Violation of FCRA**

The SAC's Second Cause of Action alleges PenFed violated section 1681s-2(b) of the FCRA. (Dkt. No. 98 at 28–31.) According to the SAC, PenFed is a furnisher of credit information; Plaintiff is a consumer; PenFed furnished inaccurate information to lenders, including inaccurately and inconsistently reporting the balance allegedly owed on the PenFed alleged debts and failing to mark the accounts as sold, transferred, disputed; Plaintiff disputed the alleged inaccuracies to the CRAs; PenFed "continued to report these accounts on Plaintiff's consumer report after being notified of his dispute/request for reinvestigation regarding the accounts and all aspects of the information and balances being reported or not reported and published to third parties"; and

PenFed's "willful, negligent, and reckless" action and/or inaction violated provisions under § 1681s-2. (Dkt. No. 98 at 2–3, 9, 14–16, 19, 28–31.)

### 1.     Standard

The FCRA is "a comprehensive statutory scheme designed to regulate the consumer reporting industry." *Ross v. F.D.I.C.*, 625 F.3d 808, 812 (4th Cir. 2010). Among other things, it creates a duty for furnishers of credit information to provide accurate information to CRAs, as well as a duty to correct inaccuracies and to investigate disputed information upon notice. 15 U.S.C. § 1681s-2. In particular, § 1681s-2(b) imposes requirements upon persons who provide information to agencies, upon receiving notice by an agency of a dispute by a consumer or reseller involving that information. *See* 15 U.S.C. § 1681s-2(b); *id*. § 1681i(a)(2). After receiving notice, such a furnisher must investigate the disputed information; review all relevant information provided by the agency; report the results of the investigation to the agency; report any inaccurate or incomplete information to all other agencies; and modify, delete, or block an inaccurate or incomplete item of information for the purposes of reporting to agencies. *Id*. § 1681s-2(b)(1). In short, this provision "requires creditors, after receiving notice of a consumer dispute from a credit reporting agency, to conduct a reasonable investigation of their records to determine whether the disputed information can be verified." *Johnson v. MBNA America Bank, NA*, 357 F.3d 426, 431 (4th Cir. 2004).

"To prevail on a claim under § 1681s-2(b), a plaintiff must demonstrate that (1) she notified a consumer reporting agency of the disputed information, (2) the consumer reporting agency notified the furnisher of the dispute, and (3) the furnisher failed to investigate and modify the inaccurate information." *Shulman v. Lendmark Fin*., No. 3:21-cv-1887-CMC-SVH, 2021 WL

4691027, at *4 (D.S.C. Oct. 6, 2021) (quoting *Wilson v. Wells Fargo Bank, N.A.*, No. 2:20-cv-2780-BHH-MHC, 2021 WL 2003524, at *4 (D.S.C. Apr. 30, 2021)), *adopted by*, 2021 WL 5141118 (D.S.C. Nov. 4, 2021).

### 2.    Analysis

In its Motion to Dismiss, PenFed argues that this claim should be dismissed because Plaintiff has failed to sufficiently allege: (1) that PenFed reported inaccurate information to the CRAs; (2) that he has suffered any adverse harm sufficient to establish standing; and (3) that he notified a CRA of the disputed information. (3) (Dkt. No. 106-1 at 5–14.) The undersigned considers these arguments below.

### a.    Reporting Inaccurate Information and Standing

PenFed argues that Plaintiff cannot allege the reporting of inaccurate information under § 1681s-2(b) based on PenFed's reporting of charged off accounts with a balance. (Dkt. No. 106-1 at 10–12.) PenFed further argues that Plaintiff has failed to allege that he has suffered any adverse harm from the inaccurate reporting sufficient to establish standing. (*Id.* at 7–8.)

