# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | |
|---|---|
| NELSON L. BRUCE,<br><br>    Plaintiff,<br><br>v.<br><br>PENTAGON FEDERAL CREDIT UNION a.k.a. PENTAGON FEDERAL CREDIT UNION FOUNDATION ("collectively" PENFED), EXPERIAN INFORMATION SOLUTIONS, INC., TRANS UNION, LLC, EQUIFAX INFORMATION SERVICES, LLC, all unknown Does 1-100, et al.,<br><br>    Defendants. | Case No. 2:22-cv-02211-BHH-MGB<br><br>**DEFENDANT EQUIFAX INFORMATION SERVICES LLC'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL** |

Defendant Equifax Information Services LLC ("Equifax"), by Counsel, hereby submits its Response in Opposition to Plaintiff's Motion to Compel (Doc. 216), and shows the Court as follows:

## INTRODUCTION

Equifax timely served its objections and responses to Plaintiff's first set of discovery on Friday June 7, 2024. On Sunday, June 30, 2024, after the time for *filing* a motion to compel had already elapsed, Plaintiff sent an e-mail to Equifax's counsel regarding the discovery responses. Plaintiff was plainly aware of the 21-day deadline for filing a motion to compel set forth in Local Rule 37.01, as he requested that Equifax "consent to an extension of the 21-day extension [sic] for Plaintiff to file such a motion." (Doc. 216, at 2.) The following week was the week of the Fourth of July holiday, and Equifax's counsel did not respond to Plaintiff immediately. When Plaintiff followed up, on July 12, 2024, Equifax's counsel, back in the office, responded the same day,

312597175v.1

pointing out that any motion Plaintiff might file would be untimely. Ten days later, Plaintiff filed his Motion to Compel.

## STANDARD

Parties to a civil litigation may obtain discovery regarding "any nonprivileged matter that is relevant to any party's claim or defense" so long as the information is "proportional to the needs to the case . . . ." Fed. R. Civ. P. 26(b)(1). "The scope and conduct of discovery are within the sound discretion of the district court." *Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 568 n.16 (4th Cir. 1995); *accord Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs.*, 334 F.3d 390, 402 (4th Cir. 2003) ("Courts have broad discretion in [their] resolution of discovery problems arising in cases before [them].").

Under District of South Carolina Local Rule 37.01, "Motions to compel discovery must be filed within twenty-one (21) days after receipt of the discovery response to which the motion to compel is directed[.]" After this time period has elapsed, it can be extended for "excusable neglect" under Rule 6(b)(1)(B) of the Federal Rules of Civil Procedure. *See ContraVest Inc. v. Hawley Ins. Co.*, 273 F.Supp.3d 607, 626 (D.S.C. 2017). "Factors to be considered in determining whether excusable neglect has occurred include: [1] danger of prejudice to the non-movant, [2] the length of delay and its potential impact on judicial proceedings, [3] the reason for the delay, including whether it was within the reasonable control of the movant, and [4] whether the movant acted in good faith." *Id*. (quotations and alterations omitted).

These factors are to be applied judiciously. "'Excusable neglect' is not easily demonstrated, nor was it intended to be." *Thompson v. E.I. Dupont de Nemours & Co., Inc.*, 76 F.3d 530, 534 (4th Cir. 1996).

312597175v.1

# ARGUMENT

### I. Plaintiff's Motion To Compel Is Untimely And He Cannot Show Excusable Neglect

Plaintiff's Motion to Compel is untimely. Under Local Rule 37.01, he was required to *file* a motion to compel within 21-days after receipt of Equifax's discovery responses, unless Equifax agreed to extend the time. Equifax timely served its discovery responses on June 7, 2024. Therefore, Plaintiff's deadline for filing a motion to compel was June 28, 2024. Plaintiff first reached out to Equifax to request a meet and confer on June 30, 2024, *after* the deadline to *file* had already expired. Equifax has not agreed to extend Plaintiff's deadline by agreement, and, therefore, the Motion is untimely.

To excuse the untimeliness, Plaintiff must show "excusable neglect" under Rule 6(b)(1). *See ContraVest Inc.*, 273 F.Supp.3d at 626. "Excusable neglect" is a well-known standard, used across a variety of provisions within the Federal Rules of Civil and Appellate Procedure, and elsewhere. The factors to be considered in determining whether excusable neglect has occurred come from the Supreme Court's opinion in *Pioneer Inv. Servs. Co. v. Brunswick Associates Ltd. P'ship*, 507 U.S. 380, 395, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993)). "[T]he third *Pioneer* factor— the untimely party's reason for the delay—is the most important to the excusable neglect inquiry." *Symbionics Inc. v. Ortlieb*, 432 Fed. App'x 216, 219 (4th Cir. May 23, 2011) (citing *Thompson*, 76 F.3d at 534).

