RECEIVED
CLERK, CHARLESTON, SC
2025 JAN 16 AM 8: 25

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| Nelson L. Bruce,<br><br>Plaintiff,<br><br>v.<br><br>Pentagon Federal Credit Union; et al.<br><br>Defendants. | **Case No.: 2:22-cv-02211-BHH-MGB**<br><br>**PLAINTIFF'S RULE 60(b) PETITION FOR RELIEF FROM PRIOR COURT ORDERS AND PETITION FOR EXTENSION OF TIME RELATED TO ORDER NO. 371** |

## I. INTRODUCTION

Plaintiff, **Nelson L. Bruce**, respectfully petitions this Court under Rule 60(b) of the Federal Rules of Civil Procedure for relief from its prior orders, specifically ECF Nos. **154, 250, 358**, **336**, and **371 which are incorporated in their entirety by reference**, which denied Plaintiff's motions to amend, motions to compel, and motions for subpoenas. Plaintiff asserts that newly discovered evidence, manifest errors in fact and law, and constitutional due process violations necessitate revisiting these rulings to prevent manifest injustice.

This petition incorporates Exhibits **21–32**, which substantiate systemic practices by Pentagon Federal Credit Union (PenFed) involving the pledging of promissory notes, inaccuracies in credit reporting by the failure to conduct an unreasonable investigation/reinvestigation, Violations of the South Carolina Uniform Commercial Code and violations of the South Carolina Unfair Trade Practices Act (SCUTPA) and the Fair Credit Reporting Act (FCRA).

On 1-13-2025 plaintiff received a letter from the court with a date of **"10 JAN** 2025"however, when plaintiff opened the envelope, it had court documents related to another case not related to the plaintiff (see…Exhibit 33). Plaintiff checked pacer and noticed that the

court filed ECF No. 371 denying in part plaintiff's depositions. This filing requests an extension of time until this court rules on this filing as it is not lucrative to have a deposition to be allowed to only ask "3" questions and based on the evidence presented to this court, it proved that the topics of discussion and questions associated are relevant to the claims in this case.

## II. JUDICIAL NOTICE AND INCORPORATION OF NEW EVIDENCE

The Court is to take judicial notice of the entirety of this filing and Exhibits **21–32**, incorporated herein by reference. These exhibits include critical new evidence obtained after the issuance of the orders in question. Collectively, this evidence substantiates Plaintiff's claims and directly rebuts Defendants' assertions regarding the handling of Plaintiff's promissory notes and financial instruments further supporting the need to issue subpoenas and to receive production of discovery applicable to plaintiff's discovery requests associated with the FRB. These materials provide irrefutable evidence of systemic practices directly relevant to Plaintiff's claims, justifying relief under Rule 60(b) and further justifying that plaintiff's claims is not a theory as alleged by the court (ECF No. 371 at 8) without any facts nor conclusions of law to support their opinion leading to a decision to deny plaintiff of his due process rights and that PenFed received credits to an account on plaintiff's behalf from the FRB under the BIC program. It appears by the evidence and exhibits presented with this filing that PenFed's financials are indeed relevant to the claims in this matter that goes beyond the requirements of an affidavit as plaintiff has a right to see actual transactions related to alleged loans as these transaction directly involve the plaintiff.

***Summary of Key Evidence Discovered (Exhibits 21–32) that are material to this case:***

1. **Exhibit 21 (Federal Reserve Database):** Confirms PenFed's status as a Federal Reserve member since 1994, granting access to programs such as Borrower-in-Custody (BIC).

2. **Exhibit 22 (Call Reports):** Reveals PenFed's standard practice of pledging consumer loans, including Plaintiff's promissory notes, as collateral to the Federal Reserve under the BIC program.
3. **Exhibit 23 (Federal Reserve Collateral Guidelines):** Demonstrates that promissory notes are eligible collateral, contradicting PenFed's assertions that these notes lack intrinsic value.
4. **Exhibit 24 (Discount Window Documentation):** Details PenFed's use of Federal Reserve facilities for liquidity by pledging Plaintiff's loans.
5. **Exhibit 25 (Craig Olson Declaration):** Highlights inaccuracies and omissions in PenFed's prior representations, undermining the Court's reliance on this testimony.
6. **Exhibit 26 (BIC Certification):** Provides direct evidence of PenFed's pledging of Plaintiff's promissory notes as collateral to the Federal Reserve.
7. **Exhibit 27 (UCC Filings):** Documents PenFed's pledging of assets, raising questions about third-party interests and the mishandling of Plaintiff's loans.
8. **Exhibit 28 (Additional UCC Filings):** Highlights involvement of third parties in securitizing Plaintiff's loans, implicating violations of the FCRA.
9. **Exhibit 29 (Mutual of Omaha):** Demonstrates the existence of insurance policies and asset-backed securities linked to Plaintiff's loans.
10. **Exhibit 30 (Operating Circular 10):** Confirms PenFed's participation in the BIC program, which involves pledging consumer loans as collateral.
11. **Exhibit 31 (Pledging Collateral):** Reinforces PenFed's systemic use of consumer loans as collateral, including Plaintiff's promissory notes.
12. **Exhibit 32 (Call Report Details):** Specifically links Plaintiff's vehicle promissory note to collateral pledged under the BIC program.

