## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

|  |  |
|---|---|
| NELSON L. BRUCE,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>PENTAGON FEDERAL CREDIT UNION a.k.a. PENTAGON FEDERAL CREDIT UNION FOUNDATION ("collectively" PENFED), EXPERIAN INFORMATION SOLUTIONS, INC., TRANS UNION, LLC, EQUIFAX INFORMATION SERVICES, LLC, all unknown Does 1-100, et al.,<br><br>　　　　　Defendants. | Case No. 2:22-cv-02211-BHH-MGB<br><br>**DEFENDANT EQUIFAX INFORMATION SERVICES LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |

Defendant Equifax Information Services LLC ("Equifax"), by Counsel, hereby submits its Memorandum in Support of its Motion for Summary Judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, and shows the Court as follows.

### BACKGROUND & INTRODUCTION

#### *Plaintiff's Loans With Pentagon Federal Credit Union*

The Plaintiff in this case, Mr. Nelson Leon Bruce, took out three loans with Pentagon Federal Credit Union ("PenFed"): (1) an auto loan, (2) a line of credit, and (3) a credit card. (N. Bruce Depo. 22:11-14; 33:16-18; 41:12-14) (attached hereto as Exhibit E). Subsequently, Plaintiff stopped making payments on all three accounts, because, according to him, the promissory notes or agreements he entered into are a form of payment backstopped by the Federal Reserve. (*Id*. 25:10-26:21; 41:6-41:11; 42:16-43:1 & 48:14-49:9 & 58:3-59:20.)   According to Mr. Bruce, anybody who signs a promissory note to get a loan would be foolish to pay back the money because the government will actually pay it for them. (*Id*. 214:7-214:12 & 215:12-22.)

PenFed produced Mr. Bruce's account statements in this litigation, and selected months are attached here as Exhibit F (credit card statements March 2016-July 2017) and Exhibit G (combined account statements, with auto and line of credit accounts, April 2016-July 2018). The account statements show that the credit card went delinquent in January 2017, (Ex. F, at pg. 33), and no payment was made on the account thereafter, (*see generally* Ex. F). The combined account statements show that the last full payment (approximately $600.00) on the auto loan was made September 6, 2016, (Ex. G, at pg. 15), that the account went delinquent in October 2016, (Ex. G, at pg. 17), that the last payment of any kind on the account occurred October 24, 2017 when PenFed reduced the balance by waiving accumulated finance charges, leaving only the principal balance, (Ex. G, at pg. 48), and that no payment was made on the account thereafter, (*see generally* Ex. G). The combined account statements show that the last full payment on the line of credit (an online transfer credit totaling approximately $90.00) was made December 5, 2016, (Ex. G, at 22), that the account went delinquent in January 2017 (Ex. G, at pg. 25), that the last payment of any kind on the account occurred September 27, 2017 when PenFed closed Plaintiff's share account and transferred the remaining $5.00 to the line of credit, then further reduced the balance by waiving accumulated finance charges, leaving only the principal balance, (Ex. G, at pg. 46), and that no payment was made on the account thereafter, (*see generally* Ex. G).

At all times relevant to this lawsuit, PenFed has never sold, assigned, or transferred its ownership rights with respect to any of the three PenFed accounts. (Second Declaration of Craig Olson ("Olson Decl.") ¶ 9) (filed on the Court's docket as Doc. 345-1 and attached hereto as Ex. I). At all times relevant to this lawsuit, PenFed has retained sole legal ownership over the accounts. (*Id.* ¶ 10.) An April 11, 2022 letter from PenFed to Plaintiff indicated that the credit card account had been sold to the United Holdings Group ("UHG"), but, while PenFed had planned on selling

316183095v.1

the account to UHG, PenFed never completed the sale. (*Id*. ¶¶ 12-13.) UHG confirmed, in a response to a subpoena served in this litigation, that it did not acquire the account. (*Id*. ¶¶ 15-16.) The April 11, 2022 letter from PenFed to Bruce also indicated that PenFed had "assigned" the line of credit account to Nationwide Credit Corporation ("NCC"), but NCC is a debt collection agency that recovers past-due accounts for others and the line of credit account was "assigned" to NCC so that NCC could collect the past-due debt on behalf of PenFed. (*Id*. ¶¶ 17-19.) The April 11, 2022 letter from PenFed to Plaintiff informed Plaintiff that the auto loan account was "still owned and serviced by PenFed" and urged Plaintiff to contact PenFed. (Ex. 1 to Second Olson Decl.)

The first time Plaintiff came to believe that one or more of his accounts with PenFed may have been transferred or sold to another entity was in a December 2021 telephone call with PenFed. (N. Bruce Depo. 229:2-230:2.) Prior to this, Plaintiff believed that the accounts were being held and serviced by PenFed. (*Id*. 230:2-7.)

PenFed has never been compensated by the Federal Reserve, Plaintiff, or anybody else, for the debt Plaintiff owes in connection with the auto loan, the line of credit, or the credit card account. (Olson Decl. ¶ 34.) PenFed has never created or otherwise opened any accounts with the Federal Reserve in Plaintiff's name. (*Id*. ¶ 35.)

### *Equifax's Business Practices*

Equifax is a consumer reporting agency ("CRA") that creates and maintains credit files on more than 200 million consumers in the United States. (Declaration of Shetonjela Barber ("Barber Decl.") ¶ 10.) Equifax gathers information about consumers from various sources, including banks, collection agencies, and lenders, as well as court records, which it uses to create credit files. (*Id*. ¶ 11.) Equifax's credit files are used to prepare consumer reports, requested by its subscribers, when they need to evaluate whether to extend credit to a consumer, among other permissible purposes.

(*Id*. ¶ 12.) Equifax maintains procedures designed to assure the maximum possible accuracy of the information it reports to its subscribers regarding consumers, to correct errors that are brought to its attention, and to properly address consumer disputes. (*Id*. ¶ 13.) When Equifax receives a dispute from a consumer, Equifax's process is to open a dispute case that tracks the progress of the reinvestigation in a system known as "CCMS," at times also referred to by the acronym for its predecessor, "ACIS." (*Id*. ¶ 14.) The CCMS record reflects, among other things, when the dispute was received, how it was received, the steps taken in response to the dispute, and the date(s) any correspondence was sent to the consumer. (*Id*. ¶ 15.)

