# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | |
|---|---|
| Nelson L. Bruce, | ) |
|           Plaintiff, | ) |
|     v. | ) CASE NO.: 2:22-cv-02211-BHH-MGB |
| Pentagon Federal Credit Union; *et al.* | ) |
|           Defendants. | ) |

## PENTAGON FEDERAL CREDIT UNION'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Dated: April 11, 2025

**PENTAGON FEDERAL CREDIT UNION**

*/s/ G. Troy Thames*
G. Troy Thames (Federal ID No.: 07713)
WILLSON JONES CARTER & BAXLEY, P.A.
4922 O'Hear Avenue, Suite 301
North Charleston, SC 29405
Telephone: (843) 284-0832
Facsimile: (843) 606-3300
Email: tthames@wjcblaw.com

Michael A. Graziano (*pro hac vice*)
Sarah A. James (*pro hac vice*)
ECKERT SEAMANS CHERIN & MELLOTT, LLC
1717 Pennsylvania Avenue, N.W., Suite 1200
Washington, D.C. 20006
Telephone: 202.659.6671
Facsimile: 202.659.6699
E-mail: mgraziano@eckertseamans.com
        sjames@eckertseamans.com

*Attorneys for Pentagon Federal Credit Union*

i

## TABLE OF CONTENTS

I.   SUMMARY OF THE NATURE OF THE CASE ................................................................1

II.  STATEMENT OF MATERIAL FACTS NOT IN DISPUTE ............................................2

III. STANDARD OF REVIEW...................................................................................................8

IV.  ARGUMENT .........................................................................................................................9

    A.   Bruce's FCRA Claim Fails ..........................................................................................9

    B.   Bruce's Defamation Claim Fails ................................................................................11

    C.   The Court Should Dismiss Bruce's Section 36-9-210 Claim .....................................12

# TABLE OF AUTHORITIES

**Cases**

*Alston v. United Collections Bureau, Inc.*, No. CIV.A. DKC 13-0913, 2014 WL 859013 (D. Md. Mar. 4, 2014) .................................................................................................................. 10

*Alvarez v. Smith*, 558 U.S. 87 (2009) ........................................................................................ 13

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................ 8

*Beattie v. Nations Credit Fin. Servs. Corp.*, 69 Fed. App'x. 585 (4th Cir. 2003) ...................... 11

*Beckham v. Sun News*, 344 S.E.2d 603 (S.C. 1986) .................................................................. 11

*Bruce v. Pentagon Fed. Credit Union*, No. 2:17-CV-2170-BHH, 2018 WL 4476129, at *2 (D.S.C. Sept. 19, 2018), *aff'd*, 765 F. App'x 30 (4th Cir. 2019) .......................................... 5

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................................... 8

*Edeh v. Midland Credit Management, Inc.*, 413 F. App'x 925 (8th Cir. 2011) ......................... 10

*Fountain v. First Reliance Bank*, 730 S.E.2d 305 (S.C. 2012) .................................................. 11

*Johnson v. MBNA Am Bank, NA*, 357 F.3d 426 (4th Cir. 2004) ................................................ 10

*Murray v. Holnam, Inc.*, 542 S.E.2d 743 (S.C. 2001) ............................................................... 11

*Parrish v. Allison*, 656 S.E.2d 382 (S.C. Ct. App. 2007) .......................................................... 11

*Rezene v. Hornan*, No. 2:14CV514, 2015 WL 4069491 (E.D. Va. July 2, 2015) .................... 13

*Roberts v. Carter-Young, Inc.*, 131 F.4th 241 (4th Cir. 2025) .................................................... 9

*Ross v. F.D.I.C.*, 625 F.3d 808 (4th Cir. 2010) ......................................................................... 11

*Saunders v. Branch Banking & Tr. Co. of VA*, 526 F.3d 142 (4th Cir. 2008) ............................. 9

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ............................................................................ 13

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ................................................................... 13

*Westra v. Credit Control of Pinellas*, 409 F.3d 825 (7th Cir. 2005) ........................................ 10

**Statutes**

15 U.S.C. § 1681h(e) ..................................................................................................................... 11

15 U.S.C. § 1681s-2(a) ................................................................................................................... 9

15 U.S.C. § 1681s-2(b) ................................................................................................................... 9

28 U.S.C. 1367(c)(3) ..................................................................................................................... 13