Plaintiff alleges that PenFed's inconsistent reporting of a balance on his charged off accounts was inaccurate and misleading. He has alleged that this inaccurate reporting "negatively affects plaintiff's credit score, which lenders look at to approve or deny credit to a consumer and is also confusing to a lender who sees a balance on one report and a zero balance on another consumer report." (Dkt. No. 98 at 19.) Plaintiff appears to argue that the failure to consistently report the accounts at issue with a zero balance was inaccurate and misleading both because the accounts at issue had been sold and/or assigned and because the accounts were listed as charged off. Plaintiff does not allege that these accounts were simultaneously reported by a third party elsewhere in any of the consumer reports published by the CRAs.

Here, PenFed relies on non-binding authority to argue that reporting a balance owed on a charged off account is factually accurate and not misleading as a matter of law. (Dkt. No. 106-1 at 10–11.) Specifically, in *Artemov v. TransUnion, LLC,* a federal court in the Eastern District of New York dismissed the plaintiff's FCRA claims for failure to allege an inaccuracy where the plaintiff claimed two of his accounts were reported "as charged off' and 'closed' and contained a non-zero past due balance" because "listing a past due balance for a charged off account was factually accurate and not misleading." 2020 WL 5211068, at *2–*5 (E.D.N.Y. Sept. 1, 2020).

Notably, courts in this circuit "generally have deemed the question of accuracy, in FCRA cases, ill-suited for pre-discovery resolution." *Newman v. Am. Honda Fin. Corp*., No. 1:21-cv-3, 2022 WL 657630, at *6 (M.D.N.C. Mar. 4, 2022); *Price v. Equifax Info. Servs*., No. 5:19-cv-00886, 2020 WL 2514885, at *5 (S.D.W. Va. May 15, 2020) ("[W]hether technically accurate information is sufficiently misleading to qualify as inaccurate for purposes of the FCRA is generally a question to be determined by the trier of fact."). Courts in this circuit have further "rejected, at the motion-to-dismiss stage, arguments by furnishers regarding the accuracy of reporting historical information on closed accounts." *Newman*, 2022 WL 657630, at *6 (collecting cases); *see also Short v. Experian Info. Sys., Inc*., No. 2:16-cv-09294, 2017 WL 2296887, at *4 (S.D.W. Va. May 25, 2017) (denying motion to dismiss where furnisher argued that "it is not an FCRA violation for a creditor to accurately report negative historical information about a paid account"; noting that court "lack[ed] facts necessary to determine whether [furnisher]'s reporting accurately reflected the history of [p]laintiff's account").

While most of those cases involve allegations of reporting a monthly payment on a closed account, the undersigned cannot find Plaintiff's claim here fails merely because it is not specific to that issue. Indeed, the fact that PenFed reported the charged off accounts with a zero balance to

9

one CRA and not another indicates it may have been misleading for PenFed to have reported any of the charged off accounts at issue with a balance, regardless of whether the debt had been sold and/or assigned. Upon a full development of the factual record, the out-of-circuit case law cited by PenFed could prove convincing on this issue. However, given the current allegations in the record, the undersigned cannot find that PenFed's argument here compels dismissal of Plaintiff's FCRA claim at this time.

Further, as discussed above, Plaintiff has alleged that PenFed's failure to report certain accounts that it had sold or assigned with a zero balance violated Metro 2 Guidelines. Another court in this circuit recently recognized that "inaccuracies . . . which derive from purported deviations from the Metro 2 Guidelines" fall under the "category" of "those inaccuracies that are . . . misleading in such a way and to such an extent that they can be expected to adversely affect credit decisions." *Arriaza v. Experian Info. Sols., Inc.*, No. 20-cv-3073, 2021 WL 1019937, at *4 (D. Md. Mar. 17, 2021) (quoting *Dalton*, 257 F.3d at 415 (internal quotations omitted)). Per the Metro 2 Guidelines, the sale or assignment of an account necessarily affects how the credit information of the consumer is reported by the prior owner of the account, including the listing of a zero balance both as the current balance and the amount past due.