Plaintiff proffers the following reason for his delay:

> Because of the amount of discovery that [he] had received and was required to respond to in this case from the 5 different defendants (Equifax discovery requests received on 4-4-2024, LNRS discovery requests received on 4-26-2024, Experian discovery requests received on 4-30-2024, PenFed request for discovery received on 5-31-2024, and Trans Union discovery request received on 5-9-2024) and also reviewing [defendants'] responses to his 1st set of

> discovery [received] from defendants . . . it [was] impossible to view all discovery received from defendants within 21 days and timely be able to request and meet and confer and or motion to compel within 21 days[.]

(Doc. 216, at 4.)

This purported explanation is completely unconvincing. As an initial matter, Plaintiff's need to respond to discovery served by defendants in April and early-May should not have impeded his ability to review Equifax's discovery responses in June. He should have already served his responses long before needing to turn to any review of defendants' responses. Indeed, Plaintiff served his responses to Equifax's discovery on May 13, 2024.

Turning then to his other purported explanation, Plaintiff's need to review defendants' discovery responses close in time to one another was something entirely within his control. *He* decided when to serve his discovery requests to each defendant. *He* elected to serve them all within a few days of each other. (*See* Doc. 216, at 4.) Plaintiff is no stranger to this Court.[1] He should have been well aware that he would need to review the defendants' discovery responses close in time to one another for perceived deficiencies and timely queue up motions to compel if needed.

In short, Plaintiff decided the schedule himself. He cannot now invoke it to show excusable neglect. *See Thomas*, 76 F.3d at 534 (in finding no excusable neglect for untimely filing of notice of appeal, holding that "the unincarcerated litigant *who decides* to rely on the vagaries of the mail must suffer the consequences if the notice of appeal fails to arrive within the applicable time period") (emphasis added).

Finally, to the extent that Plaintiff claims Equifax's counsel is somehow to blame for his untimely filing, nothing could be further from the truth. Plaintiff waited until *after* his deadline

---

[1] A search of the Court's PACER system suggests that Plaintiff has been a litigant in at least fifteen federal lawsuits in this District against various consumer-facing companies.

312597175v.1

had elapsed to reach out to Equifax's counsel. And, in any event, "[a] Defendants' failure to respond to [a] Plaintiff's e-mail [is] not a reasonable explanation for [a] Plaintiff's failure to timely file his motion to compel." *Cardoso v. Holder Construction Co.*, 2017 WL 976315, at *2 (D.S.C. Mar. 14, 2017).

## II. Plaintiff's Arguments Regarding Relevance Are Unavailing

In his Motion to Compel, Plaintiff identifies four interrogatories (and document requests corresponding thereto) and one additional document request. (Doc. 216, at 2-3.) Plaintiff claims that "[a]ll of the above requests are relevant to the claims in this matter in some way, shape or form and the failure to provide a sufficient response and or produce such documents affects plaintiff's ability to support his claims and any or and any [sic] foreseeable defenses by the defendants at trial." (*Id.*, at 4.) That is the entirety of Plaintiff's argument.

Plaintiff's argument, in addition to being brief to the point of non-existent, is also misplaced. It is worth revisiting what, exactly Plaintiff claims that Equifax did wrong. The Third Amended Complaint contains the following allegations specific to Equifax: Plaintiff alleges that Equifax "prepared and issued credit reports concerning the Plaintiff that included inaccurate, incomplete, untrue, incorrect and materially misleading information relating to PENFED, and/or REV[2] accounts being reported." (Doc. 171 ¶ 28.) More specifically, Plaintiff alleges that Equifax

---

[2] "REV" refers to REV Federal Credit Union. Unlike the PENFED accounts, which Plaintiff alleges inaccurately reported a balance because they had been transferred, sold, or assigned, Plaintiff's sole claim of inaccuracy regarding the REV account appears to be that it could not report with a balance because "REV has written off the alleged debts[.]" (Doc. 177 ¶ 88.) While Equifax previously noted that Plaintiff's assertion that charged off accounts must be reported with a zero balance is incorrect as a matter of law, (Doc. 100 at 4 n.6), the Court previously found Equifax's argument on this point less than compelling, (Doc. 131 at 14-15).
  Equifax now proffers a more fulsome explication: "'Charge off' is a term of art for credit providers, understood as writing off a debt as a loss because payment is unlikely." *Makela v. Experian Info. Sols., Inc.*, 2021 WL 5149699, at *3 (D. Or. Nov. 4, 2021) (citing Charge Off, Black's Law Dictionary (11th ed. 2019)). "Federal regulations require banks to 'charge off' debt

inaccurately reported "the balance allegedly owed to PENFED and REV," (*id*. ¶ 45), and failed "to report the [PenFed] accounts as sold, transferred, charged-off with a zero balance and zero amount past due," (*id*. ¶ 77).