## III. BACKGROUND

Plaintiff initiated this action on July 12, 2022, alleging violations of the FCRA, SCUTPA, and other claims related to PenFed, their financial practices, including misrepresentation of promissory notes, improper credit reporting, and deceptive trade practices. Plaintiff now presents newly discovered evidence, obtained after diligent efforts, that supports the reopening of discovery and amending the complaint to include the Federal Reserve Bank of Richmond and related parties as defendants or at the very least the right to subpoena these third parties who are non-parties to this case in connection with the Federal Reserve and the BIC program.

Plaintiff has recently discovered that PenFed participates in the BORROWER-IN-CUSTODY PROGRAM (BIC) which is the legal framework enabling borrowers (the plaintiff)

to deposit promissory notes into depository institutions, which are then allowed to leverage these notes for the purpose of obtaining liquidity through the Federal Reserve's discount window. It is a financial arrangement established by the Federal Reserve, allowing depository institutions (DIs) to pledge consumer loans as collateral for liquidity purposes, such as accessing the Federal Reserve's Discount Window, while retaining physical custody of the loan documents. The program operates under strict guidelines to ensure the security, eligibility, and appropriate management of the pledged collateral.

***A. A brief outline of the BIC is below:***

1. **Depositing the Promissory Note**

   A borrower issues a promissory note, which represents a promise to pay a specific amount of money under agreed-upon terms. The borrower then deposits this note into a depository institution (such as a bank or credit union, in this case PenFed) who are members of the Federal Reserve that are legally authorized to participate in the BIC program. When the borrower deposits a promissory note with a depository institution such as PenFed in this case, under the BIC program, they authorize the institution to endorse the note and, as per Federal Reserve Operating Circular 10 Section 12.3, transfer the note, and substitute parties without restriction. The borrower's consent allows the financial institution to take these actions, including endorsing the note which the borrower has tendered as payment which was deposited with the Depository institution under this program. This is the pivotal moment when the promissory note begins its transformation.

2. **Fractional Reserve Banking**
   Upon receiving the promissory note, the depository institution can use the note to fractionally reserve funds. Fractional reserve banking allows the institution to hold only a fraction of the deposit in reserve, while using the remaining portion for lending or other purposes.

3. **Pledging the Collateral**
   The promissory note serves as collateral for borrowing purposes. Under the guidelines set out by **Federal Reserve Operating Circular 10**, the depository institution may pledge the note as collateral to borrow funds from the **Federal Reserve's discount window**. This is done with the borrower's consent and in accordance with the regulatory guidelines.
4. **Borrowing from the Federal Reserve**
   Once the depository institution has pledged the promissory note to the Federal Reserve, it can borrow from the Federal Reserve's discount window. This facility provides liquidity

to financial institutions that face short-term funding needs, and the funds are typically available at a discounted rate compared to market rates.

5. **Depositing Funds in Borrower's Account**
The funds obtained from the Federal Reserve through the **discount window** are then **deposited into the borrower's account**. This facilitates the borrower's access to liquidity, which can be used for business operations or any other financial purposes.

6. **Fractional Reserve on Borrowed Funds**
Once the institution receives the funds from the Federal Reserve, it can **fractionally reserve these funds** as per the legal requirements of fractional reserve banking. This allows the institution to lend out more money than it holds in reserves, thereby creating new money in the economy.

7. **Securitization and Trading of the Promissory Note**
The promissory note deposited by the borrower is **securitized** (converted into a tradable asset) and may be **traded in the financial markets**. This trading allows the financial institution to manage liquidity and risk associated with these notes and their underlying value.

8. **Legal Framework: 59 STAT 237 § 2**
The legal framework under which this program operates is based **on 59 STAT 237 § 2,** which allows for the **borrowing of funds in excess of Federal Reserve notes.** This statute is key because it establishes the legality of the BIC system and allows financial institutions to borrow against collateral that exceeds the immediate cash reserves in the Federal Reserve system.

9. **Trust and Securitization**
Funds obtained through the BIC process are held in trust by the Depository institution. This trust relationship ensures that the funds are used appropriately and in accordance with the terms outlined in the borrower's agreement with the depository institution. The promissory note is also securitized and may be sold in financial markets as a tradable asset under the specific rules governing the BIC program.