Upon receipt of a dispute from a consumer, Equifax's policy is to review and consider all of the relevant information, if any, that the consumer provides regarding the nature of the dispute and the contents of the consumer's credit file. (*Id*. ¶ 16.) If, upon review of the dispute, the contents of the file, and the information provided, Equifax is able to make updates, Equifax's policy is to undertake those immediately. (*Id*. ¶ 17.) If further investigation of the consumer's dispute is required, Equifax's policy is to notify the source of the information and advise it of the consumer's dispute, describe all relevant information (if the dispute is by mail, this includes providing a digital image of its contents to aid the data furnisher in their investigation), provide the consumer's account information as it then appears in the consumer's Equifax credit file, and ask the data furnisher to investigate the consumer's dispute and to advise Equifax if the account information is inaccurate. (*Id*. ¶ 18.)

The data furnisher is in the best position to investigate a dispute, as it has the applications for credit, account history, or other direct information concerning the account. (*Id*. ¶ 19.) Communications between Equifax and the data furnisher are generally made through a process wherein Equifax electronically transmits a form called an Automated Consumer Dispute

Verification ("ACDV") to the data furnisher. (*Id*. ¶ 20.) The ACDV process is an industry standard used by all three of the nationwide consumer reporting agencies (Equifax, Experian, and Trans Union), and is implemented by a system called E-OSCAR, which requires a data furnisher to view the ACDV and any associated images before providing a response. (*Id*. ¶ 21.)

Once Equifax receives the ACDV back from the data furnisher, Equifax's policy is to review the ACDV response, then look to its own internal policies and procedures to see if they require a specific action, depending on the type of dispute, and, if not, then to make no changes to the account if the data furnisher verifies that the account is being reported accurately or take any necessary action if the data furnisher advises Equifax to delete or otherwise update the account information. (*Id*. ¶ 22.) Following the completion of its reinvestigation, Equifax's policy is to send the consumer the results of the reinvestigation. (*Id*. ¶ 23.) Equifax's policy is that the aforementioned steps are to be completed within the time frame provided by the FCRA. (*Id*. ¶ 14.)

### *Plaintiff's Disputes To Equifax*

On or around September 27, 2021, Equifax received a dispute package from Mr. Bruce. (*Id*. ¶ 25 & Ex. A.) Mr. Bruce's September 27, 2021 dispute package disputed four accounts appearing on his Equifax credit file: (1) a Pentagon Federal Credit Union auto account, (2) a Pentagon Federal Credit Union line of credit account, (3) a Pentagon Federal Credit Union credit card account, and (4) a REV Federal Credit Union account. (*Id*. ¶ 26 & Ex. A.) Mr. Bruce's September 27, 2021 dispute package contained multiple "Reason" paragraphs as to why he claimed each account was inaccurate. (*Id*. ¶ 27 & Ex. A.)

As a result of Mr. Bruce's September 27, 2021 dispute, an Equifax agent sent an ACDV to REV Federal Credit Union, which included digital images of the dispute letter and documents Mr. Bruce submitted with the dispute, the account information as it then appeared in Mr. Bruce's

316183095v.1

Equifax credit file, and a request that REV Federal Credit Union ("REV FCU") investigate the dispute. (*Id*. ¶ 28.) REV FCU did not respond to the ACDV sent to it by Equifax, and, as a result, Equifax suppressed the REV FCU account from Mr. Bruce's credit file. (*Id*. ¶ 29.)

As a result of Mr. Bruce's September 27, 2021 dispute, an Equifax agent sent three ACDVs to Pentagon Federal Credit Union (one for each account), which included digital images of the dispute letter and documents Mr. Bruce submitted with the dispute, the account information as it then appeared in Mr. Bruce's Equifax credit file, and a request that Pentagon Federal Credit Union investigate the accounts, specifically noting that Mr. Bruce had disclaimed ownership of the accounts. (*Id*. ¶ 30.) On October 15, 2021 Pentagon Federal Credit Union responded to Equifax's ACDV for the line of credit account, verifying that it belonged to Mr. Bruce and that the account was accurate as reported: as a charged off account with a balance of $4,427, a date of first delinquency of February 2017, and a date of last payment of September 2017. (*Id*. ¶ 31.) On October 15, 2021 Pentagon Federal Credit Union responded to Equifax's ACDV for the auto account, verifying that it belonged to Mr. Bruce and that the account was accurate as reported: as a charged off account with a balance of $31,794, a date of first delinquency of October 2016, and a date of last payment of October 2017. (*Id*. ¶ 32.) On October 18, 2021 Pentagon Federal Credit Union responded to Equifax's ACDV for the credit card account, verifying that it belonged to Mr. Bruce and that the account was accurate as reported: as a charged off account with a balance of $13,777, a date of first delinquency of January 2017, and a date of last payment of December 2016. (*Id*. ¶ 33.)

In light of Pentagon Federal Credit Union's specific responses to the ACDVs for Mr. Bruce's specific accounts, Equifax's policies and procedures did not require it to take any specific action, and, as a result, Equifax made no changes to the accounts as they appeared on Mr. Bruce's

credit file. (*Id*. ¶ 34.) On October 24, 2021, Equifax concluded its reinvestigation of Mr. Bruce's September 27, 2021 dispute, and sent him a reinvestigation results letter. (*Id*. ¶ 35 & Ex. B.)

On or around May 17, 2022, Equifax received another letter from Mr. Bruce. (*Id*. ¶ 36 & Ex. C.) Mr. Bruce's May 17, 2022 letter identified the three Pentagon Federal Credit Union accounts referenced above, but did not make any specific allegation of inaccuracy regarding any of them. (*Id*. ¶ 37 & Ex. C.) Nevertheless, as a result of Mr. Bruce's May 17, 2022 letter, an Equifax agent sent three ACDVs to Pentagon Federal Credit Union (one for each of the three accounts referenced above), which included digital images of the letter and documents Mr. Bruce submitted with the letter, the account information as it then appeared in Mr. Bruce's Equifax credit file, and a request that Pentagon Federal Credit Union investigate the accounts, specifically noting a request for PenFed to verify all account information.. (*Id*. ¶ 38.)