S.C. Code Ann. § 36-9-102(A)(4) ................................................................................................ 12

S.C. Code Ann. § 36-9-102(A)(7) ................................................................................................ 12

S.C. Code Ann. § 36-9-625(f) ................................................................................................ 12, 13

**Rules**

Fed. R. Civ. P. 56(c) ....................................................................................................................... 8

## I.　SUMMARY OF THE NATURE OF THE CASE

Nelson Bruce borrowed substantial sums from Pentagon Federal Credit Union ("PenFed") and then passed fake money orders and other phony financial instruments, and filed a frivolous lawsuit, to avoid repaying his debts. When those schemes did not work, Bruce falsely claimed his debts were actually settled based on a fantastical theory that the government hands out free money to financial institutions every time they issue a loan to a consumer. Bruce now seeks to extract even more money from PenFed via a second frivolous lawsuit. Incredibly, Bruce alleges that PenFed violated federal and state law by simply reporting the truth to credit reporting agencies ("CRAs"), *i.e.*, the fact that Bruce did not repay the money he borrowed from PenFed.

Bruce's active pleading is the fourth amended complaint he filed on September 26, 2024 [ECF 291] ("the complaint"). The complaint asserts three claims against PenFed. (4th Am. Compl. [ECF 291] at ¶¶ 122-146 & 155-159.) First, Bruce claims PenFed violated the Fair Credit Reporting Act ("FCRA") by furnishing supposedly inaccurate information to the CRAs, and not modifying its reporting after receiving disputes. (*Id*. at ¶¶ 122-137.) Second, Bruce asserts a defamation claim based on the same factual predicate as his FCRA claim. (*Id*. at ¶¶ 138-146.) Third, Bruce alleges that PenFed violated the South Carolina Commercial Code by not providing an "accounting" under S.C. Code Ann. § 36-9-210 ("Section 36-9-210"). (*Id*. at ¶¶ 155-159.)

As explained in detail below, Bruce's FCRA and defamation claims fail for the simple reason that the information PenFed reported to the CRAs was accurate. Bruce claims PenFed should not have reported the relevant accounts to the CRAs because PenFed supposedly sold the accounts. Unrebutted evidence proves otherwise: PenFed owned the accounts at all relevant times.

Bruce's Section 36-9-10 claim fails because PenFed had reasonable cause to believe that Bruce's request for an accounting was not serious based on his prior bad faith conduct. Either way, if the Court dismisses Bruce's other claims, it will lack jurisdiction over the Section 36-9-10 claim.

1

## II. STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

### Bruce's Personal Line of Credit

1. Bruce became a member and opened an account with PenFed in February 2016. (Signature Card, Ex. A-1.)

2. In early 2016, Bruce opened a personal line of credit with an account number ending in 6770 ("the PLOC"). (Account Statements, Ex. A-5; Bruce Dep., Ex. C at 33:16-18.)

3. Bruce took advances on the PLOC from June 1, 2016, through December 5, 2016. (Account Statements, Ex. A-5; Bruce Dep., Ex. C at 35:9-19.)

4. Bruce initially made payments on the PLOC, but he ceased making any payments by the end of 2016 when the PLOC had an unpaid balance exceeding $4,000.00. (Account Statements, Ex A-5; Bruce Dep., Ex. C at 35:24-36:5.)

5. On September 27, 2017, PenFed transferred $5.01 from Bruce's deposit account to the PLOC and charged off the unpaid balance of the PLOC. (Account Statements, Ex. A-5.)

6. PenFed never sold, assigned, or transferred its ownership rights, and PenFed was the sole owner of the PLOC at all relevant times. (2d Olson Decl., Ex. B at ¶¶ 9-10.)

### Bruce's Credit Card Account

7. In early 2016, Bruce opened a credit card account with PenFed ending in account number 1336 ("the credit card"). (Credit Card Auth., Ex. A-4; Bruce Dep., Ex. C at 41:12-18.)

8. Bruce transferred balances from other accounts to the credit card account and made purchases using the credit card account from February 25 to November 14, 2016. (Credit Card Statements, Ex. A-6; *See* Bruce Dep., Ex. C at 42:4-11.)