Here, Plaintiff has alleged that PenFed's failure to consistently report a zero balance on its charged off accounts "negatively affects plaintiff's credit score, which lenders look at to approve or deny credit to a consumer and is also confusing to a lender who sees a balance on one report and a zero balance on another consumer report." (Dkt. No. 98 at 19.) In other words, Plaintiff alleges that PenFed's inconsistent reporting of a balance on charged off accounts may prompt those making credit decisions to draw a more negative inference from PenFed reporting a balance on the charged off accounts and failing to identify the accounts as sold or assigned than if it reported a

zero balance on these accounts. Plaintiff alleges he has suffered, *inter alia*, "a diminished credit score, . . . a chilling effect on credit applications, and the mental and emotional distress and pain, anguish, humiliation and embarrassment caused by the inability to obtain financing for everyday expenses." (*Id*. at 26–35.)

Because Article III of the United States Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies' " a plaintiff "must have a 'personal stake' in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2203 (2021) (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). In order to establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id*. (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). Relevant here, Plaintiff, to demonstrate an injury-in-fact, must suffer "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). In the credit reporting context, the Supreme Court has stated that "not all inaccuracies cause harm or present any material risk of harm." *Id*. at 342. Citing an incorrect zip code as an example in *Spokeo*, the Court found "[i]t is difficult to imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm." *Id*. More recently, in *TransUnion LLC v. Ramirez*, the Supreme Court found that an alleged inaccurate credit report could result in concrete harm where it was disseminated to a third party, noting that such injury bore a "close relationship" to "the reputational harm associated with the tort of defamation." 141 S. Ct. at 2208.

Given these allegations, the undersigned finds Plaintiff has plausibly alleged PenFed's inconsistent reporting of a balance on his charged off and sold and/or assigned accounts was inaccurate and misleading in such a way and to such an extent that it could be expected to adversely affect credit decisions. In other words, Plaintiff's allegations about damage to his credit based on the inaccurate and misleading information in his credit report, which was shared with third parties, sufficiently alleges he suffered concrete harm. *See, e.g.*, *Gaillard v. Cap. One Auto Fin*., No. 3:21-cv-02228-SAL, 2022 WL 18495862, at *8 (D.S.C. Sept. 29, 2022) (plaintiff's FCRA claim alleged "qualifying concrete injury under Article III" where she claimed defendant's "report of an adverse charge off" caused her " to lose funds and damage her credit"); *Evans v. Am. Collection Enter.*, 624 F. Supp. 3d 593, 600 (D. Md. 2022) (noting "alleged dissemination [of inaccurate information on credit report] to a third party is enough to constitute a concrete injury"); *Burns v. Trans Union, LLC*, No. 4:18-cv-03120-MGL, 2019 WL 3890833, at *3 (D.S.C. Aug. 19, 2019) (finding allegations that plaintiff "experienced both credit and emotional damages, undue stress, and anxiety" establishes "the injury in fact requirement" because "the threat of harm bad credit imposes is cognizable and does actually exist"); *Phillips v. Trans Union, LLC*, No. 3:16-cv-00088, 2017 WL 3911018, at *3 (W.D. Va. Sept. 6, 2017) (allegation that furnisher falsely reported the date of first delinquency on a loan was a "sufficiently concrete injury because 'ensuring the accuracy of the information inaccurately reported by [furnisher] seems directly and substantially related to the FCRA's goals."); *cf. Arriaza*, 2021 WL 1019937, at *4 (allegation that Experian deviated from Metro 2 Guidelines could not be expected to adversely affect credit decisions because "correcting [alleged inaccuracy of reporting a lower past due balance on a charged-off account] would further harm, not improve, [plaintiff's] creditworthiness").