According to Plaintiff, "[a]ccounts are required to be reported to the credit reporting agencies in Metro 2 Format which the bureaus have all adopted. The reported accounts are considered inaccurate, incomplete, incorrect if not in compliance with Metro 2 Standard Format." (*Id*. ¶ 90.) Plaintiff alleges that to comply with "Metro 2 reporting standards," Equifax's policy "require[s] PENFED" to accurately report "balance information, open date, date of first delinquency, [and] whether an account is sold." (*Id*. ¶ 89.) Plaintiff alleges that the Metro 2 reporting standards require the reporting of "the accounts as sold, transferred, charged-off with a zero balance and zero amount past due to be accurate." (*Id*. ¶ 77.)

"In other words, Plaintiff alleges that Equifax's reporting of a balance on the charged off accounts that had been sold and/or assigned may prompt those making credit decisions to draw a more negative inference than if Equifax had reported a zero balance[.]" (Doc. 131, at 16.)

---

that is past due by over 180 days." *In re Anderson*, 884 F.3d 382, 386 n.2 (2d Cir. 2018) (citing Uniform Retail Credit Classification and Account Management Policy, 65 Fed. Reg. 36,903, 36,904 (June 12, 2000)). Otherwise, a bank's "balance sheets would 'misleadingly reflect accounts as assets that have little chance of achieving their full valuation.'" *Makela*, 2021 WL 5149699, at *3 (quoting *Artemov v. TransUnion, LLC*, 2020 WL 5211068, at *3 (E.D.N.Y. Sept. 1, 2020)). However, "[s]ince financial institutions are required to comply with this federal requirement, it follows that charging off an account does not equate to debt forgiveness." *Artemov*, 2020 WL 5211068, at *4. Thus, "charging off a debt does not diminish the legal right of the original creditor to collect the full amount of the debt." *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1297 (11th Cir. 2016); *accord Dye v. TransUnion, LLC*, 2013 WL 5663094, at *3 (D. Nev. Oct. 15, 2013) ("[Charged off] debt is still enforceable.").
Plaintiff's contention that charged off debt must report with a zero balance is frivolous. In any event, the TAC acknowledges that it deleted the disputed REV account in its reinvestigation of Plaintiff's September 2021 dispute. (Doc. 171 ¶ 65.)

- 7 -

With this in mind, the question then becomes the relevance, proportionality, and intelligibility of Plaintiff's discovery requests.

Plaintiff seeks to compel a response to his **Interrogatory No. 6**, which seeks to know whether Equifax requires data furnishers to upload account information every 30 days. (Doc. 216 at 2.) This is simply irrelevant to the question of whether Equifax inaccurately reported PenFed accounts that had been sold as having balances.

Plaintiff seeks to compel a response to his **Interrogatory No. 9**, which seeks to know whether Equifax "investigated" the PENFED and REV accounts "for maximum possible accuracy (100% accuracy)" before publishing the information. (*Id*.) But the Interrogatory belies Plaintiff's misapprehension of the FCRA's requirements, specifically those of 15 U.S.C. § 1681e(b). This section of the FCRA "does not require error free consumer reports. If a consumer reporting agency accurately transcribes, stores and communicates consumer information received from a source that it reasonably believes to be reputable, and which is credible on its face, the agency does not violate this section simply by reporting an item of information that turns out to be inaccurate." *Cassara v. DAC Services, Inc.*, 276 F.3d 1210, 1217 (10th Cir. 2002) (quoting official commentary of former regulator Federal Trade Commission). Plaintiff himself alleges that Equifax's "policies require PENFED and REV to report accurate, complete, and correct information[.]" (Doc. 171 ¶ 89.) Thus, the relevant question is whether Equifax reasonably believed PENFED to be reliable and whether PENFED's reporting was facially credible. Logically, absent a dispute from Plaintiff that actually put Equifax on notice that PenFed might have sold one or more of its accounts, Equifax would have no reason to doubt PenFed's reporting of the accounts as having balances owed. Meaning that, apart from Plaintiff's claim that he put Equifax on notice that the PenFed accounts

had been sold, the only question to be ascertained is whether Equifax reasonably believed PenFed to be a reliable source.