10. **The Role of Federal Reserve Operation Circular 10**
**Federal Reserve Operating Circular 10** and its appendices provide specific guidelines for how institutions may use the **discount window** and pledge collateral. This document outlines the rule for eligible collateral, including how promissory notes can be used, and specifies the procedures that depository institutions and or their associated third parties must follow in borrowing from the Federal Reserve.

11. **Legal Tender of Payment & Pledge of Collateral**
By depositing the promissory note, the borrower is effectively tendering payment to the institution as agreed upon in the promissory note agreement. As per **12 USC 412**, this is a form of tender of payment and pledge of collateral at face value. This means that the promissory note serves as **collateral security** in its full value without any discount or

reduction, as the borrower is legally offering the note as payment, satisfying their underlying debt obligation.

12. **Transformation into a Negotiable Promissory Note**
A crucial legal step in the BIC program is the endorsement by the depository institution. When the financial institution places an endorsement on the promissory note as required by the BIC program, it ceases to exist as a promissory non-negotiable promissory note and because a negotiable instrument under the Uniform Commercial Code (UCC) and state adopted equivalent. The non-negotiable promissory note which binds the borrower to the debt is no longer valid after the endorsement. What replaces it is a negotiable promissory note, a new legal instrument that removes the borrower's obligation to pay because the note has been converted into a negotiable form, transferrable and payable to a holder in due course.

13. **The difference between Article 3 and Article 9 of the UCC and the state adopted equivalent is essential here:**

- Article 3 governs negotiable instruments, which include promissory notes that are transferrable and may discharge obligations if endorsed and passed to a third party.
- Article 9 deals with secured transactions and is relevant in that the promissory note, while initially deposited as collateral, becomes part of a security interest when endorsed and turned into a negotiable instrument.

14. **Impact of the Endorsement: Discharge of Borrower's Debt**
Once the Depository institution endorses the note, it signifies that the borrower's debt obligation ceases to exist under the original non-negotiable terms of the note. The borrower's liability is discharged because the negotiable promissory note is no longer a direct obligation of the borrower, rather, it becomes a transferable, negotiable asset, now owned by the institution (or third party in the event of further transactions). This action is an application of UCC Article 3 and state adopted equivalent principles, where a negotiable instrument can effectively be transferred and discharged of the borrower's original obligation. The Financial institution cannot converted it back to a non-negotiable instrument because the instrument has already been converted and transferred, purchased and sold.

15. **The Role of the Federal Reserve and Collateralization**
As described in the BIC program, once the promissory note is endorsed and becomes a negotiable instrument, the depository institution can then use it as collateral to access liquidity from the Federal Reserve. This facility is governed by the Federal Reserve's Discount Window and the ability of depository institutions to pledge eligible collateral (which is promissory notes, now negotiable, qualifies as eligible collateral).

Federal Reserve Operating Circular 10, Section 12.3, and 12 USC 412 clearly indicate that the promissory note can now be placed into the Federal Reserve system as collateral, supporting the institution's borrowing ability. The endorsement signifies that the

borrower's debt is satisfied upon transfer, while the negotiable instrument now serves as the primary vehicle for collateral in the lending process.

**Summary of Key Points:**

- **Borrower's Consent:** The BIC program operates under the borrower's consent, as outlined in Federal Reserve Operating Circular 10, Appendix 3. The borrower consents to the endorsement and transfer of the note as per Federal Reserve Operating Circular 10 Section 12.3, thus allowing the Depository institution to act on their behalf.
- **Tender of Payment:** By depositing the note, the borrower tenders payment and pledges the note at face value as collateral.
- **Transformation to Negotiable Note:** The depository institution's endorsement on the promissory note converts it from a non-negotiable obligation into a negotiable instrument under UCC Article 3 and adopted state equivalent. This removes the borrower's debt liability.
- **Federal Reserve Collateralization:** The institution can use the negotiable note as collateral to borrow from the Federal Reserve, benefiting from the discount window access.
- **Article 3 vs Article 9 UCC and state adopted equivalent:** Article 3 and the state adopted equivalent governs the transfer and negotiability of the promissory note, while Article 9 and the state adopted equivalent concerns the secured interest that the note represents once it is endorsed.
- **Federal Reserve:** Banks use fractional reserve banking, where they only need to keep a fraction of the deposit on hand and can lend out the rest.
- **Securitization:** Promissory notes are securitized and can be traded in financial markets.
- **Federal Reserve Access:** The BIC program provides borrowers with indirect access to the Federal Reserve's discount window by using Depository institutions as intermediaries.
- **Possession of Documents:** Instead of sending these loan documents to the Federal Reserve, institutions maintain them under strict custody protocols on their premises.
- **BORROWER-IN-CUSTODY PROGRAM:** Thus serves as a mechanism for borrowers to leverage their promissory notes for financial liquidity while adhering to the guidelines set by Federal Reserve regulations and fractional reserve banking principles.
- **Transformation of Promissory note**: This transformation process ensures that the borrower's obligations are effectively extinguished, while the promissory note serves as a negotiable, tradable instrument, providing value to the depository institution and facilitating access to Federal Reserve liquidity.