On June 8, 2022 Pentagon Federal Credit Union responded to Equifax's ACDV for the line of credit account, verifying that it belonged to Mr. Bruce and that the account should report as a charged off account with a balance of $4,427, a date of first delinquency of February 2017, and a date of last payment of September 2017. (*Id*. ¶ 39.) On June 8, 2022, Pentagon Federal Credit Union responded to Equifax's ACDV for the auto account, verifying that it belonged to Mr. Bruce and that the account should report as a charged off account with a balance of $31,794 and a date of first delinquency of October 2016. Pentagon Federal Credit Union changed the date of last payment from October 2017 to December 2017. (*Id*. ¶ 40.) On June 8, 2022 Pentagon Federal Credit Union responded to Equifax's ACDV for the credit card account, verifying that it belonged to Mr. Bruce and that the account should report as a charged off account with a balance of $13,777, a date of first delinquency of January 2017, and a last payment date of December 2016. (*Id*. ¶ 41.)

In light of Pentagon Federal Credit Union's specific responses to the ACDVs for Mr. Bruce's specific accounts, Equifax's policies and procedures did not require it to take any specific action, and, as a result, Equifax made no changes to the accounts as they appeared on Mr. Bruce's credit file. (*Id.* ¶ 42.) On June 8, 2022, Equifax sent Mr. Bruce a reinvestigation results letter. (*Id.* ¶ 43 & Ex. D.)

### *Plaintiff's Alleged Damages*

In his Fourth Amended Complaint, Plaintiff claims that, as a result of "the wrongful conduct, action and inaction of Defendants" he suffered "significant damages" such as "a diminished credit score, loss of credit, loss of the ability to purchase and benefit from credit, a chilling effect on credit applications, and then the mental and emotional distress and pain, anguish, humiliation and embarrassment caused by the inability to obtain financing for everyday expenses, bank account denials, denials of credit and credit card applications, [and] higher interest rates on loans and credit cards[.]" (Doc. 291 ¶¶ 117, 144, 154.)  Thus, Plaintiff's injury claims come in two flavors: (1) the inability to obtain credit, and (2) emotional distress and related damages caused by the claimed inability to obtain credit.

When Equifax asked him specifically, in discovery, to identify the credit denials allegedly attributable to Equifax, he identified four instances of inability to obtain credit, ***all*** of which were sought for business purposes:

> [P]laintiff states at this time that he has been denied a Cash Back Visa credit card from SECU on or about 12-9-2021, that Plaintiff sought to acquire at least $30,000 of credit to use towards his real estate business. That on 11-27-2021 plaintiff was denied a Premier cash reward visa signature credit card from U.S. Bank that plaintiff sought to acquire at least $20,000 of credit to use towards his real estate business. That on 5-3-2022/5-4-2022/5-5-2022, plaintiff was denied a mortgage loan with AmeriSave Mortgage Corporation that plaintiff sought to acquire a minimum of $200,000 to acquire real estate investment property with. That between May 17, 2022 and May 24, 2022 plaintiff applied for a credit limit increase on his Visa Signature Cash Rewards credit card with Navy Federal Credit Union and was

- 8 -

> denied for the increase of $12,000 that plaintiff sought to acquire to use towards both his everyday expenses and Capital Return Investments business.

(Plaintiff's Response to Equifax's Interrogatory No. 6) (attached hereto as Ex. H.)   At his deposition, when asked whether the loans were sought for business or personal use, Plaintiff claimed that he could not "recall" or "100 percent respond" to that question "without [] being approved for the credit," (N. Bruce Depo. 232:20-23; 234:15-16), but, when he actually provided substantive responses, repeatedly testified to the former, stating with regard to the SECU denial that he was "trying to get back into real estate … [s]o it probably would have went to some expenses as relates to that," (*id*. 232:14-16), with regard to the U.S. Bank denial that it "more likely would be business," (*id*. 234:10-11), with regard to the AmeriSave denial that it was "correct" to say the loan was "for part of [his] real estate business," (*id*. 237:1-3), with regard to the Navy Federal denial that he "was trying to get back into real estate to, you know, buy and flip homes again," (*id*. 238:4-6).   At his deposition, as in his Fourth Amended Complaint, he articulated that his alleged emotional distress damages were caused by the claimed credit denials:

> Q.     Okay. What emotional distress damages are you seeking from Equifax?
>
> A.     It would be the same response as before as it relates to the denials, third parties seeking inaccurate information that triggered the denials.

(*Id*. 232:24-243:5.)

Finally, Plaintiff's defamation claim against Equifax and the other defendants in this case also relates to his claims that Equifax (and the other defendants) published inaccurate information regarding the PenFed accounts; specifically "reporting the [accounts] as not being sold, transferred to a third party or the balances as they should be reported." (*Id*. 103:15-18.)

## **STANDARD**

Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding whether a genuine issue of material fact exists, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in his favor. S*ee Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The moving party has the burden of proving that summary judgment is appropriate. Once the moving party makes this showing, however, the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). A party asserting that a fact is genuinely disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). A litigant "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

"[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991). "Summary judgment is proper only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir.

1987). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S. Ct. 2505.

Finally, although *pro se* pleadings are "held to less stringent standards than formal pleadings drafted by lawyers," *Allen v. Brodie*, 573 F. Supp. 87, 89 (D. Md. 1983) (quoting *Haines v. Kerner*, 404 U.S. 519, 520–21, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)), courts in this Circuit still hold that "*pro se* status does not lessen a party's burden with respect to the court's consideration of a summary judgment motion." *Eastridge v. Fifth Third Bank*, No. SAG-19-1516, 2021 WL 1530175, at *3 (D. Md. Apr. 19, 2021). Accordingly, *pro se* litigants "must still set forth facts sufficient to withstand summary judgment." *Symeonidis v. Paxton Cap. Grp., Inc.*, 220 F. Supp. 2d 478, 480 n.4 (D. Md. 2002).

## ARGUMENT & CITATION TO AUTHORITY

I. **PLAINTIFF'S CLAIMS OF INACCURACY REGARDING EQUIFAX'S ALLEGED REPORTING OF THE PENFED ACCOUNTS ARE NOT SUPPORTED BY ANY COMPETENT EVIDENCE**

a. **Plaintiff's Claim That The PenFed Accounts Were Sold Is Unsupported, And, In Any Event, He Did Not Present This Claim Of Inaccuracy To Equifax In Either His September 2021 or May 2022 Letters**

The primary—if not the sole—allegation of inaccuracy set forth in Plaintiff's Fourth Amended Complaint is that Equifax allegedly reported the three PenFed accounts with balances, even after they had been transferred or sold. (Doc. 291 ¶ 77) ("After January 22, 2018, the date of sale, assignment and or transfer of the credit card and line of credit accounts, PenFed to be in compliance with the FCRA and Metro 2 reporting standard for maximum possible accuracy, they are required to report the accounts as sold, transferred, charged-off with a zero balance and zero

amount past due to be accurate, complete, true, correct and not misleading regardless of whether the third party is reporting it or not.").