9. Bruce initially made payments on the credit card account, but he ceased making any payments by the end of 2016 when the credit card account had an unpaid balance exceeding $13,000.00. (Credit Card Statements, Ex. A-6; Bruce Dep., Ex. C at 42:12-43:9.)

10. PenFed charged off the unpaid balance and interest on the credit card account on July 27, 2017. (Credit Card Statements, Ex. A-6.)

11. PenFed never sold, assigned, or transferred its ownership rights, and PenFed was the sole owner of the credit card account at all relevant times. (2d Olson Decl., Ex. B at ¶¶ 9-10.)

<u>Bruce's Vehicle Loan</u>

12. In April 2016, Bruce signed a promissory note with a security agreement establishing an account (ending in 3812) to finance Bruce's purchase of a BMW ("the vehicle loan"). (Promissory Note, Ex. A-2; Bruce Dep., Ex. C at 19:21-:20-11.)

13. PenFed issued a cashier's check payable in the amount of $33,478.00 to Chapman BMW to fund Bruce's vehicle loan. (*Id*., Ex. at ¶ 12; Vehicle Loan Check, Ex. A-3.)

14. Bruce endorsed, and Chapman BMW cashed, the check PenFed issued to fund the vehicle loan, resulting in a $33,478.00 debit from PenFed's account with the Federal Reserve Bank through which the check was negotiated. (*Id*.; *see also* 2d Olson Decl., Ex. B at ¶¶ 22-34.)

15. Bruce initially made a few small payments on the vehicle loan, but he ceased making any payments by the end of 2016 when the unpaid balance exceeded $30,000.00. (1st Olson Decl., Ex. A at ¶ 14; Account Statements, Ex. A-5; Bruce Dep., Ex. C at 24:8-26:21.)

16. PenFed never sold, assigned, or transferred its ownership rights, and PenFed was the sole owner of the vehicle loan account at all relevant times. (2d Olson Decl., Ex. B at ¶¶ 9-10.)

<u>Bruce's Attempts to Avoid Paying His Debts</u>

17. On July 9, 2016, Bruce sent documents to PenFed that purported to unilaterally modify the terms of the vehicle loan by reducing the amount of Bruce's monthly payments and the total amount due during the term of the vehicle loan, but which also appeared to suggest that the

act of providing the documents in and of itself satisfied Bruce's obligation to repay the vehicle loan. (7/9/2016 Documents, Ex. A-7.)

18. On July 22, 2016, PenFed sent a letter to Bruce returning the documents he had sent on July 9, 2016, and explaining that they were "not sufficient to serve as payment for the account" and that Bruce was "responsible for making payment in United States Dollars in accordance with the terms and conditions of the promissory note and security agreement which you agreed to for this account." (7/22/2016 Letter, Ex. A-8.)

19. On May 9, 2017, Bruce sent three documents to PenFed that purported to be "MONEY ORDER[S]" to pay off the PLOC, the credit card account, and the vehicle loan. (Phony Money Orders, Ex. A-10.)

20. The so-called money orders that Bruce sent on May 9, 2017, were not issued by a legitimate financial institution; instead, they purported to be issued by "The Nelson Bruce Estate a foreign state[.]" (*Id.*)

21. On June 3, 2017, Bruce sent an email to PenFed claiming that the so-called money orders could be "processed through my private treasury direct account setup with the U.S. Treasury." (*Id.*)

22. Bruce's representation that he had an account with the U.S. Treasury with sufficient funds to satisfy the money orders was false. (*See id.*)

23. PenFed sent a letter to Bruce explaining that the so-called money orders were "not an acceptable form of payment to satisfy the subject obligations to PenFed and [were] being returned to [Bruce]." (Dorn Letter re Money Orders, Ex. A-11.)

### Bruce's First Frivolous Lawsuit Against PenFed

24. On August 15, 2017, Bruce filed a complaint against PenFed in this Court falsely alleging that PenFed "at no time loaned plaintiff legal tender or other 'depositors' money in the amount of ($33,478.00)." (Prior Compl., Ex. D at ¶ 18; Prior Am. Compl., Ex. E at ¶ 18.)

25. This Court dismissed Bruce's prior lawsuit, and in doing so found "it is clear from Plaintiff's own allegations that some sort of lending agreement necessarily existed prior to June 17 of 2016." *Bruce v. Pentagon Fed. Credit Union*, No. 2:17-CV-2170-BHH, 2018 WL 4476129, at *2 (D.S.C. Sept. 19, 2018), *aff'd*, 765 F. App'x 30 (4th Cir. 2019).