In sum, the undersigned finds Plaintiff has alleged sufficient facts to support a prima facie showing that PenFed's reporting is inaccurate or misleading when assuming all of Plaintiff's factual allegations are true, and construing them in the light most favorable to him.[5] To prove his case, Plaintiff will need to establish "through admissible evidence that [updating the status of a charged off account as sold or assigned with a zero balance] is in fact the industry standard, that [PenFed] deviated from it, and that this particular deviation might adversely affect credit decisions." *Nissou-Rabban v. Cap. One Bank (USA), N.A*., 2016 WL 4508241, at *5 (S.D. Cal. June 6, 2016) (finding plaintiff plausibly alleged a claim under the FCRA violation based on furnisher's failure to comply with Metro 2 reporting guidelines). Alternatively, Plaintiff will need to establish through admissible evidence that inconsistently reporting a charged off account with an unpaid balance, regardless of its status as sold and/or assigned, would mislead lenders and adversely affect credit decisions when those same charged off accounts were reported to other CRAs with a zero balance. Whether Plaintiff's allegations on these issues turn out to be true is a question of proof that is not suited for resolution in a motion to dismiss.

### b.    Notice

Finally, PenFed argues that Plaintiff has failed to sufficiently allege that "he notified a CRA of the disputed information in relation to sold loans," and therefore he cannot bring a FCRA claim against PenFed based on this alleged inaccuracy. (Dkt. No. 106-1 at 8.) As noted above, § 1681s–2(b) mandates that "furnishers" of credit information must "after receiving notice of a consumer dispute from a credit reporting agency . . . conduct a reasonable investigation of their records to determine whether the disputed information can be verified." *Johnson*, 357 F.3d at 431. "This

---

[5] For these same reasons, the undersigned finds no merit to PenFed's argument that "[t]he SAC does not state a viable claim under Sub-section (b) because it does identify a bona fide dispute that PenFed was required to note after having received a notice of dispute from a CRA." (Dkt. No. 106-1 at 13.)

determination whether a furnisher's investigation was 'reasonable' is based on an evaluation of information within the furnisher's possession, such as correspondence between the consumer and the furnisher, the data identified by the reporting agency as disputed, and the furnisher's other records relating to the disputed account." *Daugherty v. Ocwen Loan Servicing, LLC*, 701 Fed. App'x 246, 253 (4th Cir. 2017) (citing *Saunders v. Branch Banking & Tr. Co.*, 526 F.3d 142, 151 (4th Cir. 2008)). Under Section 1681s–2(b), a furnisher is only required to investigate information it has provided if a credit reporting agency notifies it that a consumer has contacted the agency and disputed the furnished information. 15 U.S.C. § 1681s–2(b)(1); s*ee also Alston v. United Collections Bureau, Inc*., No. 13-cv-0913, 2014 WL 859013, at *8 (D. Md. Mar. 4, 2014) ("Federal appellate courts have . . . recognized [the] principle that the reasonableness of the investigation undertaken by furnishers depends on the information provided to them.").

Upon careful review, the undersigned finds that, given the allegations and documents incorporated into the SAC, PenFed's arguments about lack of notice involve issues that are more appropriate to resolve at summary judgment. As discussed above, the SAC alleges that PenFed failed to accurately report to Equifax, a CRA, *inter alia*, Plaintiff's PenFed "accounts as sold, transferred, charged off with a zero balance and zero amount past due." (Dkt. No. 98 at 3, 8, 16.) In his September 24, 2021 letter to Equifax, Plaintiff disputed PenFed's reporting of a balance on certain charged off accounts because such accounts had been deemed "paid in full" through tax credits. (Dkt. No. 1-2 at 2–6.) While Plaintiff did not directly dispute PenFed's failure to report the sale and/or transfer of certain accounts in this letter, he raised additional inaccuracies separate from the specific charge off error described above that Plaintiff argues implicated the sale/assignment issue. (Dkt. No. 114 at 10.)

Specifically, Plaintiff also disputed the accuracy of two PenFed accounts because they were inconsistent with the zero balance reported by Experian. Similarly, he disputed the accuracy of the PenFed accounts because, *inter alia*, (1) "the alleged account number being reported by Equifax . . . does not match the alleged account number reported to Experian"; and (2) the date of first delinquency reported by Equifax "does not match what is being reported to Experian." (Dkt. No. 1-2 at 2–6.)