Plaintiff seeks to compel a response to his **Interrogatory No. 10**, but, in fact, he has already received one. The Interrogatory sought a description of Equifax's procedures to ensure accuracy. In his Motion to Compel, Plaintiff claims that Equifax's response "only address[ed] disputes" and is therefore "not a sufficient response" since "Section 1681e(b) does not state a dispute is required." (Doc. 216, at 3.)  But, in fact, Equifax's response to this Interrogatory began as follows:

> Subject to and without waiving the foregoing objections, Equifax states that it accepts credit information only from those sources of information, referred to as "data furnishers," that it determines to be reasonably reliable based upon a source's reputation in the community or Equifax's longstanding business relationship with it. When Equifax receives a request from a company to become a data furnisher and user of Equifax's credit information, Equifax conducts an extensive investigation to ensure that the company is reliable. Each company must complete a detailed application and sign a subscriber agreement. Upon receipt of an application, subscriber agreement, and valid business license, Equifax's new-accounts department conducts an investigation of the company, which may include an onsite visit, to determine the company's legitimacy and reliability. Equifax's standard data furnisher contract requires data furnishers to provide accurate data and to update the data regularly. The FCRA also requires data furnishers to provide accurate information and to verify information when requested to do so. Generally, data furnishers and other sources of information report credit information and update the credit history of consumers on a monthly basis through a tape-reporting process to Equifax.

(Doc. 204-3, at 12.)

Plaintiff seeks to compel a response to his **Interrogatory No. 16**, which seeks to know whether Equifax performs automated data checks to catch "missing fields" on the "submitted forms uploaded to [it] by data furnishers." (Doc. 216, at 3.)  Again, this is simply irrelevant to the question of whether Equifax inaccurately reported PenFed accounts that had been sold as having balances.

- 9 -

Simply put, Plaintiff has alleged that, although PenFed's "internal records document the accounts was sold, assigned and/or transferred to a debt buyer and/or external collections," nonetheless PenFed "failed to not mark the account as sold" and, thereby, "failed to provide accurate information regarding the entire accounts . . . to the [credit] bureaus." (Doc. 171 ¶ 130.) As noted above, absent some reason to doubt PenFed, Equifax would have no way of knowing whether any given account had been sold to a third party. Plaintiff's interrogatories are irrelevant to this kind of case, which hinges on the issue of whether Equifax reasonably believed PenFed to be reliable. As such, Plaintiff's Motion to Compel responses to the four interrogatories (and their accompanying document requests[3]) should be denied.

Plaintiff also seeks to compel a response to one additional document request, (Doc. 216, at 3), specifically: "**REQUEST FOR PRODUCTION NO. 22:** Please produce the first, middle, and last names of any and all parties who has firsthand knowledge of your policies, procedures related to disputes and investigations by you that can be called on as a witness at trial." As an initial matter, this Request is not really a Request for Production, but, rather, an Interrogatory. More importantly, this Request is nonsensical and vague in that it asks for the identification of parties by first, middle, and last name, and, yet, apart from Plaintiff, all the parties to this civil action are corporate entities, not individuals. Plaintiff has not yet sought to take Equifax's deposition in this matter, but, when he does, Equifax will designate a witness for any non-objectionable Topics pursuant to Rule 30(b)(6), and, of course, such designee will be identified to Plaintiff.

---

[3] Equifax is searching for its contract with Pentagon Federal Credit Union, and will produce it when located.

## CONCLUSION

For the reasons set forth herein, Equifax respectfully requests the Court deny Plaintiff's Motion to Compel.

DATED: July 30, 2024

Respectfully submitted,

WYCHE, P.A.

By: */s/ Rita Bolt Barker*
Rita Bolt Barker (Fed. ID No. 10566)
200 East Broad Street, Suite 400
Greenville, South Carolina 29601
Telephone: (864) 242-8235
Facsimile: (864) 235-8900
E-mail: rbarker@wyche.com

***Counsel for Defendant***
***Equifax Information Services LLC***

**CERTIFICATE OF SERVICE**

I hereby certify that on July 30, 2024, I presented the foregoing **RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record. A copy has also been sent via U.S. Mail to the following:

>Nelson L. Bruce *(plaintiff pro se)*
>c/o P.O. Box 3345
>Summerville, South Carolina  29484
>Telephone:  (843) 437-7901
>Email:  leonbruce81@yahoo.com

>*/s/ Rita Bolt Barker*
>Rita Bolt Barker
>***Counsel for Defendant***
>***Equifax Information Services LLC***

312597175v.1