## IV. ARGUMENTS IN SUPPORT OF RULE 60(b) RELIEF

### A. Rule 60(b)(2): Newly Discovered Evidence Warrants Reopening Discovery

The newly discovered evidence, detailed in Exhibits **21–32**, provides material facts previously unavailable despite Plaintiff's diligent efforts. These include:

1. **SCUTPA Claims**:
New evidence substantiates that PenFed's practices impact a broader class of consumers, satisfying SCUTPA's requirement to demonstrate public harm. Exhibits 22, 26, and 28 reveal systemic practices of pledging consumer loans as collateral also constituting unfair and deceptive practices under federal and state law although a consumer only has a private right of action under the state law in this matter.

2. **BIC Program Details**:
Exhibits 21-32, prove PenFed's active participation in the BIC program, contradicting their prior assertions and justifying the reopening of discovery including the issuance of subpoenas to the Federal Reserve and other third parties.

    a) Penfed is a "Member bank" of the Federal Reserve and have been since 7/11/1994. **see…exhibit 21 (Federal Reserve Database: Existing Access Member Bank).** Under **12 CFR § 204.2(n)**, a **"Member bank"** is defined as a **"Depository Institution"** that is a member of the Federal Reserve System. Under **12 CFR § 204.2(m)(1)(iii), "Depository institution"** means **"Any insured credit union as defined in section 101 of the Federal Credit Union Act (12 U.S.C. § 1752(7))".** PenFed acted as a **"Depository institution"** as a member bank of the Federal Reserve when dealing with plaintiff promissory notes or other applicable collateral accepted by the Federal Reserve under their **Borrower-In-Custody** program with the Federal Reserve Bank of Richmond or other unknown at this time Federal Reserve Banks.

    b) Penfed's own call report evidences that they, as a standard practice, Pledge consumer loans as Collateral with the Federal Reserve which document the value of the collateral. **See…exhibit 22 (at pages 2, 5, 6, 13, 16, and 17 evidences loans sold and purchased as part of the Borrower-In-Custody program with the federal reserve that PenFed participates in as the Depository Institution as a Member bank).**

    c) The collateral that PenFed pledges and the Federal Reserve accepts are provided Under the "loan" section of the "Federal Reserve collateral guidelines" **see…exhibit 23 (at page 11-12)** which also references that consumer promissory notes ("Notes") are pledged as collateral and have a face value (at par with the full amount of credits received) evidencing that the promissory notes are deposited with a value. The fact that Promissory notes can be deposited proves that it has value and is no longer a promissory note, it is a negotiable instrument redeemable in lawful money such as credits and federal reserve notes. The receipt of credits and or Federal Reserve Notes for the tendered collateral under the "BIC Program" is evidence that PenFed received payment in credits on behalf of the plaintiff in an account in the plaintiff's name and or in an account designated for such extensions of credit to be deposited under the BIC program. **Exhibit 23** further supports that the **5300 call reports** that PenFed files with the NCUA is because PenFed is a participant in the Borrower-in-Custody Program (also known as the "BIC" program) with the Federal Reserve which allows them to pledge

consumers loan instruments as collateral with the Federal Reserve into an account. The consumer loans referenced in PenFed's call reports are part of the BIC program which PenFed participates in which were used to secure public funding, the credits related to the accounts in this case. **Exhibit 23 (at page 3)** also evidences that PenFed has on file with the Federal Reserve an "Operating Circular 10". This is done as a standard practice of PenFed evidenced by their regular consistent filing of call reports **(see...Exhibit 22).** Based on the evidence presented, it is highly likely that Plaintiff's alleged loans was pledged by PenFed to the Federal Reserve Bank ("FRB") as a standard practice. It is clear that the statements in Olson's affidavits is inconsistent and contains inaccurate information and leaves out certain necessary material details related to the BIC program in which the consumers loans/the promissory notes are the collateral to which credits were issued to PenFed as the depository institution or a third party they hire or are affiliated with on behalf of the borrower, the plaintiff in this case from the FRB.