However, as set forth above, although Plaintiff may have been mistakenly informed that one of the PenFed accounts had been sold, at all times relevant to this lawsuit, PenFed has never sold, assigned, or transferred its ownership rights with respect to any of the three PenFed accounts, and PenFed has retained sole legal ownership over the accounts. (Olson Decl. ¶¶ 9-10.) Further, PenFed has never been compensated by the Federal Reserve, Plaintiff, or anybody else, for the debt Plaintiff owes in connection with the auto loan, the line of credit, or the credit card account. (*Id.* ¶ 34.) Thus, as a factual matter, Plaintiff's claims of inaccuracy—that the accounts were inaccurate because they were not marked transferred or sold, with a $0 balance—are unsupported.

The fact that PenFed may have "assigned" one of the accounts to a third party debt collector to collect the past-due balance on PenFed's behalf neither renders PenFed's continued reporting of the account with a balance "patently incorrect" nor "misleading in such a way and to such an extent that it can be expected to have an] adverse effect." *Dalton v. Capital Associated Industries, Inc.*, 257 F.3d 409, 415 (4th Cir. 2001) (citations and alterations omitted). The alleged reporting of a balance is not "patently incorrect" because Plaintiff still owed PenFed a balance. It was not "misleading" because, although the debt may have been "assigned" to a third-party debt collector, Plaintiff makes no allegation that the debt collector was also reporting a tradeline to the credit bureaus, which might cause creditors to believe he owed twice the amount he actually did.[1] *Cf. Arriaga v. Logix*, No. 18-cv-9128, 2021 WL 4459759, at *3 (C.D. Cal. May 21, 2021) (denying motion for reconsideration of summary judgment denial that had "acknowledged Logix's

---

[1] Nor can Plaintiff make such an allegation, as no such collection tradeline was reporting on the file. (*See* Barber Decl. ¶¶ 26, 37.)

argument that it was not required to report a zero balance for its account since its account had only been assigned to Fidelity for collection, and not sold, and therefore the $5,196 balance it reported was not inaccurate since Plaintiff still owed the balance to Logix" but "found that double reporting of balances owed by Plaintiff on the same debt could be misleading.") (quotations omitted).

Regardless, Plaintiff did not present this claim of inaccuracy in either his September 2021 or May 2022 letters, and, therefore, Equifax had no duty to reinvestigate it. Under § 1681i of the FCRA, a consumer reporting agency ("CRA") is required to conduct a reasonable reinvestigation of the accuracy of an item of information on a consumer's credit file "if . . . the consumer notifies the agency . . . of such dispute." 15 U.S.C. § 1681i(a)(1)(A). Under this provision, a CRA's duty to reinvestigate is cabined to the dispute the consumer presents; even where the consumer's dispute identifies generally the piece of information they wish to dispute—a conviction, an account—they cannot bootstrap a § 1681i claim based on one alleged inaccuracy from their dispute of a different alleged inaccuracy. *See Aldaco v. RentGrow, Inc.*, 921 F.3d 685, 690 (7th Cir. 2019) (where consumer's dispute "contended only that the battery record wasn't hers," CRA had duty to "investigate and confirm with its sources the only information that was disputed: whether the battery record pertained to Aldaco" and not "the reported length of the sentence or the omission of the charge's dismissal"); *accord Herisko v. Bank of America*, 367 F. App'x 793 (9th Cir. 2010) (where "the only notice Plaintiff provided to Experian about his dispute was a letter [that] . . . did not put Experian on notice that Plaintiff was claiming a different purported inaccuracy [which was] . . . . the alleged inaccuracy underlying the present suit[,] Plaintiff's dispute letter was therefore insufficient to trigger Experian's duty under § 1681i").

The Court previously concluded that it could not be sure that Plaintiff's September 2021 letter did not relate to Plaintiff's allegation of inaccuracy that the accounts should be zeroed out

because they had been transferred or sold. (Doc. 131 at 13-14.) It is clear now, however, as Plaintiff testified at his deposition that he first came to believe (erroneously, as it turns out) that one or more of his accounts with PenFed may have been transferred or sold to another entity was in a December 2021 telephone call with PenFed. (N. Bruce Depo. 229:2-230:2.) Prior to this, Plaintiff believed that the accounts were being held and serviced by PenFed. (*Id*. 230:2-7.) Simply put, if Plaintiff did not (erroneously) believe the accounts had been transferred or sold until December 2021, he *could not* have made that claim of inaccuracy in a September 2021 dispute letter to Equifax. Further, this Court has already acknowledged that Plaintiff's May 2022 letter to Equifax did ***not*** place Equifax on notice of any specific inaccuracy, (Doc. 131 at 10), but later concluded that it could "not say, as a matter of law, that Equifax did not view the May 3, 2022 letter as 'part and parcel' of the specific disputes raised in Plaintiff's September 25, 2021 letter, and conducted their reinvestigation accordingly," (Doc. 292 at 20). Given, however, that Plaintiff's September 2021 dispute did not – *could not* – have included any claim that the PenFed accounts were transferred or sold, there is no possibility that Equifax could have viewed Plaintiff's May 2022 letter as "part and parcel" of any such claim.

### b. Plaintiff's Claim That Charged Off Accounts Must Report With a $0 Balance Is Without Foundation In Law

In his Fourth Amended Complaint, Plaintiff alleges that the PenFed accounts "were charged off/written off therefore no accounts nor debts existed as an asset of PENFED." (Doc. 291 ¶ 76.) But Plaintiff is simply incorrect that a "charged off" debt ceases to exist.