### Bruce's Attempts to Extract Additional Money from PenFed

26. On January 28, 2021, Bruce sent an affidavit to PenFed claiming that the phony financial instruments he had sent created "new credits in my account that resulted in a bank asset a liability (funds owed to me) per GAAP." (Pl.'s Ex. A [ECF 1-2] at 23-28.)[1]

27. PenFed responded to Bruce's January 28, 2021, correspondence on February 8, 2021, and explained that PenFed had previously investigated Bruce's disputes, determined that they were frivolous, and provided evidence establishing that the relevant accounts "are legally established debts for which [Bruce] [was] liable to repay." (Pl.'s Ex. C [ECF 1-4] at 2.)

28. On March 12, 2021, Bruce sent a document to PenFed titled "Notice of Fault in Dishonor" that threatened to file a second lawsuit if PenFed did not pay Bruce $100,009.92. (Pl.'s Ex. A ECF [1-2] at 30-31.)

---

[1] This memorandum refers to exhibits Bruce previously filed as "Pl.'s Ex." followed by the letter that Bruce assigned to the exhibit and the docket entry number. For the court's convenience, excerpts from the relevant portions of Bruce's exhibits are attached to this memorandum behind the new exhibits PenFed is filing.

Bruce's "Request for an Accounting"

29. Bruce sent another letter to PenFed on April 4, 2022, referencing the relevant accounts. (Pl.'s Ex. A [ECF 1-2] at 53-55.)

30. Despite the Court's prior holding, affirmed on appeal, that Bruce had entered into a lending agreement with PenFed, Bruce's letter dated April 4, 2022, states that Bruce was "hereby disputing the alleged debts[.]" (*Id.*)

31. The April 4, 2022, letter also states that Bruce disputed "all alleged balances" but that, "If I Owe Anything, It Is Possibly $10[.00], And I Am Willing To Settle The Account For That Amount Without Admitting Any Liability, Ownership Of The Debt, and/or Fault Concerning This Alleged Debt." (*Id.*)

32. In addition to disputing the debts and offering to settle for $10.00, the April 4, 2022, letter requested "an authenticated record of accounting" under the Uniform Commercial Code as well as tax filings and other information and documents. (*Id.*)

33. PenFed responded on April 11, 2022. (Pl.'s Ex. C [ECF 1-4] at 3.)

34. The April 11, 2022, letter noted that PenFed "promptly responded to prior correspondence multiple times" and "provided evidence substantiating the obligations." (*Id.*)

35. The letter responded to Bruce's request for tax documents by confirming that "PenFed has not filed any IRS forms for any of the aforementioned obligations." (*Id.*)

36. The letter explained to Bruce that the relevant accounts "are now charged off." (*Id.*)

37. The letter indicated that the credit card account "has been sold to UHG[,]" which stands for United Holdings Group, LLC. (*Id.*)

38. PenFed had planned to sell the credit card account to UHG, but the sale was never completed, and PenFed retained its ownership rights. (2d Olson Decl., Ex. B at ¶ 13.)

39. In general, when a loan account becomes the subject of a lawsuit, PenFed's routine practice is to refrain from selling the loan account while the lawsuit is pending. (*Id*. at ¶ 14.)

40. Bruce filed the original complaint in this case on July 17, 2022, meaning that PenFed's general practice required it to refrain from selling the credit card account from that date until the present. (*Id*.; *see also* Compl. [ECF 1].)

41. The April 11, 2022, letter also indicated that PenFed had "assigned" the PLOC to Nationwide Credit Corporation ("NCC"). (Pl.'s Ex. C [ECF 1-4] at 3.)

42. NCC is a debt collection agency that specializes in recovering past-due accounts for others. (2d Olson Decl., Ex. B at ¶ 18.)

43. PenFed "assigned" the PLOC to NCC so that NCC could collect the past due debt on behalf of PenFed. (*Id*. at ¶ 19.)

44. Although PenFed "assigned" NCC as the debt collector for the PLOC, PenFed did not assign its ownership rights with respect to the PLOC to NCC. (*Id*. at ¶ 20.)