As noted above, the Metro 2 excerpts incorporated into the SAC discuss furnisher reporting duties when accounts are transferred or sold, including reporting the accounts with a zero balance. (Dkt. No. 77-1 at 4–5.) Here, Plaintiff alleges that PenFed knew it had sold and/or assigned certain accounts at issue prior to January 22, 2018, and therefore, upon notice of the dispute by Equifax, PenFed would have known to correct the disputed information by indicating it had been sold and/or assigned with a zero balance. A more developed record could better resolve whether a reasonable investigation into whether a balance was correctly reported on these PenFed accounts would necessarily encompass inquiring as to the current creditor of these accounts. *See*, *e.g.*, *Alston*, No. 2014 WL 859013, at \*6–\*9 (relying in part on affidavit from furnisher's general counsel submitted in support of summary judgment motion to find that furnisher's investigation was reasonable based on the information provided to it by the CRA); *Beachley v. PNC Bank, Nat. Ass'n*, No. JKB-10-cv-1774, 2011 WL 3705239, at \*3 (D. Md. Aug. 22, 2011) (finding, at summary judgment, that plaintiff "has failed to create a genuine dispute of material fact as to whether [furnisher] violated the FCRA"; "[Furnisher's] responses to the September 2008 disputes with TransUnion and Equifax were reasonable based on the information the CRAs gave to PNC").

In short, the undersigned cannot find that notice of these additional alleged inaccuracies "would have borne no relationship to the purported inaccuracies underlying Plaintiff's claims

2:22-cv-02211-BHH-MGB    Date Filed 09/25/23    Entry Number 132    Page 16 of 24

here," such that it is clear PenFed did not have sufficient notice of the alleged inaccuracies stemming from the sale/assignment issue as a matter of law. *See* , *e.g.*, *Herisko v. Bank of Am.*, 367 F. App'x 793, 794 (9th Cir. 2010) (granting summary judgment to defendants Experian and Bank of America because notice of the inaccuracies referred to in the plaintiff's dispute letter "would have borne no relationship to the purported inaccuracies underlying" the plaintiff's claims raised in the lawsuit); *Lao v. Green Tree Fin. Corp.*, 2012 WL 12055044, at *4 (C.D. Cal. Oct. 16, 2012) (rejecting argument that inaccuracies raised in underlying dispute letter were not specific enough to establish the requisite notice for the inaccurate statements alleged in the complaint; noting "the facts may show that the alleged inaccuracy is simply part-and-parcel of the same dispute . . . . To the extent this statement represents a continuation of the same disputed inaccuracy, the law should not compel [plaintiff] to send ongoing, never-ending letters with respect to every iteration of [furnisher's] error").

Separate from Plaintiff's communications with Equifax, the SAC also alleges LexisNexis, acting as a CRA, received a verbal dispute (over the phone) on August 15, 2022 from Plaintiff, " disputing all accounts and information reported by PenFed." (Dkt. No. 98 at 11.) PenFed only acknowledges this allegation in a footnote, stating that the SAC "does not . . . identify any specific errors Bruce raised with LexisNexis." (Dkt. No. 106-1 at 4 n.2.) However, given the other allegations in the SAC, the undersigned finds Plaintiff has plausibly alleged that his verbal dispute with LexisNexis included PenFed's failure to report the charged off accounts that it had sold and/or assigned with a zero balance. (Dkt. No. 98 at 6, 8–9, 19–21, 32.)

Based on the foregoing, the undersigned finds Plaintiff has plausibly alleged he provided notice to a CRA of his dispute that the PenFed accounts should not be reported with a balance because the accounts had been sold or transferred to a third party. To the extent PenFed argues that

its investigation and failure to update the accounts as sold or assigned was reasonable given the information provided to the CRAs and then communicated to PenFed, such factual disputes are more appropriate to consider at the summary judgment stage, when the Court has the benefit of a full record.

Based on the foregoing, the undersigned finds Plaintiff has alleged sufficient facts to state a claim against PenFed under 15 U.S.C. § 1681s–2(b).