**Exhibit 24 ( Federal Reserve Discount Window Lending)** evidences that the "primary credits" received as a result of the pledges of collateral can be used as loans which is evidence that PenFed did not fund any loans to the plaintiff they were created by the deposit of plaintiff's collateral which is consumer loans converted into negotiable notes as collateral on behalf the consumer borrower. The BIC program allows "Depository institutions" such as PenFed to pledge collateral on behalf of the consumer while retaining custody of the loan documents which is why PenFed is misleading this court and the plaintiff, giving the allusion that they are the creditors to which a debt is allegedly owed when they are only the originators, the parties who originated the alleged loans. Since the Federal Reserve only issues credits directly to the Depository institution, not the consumer, which PenFed knows, PenFed and other member banks of the Federal Reserve have the ability to deceiving consumers which is an unfair deceptive act. **Exhibit 24 (at page 3)** also evidenced that PenFed received proceeds when they pledge plaintiff's alleged loans as collateral and security to the Federal Reserve thereby contradicts Craig Olson's declaration as this appears to be yet another inconstant statement presented to plaintiff and the court during discovery and filed on the record in this case by PenFed **(see...Exhibit 25 declaration at 23-35).** Exhibit 24 evidences that the "Lending Reserve Bank" will normally credit the Depository institution's account (which is an account setup by PenFed or on PenFed's behalf that appears to be in the plaintiff's name) as draft/checks have been created to utilize the credits advanced to the account that Plaintiff has to sign and authorize the credits to be paid to which are created by the pledged collateral to the federal reserve, once approved, the loan proceeds are available therefore issued. The "Acct. Codes" referenced in PenFeds call reports **(See...Exhibits 22)** support and evidence that the loans allegedly given to the plaintiff was pledged with the Federal Reserve as these codes match the exact "acct. codes" referenced under the **"Eligible Loan Types & Performance Criteria"** are pledged with the Federal Reserve **(See...Exhibit 23 (at pages 13-16)** which identifies the Auto loan, Line of Credit, and Credit Card Receivables as

collateral. Even the interest rate of 2.99 for the vehicle matches the collateral call report information for loan collateral pledged with the Federal Reserve for which are part of the BIC program which PenFed is participating in **(see…Exhibit 22 page 5 "Assets Continued and Exhibit 32, Vehicle Promissory Note).**

d) **Exhibit 26 (Federal Reserve Bank of Richmond Borrower-in-Custody (BIC) of Collateral Certification)** evidences that PenFed Pledges Consumers Promissory Notes as Collateral to the Federal Reserve which is purchased and Sold as evidenced in their call reports **(see…Exhibit 22, Schedule A).** The "Federal Reserve Bank of Richmond Borrower-in-Custody of Collateral (BIC) Requirements" also evidence that consumer loans are collateral pledged with the FRB further evidencing that PenFed pledged plaintiff's loans/promissory notes as collateral to secure advances and extensions of credit from the FRB which it appears that they used that credit to fund plaintiff's alleged loans. This further supports that PenFed pledged the promissory notes deposited by plaintiff with PenFed which PenFed pledged as collateral and security for credits which they received on behalf of the plaintiff under the BIC program thereby they did not fund any alleged loans to the plaintiff of their own funds. All of the plaintiff's alleged loans have a "note" associated with them which appear to have been pledged by PenFed, the Depository institution as part of the BIC program with the Federal Reserve. This exhibit also evidences that there are annual audits that can be produced related to the BIC program.

e) The federal reserve has secured their interests in the pledged collateral assets of PenFed evidenced by their UCC filings **(see…Exhibit 27)** which further supports and evidences it is a standard usual course of business activity for PenFed to Pledge consumer's loans/notes as collateral for the credit that they have been receiving on behalf of its members, the borrowers under the BIC program as PenFed appears to because PenFed is allowed under the BIC program to be in possession of the collateral/loan documents of its consumer customers/members deceptively alleging that they funded the alleged loans when clearly they did not fund the loans. It appears that PenFed provides drafts drawn on the accounts where the credits have been issued directly to the depository institution as part of the BIC program with the FRB to further deceiving the plaintiff and other members similarly situated in an attempt to disguise where the credits initiated from, who credited the account that funded the draft check which is an unfair and deceptive act to appear that they have funded the loans.