"'Charge off' is a term of art for credit providers, understood as writing off a debt as a loss because payment is unlikely." *Makela v. Experian Info. Sols., Inc.*, 2021 WL 5149699, at *3 (D. Or. Nov. 4, 2021) (citing Charge Off, Black's Law Dictionary (11th ed. 2019)). "Federal regulations require banks to 'charge off' debt that is past due by over 180 days." *In re Anderson*,

884 F.3d 382, 386 n.2 (2d Cir. 2018) (citing Uniform Retail Credit Classification and Account Management Policy, 65 Fed. Reg. 36,903, 36,904 (June 12, 2000)). Otherwise, a bank's "balance sheets would 'misleadingly reflect accounts as assets that have little chance of achieving their full valuation.'" *Makela*, 2021 WL 5149699, at *3 (quoting *Artemov v. TransUnion, LLC*, 2020 WL 5211068, at *3 (E.D.N.Y. Sept. 1, 2020)). However, "[s]ince financial institutions are required to comply with this federal requirement, it follows that charging off an account does not equate to debt forgiveness." *Artemov*, 2020 WL 5211068, at *4. Thus, "charging off a debt does not diminish the legal right of the original creditor to collect the full amount of the debt." *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1297 (11th Cir. 2016); *accord Dye v. TransUnion, LLC*, 2013 WL 5663094, at *3 (D. Nev. Oct. 15, 2013) ("[Charged off] debt is still enforceable."). Because charged off debt still exists, "it should be obvious that, even though [PenFed] labeled plaintiff's accounts as charged off, they had no obligation to zero out the overall or past due balance." *Artemov*, 2020 WL 5211068, at *4.

Indeed, if the Court were to "adopt plaintiff's reasoning – that a charge off categorically precludes a creditor from reporting the total past due amount – it would vitiate the entire existence and purpose of credit reporting companies: to present an evenhanded and fair representation of a particular consumer's ability and willingness to pay off debt, so as to encourage a creditor to take a risk and extend a line of credit to a particular consumer." *Artemov*, 2020 WL 5211068, at *6. Under such a regime, "potential creditors would hesitate to extend any line of credit until an independent and more thorough investigation into the consumer's financial background was completed, thereby increasing the cost of doing business and interest rates for consumers." *Id.*

### c. Plaintiff's Remaining Claims Of Inaccuracy Are Frivolous

#### i. Plaintiff's Claim That The Federal Reserve Has Paid His Loans Is Frivolous

In the Fourth Amended Complaint, Plaintiff claims that "[u]nder the law, the Federal Reserve Act, Plaintiff's 'Promissory Note' is the 'Collateral Security' for the loan of credit he received and when deposited with the Local Federal Reserve agent, Federal Reserve Notes are issued to the bank, in this case PenFed, therefore PenFed has been paid on both the Auto Loan and Line of Credit Accounts[.]" (Doc. 291 ¶ 82.)  This appears to be a new twist on a frivolous legal theory that has been repeatedly rejected by courts as absurd and patently frivolous. *See, e.g.*, *Baird v. Ammiyhuwd*, No. 1:16-cv-1152, 2017 WL 430772, at *2-3 (S.D. Ohio Jan. 31, 2017) (dismissing case where defendants attempted to pay court filing fee with "promissory note" they had created themselves); *Marvin v. Capital One*, No. 1:15-cv-1310, 2016 WL 4548382, at *5 (W.D. Mich. Aug. 16, 2016 )(stating that plaintiff could not pay the debt owed to the defendant by use of a purported promissory note "because such a note is not legal tender"); *Demmler v. Bank One NA*, No. 2:05-cv-322, 2006 WL 640499, at *3 (S.D. Ohio Mar. 9, 2006) (dismissing as "utterly frivolous" claims based on the premise that a "promissory note he executed [was] the equivalent of 'money' "); *see also Bendeck v. U.S. Bank Nat'l Ass'n*, No. 17-00180, 2017 WL 2726692, at *4 (D. Haw. June 23, 2017) (dismissing claims based on plaintiff's "absurd and frivolous" premise that "a promissory note is money"); *accord Martinez v. Wells Fargo Bank*, No. 12-cv-802, 2014 WL 12026058, at *5 (S.D. Cal. Sept. 11, 2014).). Plaintiff's new twist is that the Federal Reserve created the money and paid PenFed. However, PenFed has never been compensated by the Federal Reserve, Plaintiff, or anybody else, for the debt Plaintiff owes in connection with the auto loan, the line of credit, or the credit card account. (Olson Decl. ¶ 34.)  PenFed has never created or opened any accounts with the Federal Reserve in Plaintiff's name. (*Id.* ¶ 35.)

    ii.   <u>A Creditor's Alleged Failure To Respond To An FCBA Dispute Is Not A Cognizable Inaccuracy Under The FCRA</u>

In his September 2021 dispute to Equifax, Plaintiff asserted, with respect to all three PenFed accounts, that they were inaccurate because he "disputed the validity of the alleged debt and requested that the alleged creditor validate this alleged account and support it by verification of it being true and correct under firsthand knowledge which they did not respond at all to the request," and, since, "[t]he law only allows then 30 days to respond" he "demand[ed] that this alleged account be deleted immediately." (Ex. A, at pgs. 3-5.)  Attached to Plaintiff's September 2021 dispute to Equifax was a copy of a purported Fair Credit Billing Act ("FCBA") dispute to PenFed dated January 28, 2021. (*Id.* at pgs. 15-20.)  Even if PenFed did not respond to the purported FCBA dispute, a failure of a creditor to respond to a FCBA dispute does not mean that the debt ceases to exist. Rather, the creditor "forfeits any right to collect from the obligor the amount indicated by the obligor under paragraph (2) of subsection (a) of this section, and any finance charges thereon, except that the amount required to be forfeited under this subsection may not exceed $50." 15 U.S.C. § 1666(e).

But, more importantly, this "dispute" is not actually a claim of inaccuracy. It is collateral attack on the validity of a debt. As such, it is not a cognizable claim of inaccuracy under the FCRA. *See Carvalho v. Equifax Info. Servs. LLC*, 629 F.3d at 891 ("Credit reporting agencies are not tribunals. They simply collect and report information furnished by others. Because CRAs are ill equipped to adjudicate [legal] disputes, courts have been loath to allow consumers to mount collateral attacks on the legal validity of their debts in the guise of FCRA reinvestigation claims.") (citing *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 150 (4th Cir. 2008)); *Wright v. Experian Info. Sols., Inc.*, 805 F. 3d 1232, 1242 (10th Cir. 2015) (the FCRA "does not require CRAs to resolve legal disputes about the validity of the underlying debts they report"); *see*

- 17 -

*also Mader v. Experian Information Solutions, Inc.*, 56 F.4th 264, 270 (2d Cir. 2023) ("Consistent with these decisions, we hold that Mader has failed to allege an inaccuracy . . . .").