45. PenFed's letter dated April 11, 2022, urged Bruce to contact PenFed about the status of the vehicle loan. (Pl.'s Ex. C [ECF 1-4] at 3.)

### Bruce's Credit Reporting Disputes

46. Bruce alleges that he sent letters to Equifax Information Services, LLC ("Equifax") Experian Information Solutions, Inc. ("Experian") in September 2021 disputing information in his credit reports about his PenFed accounts. (4th Am. Compl. [ECF 291] at ¶¶ 51-53.)

47. Bruce also alleges that he sent letters to Equifax, Experian, and TransUnion on June 17, 2022, disputing information in his credit reports about his PenFed accounts. (*Id*. at ¶ 54.)

48. The complaint describes the specific information Bruce claims is inaccurate as follows:

7

> Defendants knew or has reasonable cause to believe that the information is inaccurate as it is clear that by their own words, their internal record document the accounts was sold, assigned and/or transferred to a debt buyer and/or external collections in this case United Holding Group and National Credit Corporation. …
>
> …
>
> PENFED allegedly verified the Plaintiff's accounts that are no longer an asset of the PENFED, no longer existed, no longer had authority over as a result of a sale, assignment and/or transfer to Trans Union, Equifax and Experian in response to each dispute it received from the credit bureaus.

(*Id.* at ¶¶ 130-132, 142-143.)

## III. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of identifying those portions of the record that it believes illustrates the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party meets this burden, the opposing party must establish specific, affirmative evidence in the record creating a genuine issue of material fact and cannot rely on mere allegations, conclusory or vague statements, or general denials in the pleadings. See *Celotex*, 477 U.S. at 324.

## IV.     ARGUMENT

### A.     Bruce's FCRA Claim Fails.

The obligations of a "furnisher" of information fall into two categories that are addressed in separate sections of the FCRA. First, § 1681s-2(a) requires furnishers to provide accurate information to CRAs. Second, § 1681s-2(b) requires furnishers to investigate consumer disputes received through the CRAs and take appropriate measures to correct any inaccuracies. The FCRA "explicitly bars private suits for violations of § 1681s-2(a)[.]" *Saunders v. Branch Banking & Tr. Co. of VA*, 526 F.3d 142, 149 (4th Cir. 2008). Accordingly, a plaintiff in a civil action is limited to asserting a claim for violations of the duties under § 1681s-2(b), which are triggered upon receipt of a dispute from a CRA. *Saunders*, 526 F.3d at 149.

To prevail on a claim under § 1681s-2(b), a plaintiff must prove three elements: "(1) the plaintiff submitted a dispute over the accuracy of information on a credit report to a consumer reporting agency; (2) the agency notified the furnisher of that dispute; and (3) the furnisher failed to conduct a reasonable investigation to determine whether the disputed information can be verified." *Roberts v. Carter-Young, Inc.*, 131 F.4th 241, 249 (4th Cir. 2025) (quotation omitted). "An essential element of a claim that a furnisher has violated its duty to investigate indirect disputes of information in a consumer's credit report is that the information in question was actually inaccurate or incomplete." *Id.* at 252. Furthermore, the inaccuracy or incompleteness must be "objectively and readily verifiable." *Id.*

Bruce cannot satisfy his burden of proof as to the essential elements of his FCRA claim against PenFed because it is undisputed that the information in question was accurate. The gravamen of Bruce's complaint is that his PenFed accounts did not have unpaid balances because the accounts were "sold, assigned and/or transferred therefore no longer due or owing to [PenFed]." (4th Am. Compl. [ECF 291] at ¶¶ 130-132, 142-143.) Bruce focused on the same issue

9

in response to an interrogatory that asked him to list "each and every item of information" about which he believed PenFed furnished inaccurate information to a CRA during the five years preceding this case. (Pl.'s Interrog. Answers, Ex. F at Interrog. No. 3.) It is indisputable, however, that PenFed never sold the accounts, and retained its ownership rights at all relevant times. (2d Olson Decl., Ex. B at ¶¶ 9-10, 13-14, 18-20.) In fact, the Court has already found that "'PenFed has never sold, assigned, or transferred its ownership rights with respect to any of the accounts' at issue in this action." (3/5/2025 Order [ECF 395] at 3 (quoting Dkt. No. 345-1 at 3).)