### B.    Defamation Claim

The SAC's Third Cause of Action alleges PenFed's false reporting of credit information to one or more CRAs constituted defamation under South Carolina common law. (Dkt. No. 98 at 31–33.) Plaintiff's defamation claim is preempted by the FCRA absent an allegation of malice or willful intent to injure Plaintiff. *See* 15 U.S.C. § 1681h(e) ("[N]o consumer may bring any action or proceeding in the nature of defamation . . . with respect to the reporting of information . . . except as to false information furnished with malice or willful intent to injure such consumer."); *Ross*, 625 F.3d at 814 ("The only exception to this bar is a narrow one, requiring proof of 'malice or willful intent to injure [the] consumer.'"). Under South Carolina law, "'[m]alice' is established only if 'the defendant acted with ill will toward the plaintiff or acted recklessly or wantonly, meaning with conscious indifference toward the plaintiff's rights.'" *Beattie v. Nations Credit Fin. Servs. Corp.*, 69 Fed. App'x. 585 (4th Cir. 2003) (citing *Murray v. Holnam, Inc*., 542 S.E.2d 743, 750 (S.C. 2001)).

In arguing for the dismissal of this claim, PenFed largely repeats its arguments that Plaintiff has failed to sufficiently allege that PenFed reported any material information inaccurately. (Dkt. No. 106-1 at 14–15.) For the reasons discussed above, this argument is without merit. Here, the SAC alleges that even after Plaintiff told PenFed that he disputed the accuracy of his accounts,

PenFed failed to investigate and reported the alleged inaccuracies to third parties. (Dkt. No. 98 at 28–35.) Plaintiff alleges that PenFed acted "with malice, willful intent to injure the plaintiff." (*Id.* at 33.) At this early stage in proceedings, the undersigned recommends these allegations plausibly allege malice or willful intent under Rule 12(b)(6). *See*, *e.g. Hoback v. Synchrony Bank*, No. 6:19-CV-18, 2019 WL 2438794, at *4 (W.D. Va. June 11, 2019) ("Courts assessing defamation claims brought in the context of credit reporting errors and FCRA violations tend to permit such claims to proceed to discovery if plaintiffs assert any allegations beyond 'merely reciting the legal standard.'"); *Potter v. FIA Card Servs., N.A.*, No. 2:12-cv-1722-RMG, 2012 WL 13005806, at *2 (D.S.C. Sept. 28, 2012) (denying motion to dismiss defamation claim where plaintiff alleges he "repeatedly told the Defendants he was not an obligor on the account, but they continued to tell [credit reporting agencies] for two years that he was").

### C.    Violation of Uniform Commercial Code

The SAC's Fifth Cause of Action alleges that PenFed violated "U.C.C. 9-210 *et seq*. and 36-9-210 *et seq*" by failing to comply with Plaintiff's April 4, 2022 request for an authenticated accounting. (Dkt. No. 98 at 35–36.) The SAC refers to Exhibit A of the initial complaint as support for this claim. (*Id.*) Exhibit A includes a letter from Plaintiff to PenFed dated April 4, 2022, in which Plaintiff requests "an authenticated record of accounting" within 14 calendar days. (Dkt. No. 1-2 at 53–54.) In this letter, Plaintiff states that this "authenticated record must include all tax filings . . . any and all trades and/or investments and/or interests associated with this account of which I am alleged to be a party." (*Id.* at 54.)

"Article 9 of the UCC is a comprehensive statutory scheme governing the rights and relationships between secured parties, debtors, and third parties." *McCullough v. Goodrich & Pennington Mortg. Fund, Inc.*, 373 S.C. 43, 53, 644 S.E.2d 43, 49 (2007). S.C. Code Ann. § 36-9-

210 defines a "[r]equest for an accounting" as "a record authenticated by a debtor requesting that the recipient provide an accounting of the unpaid obligations secured by collateral and reasonably identifying the transaction or relationship that is the subject of the request." § 36-9-210(a)(2). The statute states, *inter alia*,

> (e) A person that receives a request for an accounting or a request regarding a statement of account, claims no interest in the obligations when it receives the request, and claimed an interest in the obligations at an earlier time shall comply with the request within fourteen days after receipt by sending to the debtor an authenticated record:
>
> (1) disclaiming any interest in the obligations; and
> (2) if known to the recipient, providing the name and mailing address of any assignee of or successor to the recipient's interest in the obligations.