f) Based on the recent discovery of the exhibited evidence presented to this court, U.S. Bank Trust Company, N.A. is the indenture trustee, the third party, custodian, depository institution, the secured party who appears to be monitoring and conducting the transactions related to the pledged collateral, the securities accounts associated with PenFed and consumer loans, and the accounts referenced in this case and are involved in the credit transactions including write-off's/charge-offs, discharging of debts, offsetting debts, transferring collateral securities, and settling of the debts and the accounts including credit transactions

as it appears they are the parties holding the interest in the alleged consumer loans pledged, not PenFed. The indenture Trustee appears to be the party who has created an account in plaintiff's name to complete credit transactions and receive credits. **See…Exhibit 28 (US bank UCC filings).** This filing also supports that there has been a sale and purchase of the plaintiff's alleged debts into asset backed security pools converting the promissory notes into negotiable instruments governed under Article 3 of the UCC and the state adopted equivalent which is no longer a promissory note as it appears that it is a security being traded on the secondary market. The receivables have been purchased and sold further supporting that the debts and receivables are marketable and can or have been purchased and sold of which current account statuses have not be reported accurately or completely in violation of the FCRA which is claimed in this case. Metro 2 reporting standards and the Data Furnisher rule, Rule 660 was put in place so that accurate and complete information is reported to the Consumer Reporting Agencies related to the current status of the consumer accounts which include includes whether the account has been purchased, sold or assigned/transferred to a 3rd parties. Metro 2 also provides Reporting requirements when the debt has been sold or assigned/transferred to 3rd parties invoking specific reporting requirements in order to be in compliance with the FCRA, for accurate, complete and verified information to be reported regarding the consumer and the account. Exhibit 28 references that defaulted debts are deemed to be zero, have a zero balance **(see…exhibit 28 at page 2)** which evidences that there are default Receivables procedures that require the receivables to be deemed as zero. It provides that the outstanding principal balance of any receivable that becomes a defaulted receivable shall be deemed to be zero as of the date it becomes a Defaulted receivable, further supporting the requirement to report a zero balance on the Accounts as the charge-off references a defaulted receivable.

Plaintiff's claims include all the claims presented in his 4th amended complaint including exhibits which include but are not limited to PenFed reporting inaccurate, incomplete and incorrect account information, this includes the requirement for reporting an account that has been sold, assigned/transferred to a third party, that PenFed has already been paid, the requirement to report the accounts as disputed by the consumer, and also all aspects of a charge-off including transactions that would require the account information to be reported with zero balances as the current status of the accounts as provided in his disputes **(see…Exhibit A** filed with plaintiff's complaint) which are hereby incorporated by reference, not just because "PenFed's reporting here was inaccurate and misleading because the accounts at issue had been sold and/or assigned and because the accounts were listed as charged off" as stated by the court (see…ECF No. 371 at 1). Plaintiff is the master of his complaint (see… ***Old Dominion Electric Cooperative v. PJM Interconnection, LLC*** **24 F.4th at 271 (4th Cir. 2022)** however it appears that this court on multiple occasion have attempted to rewrite or substantially alter the complaint by its statements in its orders limiting the full nature and scope of plaintiff's claims to one specific claim when there are

multiple claims alleged in the 4th amended complaint which relate to the PenFed accounts as presented in the amended complaint that ultimately render the reporting inaccurate, incomplete, incorrect, misleading, and not being reported with maximum possible accuracy to be addressed at trial for the jury to decide as plaintiff has exercised his right and demanded a trial by jury under the 7th amendment of the U.S. Constitution.

g) The federal reserve by its board of directors acknowledge that "Note" such as promissory notes are considered commercial, agricultural, and industrial paper eligible for advances of credit to member banks i.e. notes are eligible paper which the advances can be used for consumers to purchase goods such as automobiles. **See…12 CFR § 201.104(c) & (d).** This section of the code supports the Federal Reserve Act section 13 paragraph 2, that consumer notes, drafts and bills of exchanges are eligible for discount through member banks such as PenFed when pledged to the FRB.

h) **Exhibit 29** amongst the other UCC filings presented with this filing evidences that PenFed is the debtor, that multiple parties may have interests in the pledged collateral of the plaintiff, that the promissory notes have been converted to negotiable instruments governed under article 3 of the UCC and state adopted equivalent are collateral and security for the alleged loans and that there are insurance policies associated with the pool of alleged loans being traded on the secondary market as "Mutual of Omaha" is a known insurer to which they may have been insurance claims filed related to the collateral of the plaintiff.

i) **Exhibit 30** supports and evidences that PenFed is a depository institution is part of the BIC program and as such completes a "Circular 10". That they or the third party associated pledges consumer collateral which are consumer loans to the FRB on behalf of its consumer members, the plaintiff in this case for which they and/or the third party receives credits on the consumer's behalf. It supports that there are third parties such as the "Indenture trustee" that are involved that conducts the transactions which includes opening and managing accounts the collateral pledged is deposited in, receiving credit, and transferring credit, and other activities related to the debt instruments/collateral pledged.

j) **Exhibit 31** is similar to **Exhibit 23** however provides additional information related to pledging collateral that supports that BIC arrangements may be used when a pledging institution would like to pledge a portfolio of its loans while maintaining possession of the loans either on its own premises, or on the premises of a third-party custodian such as the Indenture Trustee.