### iii.   Experian's Alleged Reporting Of Accounts With A $0 Balance Does Not Support A Claim Of Inaccuracy Where The Accounts Do Have Balances

In his September 2021 dispute to Equifax, Plaintiff asserted, with respect to two of the three PenFed accounts, that they were inaccurate because Experian allegedly was reporting them with a $0 balance. (Ex. A, at pg 4.)  The record establishes, however, that PenFed has never been compensated by the Federal Reserve, Plaintiff, or anybody else, for the debt Plaintiff owes in connection with the auto loan, the line of credit, or the credit card account. (Olson Decl. ¶ 34.) Moreover, at all times relevant to this lawsuit, PenFed has never sold, assigned, or transferred its ownership rights with respect to any of the three PenFed accounts, and PenFed retained sole legal ownership over the accounts. (*Id.* ¶¶ 9-10.)  Thus, Experian's alleged (inaccurate) reporting of the accounts with a $0 balance does not establish an inaccuracy in Equifax's reporting.

### iv.   The Date Of Last Payment Can Post-Date The Date Of Delinquency

In his September 2021 dispute, Plaintiff asserted, with respect to two of the three PenFed accounts—the auto loan and the line of credit—that they were inaccurate because the "Date of Last Payment" was after the "Date of First Delinquency." (Ex. A, at pgs. 3-4.)  However, this, in itself, is not the basis for any claim of inaccuracy. Moreover, after the accounts went delinquent, PenFed either applied funds seized from Plaintiff's share account or reduced the balance on the account by waiving financing charges. (Ex. G, at 46, 48.) Thus, this claim of "inaccuracy," to the extent incorporated into Plaintiff's Fourth Amended Complaint by reference, is patently frivolous.[2]

## II.    EQUIFAX REASONABLY REINVESTIGATED PLAINTIFF'S DISPUTES

---

[2] Any remaining quibbles presented by the various "Reasons" listed in Plaintiff's September 2021 dispute fail to present a colorable inaccuracy in light of the tradeline "as a whole." *Sanchez v. JPMorgan Chase Bank*, 643 F.Supp.3d 1025, 1033 (D. Ariz. 2022).

316183095v.1

Equifax is entitled to summary judgment on Plaintiff's FCRA claims solely because Plaintiff's allegation, or allegations, of inaccuracy are without any foundation. *See Dalton*, 257 F.3d at 415 ("Thus, a consumer reporting agency violates § 1681e(b) if (1) the consumer report *contains inaccurate information . . . .*") (emphasis added); *Hinton v. Trans Union LLC*, 654 F.Supp.2d 440, 451 (E.D. Va. 2009) ("[A] consumer who brings a § 1681i failure to reinvestigate claim must first show that his credit file contains inaccurate or incomplete information."). Equifax is also entitled to summary judgment on Plaintiff's § 1681i failure to reasonably reinvestigate claim because Equifax's reinvestigations of Plaintiff's disputes were reasonable as a matter of law.

When a consumer disputes information on his credit file, § 1681i requires a consumer reporting agency ("CRA") to "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate[.] 15 U.S.C. § 1681i(a)(1)(A). Equifax has established procedures and followed them in reinvestigating Plaintiff's disputes. Equifax sent ACDVs, which included all the information and the documents Plaintiff submitted, to the data furnishers. (Barber Decl. ¶¶ 28, 30.) When REV FCU did not respond, Equifax deleted the disputed account from Plaintiff's credit file, in accordance with the FCRA. *See* 15 U.S.C. § 1681i(a)(5)(A) ("If . . . an item of the information . . . cannot be verified, the consumer reporting agency shall . . . promptly delete that item of information from the file of the consumer . . . [.]").

After Equifax received PenFed's responses verifying the accounts, because Equifax's policies and procedures did not require it to take a specific action in light of PenFed's specific responses, Equifax made no changes to the accounts; it then concluded its reinvestigation by notifying Plaintiff of the results. (Barber Decl. ¶¶ 31-35.) Under the circumstances presented by Plaintiff's disputes, this was reasonable as a matter of law.

Plaintiff's first dispute was a "kitchen sink"-style dispute full of dubious allegations of inaccuracy, but the first-listed allegation regarding each PenFed account was "I do not have a contract with this company . . . ." (Ex. A, at pgs. 3-6.)  In other words, Plaintiff was making an ownership dispute.[3]  In the context of ownership disputes, courts have determined that it is reasonable as a matter of law for a CRA to contact the data furnisher via ACDV to verify that it belongs to the consumer on whose credit file the CRA has placed it, but who is now disputing ownership. *See, e.g.*, *Westbrook v. Equifax Info. Servs. LLC*, No. 23-cv-477, 2025 WL 399940, at *8 (M.D. Fla. Feb. 5, 2025) (concluding that "Equifax's response to the First Dispute was reasonable as a matter of law" where the consumer made an ownership dispute and Equifax "asked Capital One to verify whether the Account existed in Plaintiff's name"). Here, Equifax's ACDVs to PenFed specifically noted that Plaintiff had disclaimed ownership of the accounts, and PenFed verified that the accounts belonged to Plaintiff. (Barber Decl. ¶¶ 30-33.)

Moreover, Plaintiff's dispute letter, with its plethora of other, dubious claims, was sent along with the ACDV and PenFed was required to view the image before responding. (*Id.* ¶¶ 21, 30.) Therefore, PenFed was appraised of the full panoply of Plaintiff's dubious claims, and its verification of the account details must be viewed in light of that fact. Therefore, because Equifax fully apprised PenFed of the nature of Plaintiff's dispute, it was reasonable as a matter of law for Equifax to rely on PenFed's verification of the account details, as other courts have held. *See, e.g.*, *Ghazaryan v. Equifax Info. Servs., LLC*, 740 Fed. App'x 157, 158 (9th Cir. Oct. 18, 2018) ("Equifax's investigation was reasonable as a matter of law. Equifax notified Discover that

---

[3] An ownership dispute – i.e., a dispute that the account does not belong to the consumer (meaning that the CRA has placed it on the wrong consumer's credit file by error) – is a non-frivolous dispute, at least on its face, in almost every circumstance. Here, of course, it was a *false* dispute, as Plaintiff now concedes that the PenFed accounts belonged to him, but this would not necessarily have been apparent to the agent investigating the dispute at the time.