Moreover, Bruce cannot prove that PenFed received and failed to investigate a qualifying dispute from a CRA related to the ownership of the accounts at issue. The Court has already held that the letters Bruce sent to certain CRAs on May 3 and June 17, 2022, did not trigger a duty to investigate under the FCRA. (9/25/2023 Report & Recommendation [ECF 131] at 10-12; 3/20/2024 Order [ECF 154] at 14.) The only other disputes that Bruce points to are the letters he sent to Experian and Equifax in September 2021. Bruce's reliance on those letters also fails.

A "furnisher of information need investigate only what is contained in the CRA's dispute notice as to the nature of the dispute." *Edeh v. Midland Credit Management, Inc.*, 413 F. App'x 925, 926 (8th Cir. 2011); *Alston v. United Collections Bureau, Inc.*, No. CIV.A. DKC 13-0913, 2014 WL 859013, at *8 (D. Md. Mar. 4, 2014) (citing *Johnson v. MBNA Am Bank, NA*, 357 F.3d 426, 431 (4th Cir. 2004)); *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005) (furnisher's investigation was "reasonable given the scant information it received regarding the nature of [the consumer's] dispute").

The September 2021 letters could not have triggered a duty to investigate whether any of the relevant accounts had been sold because the letters did not mention that issue. (Pl.'s Ex. A [ECF 1-2] at 2-6, 36-39.) That omission is not surprising because the only evidence Bruce has ever cited

in support of his contention that PenFed sold the loans is a letter that PenFed did not send until April 11, 2022—which was more than six months *after* Bruce sent the dispute letters in September 2021. (Pl.'s Ex. C [ECF 1-4] at 3.) Setting aside the fact that PenFed never followed through with selling the relevant account, Bruce could not possibly have raised the issue six months before he knew about it. (*See id*.) As such, the earlier disputes that Bruce raised in September 2021 did not trigger a duty for anybody to investigate whether PenFed had sold the accounts.

### B. Bruce's Defamation Claim Fails.

As the Court has already held, Bruce's defamation claim is "preempted by the FCRA absent an allegation of malice or willful intent to injure Plaintiff." (9/25/2023 Order [ECF 131] at 19 (citing 15 U.S.C. § 1681h(e) ("[N]o consumer may bring any action or proceeding in the nature of defamation . . . with respect to the reporting of information . . . except as to false information furnished with malice or willful intent to injure such consumer."); *Ross v. F.D.I.C.*, 625 F.3d 808, 814 (4th Cir. 2010)).) Under South Carolina law, "'[m]alice' is established only if 'the defendant acted with ill will toward the plaintiff or acted recklessly or wantonly, meaning with conscious indifference toward the plaintiff's rights.'" *Beattie v. Nations Credit Fin. Servs. Corp.*, 69 Fed. App'x. 585 (4th Cir. 2003) (citing *Murray v. Holnam, Inc.*, 542 S.E.2d 743, 750 (S.C. 2001)).

Bruce's defamation claim fails because he cannot satisfy his burden of proving that PenFed acted with ill will or with conscious indifference toward his rights. Bruce did not adduce one iota of evidence during discovery that could give rise to an inference of actual malice.

Moreover, truth is a complete defense to a claim of defamation. *Fountain v. First Reliance Bank*, 730 S.E.2d 305, 310 (S.C. 2012); *Parrish v. Allison*, 656 S.E.2d 382, 391 (S.C. Ct. App. 2007); *Beckham v. Sun News*, 344 S.E.2d 603, 604 (S.C. 1986). Bruce cannot prevail because his defamation claim is premised on the same incorrect assumption as his FCRA claim, *i.e.*, that the relevant accounts "are no longer an asset of the PENFED[.]" (4th Am. Compl. [ECF 291] at ¶¶

11

130-132, 142-143.) Since PenFed retained ownership of the accounts at all relevant times, publishing that fact to the CRAs was not defamatory as a matter of law.

### C.   The Court Should Dismiss Bruce's Section 36-9-210 Claim.

Bruce claims that PenFed violated Section 36-9-210 by not providing an authenticated record of accounting in response to Bruce's letter dated April 4, 2022. (4th Am. Compl. [ECF 291] at ¶¶ 155-159.) A debtor can recover damages and $500.00 for noncompliance, but only if the secured party acted "without reasonable cause[.]" S.C. Code Ann. § 36-9-625(f).