§ 36-9-210(e).

PenFed asserts that the April 11, 2022 letter within Exhibit C demonstrates that PenFed complied with Plaintiff's request. (Dkt. No. 106-1 at 16–17.) While the April 11, 2022 letter does appear relevant to Plaintiff's claim here (Dkt. No. 1-4 at 3), the undersigned cannot find that the letter alone demonstrates that PenFed complied with § 36-9-210 as a matter of law. Accordingly, the undersigned recommends PenFed's motion to dismiss Plaintiff's UCC claim be denied.

### D.     Violation of SCUTPA

Finally, the SAC's Sixth Cause of Action alleges, verbatim, that PenFed violated SCUTPA "by loaning plaintiff and its members their credit and depositors credit which is unfair, deceptive act or practice that affects commerce and all of the members of the bank receiving loans from PENFED." (Dkt. No. 98 at 36–37.) The SAC further alleges here that PenFed, *inter alia*,

> by its policies and procedures and practices takes its members Notes and deposits them with the Local Federal Reserve agent in exchange for Federal Reserve Notes in the amount of the Notes deposited and therefore have been paid but does not inform its members which is an unfair and deceptive act and practice.

(*Id.*)

19

PenFed argues that this claim fails because Plaintiff fails to allege sufficient facts in support of his claim that PenFed's alleged violations of SCUTPA has an effect on the public interest. (Dkt. No. 124 at 7.) In his response, Plaintiff disputes that he must allege an adverse impact on the public interest in order to survive dismissal of his SCUTPA claim. (Dkt. No. 121 at 43–47.) Plaintiff further argues that it would be premature to dismiss this claim because PenFed's policies and procedures "could very well be determined to be unfair and deceptive as it relates to the process of writing off debts . . . which affects not only the plaintiff but other members with accounts with the defendant similarly situated." (*Id.* at 45.)

The SCUTPA prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code Ann. § 39-5-20. "A plaintiff bringing a private cause of action under SCUTPA must allege and prove that the defendant's actions adversely affected the public interest." *Morgan v. HSBC Bank USA, Nat. Ass'n*, No. 6:13-CV-03593-JMC, 2015 WL 3888412, at *4 (D.S.C. June 24, 2015) (citing *Noack Enterprises Inc. v. Country Corner Interiors, Inc.*, 351 S.E.2d 347, 349–50 (S.C. Ct. App. 1986)). "Conduct that affects only the parties to the transaction provides no basis for a SCUTPA claim." *Id.* (citing *Robertson v. First Union Nat'l Bank*, 565 S.E.2d 309, 315 (S.C. Ct. App. 2002)). The "adverse effect on the public must be proved by specific facts." *Jefferies v. Phillips*, 451 S.E.2d 21, 23 (S.C. Ct. App. 1994).

> An impact on the public interest may be shown if the acts or practices have the potential for repetition. The potential for repetition may be shown in either of two ways: (1) by showing the same kind of actions occurred in the past, thus making it likely they will continue to occur absent deterrence; or (2) by showing the company's procedures created a potential for repetition of the unfair and deceptive acts.

*Skywaves I Corp. v. Branch Banking & Tr. Co*., 814 S.E.2d 643, 655 (S.C. Ct. App. 2018 (quoting *Singleton v. Stokes Motors, Inc.*, 595 S.E.2d 461, 466 (S.C. 2004))).