The following case law supports the reopening of discovery under Rule 60(b)(2) for newly discovered evidence:

1. **Gonzalez v. Crosby**, 545 U.S. 524, 535 (2005) – Newly discovered evidence that could not have been presented earlier warrants Rule 60(b)(2) relief.
2. **United States v. Metro. St. Louis Sewer Dist.**, 440 F.3d 930, 933–34 (8th Cir. 2006) – Evidence that materially impacts the case justifies reopening discovery.
3. **Mitchell v. Rees**, 261 F. App'x 825, 828 (6th Cir. 2008) – Newly discovered evidence must be timely and material to qualify under Rule 60(b).
4. **Clayton v. Ameriquest Mortg. Co.**, 388 F. App'x 339, 342 (4th Cir. 2010) – The Fourth Circuit affirmed Rule 60(b)(2) relief when the evidence was both new and likely to produce a different outcome.

**B. Rule 60(b)(2): Manifest Errors in Fact and Law in Prior Orders**

The denial of Plaintiff's petitions and or motions to compel and subpoenas has perpetuated a significant injustice by precluding access to critical evidence. This has deprived Plaintiff of his due process rights and undermined the integrity of these proceedings. The Court's denial of discovery and Plaintiff's motion to amend (ECF No. **358**) relied on:

1. **Mischaracterizations of Evidence:** The Court's reliance on Craig Olson's affidavit (Dkt. No. **345**) ignored inconsistencies and lack of firsthand knowledge demonstrated in the affidavit.
2. **Improperly Narrow Scope of Discovery:** The denial of Plaintiff's subpoenas in ECF No. **371** was based on an erroneous conclusion that the requested information was irrelevant. Exhibits **21–32** prove otherwise.

The following case law demonstrates that Rule 60(b) relief is appropriate for addressing manifest errors in fact and law:

- **Standard Oil Co. of California v. United States**, 429 U.S. 17, 19 (1976) – Rule 60(b) applies to correct substantive errors in judgment.
- **In re American Preferred Prescription, Inc.**, 255 F.3d 87, 94 (2d Cir. 2001) – Relief is appropriate where the Court's judgment is based on a misunderstanding of evidence.
- **Robinson v. Wix Filtration Corp.**, 599 F.3d 403, 408–09 (4th Cir. 2010) – The Fourth Circuit emphasized the need to correct errors in law or fact to prevent injustice.
- **Buck v. Davis**, 580 U.S. 100, 123 (2017) – Errors that fundamentally affect the fairness of proceedings warrant relief under Rule 60(b).

**C. Rule 60(b)(6): Relief is Necessary to Prevent Manifest Injustice**

The denial of Plaintiff's petition and or motions to compel and subpoenas perpetuates a

significant injustice, depriving Plaintiff of a due process right and the ability to obtain evidence crucial to his claims as all of the information requested in discovery effect the current status of the accounts including balances, transactions and the interests.

The following case law supports Rule 60(b)(6) relief to prevent manifest injustice:

1. **Compton v. Alton Steamship Co.**, 608 F.2d 96, 102 (4th Cir. 1979) – Rule 60(b)(6) relief is warranted where extraordinary circumstances justify preventing injustice.
2. **Liljeberg v. Health Servs. Acquisition Corp.**, 486 U.S. 847, 864 (1988) – Relief is appropriate where errors undermine confidence in the fairness of the proceedings.
3. **Valero Terrestrial Corp. v. Paige**, 211 F.3d 112, 118 (4th Cir. 2000) – The Fourth Circuit found that extraordinary circumstances and substantial injustice justify Rule 60(b)(6) relief.
4. **Ackermann v. United States**, 340 U.S. 193, 202 (1950) – Rule 60(b)(6) relief is an equitable remedy to address situations where adherence to judgment would be unjust.

## REQUESTED RELIEF

Plaintiff respectfully requests the Court to grant relief from orders **154, 250, 358**, **336**, and **371**:

1. **Reopen Discovery:**
   - Allow Plaintiff to subpoena Mr. Craig Olson, PenFed, the Federal Reserve, and other relevant third parties involved in the transaction associated with plaintiff's consumer loans and collateral.
   - Permit depositions and production of documents related to PenFed's use of Plaintiff's promissory notes as collateral, interactions with the Federal Reserve and third parties associated with the BIC program and insurance related to the asset backed securities pool of the pledged collateral.
   - Allow PenFed time to supplement their discovery responses to plaintiff, discovery sets 1 – 4.