Ghazaryan disputed being late on her credit card payment and stated that Discover representative Jordan 'confirmed . . . that she was never late.' Equifax also passed along the phone number for Jordan that Ghazaryan had provided. Equifax transmitted this information 'in the manner established with' Discover, 15 U.S.C. § 1681i(a)(2)(A), using ACDV, the 'automated system' envisioned by the FCRA, 15 U.S.C. § 1681i(a)(5)(D)."); *accord Jianqing Wu v. Trans Union*, No. 03-cv-1290, 2006 WL 4729755, at *8-9 (D. Md. May 2, 2006) *aff'd* 219 F. App'x 320 (4th Cir. Feb. 27, 2007); *Letren v. Trans Union, LLC*, 2017 WL 445237, at *11-12 (D. Md. Feb. 2, 2017).[4]

Plaintiff's second dispute of the PenFed accounts was, as has been previously noted, so cursory as to not even allege any specific inaccuracy. (*See* Ex. C.)  Even data furnishers, whose reinvestigation obligation arises under a different section of the FCRA, 15 U.S.C. § 1681s-2(b), when faced with such a dispute regarding *their own data*, need conduct only a cursory review. *See Hoffman v. Wells Fargo Bank, N.A.*, 242 F.Supp.3d 372, 393 (E.D. Pa. 2017) ("In order for Wells Fargo to conduct an appropriate investigation into Plaintiff's dispute, Plaintiff needed to provide some clue as to the basis of that dispute. Her failure to do so meant that Wells Fargo's corresponding investigatory responsibility was minimal. On the unique facts of this case, where Plaintiff failed to provide any insight into the nature of her dispute, I find that even a cursory investigation performed by Wells Fargo would pass muster as 'reasonable' for purposes of § 1681s–2(b). Because the parties agree that some level of investigation took place, I find that Plaintiff's claim fails as a matter of law."). Here, there is no doubt that Equifax dutifully contacted PenFed and asked it to check all the account information on the three accounts. (Barber Decl. ¶ 38.)  Under these circumstances, Equifax's reinvestigation was reasonable as a matter of law.

---

[4] Indeed, just last year, this Court analyzed *Jianqing Wu* and *Letren* extensively to grant a CRA's motion for summary judgment. *See Gadson v. Experian Info. Sols., Inc.*, No. 23-cv-00029, 2024 WL 3745476, at *8-11 (D.S.C. Jul. 18, 2024)

III.  **EQUIFAX'S ALLEGED REPORTING OF THE REV FCU ACCOUNT CANNOT SUPPORT ANY OF PLAINTIFF'S CLAIMS BECAUSE EQUIFAX REMOVED THE ACCOUNT AS A RESULT OF PLAINTIFF'S SEPTEMBER 2021 DISPUTE**

In the Fourth Amended Complaint, Plaintiff alleges that, because Equifax removed the REV FCU account from his credit file it "thereby admitt[ed] to the inaccuracy" of the account. (Doc. 291 ¶ 65.)  This is not, in fact, what occurred. Equifax simply deleted the account per a provision of the FCRA, 15 U.S.C. § 1681i(a)(5)(A), because the data furnisher did not respond to Equifax's request for reinvestigation, (*see* Barber Decl. ¶ 29). But not withstanding the reasoning behind Equifax's deletion of the REV FCU account, because it was suppressed from Plaintiff's file by October 24, 2021, (*id.* ¶¶ 29, 35), it necessarily could not have been included in the November 2021, December 2021, and May 2022 consumer reports that Plaintiff alleges Equifax published about him. Accordingly, any 15 U.S.C. § 1681e(b) claim necessarily fails to the extent premised upon allegedly inaccurate reporting of the REV FCU account. *Dalton*, 257 F.3d at 415 ("Thus, a consumer reporting agency violates § 1681e(b) if (1) the *consumer report* contains inaccurate information . . . .").

IV.  **PLAINTIFF HAS NO EVIDENCE REGARDING THE CONTENTS OF THE ALLEGED CONSUMER REPORTS HE CLAIMS EQUIFAX SENT TO THIRD PARTIES, NOR ANY EVIDENCE THAT EQUIFAX FAILED TO FOLLOW REASONABLE PROCEDURES**

Pursuant to 15 U.S.C. § 1681e(b), "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." The FCRA defines a "consumer report" as a "communication of any information by a consumer reporting agency bearing on a consumer's creditworthiness . . . for the purpose of serving as a factor in establishing the consumer's eligibility for credit," insurance, employment or other permissible purposes.

15 U.S.C. § 1681a(d)(1). In other words, publication to a third party for consumer credit eligibility or similar purposes is necessary for there to be a "consumer report." Publication to the consumer himself is insufficient. The FCRA "does not allow suit against the credit agency for creating, possessing, *or revealing to a consumer* credit files containing erroneous information[.]" *Hyde v. Hibernia Nat. Bank*, 861 F.2d 446, 449 (5th Cir. 1988) (emphasis added). Plaintiff has no evidence regarding the contents of the consumer reports allegedly published by Equifax (which does not generally keep copies of the consumer reports it issues), and therefore cannot meet his burden[5] to show that Equifax prepared a consumer report containing inaccurate information. Nor can he meet his burden[6] to show that Equifax acted unreasonably in the preparation of any consumer report, as it is undisputed that Equifax maintains procedures designed to assure the maximum possible accuracy of the information it reports to its subscribers regarding consumers. (Barber Decl. ¶ 13.)

## V.   THE ALLEGED CONSUMER REPORTS THAT PLAINTIFF CLAIMS EQUIFAX SENT TO THIRD PARTIES ALL RELATE TO APPLICATIONS FOR BUSINESS CREDIT, PLACING THEM OUTSIDE OF THE FCRA

Even if Plaintiff could establish that Equifax included inaccurate information in a consumer report (he cannot) and acted unreasonably (he cannot), Equifax would still be entitled to summary judgment on his § 1681e(b) claims because all the credit denials he claims were caused by Equifax's alleged reporting were for *business* credit. (N. Bruce Depo. 232:14-16, 234:10-11, 237:1-3, 238:4-6). The FCRA is a *consumer* protection statute, and it was not intended by Congress to cover credit reporting used for business purposes. In supporting passage of the FCRA, Congresswoman Lenore Sullivan, considered the chief architect of the FCRA, stated:

---

[5] "Plaintiffs have the burden of establishing the inaccuracy with the consumer report; failure to do so is fatal to their FCRA claims." *Martino v. Bank of Am., N.A.*, No. 23-cv-61780, 2024 WL 4297825, at *4 (S.D. Fla. Aug. 19, 2024).