An "accounting" is defined as "a record: (A) authenticated by a secured party; (B) indicating the aggregate unpaid secured obligations as of a date not more than thirty-five days earlier or thirty-five days later than the date of the record; and (C) identifying the components of the obligations in reasonable detail." S.C. Code Ann. § 36-9-102(A)(4). "'Authenticate' means: (A) to sign; or (B) with present intent to adopt or accept a record, to attach to or logically associate with the record an electronic sound, symbol, or process." S.C. Code Ann. § 36-9-102(A)(7).

PenFed acknowledges that the letter it sent on April 11, 2022, in response to Bruce's letter dated April 4, 2022, may not have technically complied with Section 36-9-210 because it did not state "the aggregate unpaid secured obligation" associated with the vehicle loan. That said, however, PenFed had "reasonable cause" to believe that Bruce was not making a serious request for that information based on the prior history between the parties.

As demonstrated above, PenFed repeatedly tried to collect the unpaid balance on the vehicle loan, but Bruce responded by passing fake money orders and other phony financial instruments, filing a frivolous lawsuit that this Court dismissed, and then falsely claiming that it was PenFed who owed Bruce money. Moreover, the April 4, 2022, letter itself indicated that Bruce was "disputing the alleged debts" and offered to settle for $10.00. (Pl.'s Ex. A [ECF 1-2] at 53-55.) Under the circumstances, it was eminently reasonable for PenFed to believe that Bruce was

12

not seriously requesting the aggregate balance of the vehicle loan account. In any event, PenFed's response "urge[d]" Bruce to call PenFed to confirm the status of the loan. (Pl.'s Ex. C [ECF 1-4] at 3.) If Bruce actually wanted to know the balance, all he had to do was call.

Alternatively, if the Court finds that summary judgment is warranted as to Bruce's FCRA and defamation claims but not his Section 36-9-210 claim, then the Court should dismiss the Section 36-9-210 claim on jurisdictional grounds. Dismissal based on jurisdiction is appropriate for two independent reasons.

First, a plaintiff must have standing "throughout all stages of the litigation in order for a federal court to maintain jurisdiction." *Rezene v. Hornan*, No. 2:14CV514, 2015 WL 4069491, at *2 (E.D. Va. July 2, 2015) (citing *Alvarez v. Smith*, 558 U.S. 87, 92 (2009)). Bruce, however, does not have standing to pursue a standalone claim under Section 36-9-210 because he cannot prove that he suffered any concrete harm. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 440 (2021). "'[B]are procedural violation[s]" of a statute, "divorced from any concrete harm[,]'" are not actionable in federal court. *Id*. (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). Bruce cannot point to a single shred of evidence suggesting that a technical violation of Section 36-9-210 caused any harm to him whatsoever.

Second, a federal court can decline to exercise supplemental jurisdiction over state law claims that do not meet the amount-in-controversy requirement for diversity jurisdiction when "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. 1367(c)(3). Even if the $500.00 statutory penalty available under S.C. Code Ann. § 36-9-625(f) could establish standing, which it cannot, the Court should decline to exercise supplemental jurisdiction over such a *de minimis* dispute arising under state law.

Dated: April 11, 2025.

Respectfully submitted,

**PENTAGON FEDERAL CREDIT UNION**

*/s/ G. Troy Thames*
G. Troy Thames (Federal ID No.: 07713)
WILLSON JONES CARTER & BAXLEY, P.A.
4922 O'Hear Avenue, Suite 301
North Charleston, SC 29405
Telephone: (843) 284-0832
Facsimile: (843) 606-3300
Email: tthames@wjcblaw.com

Michael A. Graziano (*pro hac vice*)
Sarah A. James (*pro hac vice*)
ECKERT SEAMANS CHERIN & MELLOTT, LLC
1717 Pennsylvania Avenue, N.W., Suite 1200
Wahington, D.C. 20006
Telephone: 202.659.6671
Facsimile: 202.659.6699
E-mail: mgraziano@eckertseamans.com
           sjames@eckertseamans.com

*Attorneys for Pentagon Federal Credit Union*

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of April, 2025, I served the foregoing via e-mail and first class mail on:

>Nelson L. Bruce
>P.O. Box 3345
>Summerville, SC 29484
>*Pro Se Plaintiff*

>*/s/G. Troy Thames*