Upon review, the undersigned finds that Plaintiff has not alleged an adverse impact on the public interest sufficient to establish a SCUTPA claim. Notably, the allegations in the SAC relate to the parties in this lawsuit. The few references to other "members" of PenFed are entirely speculative and conclusory. Further, Plaintiff's assertion that PenFed's "policies and procedures" are "unfair and deceptive as it relates to their process of writing off debts" does not sufficiently suggest that Plaintiff's experience is likely to be the experience of others. Without more, the undersigned cannot find that Plaintiff has established a potential for repetition of any unfair or deceptive act by PenFed or otherwise indicated an adverse impact on the public interest. *See also White v. White*, 886 F.2d 721, 723 (4th Cir. 1989) (dismissing *pro se* complaint because it "failed to contain any factual allegations tending to support his bare assertion"); *Morgan*, 2015 WL 3888412, at *5 (dismissing SCUTPA claim because "Plaintiffs did not allege facts which suggest Defendants' actions have a potential to impact the public interest. Plaintiffs failed to provide any specific facts that suggest that their experience is likely to be the experience of others. Plaintiffs did not establish that the alleged conduct is standard business practice for [defendant]"); *Flowers v. Anderson*, No. 2:17-cv-2739-BHH-MGB, 2018 WL 3254485, at *6 (D.S.C. May 11, 2018) ("Speculative claims of adverse public impact are not sufficient to establish a claim under SCUTPA."), *adopted by*, 2018 WL 3980210 (D.S.C. Aug. 21, 2018); *Ethox Chem., LLC v. Coca-Cola Co.*, No. 6:12-CV-01682-TMC, 2013 WL 41001, at *3 (D.S.C. Jan. 3, 2013) ("Even if Coca-Cola has been accused of similar past violations, which the court is not assuming without additional factual allegations, allegations of accusations are not the same as allegations of specific similar past acts. Similarly, the complaint fails to allege any specific procedures or business practices that create the potential for repetition. The court also notes that the outcome of this case will affect only the parties and not the broader public.").

Based on the foregoing, the undersigned recommends Plaintiff's Sixth Cause of Action for violation of SCUTPA be dismissed. Further, given the proceedings in this case, the undersigned recommends this dismissal be with prejudice. Plaintiff filed this case on July 12, 2022. (Dkt. No. 1.) He filed an amended complaint on November 2, 2022. (Dkt. No. 31.) Then, almost one year after first filing this action, without any compelling justification for the delay, he again sought to amend the complaint. (Dkt. No. 96.) When granting Plaintiff's motion to amend, the undersigned stated,

> [G]iven the procedural history of this case, the Court does not make this decision lightly. This case has been pending almost one year, and Plaintiff has had ample time to amend his complaint. Further, entering the proposed Amended Complaint impacts the previously filed dispositive motions. Thus, this is Plaintiff's final opportunity to amend his complaint. Absent extraordinary circumstances, the Court will not entertain further requests from Plaintiff to amend his complaint.

(Dkt. No. 97.)

Notably, the undersigned's vacated R&R recommended dismissal of Plaintiff's SCUPTA claim for similar reasons. Plaintiff's most recent amended complaint was presumably in part a response to this recommendation. In short, Plaintiff has had multiple opportunities to properly plead a SCUPTA claim against PenFed. Further, this Court and the parties have devoted significant time and resources to addressing Plaintiff's claims in this action, as currently plead. Plaintiff's prior amendments to his pleadings have already significantly delayed entry of a scheduling order, which will be entered after the District Judge provides a final ruling on the pending dispositive motions. For these reasons, the undersigned recommends that Plaintiff should not be afforded yet another opportunity to amend his complaint. *See Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (finding "leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile").

22

## CONCLUSION

For the foregoing reasons, it is RECOMMENDED that PenFed's Motion to Dismiss (Dkt. No. 106) be GRANTED IN PART AND DENIED IN PART. Specifically, the Court should dismiss, with prejudice, Plaintiff's claim against PenFed for violation of SCUPTA. Plaintiff's claims against PenFed for violation of the FCRA under section 1681s-2(b), defamation, and violation of the UCC should remain pending.

**IT IS SO RECOMMENDED**.

September 25, 2023
Charleston, South Carolina

MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).