2. **Grant Leave to Amend the Complaint or Issue Subpoenas:**
   - Add the Federal Reserve Bank of Richmond as a defendant, as their direct involvement in the transactions warrants inclusion or at the very least, grant subpoenas to be issued to the Federal Reserve and associated third parties.

3. **Reinstate SCUTPA claims based on new evidence of systemic practices:**
   - Reinstate plaintiff SCUTPA claims based on the new evidence 21-32.
   - The new evidence shows PenFed's practices likely extend to other consumers, establishing systemic unfair and deceptive acts under South Carolina Unfair Trade Practices Act (S.C. Code § 39-5-20), expounding on how 15 U.S.C. § 1681s creates a

statutory obligation, and that failure to comply constitutes an unfair or deceptive act or practice in commerce.

4. **Compel Discovery:**
   - Order PenFed to produce documents and communications related to collateral pledging, promissory notes, their call reports, the BIC program, Federal Reserve transactions and all prior discovery request related to the Federal Reserve and the production of the original promissory notes to inspect the originality, actual possession, the current state of the notes and for endorsements on the notes and for modifications evidencing conversions including electronic notations on imaged loans, electronic stamps on imaged loans, attention comment on each imaged loans and all requiremes required for labeling electronic loans as provided in section 23 of **Exhibit 26** evidencing collateral loans pledged to the Federal Reserve Bank.

5. **Extend Deadlines:**
   - Extend the discovery deadline to allow Plaintiff to depose Mr. Olson as outlined in ECF No. **371** and other relevant parties and to allow sufficient time to complete additional discovery and supplement discovery responses.

## CONCLUSION

The newly discovered evidence and procedural deficiencies outlined above compel this Court to grant Plaintiff relief under Rule 60(b). To deny this petition would perpetuate legal and constitutional errors violating due process rights of the plaintiff, undermining the integrity of this judicial process. Plaintiff respectfully requests that the Court grant this petition and allow the case to proceed on a complete evidentiary record to rectify the manifest errors and prevent injustice. Dated this 14th day of January, 2025.

RESPECTFULLY PRESENTED,

Nelson L. Bruce

Nelson L. Bruce, Propria Persona, Sui Juris
"All Secured Natural Rights Explicitly Reserved and Retained"
c/o P.O. Box 3345, Summerville, South Carolina 29484
Phone: 843-437-7901
Email: leonbruce81@yahoo.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served to all parties on the service list **via the CM/ECF system.** Dated this 14th day of January, 2025.

**SENT TO:**

Willson Jones Carter & Baxley, P.A.
**Attention: G. Troy Thames**
4922 O'Hear Avenue, Suite 301
North Charleston, SC 29405
*Attorney for Pentagon Federal Credit Union*

Eckert Seamans Cherin & Mellott, LLC
**Attn.: Michael A. Graziano & Sarah A. James**
1717 Pennsylvania Avenue, N.W., Suite 1200
Washington, D.C. 20006
*Attorney for Pentagon Federal Credit Union*

Wyche PA
**Attention: Rita Bolt Barker**
200 E Broad Street, Suite 400
Greenville, SC 29601-2892
*Attorney for Equifax*

Seyfarth Shaw, LLP
**Attention: Eric F Barton**
1075 Peachtree Street NE, Suite 2500
Atlanta, GA 30309
*Attorney for Equifax*

Adams and Reese LLP
**Attention: Lyndey Ritz Zwing Bryant**
1221 Main Street, Suite 1200
Columbia, SC 29201
*Attorney for Experian*

Clement Rivers LLP
**Attention: Wilbur Eugene Johnson**
25 Calhoun Street, Suite 400
Charleston, SC 29401
*Attorney for Trans Union, LLC*

Quilling Selander Lownds Winslett and Moser PC
Attn: Kyle Pietrzak
6900 N Dallas Parkway, Suite 800
Plano, TX 75024
*Attorney for Trans Union, LLC*

Jones Day
ATTN: **Grant Edward Schnell**
1221 Peachtree Street NE, Suite 400
Atlanta, GA 30361
*Attorney for Experian*

William J. Farley III
**Attention: Troutman Pepper Hamilton Sanders LLP**
301 S. College Street, Suite 3400
Charlotte, NC 28202
*Attorney for Defendant LexisNexis Risk Solutions, Inc.*

Troutman Pepper
**Attn: Susan Jean Lloyd**
One Wachovia Center
301 South College Street, Suite 3400
Charlotte, NC 28202
*Attorney for Def. LNRS*

Nelson L. Bruce

Nelson L. Bruce, Propria Persona, Sui Juris
"All Secured Natural Rights Explicitly Reserved and Retained"
c/o P.O. Box 3345, Summerville, South Carolina 29484
Phone: 843-437-7901