[6] "[I]t is the plaintiff in an FCRA case who must demonstrate that the agency's procedures were not reasonable." *Losch v. Nationstar Mortgage LLC*, 2024 WL 1282459, at *2 (11th Cir. Mar. 26, 2024) (collecting cases).

> The purpose of the fair credit reporting bill is to protect consumers from inaccurate or arbitrary information in a consumer report, which is used as a factor in determining an individual's eligibility for credit, insurance or employment. It does not apply to reports utilized for business, commercial, or professional purposes.

116 Cong.Rec. 36,572 (1970) (Oct. 13, 1970) (remarks of Rep. Sullivan). Indeed, this limitation of the FCRA to consumer credit is expressed in the Congressional findings, which state that "[i]t is the purpose of this title to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for *consumer* credit …." 15 U.S.C. § 1681(b) (emphasis added). Courts have widely held that recovery under the FCRA does not extend an individual's business endeavors, even when their personal credit report is obtained. *See, e.g.*, *Grigoryan v. Experian Info. Sols., Inc.*, 84 F.Supp. 1044, 1083 (C.D. Cal. 2014); *Stich v. BAC Home Loans Servicing*, No. 10-cv-01106, 2011 WL 1135456, at*4 (D. Colo. Mar. 29, 2011); *Yeager v. TRW*, 961 F.Supp. 161, 162 (E.D. Tex. 1997); *Sizemore v. Bambi Leasing*, 360 F.Supp. 252, 255 (N.D. Ga. 1973). Since all the denials alleged by Plaintiff were for business credit, they are not recoverable under the FCRA. Likewise, Plaintiff's alleged emotional distress, which stems solely from the denial of credit for his real estate business, (*see* N. Bruce Depo. 232:24-243:5), is also unrecoverable.

## VI. PLAINTIFF'S STATE LAW DEFAMATION CLAIM FAILS BECAUSE THE INFORMATION ALLEGEDLY PUBLISHED BY EQUIFAX WAS ACCURATE, AND, IN ANY EVENT, IS PRE-EMPTED BY THE FCRA

Plaintiff alleges that Equifax defamed him by publishing the PenFed accounts because it "had substantial evidence by which to have verified that [his] debt was sold, assigned and/or transferred therefore no longer due or owing to the person reporting the accounts [i.e., PenFed]." (Doc. 291 ¶ 142.) However, as set forth above, PenFed has never been compensated by the Federal Reserve, Plaintiff, or anybody else, for the debt Plaintiff owes in connection with the auto loan, the line of credit, or the credit card accounts. (Olson Decl. ¶ 34.) Since "[t]ruth of the matter or substantial truth is a complete defense to a claim for defamation," *Gregg v. Am. Coll. Of Med.*

*Genetics & Genomics*, No. 22-cv-01218, 2023 WL 2047504, at *3 (D.S.C. Feb. 16, 2023), Equifax is entitled to summary judgment on Plaintiff's defamation claim. Even if the truth were somehow in doubt (it is not), Plaintiff has no evidence that Equifax furnished anything to a third party "with malice or willful intent to injure" him, and, therefore, his defamation claim is pre-empted by 15 U.S.C. § 1681h(e). Contrary to Plaintiff's claim that Equifax "had substantial evidence by which to have verified that [his] debt was sold, assigned and/or transferred," as noted above, neither of Plaintiff's disputes to Equifax could possibly have included this claim. Moreover, Equifax *twice* reasonably reinvestigated the PenFed accounts—a far cry from "malice or willful intent to injure."

## VII.    PLAINTIFF'S STATE STATUTORY CLAIM FAILS AS A MATTER OF LAW

Plaintiff's last claim against Equifax is brought under a South Carolina state statute, the South Carolina Financial Identity Fraud And Identity Theft Protection Act. (Doc. 291 ¶ 147 *et seq.*) Specifically, Plaintiff points to § 37-20-170 of the Act, which is a provision that allows a consumer to dispute information on their credit file, *in pari materia* with § 1681i of the FCRA. Thus, Plaintiff's state law claim fails, as a matter of law, for the same reasons his § 1681i claim fails. To the extent the state law might be construed to include reinvestigation obligations beyond those imposed by § 1681i, it is expressly pre-empted by 15 U.S.C. § 1681t(b)(1)(B), which forbids any state regulation "with respect to any subject matter regulated under . . . [§ 1681i] . . . in any procedure related to the disputed accuracy of information in a consumer's file." *See White v. Trans Union*, No. 24-cv-324, 2025 WL 409660, at *3 (E.D. Va. Feb. 5, 2025) (holding that § 1681t(b)(1)(B) applies to "subject matter regulated by FCRA as it pertains to actions taken by a consumer reporting agency related to the disputed accuracy of information in Plaintiffs' file").

## CONCLUSION

Accordingly, Equifax respectfully requests the Court grant summary judgment in its favor.

DATED:  April 11, 2025

Respectfully submitted,

WYCHE, P.A.


By:  */s/ Rita Bolt Barker*
    Rita Bolt Barker (Fed. ID No. 10566)
    200 East Broad Street, Suite 400
    Greenville, South Carolina 29601
    Telephone: (864) 242-8235
    Facsimile:  (864) 235-8900
    E-mail:  rbarker@wyche.com

*Counsel for Defendant*
*Equifax Information Services LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 11, 2025, I presented the foregoing MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.   A copy has also been sent via U.S. Mail to the following:

> Nelson L. Bruce *(plaintiff pro se)*
> c/o P.O. Box 3345
> Summerville, South Carolina  29484
> Telephone:  (843) 437-7901
> Email:  leonbruce81@yahoo.com

> */s/ Rita Bolt Barker*
> Rita Bolt Barker
> ***Counsel for Defendant***
> ***Equifax Information Services LLC***

316183095v.1