# EXHIBIT B

## Declaration of Wilbur Johnson

**Nelson L. Bruce**
**v.**
**Pentagon Federal Credit Union, et al.**

**Case No.:  2:22-cv-2211-BHH-MGB**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

NELSON L. BRUCE,                                    )
                                                   )
                    Plaintiff,                     )
                                                   )
v.                                                 )        Case No.: 2:22-cv-02211-BHH-MGB
                                                   )
PENTAGON FEDERAL CREDIT UNION,                     )
("PENFED), et al.,                                 )
                                                   )
                    Defendants.                    )

**DECLARATION OF WILBUR E. JOHNSON IN SUPPORT OF**
**DEFENDANT TRANS UNION LLC'S MOTION FOR SUMMARY JUDGMENT**

I, Wilbur E. Johnson, am over eighteen (18) years of age, am of sound mind, and I am fully competent to make this Declaration.  The statements contained herein are based on my personal knowledge and are true and correct.  Accordingly, under penalty of perjury, I declare, and state as follows:

1.      I am an attorney at the law firm of Clement Rivers, LLP, located at 25 Calhoun Street, Suite 400, Charleston, South Carolina 29401.  I am an attorney representing Defendant Trans Union LLC ("Trans Union") in the above-referenced and numbered cause (the "Lawsuit").:

2.      I have personal knowledge of the facts stated herein based upon my experience with this Lawsuit. I submit this declaration in support of Trans Union's Motion for Summary Judgment in the above-captioned matter.  The facts set forth herein are based upon my personal knowledge, and information available to me in the above-mentioned capacities; and if I were called upon to testify to them, I could and would competently do so.

3.      A true and correct copy of the transcript (relevant excerpts; 21:20-24 – 287:15-20) of the deposition of Plaintiff Nelson L. Bruce, dated June 10, 2024, are attached hereto as **Exhibit B-1**.

4.     A true and correct copy of Plaintiff's Second Supplemental Responses to Trans Union's First Set of Interrogatories (relevant excerpts) are attached hereto as **Exhibit B-2**.

5.     A true and correct copy of Plaintiff's Initial Disclosures (relevant excerpts) are attached hereto as **Exhibit B-3**.

6.     A true and correct copy of the Confidential Settlement and Release Agreement is attached hereto as **Exhibit B-4**.

7.     Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of April 2025, at Charleston, South Carolina.


*s/ Wilbur E. Johnson*
_____
**WILBUR E. JOHNSON**

# EXHIBIT B-1

Page 1

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF SOUTH CAROLINA
2                  CHARLESTON DIVISION
                       - - -
3

   NELSON L. BRUCE,          :
4                            :
              Plaintiff,   :
5                            :
        vs.                  :
6                            :
   REV FEDERAL CREDIT        :
7  UNION, TRANS UNION,       :
   LLC, et al.,              :
8                            :
              Defendants.  : NO. 2:22-cv-01292-BHH-MGB
9

                       - - -
10

                  MONDAY, JUNE 10, 2024
11

                       - - -
12
13         Oral deposition of NELSON L. BRUCE,
   taken remotely via Zoom, at South Carolina,
14 commencing at 10:00 a.m., by Kimberly A. Rue,
   a Registered Professional Reporter, New Jersey
15 Certified Court Reporter (Certificate No.
   30X100223500), and Notary Public.
16
17
18
19
20
21
22                     - - -
23         VERITEXT LEGAL SOLUTIONS
              MID-ATLANTIC DIVISION
24

Page 21

1          Q.      Does this look like your
2     signature at the bottom?
3          A.      I can't tell.
4          Q.      Okay.  Do you usually write "No
5     Protest" at the bottom of your signature?
6          A.      That looks like similar to what
7     I wrote.
8          Q.      Okay.  When you typically sign
9     your name do you write UCC 3-402(b)?
10          A.      I do.
11          Q.      When you typically write your
12     signature do you write "No Protest" somewhere
13     around your signature?
14          A.      It depends on the document yes,
15     I do.
16          Q.      So a document like this, a
17     promissory note, would you write "No Protest"
18     on something like this?
19          A.      Yes.
20          Q.      Okay.  Great.  Can you tell me
21     what this document appears to be?
22          A.      Some promissory note.
23          Q.      For a purchase of BMW 7 series,
24     correct?

Page 22

1          A.     I believe.  I don't know.

2          Q.     Do you own a BMW 7 series?

3          A.     Yes.

4          Q.     Okay.  And do you recall when

5    you purchased this vehicle?

6          A.     I see a date that says 2016, so

7    I am assuming around that time.

8          Q.     So you would agree that it was

9    around April of 2016?

10          A.     Yes.

11          Q.     Okay.  So your loan to purchase

12    this vehicle was with Pentagon Federal Credit

13    Union, correct?

14          A.     Correct.

15          Q.     Do you see the account numbers

16    ends in 3-81-2, correct?

17          A.     Yes.

18          Q.     And the amount financed on this

19    loan is $33,478, correct?

20          A.     Based on what I am seeing,

21    correct.

22          Q.     Okay.  It might be a little

23    difficult to read, but I am going to zoom in.

24    Let me know if you cannot see it.  Do you see

Page 23

1    right here where it says, "I promise to pay

2    Pentagon Federal Credit Union or holder the

3    amount financed stated above on the terms and

4    at the rate stated," correct?

5            A.    Based on what I am reading,

6    yes.

7            Q.    Okay.  And right below it says,

8    "Repayment.  I will make payments to you as

9    stated above which will include the amount you

10   loan to me, finance charge, and insurance if

11   applicable until the full amount has been

12   paid," correct?

13           A.    Based on what I am looking at,

14   that's what it says.

15           Q.    Okay.  And on Page 2, on the

16   second page under default and repossession, it

17   says, "I will be in default if I do not make a

18   payment when due," correct?

19           A.    That's what it says, yep.

20           Q.    Can you tell me, what does that

21   mean to you?

22           A.    I guess you would be in default

23   if you don't make a payment.

24           Q.    Okay.  When due, correct?

Page 24

1          A.      Correct.

2          Q.      Okay.  Then the last section I

3    want to bring to your attention is right here,

4    taking possession of the collateral, "If I am

5    in default you can take the collateral."  Did

6    I read that correctly?

7          A.      That's what it says.

8          Q.      Okay.  Did you make any

9    payments on this vehicle loan?

10         A.      I believe there was multiple

11   payments.

12         Q.      At some point did you stop

13   making payments on this vehicle loan?

14         A.      Yes.

15         Q.      Why did you stop making

16   payments on this account?

17         A.      Because they were already in

18   possession of the payment.

19         Q.      What payment?

20         A.      The payment, this note, or the

21   original note, wherever the original note is

22   at.

23         Q.      Did you pay to Pentagon Federal

24   $33,478?

Page 25

1          A.     That needs to be determined
2     based on their financials.  I don't have a
3     copy of their financials, so I can't answer
4     that.
5          Q.     Well, you just referenced a
6     payment, or the payment, right?
7          A.     Yes.
8          Q.     So how much was the payment in
9     the amount of?
10          A.     The promissory note is the
11     payment according to the law.
12          Q.     What law?
13          A.     The Federal Reserve Act.  It's
14     in the Complaint.
15          Q.     So you're saying that the
16     Federal Reserve Act -- can you summarize that
17     for me, actually?
18          A.     The Federal Reserve Act?
19          Q.     Or the law and how the law
20     allows the promissory note to act as payment.
21          A.     So according to the Federal
22     Reserve Act, the Federal Reserve Act says that
23     notes are considered payment and they are
24     backed by Federal Reserve Notes.  So if I gave

Page 26

```
 1   the bank a promissory note, they can deposit
 2   that and get Federal Reserve notes, which is
 3   what I believe that they did.
 4            Q.      Let me know if I have this
 5   incorrect.  So you are saying that because you
 6   signed this document the Federal Reserve Act
 7   is supposed to give PenFed money on your
 8   behalf and pay for you to own this BMW?
 9            A.      The law says it's issued to the
10   banks, so I need a copy of the bank's
11   financials to prove that information, but the
12   law says what it says.
13            Q.      Okay.  So when you signed this
14   document right here, when you signed this
15   document did you ever intend to pay back the
16   amount financed?
17            A.      Yes.
18            Q.      Okay.  But at some point you
19   stopped paying that back?
20            A.      To the extent that I found out
21   that the note was actually the payment.
22            Q.      When did you find that out?
23            A.      I can't recall any exact dates.
24            Q.      Was it before 2016?
```

Page 27

```
 1              A.      I can't recall.
 2              Q.      Okay.  Could it have been
 3    before 2016?
 4              A.      I can't recall.
 5              Q.      Okay.  How did you find out?
 6              A.      Just looking up through the
 7    law.
 8              Q.      Can you hold on one moment for
 9    me?
10              A.      Sure.
11                        - - -
12                      (Off the record)
13                        - - -
14    BY MS. JAMES:
15              Q.      Thank you so much.  Can you see
16    this document, Mr. Bruce?
17              A.      Yes.
18              Q.      Do you recognize this document?
19              A.      I can't say if I do or if I
20    don't.  It looks like from 2016, so I can't
21    recall.
22              Q.      Okay.  Let me know if you
23    cannot read it.  Can you briefly read this
24    first paragraph.
```

Page 28

1          A.        "In accordance with the terms

2     of the promissory note and security agreement

3     for the account identified above, which

4     includes the above-referenced property,

5     Pentagon Federal Credit Union, the present

6     holder and owner of the note is now entitled

7     by law to repossess the property because of

8     the above amount in default by you.  You, the

9     borrower, are in breach of the performance of

10    your agreement and/or in the discharge of your

11    liability to Pentagon Federal Credit Union."

12         Q.        And you will see that the

13    account number ends in 3-81-2, correct?

14         A.        Correct.

15         Q.        And that it's for a 2010 BMW 7

16    series?

17         A.        Correct.

18         Q.        It notes a payoff amount of

19    $31,123.64, correct?

20         A.        Correct.

21         Q.        So the second paragraph also

22    notes, "Notice is hereby given that Pentagon

23    Federal Credit Union will repossess the

24    property on or after 21 days from the above

Page 29

```
 1   date unless the account is paid up to date by
 2   payment of the amount shown above as the
 3   amount in default or paid in full."  Did I
 4   read that correctly?
 5          A.     Yes.
 6          Q.     Did you ever pay the amount of
 7   default noted above?
 8          A.     I can't recall if I did or if I
 9   didn't.
10          Q.     Okay.  What do you understand
11   this document to mean?  What is this document
12   telling you that PenFed is going to do?
13          A.     Can repossess the vehicle.
14          Q.     If you do not pay the amount of
15   default, correct?
16          A.     Correct.
17          Q.     Do you recognize this document?
18          A.     2017, I don't recall.
19          Q.     You see that the account number
20   ends in 3-81-2 and it is addressed to yourself
21   at ▮▮▮▮ Pavilion Street in Summerville, South
22   Carolina?
23          A.     Okay.
24          Q.     Can you read this highlighted
```

Page 30

1   sentence, this last sentence the second

2   paragraph starting with "Further."

3           A.      "Further, your account will be

4   subject to charge-off and reported as such to

5   the credit reporting agencies in accordance

6   with federal law."

7           Q.      So this is September 14, 2017

8   that this letter was sent to you.  Did you

9   ever respond to this letter?

10          A.      I don't recall if I did.

11          Q.      Okay.  And also you will note

12  loan balance in the amount of $31,794.99,

13  correct?

14          A.      That's what it says.

15          Q.      Okay.  And after receiving this

16  letter did you ever pay to PenFed the amount

17  in default?

18          A.      I don't recall.

19          Q.      Do you recall ever paying to

20  PenFed the payoff amount?

21          A.      I don't recall, only to the

22  extent that, like I said, the note is the

23  payment.

24          Q.      So it's safe to say you didn't

Page 31

1   make any further payments on this account to

2   Pentagon Federal Credit Union?

3           A.      I didn't make any additional

4   payments.

5           Q.      But by this letter you knew

6   that if you did not make any additional

7   payments that the Pentagon Federal was going

8   to continue to report to the consumer credit

9   reporting agencies the fact that you did not

10  make any additional payments, correct?

11          A.      Correct.

12          Q.      I was reading this document and

13  I had a couple of quick questions about it.

14  First of all, do you recognize this document?

15          A.      Those are some years ago.  So I

16  don't recall all that stuff.

17          Q.      It is document dated

18  October 19, 2017 from you to Pentagon Federal

19  Credit Union.

20          A.      Okay.

21          Q.      It appears to have been sent by

22  certified mail.  The first sentence of the

23  second paragraph reads, "Throughout the time

24  frame of August of 2017 to the present day

Page 32

1    your company has repeatedly contacted me/us."

2    Who is us?  Who are you referring to when you

3    say us?

4            A.    That's me or us, basically.  So

5    I am assuming that would be me.

6            Q.    Is there any other person that

7    you are referring to when you say us?

8            A.    I don't recall.

9            Q.    Okay.  The third paragraph

10   reads, "Such conduct from your company has

11   caused me to suffer severe humiliation and

12   embarrassment, emotional distress, and

13   physical discomfort."  Can you explain to me

14   what severe humiliation and embarrassment,

15   emotional distress and physical discomfort you

16   experienced?

17           A.    I don't recall from 2017.  That

18   was a minute ago.

19           Q.    So suffice to say that you do

20   not presently suffer any humiliation and

21   embarrassment, emotional distress and physical

22   discomfort?

23           A.    I don't recall from 2017.  My

24   issues are what happened in the Complaint.

Page 33

1              Q.      Could you say the last part
2      again?
3              A.      I said I don't recall from
4      2017.  My issues are from what I have in my
5      Complaint and it's from 2017.
6              Q.      Okay.  So the issues as
7      discussed in this letter have resolved?
8              A.      I can't recall that.
9              Q.      But you don't experience them
10     presently, right?
11             A.      Well, it's not in my report no
12     more, so I don't experience it, no.
13             Q.      What report are you referring
14     to?
15             A.      My consumer report.
16             Q.      Did you ever have a personal
17     line of credit account with PenFed?
18             A.      Yes.
19             Q.      And the last four numbers on
20     that personal line of credit are 6-77-0.  I am
21     reading that from your consolidated statement
22     for the period of November 13, 2016 through
23     December 15, 2016.  Did I read that correctly
24             A.      Yes.

Page 34

1          Q.      Okay.  Do you recognize this
2   document?
3          A.      I don't recall it, but I
4   probably seen something similar to it.
5          Q.      Could you say that again.  I
6   didn't hear you.
7          A.      I said it's 2016, so I don't
8   recall.
9          Q.      Sure.  Did you receive PenFed
10  statements electronically or through the mail?
11         A.      I believe PenFed never sent any
12  statements.
13         Q.      What was that?
14         A.      I don't believe PenFed ever
15  sent any statements.
16         Q.      Let's go back to 2016.  Did you
17  receive them electronically or through the
18  mail?
19         A.      I don't recall.
20         Q.      Okay.
21         A.      Think I have online access, so
22  I really haven't been checking them, like, at
23  that time.  If they sent it it was probably
24  online.

Page 35

```
 1            Q.     Does PenFed have an app that
 2   you can log in and check your statements?
 3            A.     I don't recall.  I don't think
 4   I ever had an app for them.
 5            Q.     So you would go on your
 6   computer or your phone and type in PenFed and
 7   log in with your credentials?
 8            A.     Yes.
 9            Q.     Okay.  What do you use this
10   personal line of credit for?
11            A.     It's no longer available so I
12   don't use it at all, no.
13            Q.     What did --
14            A.     It was real estate stuff more
15   than likely.
16            Q.     You said real estate?
17            A.     Yeah.  Probably some sort of
18   expenses, but I don't recall what I used it
19   for at this time.
20            Q.     Was this more of a business
21   line of credit?
22            A.     I don't recall right now what I
23   used it for.
24            Q.     Okay.  Did you make payments to
```

Page 36

```
 1  PenFed on this account?
 2         A.      I believe I did.
 3         Q.      Did you stop making payments to
 4  PenFed on these accounts?
 5         A.      Yes.
 6         Q.      And why did you stop making
 7  payments to PenFed on these accounts?
 8         A.      I don't recall.
 9         Q.      Earlier you said that you
10  stopped making payments on your vehicle
11  because the promissory note serves as tender,
12  correct?
13         A.      That was one of the reasons.  I
14  know I sent some communications to them to
15  verify certain things, but they never
16  responded.  So I believe that might have been
17  mostly my reason why not making certain
18  payments.
19         Q.      And you said that it was the
20  Federal Reserve that allowed a note that you
21  signed to serve as tender?  Did I say that
22  correctly?
23         A.      Yes, that's pretty much the
24  gist of it.
```

Page 37

1          Q.      And you said you weren't sure
2     when you discovered that information, correct?
3          A.      Correct.
4          Q.      Okay.  But you know that now?
5          A.      Yes.
6          Q.      Okay.  So let's say you sign
7     another promissory note.  You say that you
8     have been attempting to get another credit
9     card or increase your credit limits on credit
10    cards, correct?
11         A.      Yes.
12         Q.      Okay.  So you know this
13    information now.  Are you still signing
14    promissory notes that say that you will pay
15    these financial institutions back?
16         A.      I believe this was the last
17    promissory note that I signed.
18         Q.      So you haven't signed any
19    promissory notes since 2016.
20         A.      Not that I can recall.
21         Q.      Okay.  But you're attempting to
22    open new credit cards; is that correct?  Did I
23    read your Amended Complaint correctly, that
24    you are maintaining that you're unable to open

Page 38

1  new accounts?

2          A.      Correct.

3          Q.      Okay.  So had you been able to

4  open these accounts you would have signed a

5  promissory note likely with one of these

6  financials institutions saying that you will

7  pay them back fully knowing that you wouldn't

8  pay them back?  Did I say that correctly?

9          A.      No.  It is vague how you

10  saying, knowing that I won't pay them back.

11  They already being paid.

12          Q.      Well, the promissory note here

13  says that you would pay the full amount, the

14  full pay-off amount, correct, and you would

15  make payments to PenFed, correct?

16          A.      Yeah, but the issues in the

17  Complaint it's not about how I am going to pay

18  them back.  The issues is about how you all

19  violated the law.  I am not sure how this

20  pertains to that.

21          Q.      It goes to PenFed's defenses

22  against your claims in the count.  If you can

23  just answer the questions as you can.  I know

24  they are a little bit complicated, but I know

Page 39

```
 1   that you have a lot of experience in this.  If
 2   you don't understand what I am saying or if
 3   it's too vague, please let me know, because I
 4   definitely ask some terrible, terrible
 5   questions.
 6           A.      No problem.  Repeat the
 7   question and I will go back to it.
 8           Q.      Great.  Well, I will restate
 9   the question.  We'll get to your Third Amended
10   Complaint in a second.  Let's finish with this
11   over here.
12           A.      Yeah.
13           Q.      I appreciate it.  Thank you.
14           A.      No problem.
15           Q.      Do you recognize this document?
16           A.      I don't recall.
17           Q.      Okay.  This is an August 29,
18   2017 letter sent to yourself at the address
19   stated as ██ Pavilion Street, Summerville,
20   South Carolina.  This is an account ending in
21   6770.  Let's double-check that I have this.
22   This is still the personal line of credit.
23   This account number 6770 is still your
24   personal line of credit?
```

Page 40

1          A.     I believe so.

2          Q.     Okay.  Take a minute to read

3    this to yourself.  Once you're done reading

4    could you just tell me, what do you understand

5    this document to mean?

6          A.     That it would be sent to

7    collections, it looks like.

8          Q.     And it also says, again,

9    "Further, your account will be subject to

10   charge-off and reported as such to consumer

11   credit reporting agencies in accordance with

12   federal law," correct?

13         A.     Correct.

14         Q.     Did you ever pay the $4,432.21

15   in U.S. dollars to PenFed?

16         A.     I don't think -- at this time I

17   don't recall whether I did or not.

18         Q.     Okay.  Do you recall making any

19   further payments on this account to PenFed in

20   U.S. dollars?

21         A.     I recall making additional

22   payments at some point, yes.

23         Q.     So after August 29, 2017 you're

24   saying that you did make additional payments

Page 41

1   to Pentagon Federal Credit Union on this
2   account?
3           A.      No, I am not saying that in
4   August of 2017.  I am saying I made additional
5   payments to the account.
6           Q.      Okay.  My question was not
7   clear.  I'm sorry.  After August 29, 2017 did
8   you make any further payments to PenFed on
9   this account in U.S. dollars?
10          A.      No, I don't recall making any
11  additional payments.
12          Q.      Okay.  Did you ever have a
13  credit card with PenFed?
14          A.      Yes.
15          Q.      Okay.  Could you tell me what
16  credit card that was?
17          A.      I believe that's it on the
18  screen ending in 1336.
19          Q.      You recognize this document?
20          A.      I recognize the end of the
21  number.
22          Q.      The account number ended in
23  1336?
24          A.      Correct.

Page 42

1          Q.     Okay.  I am showing you a

2     May 2016 statement.

3          A.     Okay.

4          Q.     Do you recall making any of

5     these purchases?  I know it was some time ago.

6     Does this look familiar?

7          A.     Yeah, I don't recall.

8          Q.     Do you contest that this

9     account belongs to you?  I'm assuming no, but

10    just double-checking.

11         A.     No.

12         Q.     Did you make payments to PenFed

13    on this PenFed account?

14         A.     I made additional payments,

15    yes.

16         Q.     Okay.  At some point did you

17    stop making payments to PenFed on this

18    account?

19         A.     I believe I stopped making

20    additional payments, correct.

21         Q.     Do you know if there was a

22    remaining balance on this account at the time

23    you stopped making payments?

24         A.     I believe there was still

Page 43

1   alleged balance due on this there.

2           Q.     Why did you stop making

3   payments on this account?

4           A.     I don't recall.

5           Q.     Did you just decide that you

6   didn't want to make any more payments?

7           A.     I don't recall.  It was 2016,

8   so -- or '17, whichever date that was the last

9   payment.

10          Q.     Well, you're disputing, are you

11  not, that you don't owe this account -- that

12  you don't owe on this account?

13          A.     Yes.

14          Q.     Okay.  So my question is:  Why

15  did you not make any payments on this account?

16  Why did you stop making payments on this

17  account?

18          A.     And you're referring to the

19  2016?

20          Q.     No.  Just in general, why did

21  you stop making payments on this account?

22          A.     I don't recall.

23          Q.     Okay.

24          A.     Like I said before, I sent in

Page 44

1   some paperwork.  They just don't want to
2   respond to anything.
3          Q.     Could you say that one more
4   time?
5          A.     I think I sent in some
6   paperwork and they just don't want to respond
7   to anything.  That may have been a reason.  I
8   don't recall, but it's been a minute now.
9          Q.     Okay.  We will get back to
10  that.  Mr. Bruce, I am showing you your
11  Interrogatory answers to Pentagon Federal
12  Credit Union.
13         A.     Okay.
14         Q.     They are dated last week.  Do
15  you recognize this document as your answers to
16  Interrogatories?
17         A.     Yes.
18         Q.     Answer to Interrogatory Number
19  1 references Burnie Majeed.  Am I pronouncing
20  that correctly?
21         A.     Correct.
22         Q.     Who is Bernie Majeed.
23         A.     It's a friend of mine.
24         Q.     How do you know Mr. Majeed?

Page 45

1          A.    I don't recall how we met.  I

2    just knew him for a few years.

3          Q.    What information does Mr.

4    Majeed know about this Complaint, about the

5    allegations in your Complaint?

6          A.    He doesn't have anything to do

7    with the allegations in the Complaint.  Only

8    thing he knows is about the copy of the report

9    that I filed with my Complaint as an exhibit.

10   I think I referenced the exhibit in there.  It

11   was F-4, yes.  That's probably of his consumer

12   report showing that PenFed was reporting his

13   accounts accordingly.

14         Q.    Does this appear correct?

15         A.    No, that's not -- is that --

16         Q.    This is F-4?

17         A.    Yes.  Yes, that's it.

18         Q.    So you're saying that this is

19   Mr. Majeed's account?

20         A.    That is his account, correct.

21         Q.    Did you have his permission to

22   file this document?

23         A.    He was aware.

24         Q.    Okay.  Can you tell me a little

Page 46

1  bit more about your discussions with Mr.

2  Majeed?

3          A.      I just asked him pretty much of

4  how they were reporting his account and this

5  is what he provided when they sold his

6  account.

7          Q.      Did he -- sorry.  Go ahead.

8          A.      He just told me how it was

9  reporting and then I asked for a copy of it

10  and I posted it in here, because this shows

11  exactly how they are required to report and

12  that they know that they are required to

13  report it this way when an account has been

14  transferred or sold to a third party.

15          Q.      Did Mr. Majeed stop making

16  payments to PenFed on his credit card account?

17          A.      I have no knowledge of what he

18  has done with his account.

19          Q.      So you're not sure whether or

20  not he stopped making payments?  You're not

21  sure?  You don't have any relevant facts about

22  his account?

23          A.      I just know how they are

24  reporting it after it's been sold or

Page 47

```
 1   transferred to a third party, which is a copy
 2   of what this shows.
 3          Q.       Your answer to Interrogatory
 4   Number 2 references several letters that you
 5   sent to PenFed.  It specifically references a
 6   January 28, 2021 letter that you mailed to
 7   PenFed disputing all three PenFed accounts and
 8   billing errors, correct?  Mr. Bruce, let me
 9   know when you are done reading this.
10          A.       You can go ahead.
11          Q.       I am looking for clarification.
12   Your January 28, 2021 letter disputes three
13   PenFed accounts and billing errors, correct?
14          A.       Correct.
15          Q.       Okay.  The three PenFed
16   accounts, are those the three PenFed accounts
17   that we just discussed?
18          A.       Correct.
19          Q.       Okay.  This is your January 28,
20   2021 letter.  It redacts the account numbers
21   but shows the amounts in suit and we have
22   agreed that these account numbers are the
23   vehicle loan, the personal line of credit, and
24   the credit card, correct?
```

Page 48

1           A.     Correct.

2           Q.     Because all of the last four of

3    the account numbers are the same 8102, 1336,

4    and 6770?

5           A.     Correct.

6           Q.     Got it.  Okay.  Great.  Is this

7    the first letter that you sent to PenFed

8    disputing these accounts?

9           A.     I think it's the first letter I

10   sent disputing this one.

11          Q.     And you're disputing the

12   amounts for all three accounts, correct?

13          A.     Correct.

14          Q.     Your letter says that there is

15   a billing error.  What is the billing error

16   with these three accounts?

17          A.     I would assume it's the credits

18   that they have received related to this

19   account -- these accounts that they have not

20   applied to the account.

21          Q.     What credits?

22          A.     They've claimed that they

23   charged it off, so there is credits related to

24   what they received from the IRS when they

Page 49

1    filed their taxes, it's credits that they

2    received from the Federal Reserve when they

3    pledge it to the Federal Reserve.

4            Q.    When they pledge it to the

5    Federal Reserve?

6            A.    Yes.  It's the same thing as

7    depositing.  The thing I said before about the

8    promissory note, depositing the loan, the

9    promissory note.

10           Q.    I am just trying to understand

11   this.  So you're saying that you stopped

12   making payments on these three accounts and

13   that you don't owe those amounts back because

14   there should have been credits by the IRS and

15   from taxes that should have been applied to

16   your account?  Did I get that correctly?

17           A.    That's about right.

18           Q.    Okay.  Can you tell me why do

19   you think that there should be credit applied

20   to these accounts?

21           A.    Well, the credits wouldn't have

22   existed without the instruments that they

23   received from them.

24           Q.    You mean the credits wouldn't

Page 50

```
 1   have existed if you didn't stop making
 2   payments on the loans?
 3          A.     It's still a credit.  I am not
 4   sure what you mean by that, but it's still a
 5   credit that they receive.  So whatever they
 6   receive as it relates to this account should
 7   be applied to this account.
 8          Q.     Does PenFed get the credit if
 9   you continue making payments on these
10   accounts?
11          A.     They apply for the credit -- it
12   depends on where they apply for the credit.
13          Q.     Are you saying that PenFed
14   applied for a credit?
15          A.     Yeah, if they went to the
16   Federal Reserve they applied for a credit.  If
17   they filed on their taxes they automatically
18   received the credit.
19          Q.     And how do you know that they
20   filed anything for any credits or anything on
21   their taxes related to your accounts?
22          A.     Well, that's going to be with
23   discovery.  But, also, according to what I see
24   with their policies, they have allowance for
```

Page 51

1   loan or lease losses account, which is a

2   reserve account which is charged off to that

3   account.

4        Q.     Do you -- sorry?

5        A.     So regardless, they receive --

6   there is a debiting and crediting transaction

7   related to these accounts.  But further, there

8   is more that they failed to document on the

9   accounts as well.

10       Q.     What policy are you referring

11  -- before you referred to a PenFed policy.

12       A.     Yes.

13       Q.     What policy is that?

14       A.     As mentioned, I said, the

15  allowance for the loan or lease loses.

16       Q.     I looked that up.  Is that an

17  accounting principle?

18       A.     It's an accounting principle,

19  but it's an account as well.

20       Q.     Okay.  I'm sorry.  You said

21  something that this was an additional or there

22  were more errors in the accounting of the

23  account.  Did I get that right?  I forgot what

24  I said.  You said that there were other

Page 52

1    errors, correct?

2          A.      I said there is a billing

3    error.  They failed to credit the account.

4          Q.      So you're saying failed to

5    credit the account.  Were there other billing

6    errors?

7          A.      I'm not sure.  I have to read

8    it.

9          Q.      Okay.

10         A.      Those were the ones I can

11   remember off the top.  I can't recall the

12   others at that point without reviewing

13   everything, but regardless, they still apply.

14         Q.      Okay.  Sorry.  I'm looking at

15   this.  It says the billing error right here is

16   limited, underlined, to your failure to credit

17   my account for credits received as explained

18   herein and is not to be construed as alleging

19   anything else.  Did I get that correct?

20         A.      That's what it reads.  I

21   believe so.

22         Q.      Your Interrogatory also

23   references a letter dated March 12, 2021.

24   That's right here.  So is this the letter that

Page 53

```
 1   you were referring to in your Interrogatory
 2   response?
 3           A.      March, yes.
 4           Q.      Okay.
 5           A.      Right.
 6           Q.      We are referring to the same
 7   three Pentagon federal credit accounts ending
 8   in 8102, 1336, and 6770.
 9           A.      Correct.
10           Q.      Okay.  And so you are still
11   disputing the amounts of the three PenFed
12   accounts here?
13           A.      Correct.
14           Q.      Okay.  I am also showing to you
15   your letter dated April 4, 2022.  Do you
16   recognize this document?
17           A.      Yes.
18           Q.      What is the purpose of this
19   request for accounting?
20           A.      To have them validly verify and
21   authenticate the accounting on this account.
22           Q.      What would verification of the
23   accounting do?  What information --
24           A.      It would verify whether there's
```

Page 54

1    actually a balance there.

2             Q.       But earlier you said that you

3    had access to your PenFed account online,

4    correct?

5             A.       That was back in 2016.  That

6    was the document.  I don't have access at this

7    time, no.

8             Q.       So you're saying after 2016 you

9    didn't have access to a PenFed account?

10            A.       I don't recall exactly when,

11   but that 2016 document that you referenced, I

12   was speaking towards that, which I did have

13   access.

14            Q.       When did you stop having access

15   to your PenFed accounts?

16            A.       Probably around 2017.  I don't

17   recall, but probably around that time frame.

18            Q.       Did you log onto your PenFed

19   account in 2022 in order to see if you had

20   access to your account statements?

21            A.       I want to say I tried.  I can't

22   recall.  I wasn't able to get in for some

23   reason.  But I don't 100 percent recall

24   whether I did or not.  I think I might have

Page 55

1    tried and just didn't try no more after that.

2            Q.      So this is your letter dated

3    April 4, 2022.  I am showing you a letter

4    dated April 11, 2022 from PenFed to yourself.

5    Do you recognize this letter?

6            A.      Yes.

7            Q.      Can you briefly summarize what

8    this letter is informing you of?  If you need

9    a minute.  Just read it to yourself briefly.

10           A.      Basically, it's saying that

11   they going to report to the credit bureaus and

12   that accounts -- certain accounts have been

13   transferred and sold to third parties.

14           Q.      Did you read here in this

15   second paragraph, it says "Your dispute of

16   this and other obligations to PenFed were

17   previously investigated and we promptly

18   responded to your prior correspondence

19   multiple times.  In this correspondence we

20   provided evidence substantiating the

21   obligations."  Did I read that correctly?

22           A.      Yes, that's what it says, but

23   this was one letter and most of the other

24   correspondences were one letter.  So I don't

Page 56

```
 1    recall what they referring to as far as what
 2    they substantially owe -- provided evidence
 3    of.  So this is a general letter that they
 4    usually send.  They don't send any
 5    correspondence with that.
 6             Q.     Well, in the third paragraph it
 7    references all three of your accounts and it
 8    says, "Please be advised that your used
 9    vehicle loan ending in 3812, personal line of
10    credit ending in 6770, and Visa Platinum card
11    ending in 1336 referenced in your
12    correspondence with PenFed are legally
13    established debts for which you are liable to
14    repay," correct?
15             A.     Yeah.  And it says legally.
16             Q.     And it also says, "Having
17    validated your obligations owed PenFed will
18    continue to report payments received in
19    relation to when due as required by the Fair
20    Credit Reporting Act," correct?
21             A.     That's what it says.
22             Q.     Okay.  It further says,
23    "Similar claims and demands will be considered
24    frivolous and will be ignored as allowed for
```

Page 57

1    under the FCRA."  Did I read that correctly?

2            A.      That's what it says.

3            Q.      Do you have any documents that

4    show that the three accounts referenced in

5    this letter are not legally established debts?

6            A.      There's a difference between

7    legally and lawfully.  So they can say legally

8    all they want, but it's not lawfully.

9            Q.      Can you tell me the difference?

10           A.      Legally they referring to --

11   well, I don't know what they referring to

12   because they don't specify what they referring

13   to by legally, but lawfully it would apply to

14   how they obtain this -- the loan that they

15   claim they provided me.

16           Q.      Okay.  But earlier you agreed

17   that PenFed did provide you these loans and we

18   also saw promissory note that you signed.

19           A.      Yeah, but they are referencing

20   legally.  I have not referenced legally or

21   not.  I just said that they provided certain

22   loans.

23           Q.      But you don't dispute that you

24   took out these three loans and made purchases

Page 58

1   using these three loans, correct?

2           A.      Correct.

3           Q.      Okay.  And you don't dispute

4   that you didn't pay the full remaining balance

5   on the three loans back to PenFed, correct?

6           A.      I don't recall that, because I

7   don't have a copy of their financials based on

8   what they have done on the back end.

9           Q.      Okay.  Well, let's not talk

10  about what PenFed did.  Let's just talk about,

11  you made a purchase and you did not pay in

12  U.S. dollars PenFed back for that purchase,

13  correct?

14          A.      To the extent that I know now

15  that my notes constitute as payment, I have to

16  deny that, that they have been paid.

17          Q.      Did you pay PenFed back in U.S.

18  dollars for the expenses that you made on

19  these three accounts?

20          A.      Well, if they asked me to pay

21  in a specific amount of money, that's against

22  public law.  So as long as they received

23  medium of change they have received payment.

24          Q.      That's not my question.  My

Page 59

1    question is, in U.S. dollar, so, like, an

2    actual dollar, like, a green bill, did you

3    pay --

4            A.     That's --

5            Q.     -- in U.S. dollar or by an

6    electronic funds transfer, did you pay PenFed

7    in U.S. dollars for these three accounts?

8            A.     You asked me did I pay in those

9    specific -- I don't recall how it's paid.  I

10   don't see where the agreement shows U.S.

11   dollars of that payment.

12           Q.     So you are saying that the

13   agreement doesn't require you to pay your

14   loans in U.S. dollars?

15           A.     I don't recall what it asked to

16   pay in the loans.  They got paid.  I am pretty

17   sure they should be accepting the payment.

18           Q.     I am asking, is that your

19   interpretation of the promissory note?

20           A.     Yes.

21           Q.     Is that your interpretation of

22   how you're supposed to pay back your personal

23   line of credit and your credit card?

24           A.     I guess I am not understanding

Page 60

1  the question.

2          Q.      Sure.    That was a terrible

3  question.  I'm sorry.  Is it your

4  understanding that you did not have to pay

5  PenFed back for the amounts owed on the

6  personal line of credit and the credit card,

7  that you didn't have to pay them back in U.S.

8  dollars?

9          A.      Yeah, I don't recall it being a

10  specific amount -- a specific form of payment,

11  so no, I can't recall that.

12          Q.      I am showing you a document.

13  It's dated May 9th, 2017 and it shows -- it

14  says it's from Nelson Bruce, yourself, to

15  PenFed.  It is an account number ending in

16  3812.  It shows a check in the amount of

17  40,000 U.S. dollars payable to PenFed Credit

18  Union and it appears to possibly have your

19  signature on it.  Do you recognize this

20  document?

21          A.      I don't recall, but it looks

22  like it says money order.

23          Q.      You're right, money order.  Do

24  you recognize this document?

Page 61

1           A.      I don't recall.  It's 2017, so
2    I have to go back, but -- yeah, I don't
3    recall.
4           Q.      Does this look like a money
5    order that you typically make payments using?
6           A.      I don't recall.
7           Q.      I am just looking up here.  It
8    says, "The Nelson Bruce Estate, a Foreign
9    State UNCITRAL and without the United States,
10   ▮ Pavilion Street, Summerville, the Republic
11   of South Carolina State."  Did I read that
12   correctly?
13          A.      That's what it says.
14          Q.      Okay.  It is your contention
15   that you may not have signed this money order?
16          A.      I don't recall.  These are
17   copies anyway, so I don't -- I don't --
18          Q.      Is it your contention that
19   someone else might have submitted this on your
20   behalf.
21          A.      I don't recall when that was
22   done.
23          Q.      I am not asking when it was
24   done.  I am just asking if you think someone

Page 62

1    else might have been using your name and

2    submitting this document to Pentagon Federal

3    Credit Union for payment?

4             A.     I might have sent it.  I just

5    don't recall at this point.

6             Q.     Okay.  So does this document,

7    this money order look like something you may

8    have sent, maybe not here but in general?

9             A.     That's a possibility.

10            Q.     Do you know what the Nelson

11   Bruce Estate, a foreign state UNCITRAL, et

12   cetera, what that is?  Is that a bank?

13            A.     I assume it's referring to an

14   estate.

15            Q.     Does the estate have $40,000 in

16   it?

17            A.     I don't recall.  This is, like

18   December of 2017, so I don't recall anything.

19            Q.     Do you still make payments

20   using a money order that looks like this in

21   2024?

22            A.     I don't believe so.

23            Q.     Okay.  So at some point you

24   stopped drafting money orders that appear to

Page 63

1  be from the Nelson Bruce Estate?

2          A.      I don't recall, like I said.

3          Q.      Okay.  But you do recall using

4  something similar to this money order at some

5  point?

6          A.      I believe I had something

7  similar, yes.

8          Q.      What was your intention in

9  providing a money order like this to an entity

10 to whom you, I assume, wanted to pay?

11         A.      I'm assuming it was to set off

12 whatever balance that they claim.  I'm not

13 sure.

14         Q.      So where was this money coming

15 from.  I see the $40,000 right here.  Was

16 there $40,000 in a bank?

17         A.      I don't recall and I assume it

18 looks like it is an exchange in a way.

19         Q.      So what bank?

20         A.      If I were to say anything about

21 it I would say it would be the same thing as

22 the Federal Reserve, because they accept bills

23 or exchange as well.

24         Q.      You just drafted this money

Page 64

1    order and there wasn't $40,000 in the bank

2    that you were actually going to provide to

3    Pentagon Federal Credit Union; is that

4    correct?

5              A.     I don't recall.

6              Q.     Okay.  At the time that you

7    submitted a money order did you actually

8    intend to confer the money for which -- the

9    $40,000 and zero cents in this money order do

10   you actually intend to provide that in U.S.

11   dollars to PenFed?

12             A.     I don't recall what the intent

13   was.

14             Q.     So there's a chance that you

15   might not have actually intended to tender

16   $40,000 to PenFed?

17             A.     I don't recall what the intent

18   was.

19             Q.     Did you know that there was not

20   $40,000 in a bank that you were going to

21   provide to PenFed?

22             A.     I don't recall.

23             Q.     I am going to Interrogatory

24   Number 3.  Your answer, starting right here

Page 65

1    it says, "Subject to and without waiving any

2    such objections, plaintiff states that when an

3    account is sold and/or transferred to a third

4    party it is inaccurate, incomplete and,

5    misleading information to continue to report

6    the accounts without reporting it as sold to a

7    third party, transferred to a third party with

8    a zero balance and zero amount past due amount

9    when Metro 2 and the date of furnisher rule

10   clearly require that these types of accounts

11   be reported as sold/transferred with a zero

12   balance and zero amount past due."  Did I read

13   that correctly?

14          A.      Correct.

15          Q.      If I represent to you that

16   PenFed did not sell, transfer, or assign your

17   loan would this change your opinion?

18          A.      Well, that would just include

19   that they sending frivolous stuff through the

20   mail.

21          Q.      Would that change your opinion?

22          A.      Of how it should be reported?

23          Q.      Correct.

24          A.      Yes, because I am only going by

Page 66

1    what the requirement for reporting.

2            Q.      How would it change your

3    opinion.  Do you have a new opinion, I guess

4    is what I am asking?

5            A.      As it relates to the transfer

6    and sold, of course there will be a different

7    opinion because it wouldn't be transferred and

8    sold.

9            Q.      What is that opinion?

10           A.      It wouldn't be transferred or

11   sold.

12           Q.      So it shouldn't have reported

13   it as transferred or sold?

14           A.      Yes.

15           Q.      Okay.  Which it didn't,

16   correct?

17           A.      You're asking me if they did

18   not report it as transferred or sold, that is

19   correct.

20           Q.      All right.  Have you ever been

21   delinquent or defaulted on or failed to pay a

22   debt or obligation in the last ten years?

23           A.      I have been, I guess alleged

24   default.

Page 67

1          Q.      Okay.  And earlier we talked
2     about six or so lawsuits that involved you
3     defaulting on certain loans, correct?
4          A.      No.  Those were based on
5     reporting inaccurately, inaccurate
6     information.  They related to reporting.
7          Q.      Can you briefly summarize what
8     loans you have defaulted or been delinquent or
9     failed to pay other than the loans in this
10    lawsuit?
11         A.      Give me a second.  Let me plug
12    this up real quick.  Repeat the question for
13    me.
14         Q.      Sure.  Can you just summarize
15    the loans that you have been delinquent on,
16    you have failed to pay, or you have defaulted
17    on in the last ten years.
18         A.      I don't recall that far back,
19    but I know in the mortgage is an alleged one.
20    PenFed accounts would be the alleged ones as
21    well.  I think I had a Barclay and a
22    Synchrony, I believe.
23         Q.      Barclay and Synchrony?
24         A.      Barclay and Synchrony, and I

Page 68

1  think those were in the previous lawsuits with

2  TransUnion, Experian, and Equifax.

3          Q.     Did you sue Barclay or

4  Synchrony?

5          A.     No.

6          Q.     Why did you not sue Barclay or

7  Synchrony?

8          A.     I don't recall why. Yeah, I

9  don't recall why. I don't think they were

10 reporting anymore. That might be why, but I

11 don't recall.

12         Q.     Did they report the loan as

13 charged off?

14         A.     I don't recall. I think they

15 did, but I don't recall. I don't recall

16 whether they did or not. I think I put a copy

17 of one of them in the Complaint, so that might

18 clear up some related to your question. I

19 think I had a copy of it when they reported it

20 as sold and transferred, I believe with

21 Barclay, I believe it was. I think I put a

22 copy of that report just showing more proof of

23 how it should be reported when those type of

24 transactions take place.

Page 69

1          Q.      When you say those type of
2     actions, are you saying when an account is
3     sold or transferred?
4          A.      Correct.
5          Q.      Okay.  Showing you your
6     response to Interrogatory Number 14, it says,
7     "Computation of damages of plaintiff's pending
8     claims, claims of actual damages under FCRA 15
9     USC 1681.  Can you tell me a little bit about
10    how you calculated these damages and what
11    willful negligence and punitive damages
12    entail.  That was a compound question.  I'm
13    sorry.  Can you tell me a little bit about how
14    you calculated the $548,000 for the willful
15    damages?
16         A.      It's referring you back to
17    Interrogatory Number 5.  If you go to
18    Interrogatory Number 5 it tell you all the --
19    I think the denials and some other stuff
20    related to that, with a calculation of where
21    this came from.
22         Q.      Okay.  How do you get $548,000?
23    What is the metric for calculation for that
24    figure?

Page 70

1          A.     You have to go to Interrogatory

2     Number 5.  I can't recall off the top of my

3     head.  I just kind of did it as I drafted it.

4          Q.     So all of these reference

5     Interrogatory Number 5?

6          A.     Correct.

7          Q.     Let's go to Interrogatory

8     Number 5.  This is Interrogatory Response

9     Number 5.

10          A.     Okay.

11          Q.     So it appears that you applied

12     for a business credit card from Navy Federal

13     Credit in May of 2022; is that correct?

14          A.     Yes.

15          Q.     Okay.  And it was denied?

16          A.     Correct.

17          Q.     Are you saying that this denial

18     of this application was solely caused by

19     PenFed reporting your three accounts as

20     charged off?

21          A.     This is based on information

22     that PenFed was reporting, yes.

23          Q.     The three accounts that we just

24     talked about; is that correct?

Page 71

```
 1              A.      Correct.
 2              Q.      Okay.  Are you aware of what
 3    documents you may have had to sign from Navy
 4    Federal Credit Union had they provided you
 5    with this business credit card?
 6              A.      I don't recall.  I know there
 7    was some documents, but I would have to look
 8    for them.  I don't recall.
 9              Q.      Did you --
10              A.      They talk about the denial.
11              Q.      Did you get a loan from Navy
12    Federal Credit Union at any point?
13              A.      Not for that, no.
14              Q.      Did you get another loan?
15              A.      I got some credit cards, yes,
16    but those were based off of TransUnion's
17    report, not Experian, where these accounts
18    were showing, so those weren't included.
19              Q.      I'm sorry.  So you did apply
20    for an account or a loan from Navy Federal
21    Credit Union and you did receive a loan from
22    them?
23              A.      I received a credit card from
24    them, yes, in the past, correct.
```

Page 72

```
 1          Q.      I'm assuming that you probably
 2   had to sign some documents in order to show
 3   that you were going to repay that loan; is
 4   that correct?
 5          A.      For which one, the credit card
 6   that I applied for?
 7          Q.      Yes.
 8          A.      They were online, online
 9   applications, basically.
10          Q.      Sure.  So did you sign those
11   documents?
12          A.      I don't think it asked for a
13   signature.  I don't know.  I don't recall the
14   process.  I just know I applied for it online.
15          Q.      Do you recall agreeing to pay
16   Navy Federal Credit Union back --
17          A.      Credit union, to pay back the
18   card?
19          Q.      Yes.
20          A.      I believe so.
21          Q.      Okay.
22          A.      I'm not sure.
23          Q.      All right.  So we've
24   established that you did receive some sort of
```

Page 73

1   loan from Navy Federal Credit Union.  Is it

2   one or two loans that you received from Navy

3   Federal Credit Union?

4            A.     I think I have three credit

5   cards with them now.  Like I said, they was

6   based off TransUnion reporting.  The issue

7   here is about what Experian and Equifax has

8   been reporting, which caused the denials which

9   they are showing the inaccuracies on the

10  account.

11           Q.     When you say the inaccuracies

12  you're referring to the three PenFed accounts?

13           A.     Correct.

14           Q.     Going down to Experian exterior

15  credit match, it says "12 inquiries not able

16  to match from 9/2/21 to 5/31/22."  What does

17  that mean?

18           A.     That means that Experian, I

19  believe they have, like -- they match you to

20  certain loans based on what's being reported.

21  So they are unable to match me to any type of

22  credit card because of what's being

23  reported --

24           Q.     How do you --

Page 74

```
 1              A.      -- eligibility.

 2              Q.      I am trying to figure out how

 3    you calculated damages from --

 4              A.      I don't believe I calculated

 5    the 12.  I left that out, so that's not in

 6    there.

 7              Q.      That's not in the calculation

 8    of damages?

 9              A.      Yeah.  I haven't made that

10    calculation yet.

11              Q.      What was that?

12              A.      No, I have not made that

13    calculation yet, so no.

14              Q.      How do you make a calculation

15    out of that?

16              A.      Exactly.  I couldn't make that

17    calculation.

18              Q.      That makes sense.  I was very

19    confused.

20              A.      No, it's not included in the

21    calculation, to answer your question.

22              Q.      Going down to AmeriSave

23    Mortgage Corporation.  You applied for

24    $200,000.  That was denied on May 3, 2022 and
```

Page 75

1    May 4, 2022; is that correct?

2            A.      Correct.

3            Q.      And then you applied for

4    another mortgage from the same entity in the

5    amount of $200,000 that was denied on

6    July 5th, 2022; is that correct?

7            A.      Correct.

8            Q.      Okay.  In your calculation of

9    damages did you calculate that as $200,000 in

10   damages or $400,000 in damages?

11           A.      Separately, so four.

12           Q.      Why separately?

13           A.      Separate inquiries, separate

14   denials.

15           Q.      Do you think that if you had

16   been granted a mortgage from AmeriSave on

17   May 3rd or May 4th that you have would have

18   also been granted another $200,000 just two

19   months later from the same mortgage company?

20           A.      No, I wouldn't have applied.

21           Q.      You wouldn't have applied for

22   the July --

23           A.      If I was granted for the first

24   one, I wouldn't have applied for a second one.

Page 76

1          Q.     So you had only sought $200,000
2    from AmeriSave Mortgage Company?
3          A.     That was about the roundabout
4    figure.
5          Q.     Okay.  That was -- I'm sorry.
6    So how much did you apply for from AmeriSave
7    Mortgage Company?
8          A.     It probably was more than that.
9    I just kind of left it that to be more
10   conservative, but I don't recall exactly.
11         Q.     Do you have the documentation
12   to support that you applied for $200,000?
13         A.     No.
14         Q.     Okay.  So how -- I mean I'm --
15   sorry?
16         A.     I don't have that on me right
17   now.  I have to reach out to AmeriSave to see
18   exactly what documents, but I have been having
19   trouble getting information from them as well.
20         Q.     This was two years ago, right,
21   that you applied?
22         A.     Yes, 2022.
23         Q.     How do you remember that it was
24   $200,000?

Page 77

```
 1          A.     Because that's around the
 2   amount that I was looking for, no smaller than
 3   that.
 4          Q.     How do you recall the exact
 5   dates that each application was denied on?
 6          A.     I provided copies of the
 7   denials.
 8          Q.     Okay.  So those denials would
 9   likely say how much you sought and how much
10   was denied; is that correct?
11          A.     I don't recall where this says
12   that or not.  I just know that it says that I
13   was denied.
14          Q.     You did provide those denials
15   to us?
16          A.     Yes.
17          Q.     You provided us the denial on
18   May 4th?
19          A.     May 5th and July 5th, correct.
20   Correct.
21          Q.     And you also said if you had
22   been granted a mortgage on May 3, 2022 you
23   would not have applied for a mortgage on
24   July 5th, 2022?
```

Page 78

 1              A.      Correct.

 2              Q.      Okay.   Then the next one is PA

 3    State Employees Credit Union.   You sought

 4    $5,000, which was denied on May 5, 2022; is

 5    that correct?

 6              A.      Correct.

 7              Q.      I'm assuming you have that

 8    denial as well?

 9              A.      Correct.

10              Q.      And what was that for?   What

11    were you seeking that $5,000 to pay for?

12              A.      I don't recall.   It's probably

13    been more so of personal and business, maybe.

14    I don't recall.

15              Q.      Okay.   Because at the same time

16    you were applying for $20,000 from Navy

17    Federal Credit in the amount of $20,000 on

18    May 13, 2022.   Had you been granted the Navy

19    Federal business credit card in the amount of

20    $20,000 would you have applied for the PA

21    State Employee Credit Union $5,000 limit?

22              A.      I don't recall.

23              Q.      Probably not?

24              A.      It depends on the situation.

Page 79

1          Q.     Okay.  Maybe we can quicken

2     this up too.  If you had been approved for the

3     business credit card in the amount of $20,000

4     or from -- I am trying to figure out which was

5     the first one.  The Wells Fargo is 2021.  I am

6     jumping around here.  Looking at this bottom,

7     Navy Federal Union, you sought $18,000, which

8     was denied on 5/17/2022.  Had you been granted

9     the business credit card in the amount of

10    $20,000 on May 13, 2022 would you have applied

11    for this $18,000 which was denied on the 17th?

12         A.     I don't recall whether I would

13    have or if I wouldn't.  It would depend on the

14    situation.

15         Q.     It looks like there is a lot of

16    money that you were applying for credit limit

17    increases and credit cards for.  What was that

18    for?

19         A.     More likely would have been

20    business related and personal.  It's kind of a

21    mixture, but mostly business because I wanted

22    to get my real estate back on up and going, so

23    whatever I could try to get to establish

24    credit for to get that business going.

Page 80

1          Q.      Were you commingling these
2     funds with your personal matters and business
3     matters?
4          A.      I don't know what you mean by
5     commingling.
6          Q.      Were you using -- the credit
7     union, the PA State Employees Credit Union,
8     would that $5,000 be used for to real estate
9     funds and personal funds?
10          A.      No.  I don't recall whether it
11     would be or if it wouldn't be.
12          Q.      Last question on this.  Did you
13     apply for any credit cards or credit limit
14     increases from 2021 to the present date that
15     were granted besides the three Navy Federal
16     Credit Union accounts that you just described?
17          A.      I believe I have had increases.
18     I don't recall when they were provided.
19          Q.      Did you provide us with those
20     documents showing that there were increases
21     and that you were granted credit card
22     accounts?
23          A.      I don't recall that, but most
24     of that is on my credit report that they

Page 81

1   provide.

2                   MS. JAMES:  I probably have

3          about another hour or so to go.  I

4          don't know if we want to take a break.

5          I don't know if anybody needed a break

6          or if we want to keep going.

7                   THE WITNESS:  I'm fine.

8                   MR. BARTON:  I wouldn't mind

9          taking a quick five-minute break.

10                  MS. JAMES:  That sounds great.

11         How about 11:40, 11:45.

12                  MR. BARTON:  Great.

13                       —  —  —

14                  (Whereupon, a recess was held

15         from 11:34 a.m. to 11:45 a.m.)

16                       —  —  —

17  BY MS. JAMES:

18         Q.     Mr. Bruce, I am showing you --

19  in a minute I will be showing you your third

20  Amended Complaint.  This is your third Amended

21  Verified Complaint filed on 5/30/24.  I am

22  looking at Paragraph Number 5, which states,

23  "Unless otherwise stated, plaintiff alleges

24  that any violations by defendants were

Page 82

1   knowing, willful intentional, reckless

2   negligent, grossly negligent, done with

3   malice, the intent to injure plaintiff, to

4   harm and damage the plaintiff and its credit

5   worthiness as defendants did not maintain

6   procedures reasonably adapted to avoid any

7   such violations and/or did not do a reasonable

8   investigation and/or reinvestigation into the

9   matters."

10              My first question is:  What

11  evidence are you using to support the

12  contention or the allegation in your Complaint

13  that PenFed or any of the defendants' actions

14  were knowing, willful, intentional, reckless,

15  negligent, grossly negligent, done with malice

16  or the intent to injure or harm the plaintiff?

17          A.     I mean, there's a lot

18  associated with that.  One is the requirements

19  of Metro 2, which is the standard -- reporting

20  standards for all credit reporting agencies,

21  which they are required to follow as provided

22  in the Complaint.  The other is the data

23  furnisher rule.  According to those, like I

24  said, before the -- when you sell or transfer

Page 83

1    an account to a third party this is the
2    required reporting that it should be reported
3    as.  The evidence I provided on the record
4    shows that PenFed knows that they are supposed
5    to report it this way.  The information after
6    the dispute according to PenFed's records show
7    that they knew that the account was already
8    sold and transferred to a third party but they
9    failed to report that to the credit bureaus.
10          Q.    I want to stop you there one
11   moment.  I am going to represent to you -- and
12   I am not being misleading or trying to trick
13   you here --
14          A.    Okay.
15          Q.    Your PenFed account was not
16   sold, transferred, or assigned.  So does that
17   change your opinion here?
18          A.    Where are you getting that
19   information from?
20          Q.    From my client.
21          A.    So why would they provide me a
22   letter saying it was sold and transferred?
23          Q.    I am going to ask you the
24   questions.  I am representing to you that your

Page 84

1   account was not sold, transferred, or

2   assigned.  So does that change your opinion

3   here?

4           A.     No, it doesn't, because my

5   documents show that, so they have to prove it

6   wasn't sold or assigned.  I am pretty sure the

7   evidence shows that it's been sold or assigned

8   to a third party.

9           Q.     Hypothetically, if your account

10  was not sold, assigned, or transferred would

11  that change your opinion here?

12          A.     Well, I can't speak in

13  hypotheticals.  All I can speak is the

14  evidences.

15          Q.     I am just asking for your

16  opinion.

17          A.     I can't give my opinion on

18  hypotheticals.

19          Q.     Okay.  So if an account was not

20  sold or assigned, any account, would that

21  change your opinion, or do you not have an

22  opinion?  Is that why you're saying --

23          A.     Still sounds like a

24  hypothetical and I can't respond to a

Page 85

```
 1   hypothetical.
 2           Q.      Why not?
 3           A.      Because it's not a direct
 4   answer.
 5           Q.      What does that mean?
 6           A.      It's not facts.
 7           Q.      I am just asking for your
 8   opinion.
 9           A.      I don't have an opinion at this
10   point.  I only go by if it was sold or
11   transferred and I am just going by that.
12           Q.      Okay.
13           A.      And that based on the
14   information that I received it's showing it's
15   sold and transferred.
16           Q.      Going back to my original
17   question.  You have alleged that the
18   defendants act did willfully, intentionally,
19   recklessly, negligently, grossly negligent --
20   and I am referring to Allegation Number 25.
21   Are you saying that just because the
22   defendants did not -- allegedly did not or
23   it's your contention that they did not adhere
24   to the data furnishing rules and the
```

Page 86

1    requirements of Metro 2 that that constitutes

2    willful, reckless, intentional, negligent,

3    grossly negligent, done with malice, that

4    standard?

5              A.     It does when they know about

6    it, yes, and they know about it.  Their

7    records show it.  Their recordings show it.

8    So I don't understand why they would claim

9    that.  They haven't, so ...

10             Q.     And then earlier -- I want to

11   follow-up on one thing you said.  You said

12   PenFed knows this was reported this way.  What

13   did you mean by this and this way?

14             A.     Well, they know that they are

15   required to report it this way is what I

16   meant.

17             Q.     Report what?

18             A.     The accounts, when it's been

19   sold or transferred to a third party.  They

20   know the requirements of how to report that.

21             Q.     But if it was not sold,

22   transferred, or assigned then it wouldn't be

23   required to be reported that way, correct?

24             A.     Correct.

Page 87

```
 1          Q.      Okay.  The last part of that
 2   sentence that I read previously, it says "Did
 3   not do a reasonable investigation and/or
 4   reinvestigation into the matters."  What
 5   evidence -- my question is, what evidence are
 6   you using to support your contention that
 7   PenFed did not perform a reasonable
 8   investigation and/or reinvestigation into your
 9   disputed accounts?
10          A.      I guess the thing that you say
11   I have filed on the record already.
12          Q.      The what that you have filed?
13          A.      The disputes I filed on the
14   record.
15          Q.      Is that it, just the three
16   disputes?
17          A.      Yeah.
18          Q.      Okay.
19          A.      The ones, like, in September --
20   is it 2021, I believe, 2022, one or the other.
21   I think it's 2021.
22          Q.      I think you are correct.  I
23   think it is 2021.  Bear with me one moment.
24          A.      I think it was September of
```

Page 88

1    2021.

2         Q.    Is this the dispute,

3    January 28, 2021?

4         A.    No.  That was the first --

5    that's the first dispute.  There should be one

6    in September.  It came from the credit

7    bureaus, so that's the one --

8         Q.    But it was in 2021 about,

9    right?

10        A.    Yes.

11        Q.    Okay.

12        A.    I believe so.

13        Q.    So you previously saw what I

14   have marked as Exhibit-12.  I will produce

15   this to the parties later.  This is the

16   April 11, 2022 letter from PenFed to you --

17   this is after you disputed the accounts --

18   notifying you that PenFed had validated -- it

19   says, "Having validated your obligations owed

20   PenFed will continue to report payments

21   received in relation to when due as required

22   by the FCRA."  It also notified you that

23   PenFed has previously investigated and

24   promptly responded to prior correspondence

Page 89

1    multiple times in connection with this dispute

2    of your accounts, correct?

3          A.     Yeah, as further evidence how

4    they have knowledge of how to report accounts,

5    so ...

6          Q.     But they also acknowledge that

7    they investigated your disputes, correct?

8          A.     For 2020, which -- well, which

9    date was this one?  This was a different

10   dispute.

11         Q.     This is a different dispute?

12         A.     Yes.

13         Q.     So you're saying there is a

14   fourth account?

15         A.     No.  I am saying this is a

16   different dispute.

17         Q.     What does that mean?

18         A.     You pulled up one dispute that

19   was 2021 and I had another dispute that was in

20   September of 2021 and then I had another I

21   believe a direct dispute with them that was

22   in -- well, I don't -- might have went to the

23   credit bureaus as well, but that was in 2022.

24   I am trying to think.  This was probably the

Page 90

1    direct dispute.  It might have been a direct

2    dispute and this was the response that I got.

3    I want to say it might have been -- the

4    accounting, was that in 2022, the one that you

5    just put up?  I think this might have came

6    with the accounting, not with the information

7    from -- when I requested the accounting and

8    this is what they provided, basically tell me

9    they can't provide an accounting because they

10   sold, transferred, or assigned the account to

11   a third party.

12          Q.     Okay.  But in connection with

13   your dispute of the three accounts with

14   PenFed, of your three accounts with PenFed, do

15   you deny -- strike that.

16               This letter is in response to

17   your three accounts with PenFed, correct?  You

18   see the highlighted portion on the screen?

19          A.     Yes.

20          Q.     Okay.  So do you agree with me

21   that in response to your disputes PenFed

22   responded to your disputes and to your

23   April 4, 2022 letter to them by letting you

24   know that they did an investigation into your

Page 91

1   disputes.  I'm going to point you to the

2   second paragraph.

3         A.     So you are asking me if I am

4   saying if they have done an investigation?

5         Q.     My question is:  In this letter

6   did PenFed let you know that they had received

7   your dispute and that they have performed an

8   investigation into your disputes?

9         A.     Yes.

10        Q.     Okay.  This is still your third

11  Amended Complaint, second cause of action for

12  willful and negligent violation of the FCRA.

13  What evidence are you using to support your

14  contention that PenFed failed to fully

15  investigate your dispute?

16        A.     Mostly the exhibits that I have

17  on the record.  Basically, when I dispute the

18  account I provided further evidence that I

19  dispute directly with PenFed and then PenFed

20  as the result still reported the same way and

21  then me calling a month or so after the

22  dispute results and their saying that these

23  accounts were sold or transferred to a third

24  party and they failed to report that when I

Page 92

1    disputed the accounts.

2         Q.     My question is:  What evidence

3    are you using to support your contention that

4    PenFed didn't perform an investigation?  Are

5    you saying just because they didn't report it

6    the way they that you wanted it --

7         A.     I am not saying they didn't

8    perform an investigation.  They didn't do a

9    reasonable investigation.  That requires a

10   reasonable investigation.

11        Q.     What evidence are you pointing

12   to support your contention that PenFed did not

13   perform a reasonable investigation?

14        A.     The dispute results and the

15   information PenFed told me when I called them.

16        Q.     So you are just saying because

17   PenFed still reported your accounts as charged

18   off that that's evidence of them not

19   performing reasonable investigation?

20        A.     Correct, because it was not

21   just charged off.  According to the call, they

22   are saying it was sold and transferred.  So it

23   should have -- the result, it should have been

24   reported as sold and transferred to a third

Page 93

1    party and met the requirements after that.

2            Q.      All right.  I am interrupting

3    you.  I will stop that.

4            A.      No problem.

5            Q.      So if the account was not sold

6    off, assigned or transferred then it would

7    have been reported correctly, correct?

8            A.      To a certain extent.

9            Q.      What does that mean?

10           A.      And that extent would be to the

11   extent whether -- of them applying the credits

12   that they received from either the Federal

13   Reserve and from the IRS as a result of

14   writing the accounts off.

15           Q.      So let's say hypothetically

16   there are credits that should have been

17   applied by -- you said the Federal Reserve?

18   Is that what you said?

19           A.      Yes.

20           Q.      Would that have changed how

21   your account was reported?  Would the account

22   not have been reported as charged off?

23           A.      More than likely, no.

24           Q.      Okay.  Could you restate that?

Page 94

1   You're saying that it should have --

2          A.    If they have already -- more

3   likely they have already received the credits

4   from the Federal Reserve.  So by them applying

5   that to the account, of course the account

6   balance would not be there.  So if they have

7   properly documented the accounting, the

8   balance that they are reporting wouldn't be

9   the -- wouldn't be what they are showing now.

10  It would be a zero balance.

11         Q.    Why?

12         A.    Because they are already been

13  paid.

14         Q.    Oh, with the credits from the

15  Federal Reserve?

16         A.    Correct.

17         Q.    Okay.

18         A.    And also the credits that they

19  receive from the IRS, because they are

20  documenting their accounting.  So they receive

21  credits from the IRS, that's part of their

22  accounting, so they are not reporting that.

23         Q.    Okay.  Let's just stick with

24  what you have paid.  Let's take out the

Page 95

1   credits.  Because you didn't fully pay off the

2   balance on these accounts, which you would

3   agree with me you did not, should your account

4   have been reported as charged off?

5          A.     Well, I can't -- I don't

6   necessarily say I agree that I have not paid,

7   because, like I said, when they go to the

8   Federal Reserve based on these instruments, if

9   you want to call it, collateral instruments,

10  such as the promissory note, they are going on

11  they own behalf of the borrower, which I am

12  assuming that they claiming I am the borrower,

13  so they are getting funds issued to them

14  according to what the law says on behalf of

15  the borrower, so that means they have been

16  paid.

17         Q.     Why do you think the Federal

18  Reserve should have to pay for your loans?

19         A.     Well, the law shows that

20  information in there.

21         Q.     My question is -- I mean, the

22  Federal Reserve doesn't pay for my loans.  Why

23  do you think the Federal Reserve should have

24  to pay for your loans?

Page 96

1          A.      Well, I direct you to read the
2    law.
3          Q.      Okay.  Thank you.  All right.
4    Allegation 133 appears to allege that you have
5    suffered damages as a result of your alleged
6    violation of the FCRA.  I am going to zoom in
7    so you can read it.  The first damage says a
8    diminished credit score.  Do you have evidence
9    of your diminished credit score?
10         A.      I believe I have copies of it
11   on the record.  I can check back and see.  I
12   believe I have some on the record already.
13         Q.      So what I am specifically
14   looking for is your credit score before your
15   accounts were reported as charged off and then
16   a credit score afterwards showing that it had
17   decreased.  Do you have that?  Do you have
18   evidence of that?
19         A.      Yeah, I don't recall.  I don't
20   know if I have that information, because it's
21   over time.  So the more they continue to
22   report it the more it goes down, so it just
23   depends.
24         Q.      You also allege loss of the

Page 97

1    ability to purchase and benefit from credit.

2    Do you have evidence to support this alleged

3    damage?

4           A.     Yes, the denials of credit are

5    there.

6           Q.     Well, that's the loss of

7    credit, right?  This is the ability to

8    purchase and benefit from credit.  This

9    goes -- I don't want to educate you on it, but

10   this goes to what you would have purchased or

11   used this for.

12          A.     Correct.

13          Q.     And earlier we were talking

14   about what you were going to use those

15   accounts for and you said maybe personal and

16   maybe business, right?

17          A.     Correct.

18          Q.     So can you allege with more

19   specificity what you attempted to purchase or

20   what you were going to purchase with that

21   credit?

22          A.     Well, the mortgage is pretty

23   much self-explanatory with that one.

24   Obviously, that would have been a mortgage

Page 98

1   related to some sort of investment property,

2   of course.

3          Q.     What was the address of that

4   investment property that you were going to

5   buy?

6          A.     I don't recall any addresses at

7   the time.

8          Q.     Were you working with a real

9   estate agent to purchase that property?

10         A.     No.  I do my research when it

11  comes to properties.  So I just kind of look

12  and see what's available and try to apply for

13  loans based on that property or certain

14  property in that range.  I don't recall which

15  property it was.

16         Q.     Can you find that address of

17  the property that you were attempting to

18  purchase with that mortgage?

19         A.     I doubt it, because I have

20  already been denied.  So I just kind -- you

21  lose out on the opportunity, so I don't hold

22  on to stuff I lose out on.

23         Q.     You also allege mental and

24  emotional distress and pain, anguish,

Page 99

1   humiliation, and embarrassment.  Let's stick

2   with the mental and emotional distress.  You

3   answered the Interrogatory -- one of the

4   Interrogatories saying that you have not

5   sought medical attention from any

6   professional; is that correct?

7           A.      Correct.

8           Q.      Okay.  How did you experience

9   mental and emotional distress?

10          A.      Well, mentally just dealing

11  with this situation.  PenFed knowing what they

12  are doing in the back end but they not telling

13  you, it's lack of failure to disclose.  They

14  don't want to respond to anything.  If they

15  respond to something it's a general response,

16  as you see with that previous letter stating

17  that they have recently did this or did that

18  when they haven't.  They just provided a

19  one-letter response.  Just dealing with the

20  denials and stuff like that and, you know.

21          Q.      So suffice to say, the mental

22  and emotional distress and pain is just

23  communicating with PenFed --

24          A.      The alleged stuff like that

Page 100

1    that I have been, you know, getting during the

2    time frame of dealing with them.

3            Q.      During the time frame of

4    dealing with them.  That's, like, eight years,

5    right?

6            A.      Yup.

7            Q.      Okay.  So it's just from

8    communicating with PenFed and going back and

9    forth with them?

10            A.      Basically.

11            Q.      Okay.  Humiliation and

12    embarrassment, can you describe for me a

13    little bit more in detail about what you mean

14    by humiliation and embarrassment?

15            A.      Well, it's embarrassing to be

16    getting denied credits, so people are looking

17    at certain aspects of my report and just

18    denial just kind of puts it in there.

19            Q.      Did you tell anybody that you

20    were denied credit?

21            A.      Well, there's a third party.

22            Q.      I am asking, did you tell

23    anybody that you were denied credit?

24            A.      I am not sure.  I probably have

```
 1   spoken to somebody about denying -- being

 2   denied credit.

 3           Q.      Okay.  Who would you have --

 4           A.      I don't recall.

 5           Q.      Would you have told your

 6   parents that you were denied credit?  Would

 7   you have told someone else?

 8           A.      It might have been family

 9   members or friends.  I don't recall exactly

10   who.

11           Q.      Did you show them that you were

12   denied the credit?

13           A.      I don't recall whether I did or

14   not.

15           Q.      Okay.  Would that go along with

16   the alleged embarrassment caused by the

17   inability to obtain financing for everyday

18   expenses?

19           A.      I don't believe I calculated

20   that in there, no.

21           Q.      I'm sorry.  My question didn't

22   make sense.  I am asking, what sort of

23   embarrassment did you feel as a result of the

24   inability to obtain financing?
```

Page 102

1          A.     I believe I answered that as

2     far as being denied.  A third party seeing my

3     report denying and then that third party

4     seeing all these inquiries, so of course that

5     they know those are denials.

6          Q.     Who is all of these people?

7          A.     Whoever I got in there that I

8     provided on the record of who is third parties

9     receiving my report.

10         Q.     So credit reporting agencies?

11         A.     Financial agencies, those are

12    the third parties mainly that usually access

13    your consumer report.

14         Q.     So maybe I was a little bit off

15    base earlier.  You said humiliation and

16    embarrassment caused by you telling family

17    members that you were denied credit; is that

18    right?

19         A.     I said it was part of it, but I

20    don't think I applied for that as part of

21    being in this case.  This is more so of the

22    financial institutions and denials from that

23    and the people that they have, you know,

24    provided denials.

Page 103

```
 1          Q.      So businesses, people who work
 2   for businesses who see your credit report?
 3          A.      Correct.
 4          Q.      Got it.  The third cause of
 5   action as to all defendants alleges
 6   defamation.  Jumping off of what we were just
 7   saying, can you tell me a little bit more
 8   about your defamation count against the
 9   defendants?  I can be little more specific if
10   that's easier.
11          A.      Yeah.
12          Q.      What inaccurate information do
13   you contend is the subject of your defamation
14   complaint?
15          A.      That would be the same, it's
16   reporting the information as not being sold,
17   transferred to a third party or the balances
18   as they should be reported.
19          Q.      Okay.  And it's your contention
20   that this inaccurate -- alleged inaccurate
21   information was published to a third party,
22   correct?
23          A.      Correct.
24          Q.      Where was it published?
```

Page 104

1              A.      It was published by providing
2     copies of consumer reports to financial
3     agencies.
4              Q.      Just to the financial agencies,
5     to the employees of financial agencies?
6              A.      Right.
7              Q.      Okay.  And what harm do you
8     contend this has caused to your reputation?
9     Let me ask you this:  Are you contending that
10    there was any harm to your reputation?
11             A.      It's harm to my reputation as
12    it relates to my consumer report.
13             Q.      Can you explain that a little
14    bit?
15             A.      So my consumer report is
16    basically -- is my personal information,
17    personal file.  It's all private.  So any time
18    that they report inaccurate information that
19    defames my character as well and, like I said,
20    they have already been paid, so why are they
21    reporting stuff when they know they have been
22    paid.  They received some sort of credit
23    already as it relates to the account.  Or they
24    don't even own the account, so they shouldn't

Page 105

1   even be reporting anything related to the

2   account after it's been transferred to a third

3   party.

4           Q.     So what I am trying to figure

5   out is the harm to your actual reputation.  So

6   if this information stays -- you're saying

7   that a business employee -- once your credit

8   report is published you're saying that an

9   employee presumably looks at that credit

10  report.  How does that damage your reputation?

11          A.     Well, the credit report is part

12  of your reputation.  It represents how you are

13  paying this account, how you're doing that.

14  So that's part of your reputation.

15          Q.     And you are not saying that

16  that information that that employee has, you

17  are not saying that they are disseminating it

18  or that anybody else other than that employee

19  is seeing it, correct?

20          A.     I don't know who is all seeing

21  it, but as far as whoever I'm applying for, I

22  know that they are seeing it.

23          Q.     Just within that company.

24  Okay.

Page 106

```
 1          A.      Yeah.  Whatever third party,
 2    that the requirements, is to a third party.
 3          Q.      The third party is the business
 4    employee, is that what you're saying?
 5          A.      It's a different company other
 6    than the credit bureaus.
 7          Q.      Sorry.  Say that again.
 8          A.      It's a separate company outside
 9    of the credit bureaus.  Anything that --
10    whoever is applying for something is a third
11    party.  They are not a credit bureau.  They a
12    third party.  So when the credit bureau
13    disseminating it to the third party that's
14    part of the defamation, because going to a
15    third party.  It's information that's
16    inaccurate, incomplete, unverified and it's
17    based on my character and how I'm -- you know,
18    how -- my -- what you want to call -- my
19    experiences with that agency.
20          Q.      Okay.  When you apply for a
21    loan do you consent to your credit report
22    being run?
23          A.      If I apply personally?
24          Q.      Yes.
```

Page 107

1          A.     Yes.

2          Q.     And presumably because you

3    consent to that credit report being run you

4    consent to providing your credit report to

5    whomever you have provided that consent to,

6    correct?

7          A.     Correct, as long as it's

8    accurate information.

9          Q.     You said as long as there's

10   accurate information?

11         A.     Yes.  I give consent to giving

12   my report, but the consent still revolves

13   around the information being accurate and

14   complete information and it's not accurate and

15   complete information that's being reported, so

16   they are providing false information to a

17   third party, or at least misleading

18   information.

19         Q.     Mr. Bruce, did you submit this

20   dispute?

21         A.     I don't recall.  What's the

22   date on that?

23         Q.     I don't know.  It was redacted.

24         A.     It was redacted?  I usually

Page 108

1  always include the first page and just go

2  directly to the section --

3          Q.      Unfortunately, this was part of

4  your Exhibit-A, which was a pretty big

5  document.

6          A.      Yeah, I understand.

7          Q.      I am hoping you would be able

8  to help me understand this, since it's part of

9  your filing.

10          A.      It's probably -- yeah, I don't

11  recall the dates, but I do recall disputing

12  it.

13          Q.      So you do recall this.  Okay.

14  Can you tell me a little bit more about the

15  comment here that says "The full amount of

16  this account was tendered and has been

17  discharged by the principles of law related to

18  tender of payment which may have been refused

19  by the creditor.  I request this account be

20  deleted."

21          A.      Yeah.

22          Q.      Okay.  What tender of payment

23  was refused by the creditor?

24          A.      I don't recall.  I think it

Page 109

1    might have been the promissory note, but I

2    don't recall 100 percent on that.

3            Q.      Do you remember that check that

4    I showed you earlier?  Could that have been

5    the tender of payment that was refused by

6    PenFed?

7            A.      I don't recall.  I don't think

8    that's the only thing I sent PenFed.  I don't

9    recall if it was that or a promissory note,

10   something -- I don't recall.

11           Q.      So it was either that check

12   from the estate account, from the Nelson Bruce

13   Estate, or you're saying it was the promissory

14   note?

15           A.      Yeah, the bill of exchange, not

16   a check.

17           Q.      Oh, the money order -- excuse

18   me -- the money order or the promissory note?

19           A.      Correct.

20           Q.      Just going back to that check

21   right here, which is Exhibit-17.  Have you

22   ever attempted to pay -- I might have asked

23   you this, but just to recap, have you ever

24   attempted to pay another bill with a money

Page 110

1   order that looks like this?

2           A.      I don't recall.

3           Q.      So you could have, but you

4   could not have?  You're not sure?

5           A.      I don't recall.

6                   MS. JAMES:  All right.  That is

7           all I have.  I'm not sure who like to

8           go next.

9                   MS. LLOYD:  Sarah, I can go

10          next.

11                  MS. JAMES:  Okay.  Do you want

12          any of my exhibits?  I can share them

13          with the parties now or wait until

14          after.

15                  MS. LLOYD:  I am good.

16                          _   _   _

17                      EXAMINATION

18                          _   _   _

19  BY MS. LLOYD:

20          Q.      Hi, Mr. Bruce.

21          A.      How are you doing?

22          Q.      I am doing well.  How are you

23  today?

24          A.      Good.

Page 111

1          Q.      Good.  Well, I wanted to

2    introduce myself.  I am Susie Lloyd.  I am

3    here to represent defendant, LexisNexis Risk

4    Solutions, Inc. in this case.

5          A.      Okay.

6          Q.      I want to just set the

7    framework for our discussion today.  When I

8    refer to LexisNexis or I refer to LNRS, I am

9    referring to LexisNexis Risk Solutions, Inc.

10   Do you understand that?

11         A.      Got you.

12         Q.      Okay.  And do you understand

13   that you're still under oath taking this

14   deposition?

15         A.      Yes.

16         Q.      I know that Sarah covered some

17   of this already, so some of it may be

18   repetitive and I apologize for that, but I

19   just want to make sure we have a clear record.

20         A.      Okay.

21         Q.      Are you taking any medication

22   today that would affect your ability to answer

23   questions truthfully and fully?

24         A.      No.

Page 112

1          Q.     Have you spoken with anyone

2    about this specific case?

3          A.      I don't believe I did, no.

4          Q.     Did you speak with Mr. -- is it

5    Mr. Maheed [sic] or Majeed about this case?

6          A.      I think I told him about it,

7    but I don't think I went into specifics.  I

8    think that's when he mentioned that he had a

9    PenFed account and kind of went from there.

10   So I just asked him a copy of that and I

11   provided that on the record.

12         Q.     Did you do anything to prepare

13   for your deposition today?

14         A.     No.

15         Q.     Did you review any documents to

16   prepare for today's deposition?

17         A.      I didn't review, no.  Most of

18   the documents I have -- I have already filed

19   on the record so I have knowledge of those,

20   that information.

21         Q.     Do you have any notes with you

22   today or any documents with you today?

23         A.     No.

24         Q.     And I talk really fast, so I am

Page 113

```
 1    trying very hard to be slow and, you know --
 2              A.     It's fine.
 3              Q.     -- and say what I am asking?
 4              A.     I will ask you again if I don't
 5    understand.
 6              Q.     Just ask me if you don't
 7    understand a question or if you need me to go
 8    back, tell me.  Sometimes I keep going.  If
 9    you need to review any documents to help you
10    refresh your memory, also please let me know.
11    We can find them or I can ping Sarah and take
12    back what I just said and ask her to put
13    something up on the screen.
14              A.     Sure.
15              Q.     We have already covered your
16    general background, the lawsuits in which
17    you've been involved, so I am just going to
18    dive right in.
19              A.     Okay.
20              Q.     Have you ever submitted any
21    disputes directly to LexisNexis?
22              A.     Yes.
23              Q.     What do you understand about
24    the business of LexisNexis?
```

Page 114

1          A.       As far as them being a credit

2    reporting agency?

3          Q.       Sure.   If that's your

4    understanding, yes.   Can you expand on that a

5    little bit?

6          A.       Just them being a credit

7    reporting agency pretty much, the requirements

8    that they have to follow under Fair Credit

9    Reporting Act as well.   Go ahead.

10         Q.       Go ahead.

11         A.       No problem.

12         Q.       How did you form your

13   foundational knowledge about LexisNexis?

14         A.       Just like any credit reporting

15   agency, that they are required to follow the

16   Fair Credit Reporting Act.   So when I dispute

17   something, that they are required to follow

18   the policy with the Fair Credit Reporting Act

19   as relates to those disputes.

20         Q.       What do you understand about

21   the relationship, if any between, LexisNexis

22   and Equifax?

23         A.       I haven't dug too far into what

24   they provide other than, I guess public record

Page 115

1   information to them.  More so is -- my issues

2   are formulated related to them reporting

3   information to -- or receiving information to

4   be reported from Experian, so that's who they

5   claim that they did the investigation with or

6   provide the information to.

7           Q.      Okay.  Is that, then, a summary

8   of your understanding of the relationship

9   between LexisNexis, then, and Experian?

10          A.      As Experian being the data

11  furnisher, from what I am understanding,

12  because they are furnishing information to

13  LexisNexis as the credit reporting agency who

14  is reporting the information.

15          Q.      Is it your understanding or do

16  you have any knowledge as to whether

17  LexisNexis maintains its own information that

18  it has reported?

19          A.      Based on the report, they

20  maintain the information, yes.

21          Q.      What is your understanding of

22  LexisNexis being required to use Metro 2?

23          A.      I'm not 100 percent sure

24  whether they are using Metro 2 or not.  The

Page 116

1  requirements of Metro 2 are still there as it

2  relates to the credit reporting agencies, but

3  since they getting their information from

4  Experian, Experian is using Metro 2, so the

5  information they would receive would come from

6  Metro 2.

7          Q.     Do you have any information

8  that LexisNexis is required to use Metro 2 for

9  any reason?

10         A.     I don't know what system they

11 are using, so I can't answer that at the

12 moment.  I am not sure if it is part of my

13 discovery and I haven't went through the

14 discovery with that yet.

15         Q.     Sure.  So you had previously

16 testified in this deposition that Metro 2 is

17 required to be used by the bureaus does that

18 sound like an accurate --

19         A.     Yes.  It's an industry

20 standard.

21         Q.     Industry standard?

22         A.     Right.

23         Q.     Is it is your understanding

24 that an industry standard is is the same as a

Page 117

1    legal standard?

2           A.    I would say so, because it's

3    part of the law, again, because it all relates

4    to the Fair Credit Reporting Act that they

5    develop policies and procedures and since they

6    include Metro 2 in the policy and procedure

7    then, yes, it would be part of the legal,

8    because it's a legal requirement.

9           Q.    As you sit here today do you

10   know whether the Fair Credit Reporting Act has

11   any requirement written into the act to use

12   Metro 2 or Oscar or any other system?

13          A.    Well, they claim -- they state

14   that by they own records in their website that

15   that's the system they use.

16          Q.    Who is they?

17          A.    The credit bureaus.  I provided

18   links to their website with that information,

19   as the industry standard.

20          Q.    Sure.  But in the actual

21   language of the Fair Credit Reporting Act,

22   which I am also going to refer to as the

23   FCRA --

24          A.    Yeah, I don't recall the exact

Page 118

1   language, but it it does say that they develop

2   policies and procedures and since they develop

3   Metro 2 as part of the policies and the

4   procedures, I would say, yes, it would apply

5   because that's their policy and procedures for

6   accuracy.

7           Q.      Thank you.  You allege in your

8   Third Amended Complaint that Lexis is a credit

9   bureau.  What facts do you have to support

10  this allegation?

11          A.      Didn't I file a copy of the FTC

12  document showing that they are a credit

13  reporting agency?

14          Q.      My question is about being a

15  credit bureau.

16          A.      The language could be off.

17  It's a credit reporting agency.  They are not

18  a bureau.  They are a credit reporting agency,

19  but they usually reference themself as a

20  bureau which is probably why I put that there,

21  but according to the law they a credit

22  reporting agency.

23          Q.      Thank you.  I want to continue

24  on with the discussion that you've already had

Page 119

 1   with Sarah, so discussing briefly your PenFed
 2   accounts and as they relate to your disputes
 3   with LexisNexis.
 4          A.      Sure.
 5          Q.      Can you describe for me,
 6   summarize or in detail, what the alleged
 7   inaccuracies are that are the subject of your
 8   complaint as they relate to PenFed?
 9          A.      So as it relates to the issues
10   with LexisNexis, since they getting their
11   information Experian it would be the same
12   issues with Experian, that they -- whatever
13   they reporting is inaccurate, which is again
14   relating to the copy, sold, and transferred
15   and also related to the balance.  I believe
16   there is some other information as far as
17   dates that I highlighted in the Complaint that
18   was not consistent, so basically that's
19   inaccurate at the well.
20          Q.      Okay.  Can you be more
21   specific, when you say dates in the Complaint
22   not being consistent?
23          A.      So the dates that they are
24   reporting --

Page 120

1          Q.     That LexisNexis is reporting?

2          A.     Yes -- that Experian is

3    reporting, and basically getting that

4    information from Experian that's being

5    reported to LexisNexis.

6          Q.     Are there any other alleged

7    inaccuracies that we haven't already discussed

8    with the PenFed accounts that you're alleging?

9          A.     Not that I recall.

10         Q.     How did you first learn of

11   these alleged inaccuracies that LexisNexis is

12   supposedly reporting?

13         A.     I believe I put a copy of my

14   consumer report, I think it was in 2022, and I

15   think that's when I disputed, sometime in

16   2022.

17         Q.     And previously Sarah

18   represented to you that PenFed did not sell

19   your account.  Do you recall that

20   representation?

21         A.     I recall her saying that, yeah.

22         Q.     And it's your position as you

23   sit here today that you do not believe that is

24   accurate, correct?

Page 121

1          A.      I don't believe that's
2   accurate, because they wouldn't send me that
3   information.  If they did, then that poses
4   another issue which we would have to address.
5          Q.      When did you first become aware
6   of LexisNexis's involvement that led you to
7   filing suit against them?
8          A.      After the dispute.  Pretty much
9   everything formulates after the dispute with
10  LexisNexis.
11         Q.      What did you do after you
12  learned of the inaccuracies relating to
13  LexisNexis's --
14         A.      When I learned that they were
15  reporting it, I obviously filed a dispute and
16  I filed another dispute.  The first dispute
17  results claim that it was deleted, but I
18  waited a little while to call back and they
19  said it was still on there and so I disputed
20  it again and I got the same result, saying it
21  was deleted and it still wasn't deleted.
22         Q.      In your third Amended
23  Complaint, Paragraph 56, you allege that you
24  disputed with LexisNexis all accounts and

Page 122

1    information reported by Experian related to

2    PenFed and Rev accounts.  Does that match your

3    recollection?

4            A.      Correct.

5            Q.      What specifically in your Lexis

6    file was inaccurate?

7            A.      Oh, as it relates to the

8    accounts, so it would be the balance, of

9    course, then the -- it's not just inaccurate.

10   It's incomplete as well.  So that would

11   include the information, whether it's been

12   transferred or sold to a third party.  I don't

13   recall all of it.  I think I highlighted some

14   things and, therefore, I don't recall what I

15   highlighted.  Those are just kind of the gist

16   of it.

17           Q.      So that you don't feel like I

18   am trying to play a memory test with you, I am

19   going to definitely pull up some documents so

20   we can go through them.

21           A.      Sure.

22           Q.      Let's just go through a little

23   bit of the chronology here.  Based on your

24   third Amended Complaint, the first date I see

Page 123

1   in here as relates to LexisNexis -- and please

2   correct me if I'm wrong -- is in Paragraph 56,

3   I believe, of your third Amended Complaint.  I

4   will share my screen.  Can you see my screen

5   here?

6            A.      No, not yet.

7            Q.      All right.

8            A.      Yes.

9            Q.      Great.  So this, I'm

10  representing to you, is a copy of your third

11  Amended Complaint that was filed on May 30,

12  2024.  Do you see this?

13           A.      Yes.

14           Q.      Going to Paragraph 55 of your

15  Complaint, you state -- can you read this line

16  for me starting with "On or about."

17           A.      "On or about 1/12/22 plaintiff

18  received copy of his consumer file/report that

19  LexisNexis was reporting and published with

20  untrue, inaccurate, false incorrect,

21  incomplete information to third parties."

22           Q.      And this exhibit that you cite,

23  is this Exhibit E the exhibit that was also

24  included with your first Amended Complaint?

Page 124

1          A.      Correct.

2          Q.      Okay.  I have here what I will

3    represent to you is Exhibit-E.  Do you see the

4    docket number at the top and the filing date

5    this was originally filed?

6          A.      Yes.

7          Q.      Do you agree that this is

8    Exhibit-E from your first Amended Complaint?

9          A.      Yes.

10         Q.      Okay.  I want to take you

11   within Exhibit-E.  You have several document

12   in here that appear to be from your LexisNexis

13   consumer file; is that correct?

14         A.      That's correct.

15         Q.      Okay.  On Page 52 of the PDF,

16   that combines your Complaint with the

17   Exhibit-E, I've pulled up this document where

18   the top part is redacted.  Do you see that

19   this is LexisNexis national credit file

20   report?

21         A.      Correct.

22         Q.      What information -- and I will

23   scroll down -- do you allege in these first

24   two entries is inaccurate?

Page 125

1        A.    So I see the balance.  I'm not
2  sure about the dates without looking at the
3  other reports.  It would be also the late
4  payments depending on the discovery received
5  in this case.
6        Q.    So where it says "Times late by
7  30 days" and there is a 01, is that what
8  you're referring to as the late payments?
9        A.    Yeah.  I guess --
10       Q.    It says here by 60 days, one
11  and again, here by 90 days, two?
12       A.    Yes.  All that stuff is not,
13  you know, specific, so ...
14       Q.    I'm sorry.  When you say it's
15  not specific?
16       A.    Yeah.  You have got times late
17  and say by 31, but it's not -- it's not
18  showing the outline of the exact, like, a
19  history type thing.  It just a roundabout
20  number.
21       Q.    Okay.
22       A.    That's showing one, day one.
23  Thirty days late once, 50 days late once.  Is
24  that what that means?  I am not sure.

Page 126

1          Q.    Well, this is a copy of your
2   report and you are alleging that this is
3   inaccurate.  So what is your understanding of
4   what this means?
5          A.    Yeah.  I would say it's still
6   30 days.  All of it would still be inaccurate.
7   It depends on the discovery received.
8   Previously delinquent, yeah, that date looks
9   off.  So that was highlighted.
10          Q.    Okay.  Let me ask this first.
11   Let's just break this out a little bit.  Where
12   it says times late by 30 days, by 60 days, and
13   by 90 days, are you alleging or are you
14   stating that this is inaccurate?
15          A.    Yes.
16          Q.    Why is it inaccurate to say
17   that you were late in paying your PenFed
18   account with this account reference by 30
19   days?
20          A.    So based on the information,
21   like I said, it wouldn't show any lates
22   because they've already received the payments.
23   So any days late would be inaccurate.
24          Q.    And if PenFed or -- it's our

Page 127

```
 1   understanding based on what Sarah has already
 2   gone through that PenFed told you you were
 3   late on a payment, correct?
 4            A.     Yes.
 5            Q.     And that is what appears to be
 6   reported in this report, correct?
 7            A.     That's what it appears, yes.
 8            Q.     And if PenFed tells you that
 9   you're late on a payment and then LexisNexis
10   has that information on this report, what part
11   of this is inaccurate?
12            A.     Based on the record, it clearly
13   shows PenFed hasn't been telling me the
14   correct information, so whatever I have
15   highlighted is pretty much -- the credit card
16   might not be.  I am not sure about that one.
17   There's a credit card, so that one.
18            Q.     Okay.  First let me just
19   clarify.  When you say highlighted you're
20   talking about the arrows, correct?
21            A.     Yes.  The things pointed -- I'm
22   not sure.
23            Q.     And you drew those arrows in,
24   correct?
```

Page 128

```
 1            A.      Yes.
 2            Q.      Then we go down to the
 3   previous, prev. delinq., so previously
 4   delinquent.  Is it your understanding that's
 5   what that means?
 6            A.      So I am not going to go by the
 7   arrow.  The arrow is kind of pointing out
 8   certain sections.  I am going to go by what I
 9   know of the inaccuracies and it's going to be
10   the late payments, the delinquency dates, the
11   balance, incomplete information would be not
12   reported as being transferred or sold to a
13   third party.
14            Q.      We are going to come back to
15   this.  I am going to keep this flagged.  So
16   the first account listed here, this is one of
17   your PenFed accounts, correct?
18            A.      Yes.
19            Q.      The second account listed here
20   is referencing your credit line with PenFed,
21   correct?
22            A.      That second one, yes, I see
23   PenFed in the corner.
24            Q.      Okay.  On this particular line
```

Page 129

1  where it talks about your credit line, can you

2  read for me the description here starting with

3  credit line?

4           A.     Credit line, "Credit line

5  closed"?

6           Q.     And below that?

7           A.     "Closed account."

8           Q.     What on this account, on this

9  report is inaccurate?

10          A.     I don't see too many errors on

11 that specific one, other than as not showing,

12 I guess charged off, because that's what they

13 claim that it is.

14          Q.     Is it showing that the account

15 is closed?

16          A.     Yes.

17          Q.     Is it showing that any payments

18 are due on the account?

19          A.     Nope.

20          Q.     So other than not including the

21 language "charged off," is there anything else

22 that to you makes this account information

23 seem inaccurate?

24          A.     Not that I can see, other than

1  I am not sure that 17 -- 171, I don't know

2  that account number.  That's inaccurate.

3         Q.      So you believe this may be

4  inaccurate?

5         A.      I know that's inaccurate if

6  that's the account number.  Same thing with

7  the one at the top.

8         Q.      Let's go down.  This is the

9  second page of that -- well, Page 3.  This is

10  the next page of that.

11         A.      Yes.

12         Q.      And I am representing to you

13  that this is the Rev Financial Credit Union

14  account.  Does that appear accurate?

15         A.      Correct.

16         Q.      Can you read for me the line

17  starting with "Unpaid balance."

18         A.      "Unpaid balance reported as a

19  loss by credit grantor/charge off, deposit

20  related" is the next line.

21         Q.      Can you tell me what in this

22  account section is inaccurate?

23         A.      The balance would be one.

24         Q.      Which number are you referring

Page 131

1    to?

2            A.      I think it's the 471.

3            Q.      What is inaccurate about 471?

4            A.      There's no amount owed on that.

5            Q.      Okay.  And anything else?

6            A.      I want to say the delinquency

7    dates, but I can't -- I couldn't tell you

8    100 percent off of that.  But the account

9    number is another one.

10           Q.      Okay.  And then this is the

11   last on this part of that report.  Can you

12   see here that it says Pentagon Fed?

13           A.      Yes.

14           Q.      This is for an auto loan?

15           A.      Correct.

16           Q.      With respect to this, what is

17   inaccurate on this line or this section of the

18   report?

19           A.      So they are not reporting the

20   balance, so that's correct.  Account number,

21   yeah, I am just referring to the account

22   number.

23           Q.      So what I want to represent to

24   you, this was the exhibit that you included in

Page 132

1  your first Amended Complaint which was filed

2  on November 2nd, 2022, correct?

3         A.      Correct.

4         Q.      Okay.  And a lot of it is

5  redacted, so I wanted to make sure that we got

6  to see all of the information during this

7  deposition.  So I pulled the original letter

8  that was sent to you with this copy in it so

9  that we could see the full copy.

10        A.      Sure.

11        Q.      According to your Complaint, on

12 or about January 12th you received a copy of

13 your consumer file, correct, from LexisNexis?

14        A.      Yes.

15        Q.      This combined document that I

16 have here, it's 124 pages long and it's dated

17 January 11th, 2022.  Can you see that?

18        A.      Yes.

19        Q.      Does this look familiar to you?

20        A.      Yes.

21        Q.      Is this a copy of the documents

22 that you would have been sent after that call

23 that you had with LexisNexis in January?

24        A.      I believe so.

Page 133

1          Q.      Okay.  So let me take you to --
2    this is a copy of the report that we were just
3    reviewing.
4          A.      Yes.
5          Q.      This says LexisNexis National
6    Credit File Report, correct?
7          A.      Correct.
8          Q.      Can you tell me what it says
9    under "Date Reported"?
10         A.      Under or --
11         Q.      I'm sorry.  Next to "Date
12   Reported."
13         A.      10/1/2021.
14         Q.      What is your understanding of
15   the date reported?  What does that mean to
16   you?
17         A.      That that's the information --
18   the date that they received the information.
19         Q.      The date that who received the
20   information?
21         A.      LexisNexis.
22         Q.      And just generally, what is
23   your understanding of what a national credit
24   file report is?

Page 134

1          A.      A consumer report.

2          Q.      Do you see anything else in

3    this document that could indicate that this is

4    a consumer report?

5          A.      Yes.  It has information on a

6    consumer, so it's a consumer report.

7          Q.      I want to direct your attention

8    here to requester, where it says State Farm

9    Mutual.

10          A.      Uh-huh.

11          Q.      Is State Farm Mutual your auto

12    insurance carrier?

13          A.      Yes.

14          Q.      Do you have information as to

15    whether they requested this report to be

16    generated?

17          A.      I don't recall any information

18    on that.

19          Q.      So if we go back to your

20    exhibit, I just again want to bring it up

21    here.  If you see the number or the

22    combination of numbers and letters down here

23    in the corner, I just want to make sure that I

24    am representing to you that this is the same

Page 135

1   document just not redacted.

2          A.     Yes.

3          Q.     CD060-10-19I.  Do you agree

4   that the copy I am showing you is the same

5   number here at the bottom?

6          A.     Yes.

7          Q.     Combination of letters and

8   numbers?

9          A.     Yes.

10         Q.     So this report, as you noted,

11  is dated 10/1/2021 and it has the account

12  entries that we just discussed.

13         A.     Okay.

14         Q.     Per your Complaint, you then

15  made a dispute with LexisNexis in June of

16  2022, correct?

17         A.     Correct.

18         Q.     Between January of 2022 and

19  June of 2022 what happened?  Why did you

20  wait -- well, let me just ask.  What was going

21  on after you learned of the alleged

22  inaccuracies in January of 2022?

23         A.     Well, I been dealing with other

24  lawsuits, so I didn't have time to address.

Page 136

1    Once I received a copy of the report -- so
2    when I had time to issue the issues related to
3    the report I disputed it.
4           Q.      When you raised this dispute on
5    June 2nd, 2022, what did you dispute
6    specifically?
7           A.      The account and the information
8    being reported.
9           Q.      Did you ask specifically -- did
10   you go line by line through that report
11   similar to what we just did?
12          A.      I specifically went through
13   everything that's being reported.
14          Q.      And could you state again, why
15   did you wait almost six months to dispute this
16   information?
17          A.      Because I have -- I had
18   lawsuits still going on at the time, so I had
19   to deal with that information before I could
20   address what I received from the LexisNexis.
21          Q.      Do you recall disputing
22   anything else with LexisNexis other than your
23   PenFed and Rev account at the June 2nd date?
24          A.      No, I don't recall.

Page 137

1          Q.      When you disputed this

2    information with LexisNexis, did you have a

3    copy of that report in front of you?

4          A.      I don't recall whether it was

5    in front of me or not.

6          Q.      Did you provide LexisNexis with

7    any information regarding your dispute of

8    these inaccuracies that you allege?

9          A.      No.  I don't think I provided

10   any documentation.  I just requested that the

11   information be disputed that they reported.

12         Q.      Did you receive any response

13   from LexisNexis after your June 2nd, 2022

14   dispute?

15         A.      Yes.

16         Q.      Do you recall what you

17   received?

18         A.      The results.

19         Q.      The results of?

20         A.      Of the dispute, investigation.

21         Q.      Okay.  So did you receive a

22   packet that was similar to the one that I just

23   showed you from the January 11th packet?

24         A.      I received a letter.  I had to

Page 138

1    request again for the packet, because they

2    only sent -- I think it was -- I think they

3    just sent something about logging in to get a

4    copy of it.  So they didn't actually send me a

5    full-on report.  I had to use a code to get to

6    that report.

7            Q.    So they sent you a link to a

8    portal; is that correct?

9            A.    Yeah.  I think I had to call to

10   get it because it didn't come.

11           Q.    Okay.  Do you also recall

12   receiving a letter dated June 30, 2022?

13           A.    Something about the date, yes.

14           Q.    Can you just take a look at

15   this letter and summarize what you see here.

16           A.    Basically says, as a result of

17   seller dispute please be advised that you may

18   have multiple communications if you dispute

19   multiple items in your LexisNexis file.  You

20   recently contacted LexisNexis Risk Solutions,

21   LexisNexis regarding information associated

22   with -- to your file.  In accordance with the

23   Fair Credit Reporting Act LexisNexis filed

24   your dispute regarding the following data with

Page 139

1    the listed entity, which is Experian, on

2    8/2/2022.

3            Q.      I think it says 6.

4            A.      6/2/2022.

5            Q.      So is it your understanding

6    that this letter is the results --

7            A.      The results --

8            Q.      -- of LexisNexis's

9    investigation?

10           A.      Yes.

11           Q.      And part of that investigation

12   was that LexisNexis filed a dispute with

13   Experian?

14           A.      Correct.

15           Q.      And this letter is notifying

16   you that LexisNexis made that dispute,

17   correct?

18           A.      Correct.

19           Q.      So after your dispute on

20   June 2, 2022 you would have received this

21   letter, which, again, was included with your

22   first submission?

23           A.      Yes, I recognize the letter.

24           Q.      Okay.  Thank you.  I know you

Page 140

1  mentioned that you called LexisNexis back to

2  get a copy of your file --

3          A.      Yes.

4          Q.      -- in or around June of 2022,

5  correct?

6          A.      Correct.

7          Q.      I am going to pull up what was

8  sent to you.  So you called in around the end

9  of June 2022 to get a copy of your file and

10 there were, you know -- again, I am

11 representing to you that there were a number

12 of documents included in that packet.

13         A.      Yes.

14         Q.      I am representing that this is

15 a combined bundle of those documents.  One of

16 the letters was dated July 20, 2022.

17         A.      Yes.

18         Q.      Okay.  This is a copy, by the

19 way, of the letter we just reviewed that was

20 attached to your First Amended Complaint.

21         A.      Okay.

22         Q.      In your Complaint -- and you

23 will also see that the code down here, the

24 combination of letters and numbers, is that

Page 141

1    different than the combination that I

2    previously showed you from the other letter?

3         A.     I don't recall if it is the

4    same or different.  It looks a little bit

5    different.

6         Q.     Okay.  So if we take a look at

7    this bundle of documents, I am going to go

8    ahead and take you down to that NCF report

9    again that we have already reviewed.  Can you

10   tell me the date reported?

11        A.     It says 5/30/2022.

12        Q.     Can you tell me what it says by

13   requester name.

14        A.     State Farm.

15        Q.     Okay.  Scrolling down.  Again,

16   this is an unredacted copy.

17        A.     Yes.

18        Q.     We have two accounts reported

19   here.  Were these two of the accounts that you

20   dispute the accuracy of in June of 2022 with

21   LexisNexis?

22        A.     Yes.  PenFed accounts, correct.

23        Q.     And based on what we've already

24   reviewed, can you tell me if these are still

Page 142

1  listed inaccurately, in your opinion?

2          A.     Yes.

3          Q.     I believe you testified just a

4  few moments ago that this second account, when

5  it says "credit line closed," that there is no

6  pending balance, correct?

7          A.     Correct.

8          Q.     Payments.  I apologize.  And

9  what else in this do you allege is inaccurate?

10          A.     Where the claim is not charged

11  off, I see they corrected the charge off on

12  the top line.  So they charged off the

13  account.  The number is still inaccurate.

14  There is no balance, so that's correct.

15          Q.     And then if we scroll down to,

16  again, the auto loan.  What of this is

17  incorrect or inaccurate?

18          A.     I would say the balance -- not

19  the balance.  The account number, there is no

20  balance.

21          Q.     The account number.  All right.

22  After you received this packet, what did you

23  do with respect to LexisNexis?

24          A.     I believe I disputed again and

Page 143

1    they provided the same results.

2           Q.     You disputed again after you

3    received this letter, correct?

4           A.     Correct.  It's still on there

5    when they said it was off.

6           Q.     What is your understanding of

7    how LexisNexis was supposed to resolve this

8    dispute?

9           A.     Well, based on what they said,

10   it's supposed to be removed.

11          Q.     Based on what they said?

12          A.     The results say that the

13   accounts had been removed that I disputed.

14          Q.     Did they tell you this verbally

15   that it would be deleted?

16          A.     They wrote it down.  It's

17   written.  The first page, yeah, you go back to

18   the results, it says that we removed these

19   accounts or removed -- based your dispute, the

20   accounts or whatever was removed.

21          Q.     Okay.  Let me go back so we can

22   make sure we are on track with the dates.

23   After you made your dispute on June 2nd, you

24   received information from LexisNexis on or

Page 144

1   about June 30, correct?

2          A.     Correct.

3          Q.     And that is this packet that we

4   are discussing now, correct?

5          A.     Yes.  Right.

6          Q.     And from this packet, as we

7   have already discussed, the report is dated

8   5/30/2022, correct?

9          A.     Correct.

10         Q.     You next allege in your

11  Complaint, Paragraph 58, that on or about

12  July 29 you received an updated consumer

13  credit file and report from LexisNexis,

14  correct?

15         A.     Correct.

16         Q.     And that was enclosed --

17         A.     Yes, basically that.

18         Q.     And after this date, after

19  July 29, what did you do next with respect to

20  LexisNexis?

21         A.     I disputed again.

22         Q.     Based on your Complaint did you

23  make the dispute on August 15th, around

24  August 15th, 2022?

Page 145

```
 1          A.      Correct.
 2          Q.      And what happened next?
 3          A.      Just disputed the same way I
 4   disputed the other one, information, same
 5   accounts.
 6          Q.      What was the response that you
 7   received?
 8          A.      Again, they told me that the
 9   accounts had been removed.
10          Q.      Okay.  So after the August 15th
11   dispute that you made.  And you received
12   another packet from LexisNexis, correct?
13          A.      Correct.
14          Q.      I am going to pull up what I
15   have here.  This is the September 15th, 2022
16   letter that you would have received.  Do you
17   recognize this?
18          A.      Yes.
19          Q.      Okay.  So I am going to take
20   you down to that report again that we have
21   that contains the alleged inaccuracies.
22          A.      Okay.
23          Q.      So this is from the
24   September 15, 2022 report.  Now, can you tell
```

Page 146

1    me what it says after day reported?

2            A.      Date reported, 5/30/2022.

3            Q.      What does it say for requester?

4            A.      State Farm.

5            Q.      Okay.  I am going to represent

6    to you, because I have it pulled up here, that

7    this report, which is in your July 29, 2022

8    packet, is the exact same as the report that

9    is in your September 15th, 2022 packet.

10           A.      Okay.

11           Q.      Comparing the two, can you see

12   that the date reported says May 30, 2022?

13           A.      Yes.

14           Q.      And can you see that the

15   requester is State Farm Mutual?

16           A.      Yes.

17           Q.      Okay.  Is it your opinion that

18   this should have been updated between July 29

19   and September 15th?

20           A.      Yes.

21           Q.      Why is that your opinion?

22           A.      Because there was another

23   investigation with dispute results basically

24   saying that it was removed and they providing

Page 147

1   me the same report and still showing the
2   accounts are on there.
3          Q.      Do you believe that LexisNexis
4   should be providing updated copies of an NCF
5   report in a consumer disclosure?
6          A.      Yes.
7          Q.      Do you understand that an NCF
8   report is something that's requested by, in
9   this instance, State Farm?
10         A.      It's still part of the consumer
11  report, though.
12         Q.      Why is it your belief that this
13  is part of a consumer report?
14         A.      Because that's what it says.
15  It's been filed as a consumer report.  That's
16  what LexisNexis put in their letters.
17         Q.      And if LexisNexis compiles a
18  consumer file which has historical documents
19  in it, it is still your belief that State Farm
20  should have requested a new NCF report?
21         A.      No.  Well, LexisNexis will send
22  an update what they are are reporting.  So if
23  they compiling this exact definition of what a
24  consumer reporting agency is, so they are

Page 148

1    supposed to make the adjustments.

2          Q.     And this is a copy of a report

3    dated 5/30/2022, correct?

4          A.     Correct.

5          Q.     Okay.  This is a copy of a

6    report that had been previously generated and

7    it lives in your file with LexisNexis,

8    correct?

9          A.     Yes.

10         Q.     So is it your understanding

11   that State Farm should have requested a new

12   copy so that it could have been put into your

13   file?

14         A.     I am going by what LexisNexis

15   reporting to me.  So I don't know who

16   requested or anything of that nature.  It's

17   related to what they have in their file.  So

18   if their file is not showing an accurate

19   information and they are telling me it's

20   removed, I should get a copy of it saying that

21   it's been removed.

22         Q.     This is an NCF report.  This is

23   something that -- again, I will represent to

24   you that this something that LexisNexis sells

Page 149

1    to its customers, in this case State Farm.

2    This is a copy of a report that State Farm

3    would have requested from LexisNexis on

4    May 30th, 2022.

5            A.      Uh-huh.

6            Q.      Does that make sense?

7            A.      Yeah.  LexisNexis also has

8    SageStream, so they still in-house these

9    information on a consumer report.  Sage and

10   LexisNexis is all one.  So if you request for

11   a consumer dispute either with SageStream,

12   they direct you to LexisNexis.

13           Q.      Sure.  And when they are

14   directed to LexisNexis -- and, you know, we

15   can talk about SageStream in a moment if we

16   need to, but I am just talking purely about

17   what State Farm is asking LexisNexis for.

18   Does that make sense?

19           A.      Yeah, I mean, I get it.

20           Q.      Okay.  So with respect to this

21   NCF report which is dated May 30, 2022 -- and

22   I am representing to you that this is just a

23   historical copy of the report that was put in

24   your file.  This is not something new that was

Page 150

1  generated by LexisNexis.  Do you understand

2  what I am saying?

3          A.     I got you.

4          Q.     Okay.  If this is a historical

5  document, what was LexisNexis supposed to

6  update and send to you in September of 2022?

7          A.     It should have still been an

8  updated report.  I am assuming you still sent

9  the same thing, but if you refer back to the

10 previous dispute and it showed 2021, of course

11 they said it was removed, but if you

12 looking -- even if State Farm reported it, it

13 is still showing the account was still there.

14 So if they didn't remove it on the first one

15 they definitely didn't remove it on the second

16 one.  You can see they are different dates.

17         Q.     It's your belief that

18 LexisNexis to be accurate needed to remove

19 this account; is that correct?

20         A.     If that's what they are saying

21 they did, because that's what their results

22 show that happened.

23         Q.     After you made your dispute in

24 September did you receive another letter

Page 151

1   regarding an investigation into Experian's

2   information?

3          A.     I think I only did two

4   disputes.

5          Q.     Okay.  All right.  I am going

6   to show you -- this is a copy of a letter that

7   was attached to Exhibit-E in your Complaint.

8          A.     Okay.

9          Q.     Can you tell me what date is on

10  this letter?

11         A.     September 8, 2022.

12         Q.     Okay.  And what does it say for

13  dispute date?

14         A.     8/15/2022.

15         Q.     And what else is this letter

16  indicating to you?

17         A.     Dispute filed with Experian.

18  The account has been removed.  Information

19  disputed has been removed from your file,

20  which is the accounts.

21         Q.     What disputed information do

22  you believe should have been removed?

23         A.     Well, they saying that the

24  accounts that I dispute, basically, the

Page 152

1    accounts and the information, so the whole

2    account should have been removed.

3            Q.      Does it say in this letter that

4    the account was removed from your report?

5            A.      It says the information

6    disputed -- the disputed information from your

7    file and I have disputed all the information

8    that I recently notified you of.  So all of it

9    should have been deleted, but as you can see

10   it's still the same information.

11           Q.      Okay.  Well, it's not.  I mean,

12   that was just a copy of the report, correct?

13           A.      It's a copy of the report, but

14   it's still showing the account and this letter

15   clearly shows that it's been removed.

16           Q.      This letter, if I am reading it

17   correctly, it says "As of the date of this

18   establish LexisNexis has removed the disputed

19   information."  Did you dispute that you had an

20   account with PenFed?

21           A.      No.  I disputed the account and

22   the information reported.  That should be on

23   the call.

24           Q.      So it's your testimony that you

Page 153

1  disputed that you had an account at some point

2  in time at PenFed?

3          A.      I don't dispute that I have an

4  account.  I dispute the information, so the

5  account and the information.  Regardless, it's

6  still in dispute, both the account and

7  information, but the information is still the

8  exact same information.  So regardless,

9  whatever they claim that they removed, it

10  clearly shows it has not been removed.

11          Q.      So are you testifying that

12  LexisNexis should have deleted this entry in

13  its entirety?

14          A.      Correct.

15          Q.      And it's your understanding

16  from this letter that you received that they

17  deleted the entry in its entirety?

18          A.      Correct.

19          Q.      Where does it say in this

20  letter that they did remove your account

21  entirely from this report?

22          A.      They said that they removed

23  disputed information, so what other disputed

24  information other than the account and the

Page 154

1   information?

2          Q.      Right.  But you're testifying

3   that you disputed information about the

4   account, correct?

5          A.      Yes.

6          Q.      Did you dispute that the

7   account should not have been on the reporting

8   at all?

9          A.      Basically, yeah.

10         Q.      Basically, or did you?  I am

11  just asking.  I am trying to understand.

12         A.      I am saying based on the

13  results.  If someone is telling me something

14  has been removed, I'm assuming they removing

15  the disputed information, which is the

16  accounts and information.  You can't have the

17  information without the account.  So if you

18  are disputing it, you remove the information,

19  you got to remove the account along with it.

20         Q.      So it is your belief that in

21  order to correct an alleged inaccuracy for an

22  account that you actually did have, LexisNexis

23  should have just deleted the account; is that

24  correct?

Page 155

1          A.     I believe that they should do

2     what they notified me of as a result of their

3     investigation, which was remove the

4     information.  As I said before, you can

5     clearly see the same information is there.

6     They didn't remove anything.

7          Q.     And as we've discussed, this is

8     a copy of an old report, correct?

9          A.     This is, but the previous

10     report showed 2021.

11          Q.     Yes.  I am only talking about

12     the reports that you were sent after you made

13     your dispute.

14          A.     Okay.

15          Q.     So there were two reports that

16     you received, or two copies of reports that

17     you received in your consumer file, correct,

18     one in July and one in September, correct?

19          A.     Correct.

20          Q.     And the September report that

21     you received is a copy of the report that you

22     also received in July, correct?

23          A.     I believe so.

24          Q.     Other than this historical

Page 156

1   report, this static report, which we agree is

2   a copy from your September file as to what was

3   in your July file, where else in your consumer

4   file is any information reported about your

5   PenFed account?

6          A.    Well, I need to retract that.

7   I don't think it's copy of what I received in

8   my July file, is it?  I think that was 2021 it

9   showed, right?

10         Q.    No.  And --

11         A.    It was different?

12         Q.    Let me be clear.  Let's go

13  back.  We have your letter, your packet that

14  you received from LexisNexis --

15         A.    Okay.

16         Q.    -- in July of 2022, correct?

17         A.    Correct.

18         Q.    So we have got July 2022.

19         A.    Okay.

20         Q.    And you received this NCF

21  report that was dated 5/30/2022, correct?

22         A.    And that's from the results

23  from July.

24         Q.    Well, this is a report that was

Page 157

1    included in your consumer file --

2             A.      Okay.

3             Q.      -- that you requested in June

4    and July of 2022.

5             A.      Yeah, which is part of the

6    consumer file.

7             Q.      It is part of the consumer file

8    that you requested, correct.

9             A.      Right.

10            Q.      Is this a copy of the NCF that

11   we've been discussing, the National Credit

12   File report?

13            A.      I believe so.

14            Q.      And then going to your

15   September 15th packet that you would have

16   received.  I am going back to the same report

17   in that document that we have previously

18   discussed.  Again, is it your understanding

19   that this is a copy of the NCF report that you

20   also received in July of 2022?

21            A.      I can't confirm whether it's a

22   copy.  I know that it was included in the

23   results, I guess, the updated report.

24            Q.      And we did compare, right, if

Page 158

1    you recall --

2           A.      Yes.   Just telling me that they

3    didn't provide me an updated report.   That's

4    pretty much all that's telling me.

5           Q.      Is this telling you that this

6    is an exact duplicate of the report that we've

7    looked at from your July packet?

8           A.      It looks similar.

9           Q.      All right.

10          A.      I can't say it's an exact

11   duplicate.   I'd have to go and look at all the

12   numbers and match them up and see if it is an

13   exact duplicate.

14          Q.      Well, lucky for you I have done

15   that and I am representing to you that it is

16   an exact duplicate.   So other than these two

17   packets that we have, one from July of 2022

18   and one from September of 2022, is there any

19   other information in either the July 2022

20   packet or the September 2022 packet reported

21   about your PenFed accounts?

22          A.      Not that I can recall.

23          Q.      Okay.  Does information about

24   PenFed appear anywhere else in your consumer

Page 159

1   file?

2           A.      I don't recall.  I can't say.

3   Sorry.

4           Q.      There is no right or wrong

5   answer.  You're fine.  I appreciate that.  So

6   let's just move on.

7           A.      Okay.

8           Q.      Do you currently have car

9   insurance?

10          A.      Yes.

11          Q.      Who are you insured by?

12          A.      State Farm.

13          Q.      Have you been insured by State

14  Farm over the past five years?

15          A.      Yes.

16          Q.      Okay.  Have you had car

17  insurance with any other entities within the

18  past five years?

19          A.      No.

20          Q.      Have you ever applied for car

21  insurance with anyone else in the past five

22  years?

23          A.      Yes.

24          Q.      What was the reason for

Page 160

1   applying for different insurance?

2           A.      I guess lower rates.

3           Q.      Okay.

4           A.      Or better rates.

5           Q.      And who did you apply for

6   insurance --

7           A.      I can't recall who actually it

8   was.

9           Q.      Were you provided quotes for

10  those applications for other insurance?

11          A.      Yeah.  They were higher, so

12  that's why I stuck with State Farm.

13          Q.      Do you recall how long you had

14  car insurance with State Farm?

15          A.      Since 2008 or 2009.

16          Q.      Has your policy ever lapsed

17  with State Farm?

18          A.      No.

19          Q.      And by lapsed, do you

20  understand that I am talking about, missing

21  payments?

22          A.      Yes, I know what you mean.

23          Q.      Thanks.  Did State Farm ever

24  raise your premiums since you have been

Page 161

1   insured with them since 2009?

2           A.      Yes.

3           Q.      Do you know why they would have

4   raised your premiums since 2009?

5           A.      I want to say taxes, the

6   economy, something like that.  You have got,

7   again, records.

8           Q.      Yes.  That was actually my next

9   question.  Have you ever been in an accident?

10          A.      I have, but not when I had

11  State Farm.

12          Q.      Okay.  Have you ever reported

13  any claim to State Farm for any reason,

14  vehicle damage, accident, injury?

15          A.      No.

16          Q.      Okay.  We have covered

17  already --

18          A.      Let me retract that.  I had a

19  windshield issue.

20          Q.      Cracked windshield?

21          A.      Yes.

22          Q.      The driving in South Carolina?

23          A.      Yeah, exactly.

24          Q.      That's where my cracked

Page 162

```
 1    windshields come from.  Okay.  So we have
 2    already talk generally about the damages that
 3    you are alleging in your Complaint.  I just
 4    want to briefly touch on some of the things
 5    that you have alleged specific to LexisNexis.
 6         A.    Okay.
 7         Q.    You allege in your third
 8    Amended Complaint that LexisNexis's action and
 9    inaction has caused, quote, the loss of the
10    ability to purchase and benefit from credit.
11    Does that match your recollection?
12         A.    Yes.
13         Q.    Have you ever been denied
14    credit?
15         A.    Yes.
16         Q.    In your responses to
17    LexisNexis's request for Interrogatories, does
18    this appear to be your responses to
19    LexisNexis's requests?
20         A.    Yes.
21         Q.    And just so we are on the same
22    page, is this a verification that you signed
23    to Interrogatories?
24         A.    Yes.  Correct.
```

Page 163

1          Q.      All right.  In Interrogatory

2    Number 10 the question was related to your

3    alleged inability to purchase and benefit from

4    credit.  Then Interrogatory 11, it's a similar

5    question that you allege credit --

6          A.      Correct.

7          Q.      In your responses you allege

8    that Lexis's actions or inactions, as

9    referenced in your Complaint, caused you to be

10   denied credit with Upgrade, Inc. on 4/27/2021,

11   correct?

12         A.      Correct.

13         Q.      What kind of credit were you

14   applying for with Upgrade, Inc.?

15         A.      I believe they have -- it was

16   either a credit card or a line of credit.  I

17   don't recall.

18         Q.      Do you remember what you needed

19   a line of credit or a credit card for?

20         A.      I don't recall.

21         Q.      And I saw in your responses to

22   the request for production that you produced a

23   copy of a letter dated April 27, 2021 for

24   upgrading.  I am going to take you to that

Page 164

1    now.  Do you see that this is a document

2    labeled NLB2211-63?

3            A.      Correct.

4            Q.      Is this a copy of something

5    that you disclosed in your responses to

6    Lexis's discovery requests?

7            A.      Yes.

8            Q.      What's the date of this letter?

9            A.      4/27/2021.

10           Q.      Is this a response from

11   Upgrade, Inc. to your credit application?

12           A.      Yes.

13           Q.      Can you read for me the reason

14   they did not approve you for your application?

15           A.      It says, "Insufficient use of

16   accounts in the past 12 months.  Borrower does

17   not qualify for minimum loan amount given

18   application source, recent delinquency, high

19   number of recent inquiries."

20           Q.      And below that I see that it

21   lists the information that they have coming

22   from TransUnion, SageStream, and Lexis -- in

23   whole or in part from LexisNexis, SageStream,

24   or TransUnion, correct?

Page 165

1           A.      All three, yeah.

2           Q.      What evidence other than these

3    references do you have that Upgrade, Inc.

4    denied you for credit based on information

5    they received from LexisNexis?

6           A.      This letter is telling me that

7    they received this information from

8    LexisNexis, so the information that they have

9    is pretty much information related to PenFed.

10          Q.      And what information do you

11   have that they made this credit decision based

12   on the alleged inaccuracies of the PenFed

13   account?

14          A.      Well, as presented to the

15   previous attorney and you as well, as far as

16   the inaccuracies, if they requested a report

17   they also received those inaccuracies on the

18   report.

19          Q.      Is it possible that they made a

20   credit decision based on anything else in your

21   report?

22          A.      I only go by the way they

23   provided.

24          Q.      What information do you have

Page 166

1   that LexisNexis reported your PenFed account

2   to Upgrade, Inc.?

3           A.      By them saying that they

4   received a consumer report from them, that's

5   what this letter pretty much says.

6           Q.      But what information do you

7   have that the PenFed account was listed on

8   that report that would have been sent to

9   Upgrade, Inc.?

10          A.      Based on the consumer report,

11  or the consumer file that I received from

12  LexisNexis that showed the PenFed accounts on

13  there.

14          Q.      Sure.  As we have gone through

15  couple of times, it shows the PenFed account,

16  correct, on the NCF report?

17          A.      Correct.

18          Q.      This report was requested by

19  State Farm Mutual, correct?

20          A.      Yeah.  It was part of the

21  consumer file, right.

22          Q.      So it's your belief that

23  everything that was sent to you would also be

24  sent to Upgrade, Inc.?

Page 167

1          A.     If it was part of my consumer

2    file.

3          Q.     So it's your belief that a

4    report requested specifically by State Farm

5    Mutual with private information about your

6    accounts would have been shared with a

7    separate third party?

8          A.     Yes.

9          Q.     Do you have a copy of any

10   report from LexisNexis that was requested by

11   Upgrade, Inc.?

12         A.     No.

13         Q.     Going back to your

14   Interrogatory responses, I also see here that

15   you are alleging you were denied credit from

16   Fundation Group, LLC on November 24, 2021; is

17   that correct?

18         A.     Correct.

19         Q.     What kind of credit were you

20   applying for with Fundation Group?

21         A.     I believe they had, like, some

22   sort of business loan or credit, something

23   like that.  So it was being used for pretty

24   much my real estate business.

Page 168

1      Q.      What evidence do you have that
2  you were denied credit?
3      A.      Didn't I provide a denial?
4  Well, I don't have it, so obviously it was
5  denied.
6      Q.      Okay.  So just by virtue of not
7  having --
8      A.      I don't have it, yeah.  If I
9  don't have it, that means I wasn't approved,
10  so I was denied.
11      Q.      So do you accept every loan or
12  line of credit that you're approved for?
13      A.      Most of the time, yes.
14      Q.      And you do not have a letter of
15  denial from Fundation Group, however?
16      A.      I couldn't find one.
17      Q.      Do you believe the reason you
18  were denied credit by Fundation Group is
19  because of information sent by LexisNexis?
20      A.      Information that's being
21  reported, correct.
22      Q.      What evidence do you have that
23  LexisNexis reported your PenFed accounts to
24  Fundation Group?

Page 169

1         A.     Well, based on the consumer
2    file that they sent me, they basically telling
3    me that this is the information in my consumer
4    file.  So if this is the information in my
5    consumer file it's the information that's in
6    my consumer report.  So if they request for a
7    consumer report they will receive the same
8    information that I am looking at.
9         Q.     Again, your belief is that
10   LexisNexis would have sent a report that was
11   requested by State Farm to Fundation Group?
12        A.     They have included that --
13   whatever it is that they are saying was
14   requested from State Farm, they included it as
15   part of my consumer file.  So if they are
16   providing consumer reports, whatever is in my
17   consumer file is what they would provide to
18   whoever is requesting my report.  As a credit
19   reporting agency that's what they do.
20        Q.     What information or evidence do
21   you have that Fundation Group relied upon
22   information from LexisNexis to deny you
23   credit?
24        A.     It is showing on the report

1  that they created an inquiry with LexisNexis.

2  That's where they got the information from.

3          Q.      Did you ever speak with anybody

4  at Fundation Group about the denial of credit?

5          A.      Probably in the past.  I don't

6  recall.  I just know I got a denial.

7          Q.      Do you have an affidavit or

8  some sort of documentation that says "We

9  relied on LexisNexis to deny you credit"?

10         A.      LexisNexis is the only place I

11 see that they pulled the consumer report.

12 It's not on any other consumer reports.

13         Q.      Moving on to the third company

14 that you list in your Interrogatory responses.

15 It says that you were denied by America [sic]

16 Express on May 23, 2021; is that correct?

17         A.      Correct.

18         Q.      What kind of credit were you

19 applying for?

20         A.      I believe that was a credit

21 card.

22         Q.      And what evidence do you have

23 that you were denied credit?

24         A.      I believe I provided a copy of

Page 171

1  that denial.

2          Q.      Do you believe the reason you

3  were denied credit -- and is it America or

4  American Express?

5          A.      Yeah.  I got it wrong.

6          Q.      No problem.  I wanted to verify

7  that I have got the right company.

8          A.      Yeah.

9          Q.      What evidence do you have that

10 you were denied credit by American Express

11 because of information sent by LexisNexis?

12         A.      The denial letter, I believe.

13         Q.      Forgive me.  I didn't see a

14 denial letter in your file.

15         A.      I didn't have one?

16         Q.      I am not saying you didn't have

17 one.  I am just saying I didn't see it.  So I

18 apologize if I overlooked something.

19         A.      I probably would be able to

20 look into it, but I did still provide a copy

21 of the consumer report that shows American

22 Express.  I believe I did provide it.  I have

23 to look again to see.

24         Q.      Like I said, I may have

Page 172

1    overlooked it.  I apologize.  What evidence do
2    you have that LexisNexis reported the PenFed
3    accounts to American Express?
4          A.     Based on consumer reports that
5    I received, based off of that same
6    information.
7          Q.     What evidence do you have that
8    American Express relied on that information to
9    deny you credit?
10         A.     That's the -- LexisNexis is the
11   only credit reporting agency that they
12   requested a consumer report from.
13         Q.     Okay.  And going into your
14   damages further down, we have spoken already
15   about the allegations of the mental and
16   emotional distress and pain, anguish,
17   humiliation and embarrassment.  What facts do
18   you have to support your damages that you have
19   mental and emotional distress?
20         A.     It would be the same as
21   explained before, just denials and everything.
22         Q.     Okay.  What emotional distress
23   have you suffered as a result of the three
24   alleged credit denials listed?

Page 173

```
 1            A.      Not being able to get approved
 2   for any credit.
 3            Q.      Have you ever received
 4   counseling or therapy?
 5            A.      No.
 6            Q.      Have you ever discussed your
 7   mental anguish and distress with anyone?
 8            A.      No.
 9            Q.      Have you ever seen a doctor for
10   these damages?
11            A.      No.
12            Q.      Are you on medication for any
13   emotional distress or mental anguish?
14            A.      No.
15            Q.      Have you ever experienced any
16   physical injuries as a result of your
17   emotional distress?
18            A.      Headaches, kind of physical
19   injuries, so yes.
20            Q.      Do you understand that I
21   represent LexisNexis Risk Solutions, Inc.?
22            A.      From what with you told me,
23   yes.
24            Q.      When you called the LexisNexis
```

Page 174

1    Risk Consumer Center in January of 2022 was it

2    your belief that you were speaking to

3    LexisNexis Risk Solutions, Inc.?

4            A.      Yes.

5            Q.      Okay.   When you called the

6    LexisNexis Consumer Center on June 2nd of 2022

7    was it your belief that you were speaking to

8    LexisNexis Risk Solutions, Inc.?

9            A.      Yes.

10           Q.      And when you called the

11   LexisNexis Risk Solution Consumer Center on

12   August 15th, 2022 was it your belief that you

13   were speaking with representatives of

14   LexisNexis Risk Solutions, Inc.?

15           A.      Yes.

16           Q.      And the written communications

17   that you've received from LexisNexis Risk

18   Solutions, Inc. that are included in your

19   Complaint or in response to any requests for

20   copies of your file, is it your understanding

21   that these documents were sent by LexisNexis

22   Risk Solutions, Inc.?

23           A.      Yes.

24           Q.      You have recently made claims

Page 175

1  against LexisNexis Risk Solutions Florida and

2  LexisNexis Risk Solutions Data Management; is

3  that correct?

4         A.    Yes.

5         Q.    And what is your evidence that

6  these other entities are involved?

7         A.    Based on the information I

8  received from previous cases, I believe I --

9  did I provide that on the record?  I am not

10  sure if I did or not.  I think I just

11  referenced the case with that information,

12  that LexisNexis and these other entities are

13  involved in some way, shape, or form but they

14  are not disclosing everything.

15         Q.    And --

16         A.    That's why I am getting this

17  conflicting information.

18         Q.    And is it your belief that

19  LexisNexis continues to report alleged

20  inaccuracies?

21         A.    Based on the results that I am

22  receiving and copies of the consumer reports

23  after the results, yes.

24         Q.    So based on the copy of the

Page 176

1  May 30, 2022 NCF report that is in your

2  consumer file you believe that LexisNexis

3  continues to report alleged inaccuracies on

4  your PenFed and Rev accounts; is that correct?

5        A.     That's correct until proven

6  otherwise with the discovery I receive.

7        Q.     And based on your prior

8  testimony, you do not recall or you do not

9  know whether PenFed, the accounts, are listed

10 anywhere else in your consumer file; is that

11 correct?

12       A.     Yeah, I don't recall.

13       Q.     Other than the May 30, 2022

14 copy of the NCF report that was requested by

15 State Farm, what evidence do you have as you

16 sit here today that LexisNexis is still

17 reporting inaccuracies?

18       A.     You said based off of the --

19       Q.     I said other than the May 30,

20 2022 copy of your NCF report, what evidence do

21 you have that Lexis is still reporting alleged

22 inaccuracies?

23       A.     Other than that, I don't recall

24 any other ones right now.

```
                                              Page 177

 1                    MS. LLOYD:  Okay.  Well, that's
 2           all the questions I have.  Hopefully
 3           that wasn't too painful.
 4                    THE WITNESS:  It's fine.
 5                    MS. LLOYD:  Thank you for your
 6           time.
 7                        -   -   -
 8                    (Whereupon, a lunch recess was
 9           held from 1:33 p.m. to 2:06 p.m.)
10                        -   -   -
11                       EXAMINATION
12                        -   -   -
13   BY MR. SCHNELL:
14           Q.       Mr. Bruce, my name is Grant
15   Schnell.  As I just mentioned, I represent one
16   of the defendants, Experian Information
17   Solutions, Inc.
18           A.       Okay.
19           Q.       I am going to jump around a
20   little bit.  A lot was covered earlier and I
21   don't want to retread any of that.  It would
22   be unnecessary.  So I may need a couple of
23   moments in between topics or questions just to
24   gather my thoughts.  So if you see me moving
```

Page 178

1   some papers around or scrolling through my

2   computer, that's what I am doing.

3           A.     Sure.

4           Q.     I am trying to just make this

5   as efficient as possible for the remaining

6   time we've got.  Okay.  So what I think I have

7   heard you say today -- and let me know if you

8   disagree --

9           A.     Sure.

10          Q.     -- is that you don't pay your

11  debts on time; is that fair?

12          A.     No, I don't -- yeah.

13          Q.     That's not a fair statement?

14          A.     Not a fair statement based on,

15  like, the information I provided you related

16  to what actually goes on when it comes to a

17  loan.

18          Q.     When you say information

19  provided to you, are you referring to me, the

20  lawyer, or are you referring to Experian?

21          A.     To you, as far as if you're a

22  part of the case then it's already on the

23  record.

24          Q.     Okay.  I am not sure I

Page 179

1  understand that.  What I think I heard you say

2  today earlier, though, is that the Federal

3  Reserve is the entity that is paying your

4  debts.  Is that generally right?

5         A.     The Federal Reserve is the

6  agency that they going to on behalf of the

7  borrower to get the funds.  So if they going

8  to the Federal Reserve on behalf of the

9  borrower, then, yes, they are getting paid and

10 yes, they are registered with the Federal

11 Reserve, I already checked that, since 1994.

12        Q.     My question is a little simpler

13 than that.  My question is:  Is it your

14 contention that Federal Reserve is the entity

15 that has been paying your debts?

16        A.     The Federal Reserve --

17 according to the Federal Reserve Act,

18 according to the law, a promissory note is

19 considered payment.  So yes, if they receiving

20 a promissory note they are going to the

21 Federal Reserve, because they have access to

22 go to the Federal Reserve and the law says

23 that the promissory notes are backed by

24 Federal Reserve notes, so yes.

Page 180

1        Q.      Let's talk specifically about

2    the PenFed -- sorry.  Didn't mean to interrupt

3    you.  Go ahead.

4        A.      I was done.

5        Q.      Let's talk about the PenFed

6    account specifically.

7        A.      Sure.

8        Q.      It's your contention that the

9    Federal Reserve paid part of that account,

10   correct?  Yes or no?

11       A.      I am saying they paid the whole

12   account.

13       Q.      Understood.  Is that same thing

14   true for the Rev FCU account we have been

15   talking about earlier today?

16       A.      Rev, no.  Their account was

17   paid off based off of the credits that they

18   received from the IRS.

19       Q.      Your contention is that the IRS

20   paid for the entirety of the Rev FCU account,

21   correct?

22       A.      Rev based on they own in-house

23   transaction, that account balance should have

24   been zeroed out, but they go to the IRS to get

Page 181

1  recoupment of that credit.  So when they

2  charge it off, they charge it off to the

3  allowance for loan or lease account, that is a

4  separate account and there is a debiting and

5  crediting transaction that goes on there.

6  That is not documented and that should be

7  documented as part of the policies.  So the

8  economic principals that everyone has is not

9  100 percent, you know, informed about that

10  transaction.

11        Q.     You would agree with me, sir,

12  that sir Rev FCU was not paid, correct, by

13  either you or the IRS?

14        A.     Well the transaction is created

15  based on my account, so it's based on my

16  account.

17        Q.     That's not my question, sir.

18        A.     What's your question?  Go

19  ahead.

20        Q.     Your Rev FCU account, you would

21  agree with me that neither you nor the IRS

22  made payments on that account?

23        A.     Correct.  Well, I didn't make a

24  payment.  IRS provided them credit, so --

Page 182

1  because you're asking me if IRS made a

2  payment, whether they received a payment.  I

3  say they received a credit in the amount of

4  whatever the debt was and that offsets that

5  balance.

6          Q.     You agree with me the IRS did

7  not make any payment for that debt, correct?

8          A.     Credit is payment.

9          Q.     Would you agree with me, sir,

10 that -- you have been talking a lot about

11 inaccurate reporting.  Would you agree with me

12 if the reporting by Experian in the credit

13 reports was accurate that you would not have

14 any FCRA claims against Experian?

15         A.     Repeat that question.

16         Q.     Yes.  If Experian's reporting

17 of your information was accurate, then you

18 would not have any FCRA claims against

19 Experian, correct?

20         A.     Correct.

21         Q.     In Paragraph 12, I think it is,

22 of your third Amended Complaint there is an

23 allegation that says Experian is a quote,

24 furnisher, end quote of consumer credit

Page 183

1    information.  Do you recall that allegation?

2         A.    Yes.

3         Q.    Do you understand that a

4    furnisher as opposed to a consumer reporting

5    agency has a specific meaning under the FCRA?

6         A.    Yes.

7         Q.    What is the factual basis for

8    your contention that Experian is a furnisher

9    under the FCRA?

10        A.    Well, they furnish information

11   to LexisNexis and LexisNexis is using that

12   information to report.

13        Q.    I will break that down.  What

14   information do you contend was reported by

15   Experian to LexisNexis?

16        A.    The PenFed account and whatever

17   is in that National Consumer File, I guess it

18   was.  They reporting that as part of their

19   consumer report.  Plus, when they do the

20   dispute it goes back to whoever they got their

21   information from, which is considered usually

22   the data furnisher, which is Experian.

23        Q.    So in other words, your

24   contention is that because Experian publishes

Page 184

1    a consumer report that makes it a furnisher of
2    information under the FCRA?
3             A.      No.   They reporting information
4    to a consumer reporting agency as it relates
5    to a consumer.
6             Q.      I don't think this was covered
7    earlier.   Are you currently employed, sir?
8             A.      I work for myself.
9             Q.      Okay.   And what would you say
10   your occupation is?
11            A.      It was covered before, data
12   entry.   We talked about that at the beginning.
13            Q.      Okay.   How long have you been
14   doing data entry self-employment for?
15            A.      This one was for about as
16   presented before, it was in November of last
17   year, about around that time frame, and then
18   before that it was -- it was consulting my
19   real estate stuff.
20            Q.      Understood.   Sorry.   I must
21   have just missed that.   I don't mean to --
22            A.      Yeah.   I mentioned that at the
23   beginning.
24            Q.      You discussed earlier a number

Page 185

1   of different lawsuits you have been involved

2   in.  Do you recall that testimony?

3           A.     Yes.  We provided that

4   information as well at the beginning.

5           Q.     I was just asking if you

6   remember talking that earlier.

7           A.     Yes.

8           Q.     Were you deposed in any of

9   those lawsuits?

10          A.     Yes.

11          Q.     How many of those lawsuits were

12  you deposed?

13          A.     Two.

14          Q.     Which lawsuits were those?

15          A.     The Experian, Equifax, and

16  TransUnion, one with the state law claims, and

17  the TransUnion versus Rev case.

18          Q.     Have you ever been late on

19  paying your taxes, sir?

20          A.     Not that I can recall.

21          Q.     Have you ever filed for

22  bankruptcy?

23          A.     Yes.

24          Q.     When did you file for

Page 186

1  bankruptcy?

2      A.    It was in in 2007, but it was

3  withdrawn -- I mean, 2017, but it was

4  withdrawn shortly after.

5      Q.    What was the purpose in filing

6  bankruptcy in 2017?

7      A.    I think it was mostly related

8  to the foreclosure issue, but then I found a

9  better way to address that.

10     Q.    When you say the foreclosure

11 issue, you're referring to the Carrington

12 Mortgage account?

13     A.    Correct.  Based on -- it's a

14 lot of issues related to that case that's

15 going on.

16     Q.    What was that?

17     A.    It was more directed for an

18 actual litigation type based versus a

19 bankruptcy.  So it was redacted, basically,

20 withdrawn.

21     Q.    What property did the

22 Carrington Mortgage account relate to?

23     A.    The ███ property, Pavilion

24 Street.

Page 187

1          Q.     Can you provide that full
2     address again?
3          A.     ███   Pavilion Street.
4          Q.     Is that your current address as
5     well, sir?
6          A.     Yes.
7          Q.     And, obviously, your house has
8     not been foreclosed on finally, correct?
9          A.     Correct.
10         Q.     So that case is still in
11    litigation?
12         A.     Correct.
13         Q.     When was the last time you made
14    a payment on that mortgage?
15         A.     Last time, as far as additional
16    payments, would probably have been 2015.
17         Q.     You have resided in that house
18    since 2015 without making a payment; is that
19    correct?
20         A.     Without making any additional
21    payments, correct.
22         Q.     Did you pay the loan in full?
23         A.     They have already been paid as
24    well.

Page 188

```
 1            Q.     And that's also pursuant to the
 2    theory that the Federal Reserve paid for the
 3    mortgage?
 4            A.     There's a lot of other theories
 5    Reese associated with that, so --
 6            Q.     You didn't pay money?
 7            A.     It's pretty much what I -- I
 8    have facts on, so ...
 9            Q.     But you didn't pay money on the
10    loan, that's right, correct?
11            A.     Well, anything that's done on
12    my behalf is pretty much coming from me.
13            Q.     But you personally, sir, I am
14    asking you about you, not anything done on
15    your behalf, you did not make payments on that
16    mortgage, correct?
17            A.     I don't know what you mean by
18    personally.
19            Q.     Well, have you ever paid for
20    gas, sir?
21            A.     Yeah, I use my -- if I pay for
22    gas, if I paid with, what, $20 isn't that an
23    instrument, $20, I am paying for gas.
24            Q.     That's what I am asking.
```

Page 189

1          A.      So I provide a promissory note,
2    yes, I paid for it.
3          Q.      You personally paid for it, you
4    understand that, right?
5          A.      My promissory note is my
6    personal instrument, is it not?
7          Q.      That's what I am getting at.
8          A.      Yes.
9          Q.      You personally paid for that
10   gas?
11         A.      I am saying yes, based on my
12   promissory note.
13         Q.      But you did not personally pay
14   for the mortgage since 2015, correct?
15         A.      I didn't pay any additional.
16         Q.      Do you think that's fair you've
17   been living in a property for nearly ten years
18   and you haven't made any payments?
19         A.      I don't think it's fair that
20   the banks like to hold off stuff and hide
21   information and not disclose the full
22   transaction.
23         Q.      That wasn't my question, sir.
24         A.      Well, that's the question --

Page 190

1    that's the answer.

2         Q.    Okay.  Earlier you mentioned

3    something about an accounting principle and

4    you were talking about theories of payment.

5    Are you an accountant, sir?

6         A.    Am I an accountant, no, I am

7    not an accountant.

8         Q.    Do you know what a charge-off

9    is?

10        A.    I know what I read related to a

11   charge-off and what goes on in that

12   transaction.

13        Q.    Can you tell me what you

14   believe and understand a charge-off is in your

15   own words?

16        A.    I believe -- I can tell you

17   what I read as it relates to this situation

18   when it comes to PenFed, that, as I explained

19   before, PenFed has an allowance for loan and

20   lease lost account, which is a reserve account

21   for any losses.  When they charge off an

22   account, which means that they -- they take

23   the balance and transfer it or -- it's really

24   debited from one account to another.  So they

Page 191

1   debt the allowance account and credit the
2   receivable balance on an account, so it's not
3   even associated with that account no more.
4   But they are reporting a balance, so if they
5   did the proper accounting it would document
6   did the proper accounting of where that
7   balance actually is.  It's no longer with the
8   current account.  It's a different account
9   that it is associated with now.
10          Q.      Does that complete your answer?
11          A.      Yes.  And evidence of that is
12   on the record as well.
13          Q.      Earlier I think you looked at,
14   it was Exhibit-17, it was a $4,000 money
15   order.  Do you remember that?
16          A.      Yes, money order, bill of
17   exchange.
18          Q.      Bill of exchange.  Is there a
19   difference in your mind between a money order
20   and a bill of exchange?
21          A.      Kind of similar in nature.
22          Q.      But can you tell me what the
23   difference is?
24          A.      I don't recall the difference

Page 192

1  right now, but the money order is pretty much

2  based off of the Federal Reserve Act as well.

3         Q.     Are you aware where that money

4  order was issued from?

5         A.     I don't recall.

6         Q.     You mentioned before your data

7  entry work and you were in the real estate

8  business; is that right?

9         A.     Yes.

10         Q.     What do you do in the real

11  estate industry?

12         A.     In the real estate I used to

13  just buy and flip houses.

14         Q.     Do you have to be licensed to

15  do that?

16         A.     No.

17         Q.     Are you licensed at all in

18  connection with any real estate business you

19  have or had?

20         A.     Not licensed, no, not -- I

21  think it depends on what location they require

22  you to have a business license and if it was

23  required I would have it by then, but I don't

24  have any as of now because I am not doing that

Page 193

1    business right now.

2         Q.     At the time did you have a

3    separate entity that you were running this

4    real estate business through, a registered LLC

5    or corporation?

6         A.     No.  Not for real estate, no.

7         Q.     Have you ever registered a

8    business entity?

9         A.     Well, actually, I did have

10   another one.  It was a partnership.  It was

11   cash flowing properties a while back for real

12   estate.  But yeah, that was before the capital

13   return investments.

14        Q.     I want to talk about your claim

15   specifically to Experian.  I understand -- my

16   understanding, at least, of one them is that

17   you believe Experian -- my understanding, sir,

18   is that one of your claims against Experian is

19   that it failed to conduct a reasonable

20   reinvestigation of your disputes.  Do you

21   agree with that?

22        A.     Yes.

23        Q.     How many disputes as it

24   concerned Experian are at issue in your

Page 194

1  complaint?

2          A.      I believe it's two.  Yeah, I

3  believe it was two of them.

4          Q.      Okay.  Fair.  I pulled up one

5  of the video screens --

6          A.      I know there was one related to

7  September of 2021.  And I think --

8          Q.      Let me ask you about that

9  September of 2021 dispute.

10         A.      Okay.

11         Q.      Do you recall what accounts you

12  are contending serve as a basis of your

13  reinvestigation claim against Experian in that

14  September 2021 dispute?

15         A.      I think it was mostly the

16  credit card.  I think I disputed both of them

17  or three of them.  But the balance -- go

18  ahead.

19         Q.      That's PenFed, right, is

20  essentially what I am trying to get at?

21         A.      Rev was on there as well.

22         Q.      What was that?

23         A.      Rev Federal Credit Union was on

24  there.

Page 195

1         Q.     Any others that you can recall?

2         A.     Those four, I believe.

3         Q.     And a similar question but with

4 the second dispute, I will let you know the

5 Complaint at least says it was June of 2022.

6         A.     Okay.

7         Q.     Was it the same accounts at

8 issue in that second dispute?

9         A.     I believe it was, with the

10 exception of maybe one.

11         Q.     You mean one of the PenFed

12 accounts --

13         A.     I believe so, yeah.

14         Q.     -- had been corrected by 2022?

15         A.     I don't recall whether it was

16 corrected or not.  It might have been, but I

17 don't think I disputed it.

18         Q.     But no other accounts other

19 than the PenFed or Rev FCU at issue in this

20 case; is that fair?

21         A.     Correct.  Correct.

22         Q.     What is the basis of your

23 allegation that Experian failed to reasonably

24 reinvestigate your disputes?

Page 196

1          A.      Well, one, as spoken about

2    before, is that they failed to document the

3    account has been transferred and sold to a

4    third party.   There is some issues with the

5    dates, I believe, that I have highlighted in

6    the case.   There was a copy of the dispute

7    directly with the credit bureaus that they

8    failed to address as well, but that was

9    disputed under the Fair -- not Fair Credit --

10   Fair Credit Billing Act, which they failed to

11   review that as well.   They failed to document

12   that, which requires them to document the

13   account as disputed and they still didn't do

14   that as well.

15          Q.      Sir, you don't know what

16   Experian did to reinvestigate your account,

17   correct?

18          A.      They provided some results, but

19   they didn't provide whatever procedure they

20   used.   I think I requested that, if I am not

21   mistaken.   I have to go back and check.

22          Q.      My question is a little

23   different.   You don't know because you don't

24   work for Experian, right?

Page 197

1          A.      Correct.

2          Q.      You don't know what procedure

3  they took to reinvestigate either of your

4  disputes, correct?

5          A.      Well, I know that they created

6  an ACDV, which is an automatic dispute

7  resolution.

8          Q.      You know that through the

9  lawsuit, right?  You found it in discovery?

10         A.      What's that?

11         Q.      You learned that in discovery

12  in this case, right.

13         A.      No.  I had that already part of

14  my claims.

15         Q.      I am going to ask about the

16  second claim instead, which is the procedures

17  claim.  You understand that is a separate

18  claim in your lawsuit against Experian?

19         A.      Yes.

20         Q.      You allege Experian failed to

21  establish or follow procedures, maintain

22  possible accuracy of information, right?

23         A.      Yes.

24         Q.      In what way do you think

Page 198

1   Experian failed to establish or follow those
2   procedures?
3          A.     Well, as it relates to the
4   state claims, they don't have procedures in
5   there that require them to get specific
6   documentation as it relates to the
7   verification of the accounts, which is
8   required by the state.  In their documents
9   they reference that they are required to
10  follow the state laws as well as the federal
11  laws, but they don't have that part of they
12  policies and procedures.
13         Q.     Have you seen Experian's
14  policies and procedures, sir?
15         A.     I believe I have a copy from a
16  previous case.
17         Q.     I also understand from the
18  Complaint you're alleging a defamation claim
19  against Experian, right?
20         A.     Yes.
21         Q.     Other than what you talked
22  about with respect to the reinvestigation
23  procedures claim, is there anything different
24  about the defamation claim, any other facts

Page 199

1    supporting the defamation claim that are

2    different?

3           A.      No.  It would be the same as

4    what I presented before.

5           Q.      Are you contending that any

6    damages caused by Experian were different than

7    any of the other defendants in this case?  In

8    other words, are you seeking the same damages

9    against Experian as you are all of the other

10   defendants?

11          A.      The same type of damage there.

12   Of course, there's different reports that's

13   being pulled.  One might report -- pull from

14   TransUnion.  One might pull from Experian or

15   Equifax.  So separate damages as relates to

16   those.

17          Q.      Tell me, then, which ones are

18   you contending pertain to Experian?

19          A.      I believe I provided that in

20   the discovery.  You have to pull that up.

21          Q.      The first one here looks like

22   Navy Federal, which you talked about earlier,

23   right?

24          A.      Yes.

Page 200

1          Q.     It was a business credit card

2    in the amount of $20,000, denied May 13, 2022,

3    right?

4          A.     Correct.

5          Q.     I want to shortcut it this way:

6    Other than any documents you have, is there

7    any other evidence you intend to provide

8    showing that Experian was the entity that

9    damaged you in connection with any of these

10   credit denials identified in your

11   Interrogatories?  In other words --

12         A.     No.  Yeah, I get it.  Not at

13   the moment.  Whatever I provided so far is

14   what I have.

15         Q.     By the way, this Navy Federal

16   account for $20,000 you applied for in May of

17   2022, if you did get a $20,000 credit with

18   Navy Federal, did you ever intend to pay that

19   money, or the Federal Reserve had paid that

20   account as well?

21         A.     I haven't addressed that issue

22   yet, so it is not an issue --

23         Q.     That wasn't my question.  My

24   question is:  If you had been actually been

Page 201

1    extended credit in the amount of $20,000, you

2    would agree with me that somebody had to pay

3    Navy Federal back, right?  My question is --

4            A.    Apparently, I am paying

5    additional payments, so if that answers the

6    question.

7            Q.    No.  This is an account that

8    you don't have, right.  We are talking

9    about this $20,000 business credit card,

10   right?

11           A.    Okay.  Go ahead.

12           Q.    If you have been extended

13   credit, which you weren't, in the amount of

14   $20,000 by Navy Federal, you would agree with

15   me that somebody had to pay Navy Federal back,

16   right?

17           A.    Yes, if they provide a loan.

18           Q.    My question, then, is:  Was it

19   your intent if you have been granted this

20   $20,000 credit that you would ever pay that

21   money as opposed to the Federal Reserve?

22           A.    As I stated before, it's paid

23   on my behalf, so regardless, it would have

24   been paid.

Page 202

1          Q.     Is it fair to say that all of
2     the accounts identified in your
3     Interrogatories as to Experian, any credit
4     that you have would have been extended and you
5     weren't, you are claiming these are damages,
6     any amount of credit would have been paid back
7     on your behalf, not by you, correct?
8          A.     I mean, it's still me.  It's on
9     my behalf.  It's nobody else behalf, so ...
10          Q.     Sitting here today, sir, do you
11     know what the total calculation of damages
12     you're seeking against my client, Experian,
13     is?
14          A.     I am not sure.  Did I provide
15     one -- I am not sure if I provided one or not
16     during discovery.
17          Q.     I am not asking about in
18     discovery.  Sitting here today, you're
19     testifying under oath, do you know how much
20     you're seeking against my client, Experian, in
21     this case?
22          A.     No, I don't recall that.
23          Q.     More than $10,000?
24          A.     Yes, I am sure it's more than

Page 203

1    ten.

2            Q.      More than $100,000?

3            A.      I don't recall.  It might be

4    around that range.

5            Q.      Less than $150,000, though?

6            A.      Close to a settlement maybe.

7            Q.      I am not asking about

8    settlement.

9            A.      In total, I can't recall.  I

10   don't recall the total damages without looking

11   at what I already calculated.

12           Q.      You would agree with me that

13   Experian would be entitled to know that at

14   some point in the case, right?

15           A.      Yes.  Yes.  Like I said, I

16   think I provided it.  I am not sure.  If not,

17   it will definitely be coming soon.

18           Q.      You may have.  By the way,

19   let's take the PenFed account as an example,

20   and the Federal Reserve is paying this debt on

21   your behalf.  Can you tell me when that

22   payment was made?

23           A.      That would be a question

24   related to discovery.  I am still waiting on

Page 204

1   discovery from PenFed.

2        Q.    So your testimony is, then,

3   that you don't know, right, if a payment --

4        A.    I don't know the exact dates,

5   no.

6              MR. SCHNELL:  Those are all the

7        questions I have for you at this

8        moment, sir.

9              MR. BARTON:  I will jump in

10       next.

11                   —  —  —

12              EXAMINATION

13                   —  —  —

14   BY MR. BARTON:

15       Q.    Mr. Bruce, my name is Eric

16   Barton.  I represent Equifax in this case.

17   You realize you're still under oath, correct?

18       A.    Correct.

19       Q.    Great.  How much money did you

20   make in 2021, approximately?

21       A.    I don't recall.

22       Q.    Give me a ballpark.

23       A.    I don't -- I am under oath, so

24   I don't want to throw out numbers.

Page 205

```
 1          Q.     I understand it's not a
 2   specific number.  You can't provide any
 3   estimate at all?
 4          A.     No, because I haven't really
 5   thought about what I have made or went through
 6   any documents related to that.
 7          Q.     Was it more than $100,000?
 8          A.     I don't recall.
 9          Q.     No idea at all?
10          A.     No.
11          Q.     How about in 2022, two years
12   ago, approximately how much money did you
13   make?
14          A.     Yeah, I don't recall either.
15          Q.     You can't even make an
16   approximation?
17          A.     No.
18          Q.     How about last year, 2023?
19   Approximately how much money did you make?
20          A.     I don't know.  I don't recall.
21          Q.     $50,000?  You can't provide any
22   estimate, any range?
23          A.     No.
24          Q.     This year, approximately how
```

Page 206

1   much money have you made this year?

2          A.     I want to say a couple

3   thousand, but I am not sure.

4          Q.     Where do you recall receiving

5   payments from this year?

6          A.     Basically from the data entry.

7          A.     You mentioned the data entry.

8   What data are you entering?

9          A.     Just data from clients.

10         Q.     What clients?

11         A.     Certain information that they

12  provide me that they want documented.

13         Q.     What clients?

14         A.     Just whatever comes through the

15  data entry.

16         Q.     With all due respect, that's

17  pretty vague, data entry.  I mean, data for

18  what?

19         A.     It's just information that

20  someone provides me that they want documented.

21         Q.     Such as?

22         A.     Because its personal

23  information, I don't want to say kind of what

24  it is.  Data entry information they provide me

Page 207

1  that they want documented.

2          Q.      Companies or individuals?

3          A.      These are individuals -- well,

4  they are, like, sole proprietors.

5          Q.      Does this in any way have to do

6  with credit reporting?

7          A.      No.

8          Q.      Do you ever help any people or

9  companies with credit disputes?

10         A.      I provided information before.

11         Q.      When did you do that?

12         A.      I don't recall the dates.

13         Q.      Do you still occasionally do

14  that?

15         A.      Not really.

16         Q.      Did you do it last year?

17         A.      I don't recall.  I don't think

18  I did.  I don't recall.

19         Q.      How many times have you helped

20  either a company or an individual with

21  disputing credit information?

22         A.      I don't recall.  They send out

23  they own information.  I just provide them

24  related to what the law provides and provide

Page 208

1    them a section to review.

2         Q.      I understand.  How many times

3    have you done that?

4         A.      I don't recall.  Probably a few

5    times, six, seven.  I don't know.  I don't

6    recall.

7         Q.      Did you charge people to do

8    that?

9         A.      I think I charged them for my

10   time.

11        Q.      You charged them for your time?

12        A.      Yeah.

13        Q.      How did they find you to do

14   that?

15        A.      I guess friends of friends.

16        Q.      Did you advertise at all?

17        A.      No.

18        Q.      This data entry you're doing,

19   is this on behalf of a company?

20        A.      I'm subcontracted basically.

21        Q.      For who?

22        A.      It's called Datamass, is the

23   company.

24        Q.      So Datamass is the company.

Page 209

1  You're a subcontractor for them and they

2  provide you with data to enter?

3          A.      Yeah.

4          Q.      And what are you entering it

5  into?

6          A.      I -- just some, I guess,

7  documents, I guess.  It's just whatever

8  information, they provide it to me, I enter it

9  into a document and provide it back to them.

10          Q.      What do you charge them?  Do

11  you charge them per hour?

12          A.      It's whatever the company

13  charges.  I just get paid a percentage.  It's

14  not by hourly.

15          Q.      How many hours a week do you do

16  that?

17          A.      I would say maybe five to eight

18  a day, probably about five hours a day.  I

19  would say five days a week, maybe six.  Just

20  depends on the situation.

21          Q.      And you've been doing that

22  approximately how long?

23          A.      Just recently.  I just kind of

24  trained, just kind of finished, somewhere in

Page 210

1  maybe February.

2          Q.      You've been doing this since

3  February?

4          A.      Yeah, probably about February

5  of this year.

6          Q.      And how often do they pay you?

7          A.      It's once a month really.

8          Q.      So how much did you make last

9  month approximately?

10         A.      Last month I think it was,

11  like, $600.

12         Q.      And you said you made -- you

13 think you've made, what, $2,000 or $3,000 this

14 year?

15         A.      I don't know if I can say.  It

16 was an estimated number, so I don't

17 100 percent know.

18         Q.      Understood.  Approximately?

19         A.      Probably, approximately.

20         Q.      Any other source of income this

21 year?

22         A.      No.

23         Q.      Where are you sitting right

24 now?  Where are you at?  I'm sorry if you said

Page 211

```
 1   this.
 2           A.      I am at my house.
 3           Q.      What's that address?
 4           A.      ███  Pavilion Street.
 5           Q.      And who lives there with you?
 6           A.      My sister.
 7           Q.      What's her name?
 8           A.      Cherita Trotter (ph).
 9           Q.      How long has she been living
10   there with you?
11           A.      Probably about two years,
12   almost two years, about a year and a half
13   maybe.
14           Q.      Does she pay rent at all?
15           A.      No.
16           Q.      Over the last year and a half
17   or however long she's been there has Sharita
18   paid you rent to live there?
19           A.      No.
20           Q.      You said you have one child?
21           A.      Yes.
22           Q.      Do you make any child support
23   payments?
24           A.      No.
```

Page 212

```
 1          Q.      Are you still in touch with the
 2   child's mother?
 3          A.      Yes.
 4          Q.      Are you still in touch with the
 5   child?
 6          A.      Yes.
 7          Q.      How old is the child?
 8          A.      ████ .
 9          Q.      You have been asked a lot of
10   questions about promissory notes.  In your own
11   words, Mr. Bruce, what is a promissory note?
12          A.      In my own words as relates to
13   what the law said, it's pretty much tender of
14   payment.
15          Q.      Well, would you agree with me
16   that a promissory note is a promise to pay?
17   Promissory, sort of in the word, a promissory
18   note is a promise to pay.  Do you disagree
19   with that?
20          A.      That's how it's defined in the
21   law, yes.
22          Q.      Okay.  So if a person signs a
23   promissory note that means they are agreeing
24   to pay the amount of the promissory note; is
```

Page 213

1    that fair?

2              A.     Correct.

3              Q.     Okay.  So when you sign a

4    promissory note aren't you agreeing, Mr.

5    Bruce, to pay that amount to whoever you sign

6    the promissory note to?

7              A.     Correct.

8              Q.     So I will admit, I am at a

9    complete loss how anyone who signs a

10   promissory note then someone other than that

11   person is obligated to pay it.  Is that what

12   you're saying?

13             A.     Well, the issue is, is when you

14   sign a promissory note they don't keep it as a

15   promissory note.  They convert it.  The

16   conversion changes it into a draft instrument.

17             Q.     Who converts it?

18             A.     The banks.

19             Q.     What are you basing that on?

20             A.     The law.

21             Q.     The law, what, tell me.

22             A.     It's all on the record.  I

23   don't know why -- it's on the record.  All you

24   got to do is review the record.

Page 214

1            Q.        I have reviewed everything in
2    this case.  You're getting deposed right now.
3    I need you to tell me that what you base that
4    statement on.
5            A.        The Federal Reserve Act, the
6    information that relates to that.
7            Q.        So according to you, Mr. Bruce,
8    anyone in America, if they sign a promissory
9    note they don't have to pay it back.  The
10   government will cover that cost; is that what
11   you're saying?
12           A.        That's what the law says.
13           Q.        You can't honestly believe
14   that, sir, can you?
15           A.        Well, provide me a copy of the
16   law that says it's not true.
17           Q.        There is nothing in the law
18   that says that, sir.
19           A.        What?  So you got proof that
20   the banks don't go to the Federal Reserve?
21           Q.        You're asking me to prove that
22   the banks don't --
23           A.        I can --
24           Q.        There's nothing no support that

Page 215

1   statement, sir --

2            A.    I can --

3            Q.    -- do you agree with me?

4            A.    I can prove that they are

5   stamping these notes and they're going to the

6   Federal Reserve, because that's what the stamp

7   constitutes as.  That's what the law shows.

8   That's what the information as far as how they

9   deposit is documented.  They going according

10  to the law.  So this is exactly what they are

11  doing according to the law.

12           Q.    So everybody that signs a

13  promissory note to get a credit card or a

14  mortgage, they would be foolish to actually

15  pay that because the government should be

16  paying that directly?  Is that what you're

17  actually saying?

18           A.    I don't make the law.  I am

19  just going by what's written.

20           Q.    But you agree with what I said,

21  correct?

22           A.    That's the case.

23           Q.    Why does anyone pay any debt

24  that they take out if the government is on the

Page 216

1    hook for it?  Why would anyone make a payment?

2            A.     Well --

3            Q.     They don't know the law?  Only

4    you know what the law is?  Is that what you're

5    saying?

6            A.     That might be the case.  I

7    don't know what they know.  I can only speak

8    to what I know and read and what I can see.

9            Q.     In the lawsuits that you said

10   that you were previously involved in, some of

11   those settled, correct?

12           A.     Correct.

13           Q.     Did you ever receive any

14   monetary payment as part of any of those

15   settlements?

16           A.     I believe so.

17           Q.     Okay.  How about the T-Mobile

18   case?  Did they pay you?

19           A.     I received a settlement.

20           Q.     Correct.  Did they pay you as

21   part of the settlement?

22           A.     Well, that's confidential.  So

23   I am only at liberty to say it was settled

24   based on our agreement.

Page 217

1          Q.        You're saying that you signed a
2    confidential settlement?
3          A.        Agreement, yep.
4          Q.        How about with Bank of America?
5    You mentioned a Bank of America lawsuit.  Did
6    that settle for payment to you?
7          A.        Like I said all, I can say, it
8    was settled.  Same thing, confidential
9    agreements.
10         Q.        Well, you didn't say that
11   before.  So you're saying that you can't tell
12   me what the terms of the settlement were?
13         A.        No.  I said it was settled
14   before.  You never posed the question whether
15   there was actually payment of money.
16         Q.        That's right.  That's why I am
17   asking it now.
18         A.        I am telling you, it is
19   confidential, whether there was payment --
20   whether there was money involved or not.
21         Q.        Did you receive payment in that
22   case?
23         A.        That's the same question
24   rephrased.

Page 218

1          Q.      All right.  So you won't answer

2     that one.  Was there a second Bank of America

3     case?  Were there two Bank of America cases?

4          A.      Yes, I believe there was two.

5          Q.      And did both of those settle?

6          A.      Yes.

7          Q.      And did both of those settle

8     pursuant to a confidential settlement?

9          A.      Yes.

10         Q.      You mentioned a Carrington

11    Mortgage lawsuit.  That also settled; is that

12    correct?

13         A.      Yes.

14         Q.      Did you receive payment as part

15    of that settlement?

16         A.      Same thing, confidentiality

17    agreement.

18         Q.      Approximately when did the

19    T-Mobile lawsuit settle?

20         A.      I think it was last year.

21         Q.      Okay.  How about the two Bank

22    of America cases?

23         A.      I want to say one was last year

24    and the other one was, I think around 2017.

Page 219

1          Q.     And then Carrington Mortgage,

2    when was that?  When did that resolve?  Was

3    that that before 2020, I think you said?

4          A.     Was it in 2020?  No, I think

5    it -- it might have been -- it had to have

6    been between '17 and '18, I believe, or might

7    have been '18 and '19.  They were kind of

8    related close to the same thing as the Bank of

9    America first case in 2017.  So it was kind of

10   closely around the same time frame.

11         Q.     In 2023 last year, were you

12   employed by anyone?

13         A.     I just worked for myself, so

14   no.

15         Q.     What were you doing for

16   yourself in 2023?

17         A.     I think still the same thing,

18   consultation, just for my time.  I charge

19   people a little bit of money for my time.

20         Q.     Time to do what?

21         A.     Consultation.  They asking me

22   information about, you know, the market or

23   something like that and I would provide

24   certain information.  If they want a strategy

Page 220

1   to do this or that with real estate I provide
2   that information.
3         Q.      With all due respect, I don't
4   know.  So you did real estate consultation in
5   2023?
6         A.      Yeah.  So as I presented
7   before, I used to be doing investments, so,
8   like, buying and flipping and stuff like that.
9   So I provide strategies.  Like, someone come
10  and ask me about a strategy.  They want to get
11  into this type of investment.  I might provide
12  information related to that.
13        Q.      And how much did you charge
14  them for that?
15        A.      I don't recall what the charge
16  was.
17        Q.      Do you charge, like, an hourly
18  rate for your time?
19        A.      I don't think it's hourly.
20  Probably just a set.
21        Q.      Well, give me one example.  I
22  mean what would you charge for someone that
23  says they want some guidance in real estate?
24        A.      Maybe 75, maybe, to 150

Page 221

1    probably, I don't --

2          Q.     Seventy-five to $150?

3          A.     Yeah, maybe.

4          Q.     And how many people,

5    approximately, did you help consult in 2023?

6          A.     I don't recall.

7          Q.     Did you pay taxes in 2023?

8          A.     I don't -- I got an issue with

9    my taxes right now, so I don't know what's

10   going on.

11         Q.     Did you file for -- did you

12   file taxes?

13         A.     In '23, no.

14         Q.     In 2023?

15         A.     No.

16         Q.     How about in 2022?

17         A.     I don't believe I did.

18         Q.     2021?

19         A.     I believe I did, but I think

20   those are the ones that is under review.  So

21   there is whatever situation that is and they

22   haven't taken the time to get back with me.

23         Q.     2023, did you make more money

24   off of the settlements you reached or with the

Page 222

1    work that you did helping people?

2           A.     I don't recall.

3           Q.     Possibly more in the

4    settlements, yes?

5           A.     The way it's referenced, the

6    way I receive a payment or not with

7    settlement, so I don't recall.  I can't answer

8    the question.

9           Q.     I don't follow.  You indicated

10   that you received settlement payments.  You

11   can't tell me how much?

12          A.     I said I received a settlement.

13   I never said it was a payment or not.  Your

14   question is now whether there's a payment and

15   I am telling you I can't answer that because

16   it's confidential.

17          Q.     So you are refusing to answer

18   that question; is that fair?

19          A.     I don't understand.  I can't

20   answer it based on an agreement.

21          Q.     I haven't seen the agreement.

22   Will you provide the agreements to me?

23          A.     Sure.

24          Q.     Okay.

Page 223

1          A.      I believe one of them you had
2     because you represented your client in a
3     previous case.
4          Q.      You also were asked about
5     charge-offs earlier.  Just out of curiosity,
6     if a lender charges something off, if the
7     lender loans someone money and then they
8     charge that amount off, that's not the same as
9     the lender getting paid that money, correct?
10          A.      I don't know.  I don't know
11     whether it's paid or not.  I just know that
12     the transaction itself creates an accounting
13     and --
14          Q.      I'm saying, a person goes to a
15     bank and they say "Will you loan me $5,000?"
16     The bank says yes and they give that person
17     $5,000 and that person says "I'll pay you
18     back" and then that person doesn't pay them
19     back.  So the bank is out $5,000 and they then
20     charge it off, correct?
21          A.      I can't confirm whether they
22     out of money or not, because they got to prove
23     whether they actually funded it.
24          Q.      Well, I thought you testified

Page 224

1   before that a charge-off, it's the same as

2   getting paid.

3           A.      No.  I said a credit is the

4   same thing as getting paid.

5           Q.      I don't follow.

6           A.      If they receive a credit, isn't

7   credit payment as currency in America?

8           Q.      No, they don't credit.  They

9   are writing in their accounting books "This

10  debt is not collectible.  We are charging it

11  off.  It's down to zero."  There is no payment

12  back to them, correct?

13          A.      And that's what the issue is.

14  You all saying it's written down in they

15  books, but according to what I am reading

16  related to they policies and procedures and

17  the actual account, there is actually an

18  account, there is a debiting and crediting

19  transaction within that account.  It's not

20  just writing it down.  That's the

21  misconception.

22          Q.      You're saying money is actually

23  coming from somewhere else to pay it off?

24          A.      Money is being transferred from

Page 225

1  one account to another account when they

2  charge it off.  That's what I am saying.

3          Q.      And you base that on what?

4          A.      Their own procedures.  It's on

5  the record, allowance for loan or lease losses

6  account.  The evidence is there.

7          Q.      Would you agree that it's

8  possible you're wrong on that, sir?

9          A.      You got to prove me wrong.

10         Q.      Do you agree it's possible

11  you're wrong?

12         A.      No, I don't agree.

13         Q.      You believe it's impossible

14  that you're wrong?

15         A.      Based on what -- like I said,

16  the law and they policies and procedures as it

17  relates to National Credit Reunion -- Credit

18  Union, whatever that is, the NC -- what is

19  it -- the Credit Union Association or whatever

20  that is, this is their policy when charging

21  off accounts.  They have to have a reserve

22  account and their transactions so that they

23  have a certain amount in that account and that

24  account is supposed to be used when they

Page 226

1    charge off the account.  So until they provide

2    documents that don't say that, that's what it

3    says, because the documents I provided on the

4    record shows that this is what they do.

5            Q.     If a lender lends someone money

6    and that person does not pay it back are they

7    allowed to classify it as a charge-off?

8            A.     They are required to charge it

9    off after 90 days.

10           Q.     So there would be nothing

11   improper about that furnisher -- I'm sorry?

12           A.     180 days they are required to

13   charge it off and they required to write it

14   off after 180 days.

15           Q.     So in that case there would be

16   nothing improper about the lender who provided

17   that loan, that didn't get it paid back, to

18   report out to credit reporting agencies that

19   they charged it off, correct?

20           A.     I am only going by what they

21   policy, so ...

22           Q.     You've got to listen to my

23   question.

24           A.     I am.

Page 227

1      Q.      Is there anything improper with
2  a furnisher who has charged off a debt
3  reporting to a credit reporting agency that
4  they have charged off that debt?
5      A.      Correct, but that's not the
6  full accounting.
7      Q.      So they are never allowed to
8  say it's charged off?
9      A.      They are allowed to say it's
10 charged off, but they also allowed to say that
11 it is written off, because that's actually
12 what happened, they wrote it off.  It's two
13 things.  The charge-off --
14     Q.      You've got to listen to my
15 question.  Are they allowed to report that it
16 is charged off to a credit reporting agency?
17     A.      Yes.  Correct.
18     Q.      I am going to put a document on
19 the screen that you saw before.  Do you see
20 this document, sir, April 11, 2022, letter
21 from PenFed?
22     A.      Yes.
23     Q.      And you looked at this earlier
24 in your deposition, correct?

Page 228

1           A.     Correct.

2           Q.     Just so I'm clear, so this is

3    the letter -- I am jumping down to the last

4    paragraph in it.  "Mr. Bruce, as previously

5    communicated, the subject accounts are now

6    charged off.  The Visa Platinum credit card

7    has been sold to UHG."  Do you see that?

8           A.     Yes.

9           Q.     And then it provides a contact

10   number.  Then it says, "The personal line of

11   credit ending in 6-77-0 has been assigned to

12   Nationwide Credit Corporation for resolution."

13   Do you see that?

14          A.     Yes.

15          Q.     And then again a contact

16   number.  The next sentence says, "The auto

17   loan ending in 3-81-2 is still owned and

18   serviced by PenFed."  Do you see that?

19          A.     Yes.

20          Q.     Okay.  And just so the record

21   is clear, I am reading from -- this is from

22   Exhibit-C to your Complaint.  In this

23   letter -- and did you receive this letter in

24   the mail?

Page 229

```
 1              A.      Yes.
 2              Q.      Okay.  When you got this letter
 3      was this the first time that you learned that
 4      the Visa Platinum credit card had been sold to
 5      UHG?
 6              A.      I learned in December of, I
 7      think -- is it 2021?
 8              Q.      How did you learn in December
 9      of 2021?
10              A.      When I called PenFed right
11      after the dispute.
12              Q.      Same question for the sentence
13      about "The personal line of credit ending in
14      6-00-7 has been assigned to Nationwide Credit
15      Corporation," is that the first time you
16      learned that that had been assigned to
17      Nationwide or was that also December of 2021?
18              A.      Correct.  All of them was -- I
19      can't recall if they provided exact
20      information as far as who had it, but they did
21      say it was transferred to a third party.  I
22      received that information on a call on
23      December of 2021.
24              Q.      And that call, just to be
```

Page 230

1    clear, that was with PenFed?

2              A.        Direct call to PenFed.

3              Q.        So just for my own sort of,

4    like, internal timeline, prior to December of

5    2021 you thought that PenFed still was

6    servicing and still held those loans?

7              A.        Pretty much, yes.

8              Q.        In regards to the damages that

9    you allege against my client, Equifax, sort of

10   like Experian's counsel asked you, are the

11   damages that you're seeking against Equifax

12   the same damages as you're seeking from the

13   other defendants or the other credit reporting

14   agencies in this case?

15             A.        They similar in nature based on

16   what was disseminated from Equifax.

17             Q.        Are there any damages that

18   you're seeking in this case that you are only

19   seeking from Equifax and no one else?

20             A.        Yes.  I don't -- I got to

21   review whether I actually put down a

22   calculation for you or not.  I have to go back

23   and check.  But yes, there's specific damages

24   just for Equifax.

Page 231

1          Q.      Are you able to articulate to
2     me what those are?
3          A.      That would be based on the
4     denials.
5          Q.      I am putting one more document
6     up on the screen.  This is Plaintiff Nelson L.
7     Bruce Responses and Objections to Defendant
8     Equifax First Set of Interrogatories to
9     Plaintiff.  It's a total of 11 pages.  Is that
10    your signature on the last page there?
11         A.      It looks like my signature.
12         Q.      And the second to last page,
13    Page 10 of 11, it looks like a verification.
14    Did you execute that verification?
15         A.      Yes.  Yes, my signature.
16         Q.      Great.  So I will go up to
17    Interrogatory Number 4.  This was the
18    Interrogatory that said "Provide a list of
19    each and every" -- sorry.  That's not the one
20    I want.  Number 6, this is the Interrogatory
21    that asked you to list each and every time you
22    have been denied a loan and/or credit in the
23    last five years based on the contents of your
24    Equifax credit file.  Do you remember that?

Page 232

1          A.     Yes.

2          Q.     Okay.  So if we are looking at

3    this, you have got an objection, "Subject to

4    not waiving any objections plaintiff states at

5    this time that he has been denied a cash back

6    Visa credit card from SECU on or about

7    December 9th, 2021, that plaintiff sought to

8    acquire at least $30,000 of credit to use

9    towards his real estate business."  Do you see

10   that?

11         A.     Yes.

12         Q.     Can you explain to me what that

13   $30,000 was to be used for?

14         A.     Basically, I was trying to get

15   back into real estate.  So it probably would

16   have went to some expenses as relates to that.

17         Q.     That one was for business

18   expenses, yes?

19         A.     Well, personal and business.

20         Q.     How much personal and how much

21   business?

22         A.     I can't recall without being

23   approved for it, so ...

24         Q.     You just don't know?

Page 233

1            A.      I don't know which one.

2            Q.      Are you blaming that denial

3    100 percent on Equifax?

4            A.      I believe that was an inquiry

5    of Equifax so, obviously, yes.

6            Q.      Do you have the loan denial nor

7    for one?  Did you provide that in this case?

8            A.      I believe I provided a copy of

9    that.  I think you was -- Equifax was the

10   first one that I sent to, so I got to actually

11   do a supplement to -- response to your

12   discovery, but I added additional documents,

13   so you may not have gotten notified of that.

14           Q.      You have got more, please --

15           A.      The link that I provided you

16   is -- well, I got to send you a new link.  I

17   think I only have one link for you.  I think

18   you was the first one.  I will supplement that

19   and provide that information.

20           Q.      The next sentence says that "On

21   11/27/2021 plaintiff was denied Premier Cash

22   Reward Visa Signature credit card from U.S.

23   Bank that plaintiff sought to acquire at least

24   $20,000 of credit to use towards his real

Page 234

1   estate business."  Do you see that?

2            A.     Yes.

3            Q.     Was that all for business

4   expenses?

5            A.     It would be the same as the

6   previous response, yes.

7            Q.     The previous response being you

8   don't know how much was for business and how

9   much was for personal?

10           A.     The initial would more likely

11  would be business.

12           Q.     I'm sorry.  Say that again?

13           A.     The initial is most likely is

14  business, although -- yeah mostly business.

15  Like I said, I can't 100 percent respond to

16  that without actually being approved for the

17  credit, but it was initially applied for for

18  that.

19           Q.     Are you saying that Equifax was

20  solely 100 percent responsible for the denial

21  of that credit and no one else?

22           A.     The information that Equifax

23  had on file, correct.

24           Q.     So nothing from PenFed?  You

Page 235

1  are not seeking any money from PenFed related

2  to those first two denials?

3          A.    If you phrase it that way, it's

4  kind of -- it will be between PenFed and

5  Equifax.

6          Q.    Well, that's exactly how I am

7  phrasing it.  I need to understand which of

8  these you are blaming entirely on my client

9  and no other defendant or no other third

10 party?

11         A.    It would be both of -- so it's

12 not specifically entirely just for Equifax,

13 because the investigation required from both

14 of you guys.  So it's -- probably would be

15 split 50 and 50, I guess.

16         Q.    And any to LexisNexis, TU, or

17 Experian?

18         A.    LexisNexis, theirs is separate

19 on that end.  LexisNexis had nothing to do

20 with the issues with Equifax.

21         Q.    So you are not seeking any

22 damages from LexisNexis related to this credit

23 denial for a Premier Cash Reward Visa

24 Signature credit card from U.S. Bank; is that

Page 236

1    right?

2            A.     Correct.

3            Q.     Okay.  Then we get to, "On

4    5/3/2022, 5/4/2022, 5/5/2022 plaintiff was

5    denied a mortgage with AmeriSave Mortgage

6    Corporation that plaintiff sought to acquire a

7    minimum of $200,000 to acquire real estate

8    investment property with."  Do you see that?

9            A.     Yes.

10           Q.     Now, you are not seeking

11   damages just from Equifax on that, are you?

12           A.     Correct.

13           Q.     Who are you seeking damages

14   from as it relates to that sentence?

15           A.     It would be both, again,

16   Equifax and -- Equifax and PenFed, because

17   they are still reporting the information.

18           Q.     Weren't you alleging that

19   against Experian?

20           A.     Well, there is certain dates.

21   There is different dates there.

22           Q.     Okay.  So just Equifax and

23   PenFed on this sentence?

24           A.     Correct.

Page 237

1          Q.      And that $200,000 was for part

2    of your real estate business?

3          A.      Correct.

4          Q.      Then you say that "Between

5    May 17, 2022 and May 24, 2022 plaintiff

6    applied for a credit limit increase on his

7    Visa Signature Cash Rewards credit card with

8    Navy Federal Credit Union and was denied for

9    the increase of $12,000 that plaintiff sought

10   to acquire to use towards his everyday

11   expenses and capital return investment

12   business." Do you see that?

13         A.      Yes.

14         Q.      And from which defendants are

15   you seeking damages for that alleged denial?

16         A.      It would be both again.

17         Q.      PenFed and Equifax only?

18         A.      Correct.

19         Q.      And this $12,000 you were

20   seeking was to be used for what?

21         A.      Like I said, personal and

22   capital return business, expenses, basically.

23         Q.      Capital return investment

24   business, does that mean what, buying homes?

Page 238

```
 1            A.      Yeah, real estate, basically.
 2    That's the name of the company.
 3            Q.      What does the company do?
 4            A.      Like I said, I was trying to
 5    get back into real estate to, you know, buy
 6    and flip homes again.
 7            Q.      Residential homes?
 8            A.      Residential or commercial, just
 9    depends on the deal.
10            Q.      Have you ever bought a
11    commercial property?
12            A.      I had a commercial property
13    under contract before but never really was
14    able to obtain it.
15            Q.      What year was that?
16            A.      That was years ago.  I don't
17    know exact.
18            Q.      Is that at issue in this case?
19            A.      No.
20            Q.      Are there any other credit
21    denials that you allege that are not listed in
22    response to Interrogatory Number 6?
23            A.      I don't recall any others.
24            Q.      For all the loans you were
```

Page 239

1  seeking and you were allegedly denied that are
2  referenced in Interrogatory Number 6, if you
3  had executed a promissory note as part of
4  obtaining those loans, you would not have made
5  any payments to pay them back, would you,
6  based on your theory you described earlier?
7          A.     I don't recall what I would do
8  because I haven't been approved for them.
9          Q.     Well, you wouldn't have paid
10 them back, though, because you just explained
11 why there was no basis or legal need for you
12 to pay them back, correct?
13         A.     Yeah, but you're going in
14 theory.  I am not saying.  It would be paid
15 regardless.
16         Q.     You're saying it's possible you
17 would have paid them?
18         A.     I am not saying anything
19 because I wasn't approved for them, so I don't
20 have anything who say about them.
21         Q.     Well, sure, but I can ask you
22 what you were going to do with the money.  You
23 didn't get approved for it, but you had a
24 plan, right?  You applied for it because you

Page 240

1  had a plan for the money, didn't you?

2          A.      Yeah, but the plan is already

3  in the document you just read.  I have already

4  answered that question.

5          Q.      No, you haven't.  You had a

6  plan for what you were going to do with the

7  money, right?

8          A.      You asking me for a plan on how

9  it was going to be paid back.  I can't answer

10  that question because I wasn't approved for

11  it.

12          Q.      Listen to my question.  You had

13  a plan for what you were going to do with the

14  money, yes?

15          A.      Yes.

16          Q.      Did you have a plan for paying

17  it back?

18          A.      I can't understand that

19  question.  I mean, you asking me a question.

20  Whatever the real estate business, I guess.  I

21  don't know.  I can't answer that question

22  because I haven't been approved for the loan.

23          Q.      You were shown -- and we can

24  put it up on the screen if you don't

Page 241

1    remember -- but there was the money order that

2    the first lawyer put up on the screen for

3    $20,000.  Do you remember that document?

4            A.     I remember seeing it, yes.

5            Q.     We can put it back up if you

6    don't remember what I am talking about.  But

7    there was the money order document for the

8    $40,000 --

9            A.     Yes.

10           Q.     -- that was shown earlier in

11   the deposition.  Do you remember that one?

12           A.     Yes.

13           Q.     Okay.  Did you create that

14   document?

15           A.     I don't recall how that was

16   done.  Like I said, that was 2016 or

17   something.

18           Q.     Let me put it this way:  You

19   created that document, correct?

20           A.     I don't recall.

21           Q.     Is it possible you created that

22   document?

23           A.     I don't recall.

24           Q.     You have no idea how that

Page 242

1   document came into existence?

2           A.      I don't recall.  Like I said

3   that was some years ago.

4           Q.      Have you ever signed a money

5   order like that other than that one?

6           A.      I don't recall.  I already

7   answered that question.

8           Q.      No, didn't answer that

9   question.  Do you ever recall signing a money

10  order or document that was based on that

11  template?

12          A.      I don't recall.

13          Q.      Other than the damages for the

14  alleged credit denials that we just went over,

15  are there any other damages that you're

16  seeking from Equifax in this case?

17          A.      Not that haven't been disclosed

18  inside the case, as far as the Complaint.

19          Q.      No.  No.  I need you to

20  articulate.  Are there any other damages that

21  you're seeking from Equifax in this case?

22          A.      On denials, the emotional

23  distress, defamation, other than that, no.

24          Q.      Okay.  What emotional distress

Page 243

1    damages are you seeking from Equifax?

2           A.      It would be the same response

3    as before as it relates to the denials, third

4    parties seeking inaccurate information that

5    triggered the denials.

6           Q.      So same damages you're seeking

7    from the other defendants in the case?

8           A.      I can't say 100 percent the

9    same damages because they all based off of

10   what each -- each defendant is reporting or

11   disseminating to another third party.

12          Q.      Well, here's where you tell me

13   what you're seeking just from Equifax, because

14   I don't know.  So what emotional distress

15   damages are you only seeking from Equifax, if

16   any?

17          A.      I haven't calculated for that.

18   I want to say the one in the Complaint, 150,

19   maybe.  I don't know.  I think it is already

20   documented in the Complaint how much I was

21   seeking.

22          Q.      Well, I am not even talking

23   about an exact dollar amount.  I am talking

24   what emotional distress are you seeking that

Page 244

1   is only for Equifax?

2          A.     I can't say it's just Equifax.

3   It's probably everybody all in one.

4          Q.     Okay.  And same for damaged

5   reputation, anything just for Equifax or

6   everyone?

7          A.     Everyone.

8          Q.     In your own words you would say

9   that you have sued Equifax because they, what,

10  they failed to do what or they did what?

11         A.     Failed to do reasonable

12  investigation.

13         Q.     What do you believe they should

14  have done that they did not do?

15         A.     Well, for one, they should have

16  went by my specific dispute and found out that

17  I did dispute with them directly and that that

18  dispute was under the Fair Credit Billing Act

19  and they should have followed the cause

20  procedure as relates to the Fair Credit

21  Billing Act to document further that the

22  account was disputed by the consumer.  The

23  other one is as it relates to how they are

24  reporting charged-off or sold accounts.  They

Page 245

1   could have did the same investigation that I

2   did when I called and right after the dispute,

3   which at that point they told me the accounts

4   were sold or transferred.  So that shows me

5   they obviously didn't do a reasonable

6   investigation because if they can just tell me

7   that over the phone what type of investigation

8   that they did that they couldn't get that same

9   type of information so that could be reported

10  accurately and completely.

11         Q.    You would agree with me that

12  you submitted a dispute to Equifax dated

13  September 24, 2021, correct?

14         A.    Correct.

15         Q.    And in that dispute where you

16  listed a whole variety of things that you

17  believe -- why things were being improperly

18  reported, you never alleged that any of the

19  accounts in question were either sold,

20  assigned, or transferred, correct?

21         A.    I don't think I specifically

22  said.  I said the balance should have been

23  reported as zero, which should have caused --

24  trigger an investigation to what would cause

Page 246

1    the balance to be a zero.

2          Q.     Listen to my question.  You did

3    not allege in your September 2021 dispute that

4    any of the accounts in question were sold,

5    assigned, or transferred because as, you

6    testified today, you didn't find that out

7    until December of 2021, correct?

8          A.     Correct.

9                 MR. BARTON:  That's all the

10         questions I have.

11                     —   —   —

12                   EXAMINATION

13                     —   —   —

14   BY MR. PIETRZAK:

15         Q.     Hi, Mr. Bruce.  How are you

16   today?

17         A.     All right.  How are you doing,

18   Kyle?

19         Q.     Good.  My name is Kyle

20   Pietrzak.  I am with TransUnion.  I will be

21   asking many of the same questions that some of

22   my confederates from the other credit

23   reporting agencies have asked.  I will try my

24   best to get right down to it.

Page 247

 1                I am going to share my screen.
 2     In your own words would you describe why
 3     you're suing TransUnion in this case?
 4           A.      Basically for not doing
 5     reasonable investigation, allowing for PenFed
 6     to report information that they know is not
 7     the current status of the account; also for
 8     reinserting information on a credit report
 9     without notifying me within five business days
10     as required by law.  And I think that's
11     probably the gist of it when it comes to
12     TransUnion.
13           Q.      When did you first dispute the
14     PenFed accounts with TransUnion?
15           A.      I believe it was in 2018, maybe
16     2018, might be 2019, somewhere between there.
17           Q.      And do you recall the reason
18     that you gave to TransUnion at that time as to
19     why you believe the accounts were reported
20     inaccurate?
21           A.      It was online, so -- and I
22     think the option I picked was kind of related
23     to the balance and information reporting.
24           Q.      So as you remember it, you were

Page 248

1    limited to certain selections?  You were not

2    able to put in anything of your own

3    commentary?

4            A.     I think I added an extra

5    comment as well on top of that.

6            Q.     Do you recall what your extra

7    comment was on top of that?

8            A.     I think something related to

9    the principles of law, I think, tender of

10   payment, something like that.

11           Q.     And please describe to me what

12   you meant by that.

13           A.     Basically what I am

14   representing in here, that a promissory note

15   is considered tender or payment according to

16   the law.

17           Q.     So that had to do with the

18   promissory note argument?

19           A.     I believe so.  I am not

20   100 percent sure, because that was some time

21   ago with that.  But it still documents that

22   their failure to report maximum possibly

23   accuracy as relates to that.

24           Q.     That's not my question, sir.

Page 249

1          A.      What's that?

2          Q.      Let's just pull up the dispute

3    here, just so we are not doing a memory game

4    like you said.  It was 2018.

5          A.      Yes.

6          Q.      Can you see my screen, sir?

7          A.      Yes.

8          Q.      And you see "The full amount of

9    this account was tendered and has been

10   discharged by the principles of law related to

11   the tender of payment which may have been

12   refused by the creditor."  Does that refresh

13   your recollection?

14         A.      That sounds like the

15   information was in there.  I can't remember

16   exactly what it was referring to.  That's why

17   I say it's probably related to the promissory

18   note.

19         Q.      You don't think this has to do

20   with that $40,000 check that we looked at

21   earlier?

22         A.      I don't recall, because the

23   dates is different.

24         Q.      Okay.  So when you say it may

Page 250

1   have been refused by the creditor, what is it

2   you believe that PenFed refused?

3          A.      I believe it's probably the

4   promissory note.  I think I sent a promissory

5   note but they never returned it, so I don't

6   know whether it was refused or not, but it

7   seemed like it was accepted, so I don't know.

8          Q.      So I'm sorry.  You just said

9   earlier that you were confident that PenFed's

10  records would show that they had been paid by

11  the Federal Reserve for the promissory note;

12  is that correct?

13         A.      I said -- yeah, I believe I

14  said that.  I can't recall 100 percent.

15         Q.      So when you say here the tender

16  of payment may have been refused by the

17  creditor, why does that not line up with

18  today's testimony?

19         A.      Because I believe that's

20  referring to a different instrument.

21         Q.      What instrument is this

22  referring to?

23         A.      I can't recall because, like I

24  said, that was a minute ago.

Page 251

1           Q.      Okay.  So is it your testimony
2    that you can't remember anything from 2018
3    accurately today?
4           A.      I can't remember the document
5    referring to this one.
6           Q.      Okay.  Do you have any reason
7    to doubt that you were telling the truth when
8    you submitted this dispute to TransUnion?
9           A.      As far as it being paid by the
10   principles of law, no.
11          Q.      I don't know.  Do you consider
12   yourself to have submitted all truthful
13   disputes to TransUnion?
14          A.      Based on with the law, yeah.  I
15   pretty much based it on with the law.
16                  MR. PIETRZAK:  Can I ask
17          counsel to pull up that Number 17
18          exhibit, the check we looked at
19          earlier.
20   BY MR. PIETRZAK:
21          Q.      Do you know of the entity
22   called the Nelson Bruce Estate?
23          A.      Yeah.  Like I said before, I
24   don't recall everything related to this.

Page 252

1        Q.      What do you recall related to
2   this?
3        A.      I do not recall.  This says
4   exchange, so if it was -- part of that, it
5   would go under the same thing, under the
6   Federal Reserve Act.
7        Q.      And those numbers at the bottom
8   there, those are traditionally a routing
9   number for a financial institution.  What is
10  your understanding of what those numbers are
11  on this instrument?
12       A.      I don't recall.
13       Q.      And next to that is
14  traditionally what is an account number,
15  generally tied to a bank.  Do you recall or
16  have any knowledge of what those numbers might
17  be on this instrument?
18       A.      Yeah, I don't recall.
19       Q.      Is it possible that you
20  authored these financial instruments, as you
21  call them?
22       A.      I don't recall.
23       Q.      Are you aware of who the
24  trustee of the Nelson Bruce Trust is?

Page 253

1          A.     I don't recall.

2          Q.     Are you aware if the Nelson

3    Bruce Trust is registered in any state?

4          A.     I don't recall.

5          Q.     Okay.  Did you submit these

6    instruments to PenFed in relation to your

7    accounts?

8          A.     I don't recall or not.  These

9    are -- looks like copies, so I don't recall.

10   I don't know.

11         Q.     Is it possible that you were

12   committing wire fraud in 2017 when you

13   submitted these documents to PenFed?

14         A.     I don't recall.  I don't think

15   it would be wire fraud.

16         Q.     And why is that?

17         A.     Well, why is it wire fraud?

18         Q.     It seems to me that somebody

19   was submitting fake money orders to PenFed to

20   cover your accounts.

21         A.     It says bill of exchange.  It

22   says money order, but it's still a bill of

23   exchange.

24         Q.     And what is the difference as

Page 254

1  far as you understand that to be?

2          A.      Well, when you go to wire,

3  wiring is referring to checks.  It's not a

4  check.

5          Q.      So what do those routing

6  numbers and account numbers on the bottom

7  represent?

8          A.      I don't recall.  It's years

9  ago.

10         Q.      But you don't know who sent

11 those?

12         A.      I don't recall how it was sent,

13 who sent it or whatever.

14         Q.      And back to my disputes here

15 with TransUnion.  Was it your understanding

16 that PenFed accepted those tenders as payment

17 for your debt?

18         A.      I don't recall whether they

19 accepted or not.  Obviously not if it's still

20 reporting a balance.

21         Q.      So being that those were dated

22 2017 is it more likely than not that the

23 dispute to TransUnion from 2018 in which you

24 referred to "The full amount of this account

Page 255

1  was tendered and has been discharged by the

2  principles and that payment may not have been

3  refused by the creditor," isn't it more likely

4  than not those are referring to those

5  documents we just viewed?

6         A.      No, because that's 2018.

7  That's 2017, what you just pull up.

8         Q.      Okay.  So the dispute that

9  retroactively talks about the tender of these

10  documents could not be referring to the 2017

11  transaction?

12         A.      I don't believe it was, no.

13         Q.      Why is that?

14         A.      Because the dates don't match

15  up.

16         Q.      Does it say anywhere on your

17  dispute when this tender occurred?

18         A.      No.

19         Q.      Okay.  Did you tender any

20  payment in full personally for these Pentagon

21  Federal accounts to Pentagon Federal?

22         A.      I don't recall whether I sent

23  anything outside of that.

24         Q.      So besides those documents we

Page 256

1  just looked at you didn't send anything with

2  regard to payment of those accounts?

3          A.     I think I sent something else.

4  I just can't recall when I sent it.  I want to

5  say it was promissory note and it referenced

6  the Federal Reserve Act, for them to do the

7  same transaction basically what they already

8  did.  I think it refers to that.  I have to go

9  back to my documents to confirm, but I believe

10  that's what that is addressed to.

11         Q.     But it either has to do with

12  the documents we just looked at, which were

13  tender, or it has to do with the Federal

14  Reserve Act?  Those are the only possible

15  tenders that you made on behalf of this debt;

16  is that correct?

17         A.     I don't recall, but I

18  believe -- I believe it's referring to the

19  other tender outside of that.

20         Q.     Okay.  I will represent to you

21  here, sir, that TransUnion received this on

22  6/11/2018.  Do you see there on the top?  Do

23  you have any reason to dispute that date of

24  receipt by TransUnion?

Page 257

1          A.     6/11/2018, I don't know without

2    seeing the actual -- is this the online

3    dispute.

4          Q.     This is your online dispute,

5    correct?

6          A.     This seems like it would be.

7          Q.     Okay.  And do you recall what

8    the outcome of that dispute was?

9          A.     I believe they deleted the

10   account.

11         Q.     I will represent to you, sir

12   that in 2018 they did not delete the accounts.

13   As a result of this 2018 dispute I will show

14   you --

15         A.     Is it 2019 when they deleted

16   it?

17         Q.     I will show you.  TransUnion

18   reinvestigation result, do you see there, sir,

19   it's dated 7/4/2018 at the top there?

20         A.     Okay.  Yes.

21         Q.     Do you recall receiving these

22   results?

23         A.     I don't recall, but I am

24   assuming so.

Page 258

1          Q.     Would you agree that that's

2    within 30 days of TransUnion having received

3    the dispute on 6/11?

4          A.     Yes.

5          Q.     Okay.  Would you agree that

6    TransUnion sent you the following results of

7    all three Pentagon Federal Union accounts as

8    shown here?

9          A.     Yes.

10         Q.     And in the dispute we just

11   looked at did you reference anywhere in that

12   dispute that you believed that Pentagon

13   Federal Credit Union either did not own or did

14   not have the right to report any of these

15   accounts?

16         A.     At that time I did not know, so

17   no.

18         Q.     And when you received these

19   results what was your next step?

20         A.     I think I officially disputed

21   it again.

22         Q.     Okay.  If you look here on

23   TransUnion results it gives you a list of

24   things to do, which includes calling the

Page 259

1  creditor directly.  Did you call Pentagon

2  Federal Credit Union within 60 days of

3  receiving these results to discuss

4  TransUnion's reinvestigation?

5          A.      I don't believe I did.

6          Q.      Why is that?

7          A.      Well, I don't think I was

8  required.  These are suggestions.  They are

9  not requirements.

10          Q.      But you did not do that, right?

11          A.      I did not.

12          Q.      Okay.  And the results of these

13  investigations clearly told you that

14  TransUnion was not going to delete the

15  accounts as you requested, correct?

16          A.      Based on the results, correct.

17          Q.      Were you under the impression

18  that TransUnion was going to delete these

19  disputed accounts once you received these

20  results?

21          A.      Based off of what they provided

22  me, so I can't assume whether they was going

23  to or not.

24          Q.      Okay.  So you said the next

Page 260

1   thing you did was to submit a second dispute;

2   is that correct?

3           A.      Yeah, I believe I sent another

4   dispute.

5           Q.      Do you remember the date on

6   that?

7           A.      No, I don't recall the date.

8           Q.      I will show you here that this

9   received date was June 4, 2019.  Does that

10  seem correct?

11          A.      Okay.  Yes.

12          Q.      And I will represent to you

13  this is another online dispute.  We can look

14  at the Pentagon Federal Credit Unions here

15  which span between the two pages here over the

16  break.  Do you see those?

17          A.      Yes.

18          Q.      And for the claim description

19  it says "Claims true identity fraud.  Account

20  fraudulently opened."  Please explain to us

21  why you are telling TransUnion at this point

22  that the accounts were fraudulently opened?

23          A.      I don't recall around that

24  time.  I am going to say I disputed with the

Page 261

1  furnisher.  I guess the information is right,

2  then.

3          Q.      Well, but the part above it is

4  you chose to tell TransUnion that the accounts

5  were fraudulently opened.  Were these accounts

6  fraudulently opened?

7          A.      I don't know exactly why I

8  clicked that one.  Probably more so for them

9  to do an investigation.  I don't know.  I

10  don't recall.

11          Q.      So is it your testimony that

12  you intentionally lied in order to trigger a

13  reinvestigation to your liking with these

14  disputes?

15          A.      No.  I choose whatever option

16  that would trigger an investigation.

17          Q.      Even if it is not true?

18          A.      Well, if they not responding to

19  me obviously there's some sort of fraudulent

20  activity there.

21          Q.      Okay.  So you're choosing

22  because TransUnion is not responding, that's

23  why you said that these accounts were

24  fraudulently opened?  Is that your testimony?

Page 262

1          A.    I don't know if that's the

2     exact testimony.

3          Q.    So if you admit that these

4     accounts were yours, why did you lie and tell

5     TransUnion that the accounts were fraudulently

6     opened?

7          A.    Like I said, I don't recall why

8     I clicked that one.  Like I said, I think

9     that's probably the most option as far as them

10    doing an actual investigation.

11         Q.    But we admit that the part that

12    says the account is fraudulently opened that

13    that's a lie?

14         A.    I don't know if it's a lie or

15    not.  Like I said, if they not responding to

16    me and it all depends on how they did the

17    transaction whether it was fraudulent or not.

18         Q.    When the account was opened,

19    did you open the account, yes or no, Mr.

20    Bruce?

21         A.    I don't open accounts.  I apply

22    for an account.  It's up to the creditor to

23    open.

24         Q.    Did you apply for this account?

Page 263

```
 1          A.      I applied for three accounts
 2   with PenFed.
 3          Q.      Did you use any of the credit
 4   with these accounts?
 5          A.      Yes, I believe I utilized
 6   credit.
 7          Q.      Okay.  So when you say that the
 8   account was fraudulently opened right after
 9   you say claims identity fraud, please describe
10   to mean what you mean by that, in no double
11   speak.  Tell me the truth, did you open these
12   accounts?
13          A.      Yes, the accounts were opened
14   by me.
15          Q.      Okay.  Thank you.  And then in
16   here when you say "We have no contract," what
17   do you mean by that?
18          A.      We have no contract based on --
19   I think I sent them -- I think I sent them
20   conditional acceptance, which pretty much -- I
21   think it's some information in there as it
22   relates to the terms and conditions, changing
23   terms of the contract and stuff like that, and
24   just kind of referring that they don't respond
```

Page 264

1   pretty much to the documents that we don't

2   have any further contract and that this will

3   be the contract.

4           Q.      Did you acknowledge that there

5   was a contract before then?

6           A.      Yes, there was a contract

7   previously.

8           Q.      And that was a legally binding

9   contract for you to repay your debts to them?

10          A.      I don't know if it is legally

11  binding.

12          Q.      So you acknowledging that you

13  did have a contract with them in regards to

14  each of those three accounts?

15          A.      Correct.

16          Q.      Who did you understand the

17  creditor to be when you submitted these

18  disputes?

19          A.      I guess at the time I think

20  PenFed.

21          Q.      And do you recall what

22  TransUnion's actions were in response to this

23  with you?

24          A.      I don't recall if this was the

Page 265

1    one that they deleted.  I don't recall if it
2    was or not.
3            Q.    So I'll represent to you, sir,
4    that as a result of this dispute that the
5    three Pentagon Federal Credit Union accounts
6    were deleted.  Do you agree with that?
7            A.    Okay.
8            Q.    So do you have any issue that
9    TransUnion did not conduct a reasonable
10   investigation in regards to your June 2019
11   dispute?
12           A.    I haven't seen the
13   investigation, so I can't 100 percent say yes
14   they did or they didn't.  The results were
15   what they are.
16           Q.    Okay.  So we agree that the
17   three PenFed accounts were deleted in 2019; is
18   that correct?
19           A.    Correct.
20           Q.    But you do have an issue with
21   the 2018 dispute, correct.  Is that a yes?
22           A.    I want to say yeah, I believe
23   so.
24           Q.    Okay.  And your issue, as I

Page 266

1  understand it, is that even though you told us

2  to reinvestigate with PenFed and TransUnion

3  did go back and reinvestigate with PenFed,

4  including sending them your statement, that

5  that was unreasonable because at some point

6  later you figured out that they may have sold

7  the account before then; is that correct?

8          A.      I believe so.

9          Q.      So with regard to your issues

10 with that reinvestigation, what damages are

11 you aware that may have occurred between the

12 2018 dispute and the 2019 when they were

13 deleted?

14         A.      I don't recall off the top of

15 of my head.  I think I documented that issue

16 when I responded to your discovery.

17         Q.      Is it fair to say that the only

18 thing that you attribute directly to

19 TransUnion exclusively would be to have a

20 corresponding hard inquiry with it?

21         A.      As it relates to that third

22 party, I am assuming you meaning the credit I

23 applied for?

24         Q.      No.  I mean specifically

Page 267

 1   between 2018 and 2019, which is after the
 2   unreasonable reinvestigation, as you allege,
 3   and before TransUnion deleted the PenFed
 4   accounts, what damages occurred during that
 5   period?
 6           A.     Probably more related to apply
 7   credit, credit score, stuff like that.
 8           Q.     What was your credit score
 9   during that period?
10           A.     I can't recall.
11           Q.     Do you have any proof of what
12   your credit score was during that period?
13           A.     I have to go back and see, but
14   I don't recall at the moment.
15           Q.     Were you denied any credit
16   because of a TransUnion credit report during
17   that period?
18           A.     I can't say that I was.
19           Q.     So if there were no hard
20   inquiries on a TransUnion report during that
21   period is it fair to say that you did not
22   suffer any credit damage from TransUnion
23   reporting during that period?
24           A.     I can't 100 percent say that,

Page 268

1  because TransUnion does report the information

2  to Credit Karma, which they use that

3  information to document your eligibility to

4  apply for certain credit.  So I think at that

5  point they wasn't giving me any offers, so in

6  a way ...

7          Q.     But you have no specific proof?

8          A.     No specific denials, no.

9          Q.     Okay.  No specific proof of any

10  loss of credit or denials during that period

11  because of TransUnion; is that correct?

12         A.     Correct.

13         Q.     Okay.  Now, you allege that

14  these accounts were re-reported by TransUnion;

15  is that correct?

16         A.     I allege that one account was

17  re-reported by TransUnion.

18         Q.     And which account was that?

19         A.     That was the line of credit

20  account.

21         Q.     Okay.  And when do you believe

22  that that account was reinserted?

23         A.     I think November of, was it

24  2022, I believe, yeah.  I believe it was

Page 269

1   November of 2022.

2           Q.      Okay.  And are you aware of how

3   long it re-reported after that period?

4           A.      I think to about February of

5   2023.

6           Q.      Are you aware of the details of

7   how that reported during that period?

8           A.      Yes.  I provided copy of that

9   with the discovery.

10          Q.      Is it your opinion that it was

11  reporting inaccurate during that period?

12          A.      Correct.

13          Q.      What about it was reporting as

14  inaccurate?

15          A.      I believe it had -- the

16  balance, it didn't show that it was

17  transferred or sold to a third party.  It also

18  re-aged some dates that was there.  So the

19  date that they re-reported it, they actually

20  reported that as the closed date, which was

21  inaccurate.

22          Q.      Did you submit any disputes for

23  that account during while it was rereporting?

24          A.      I did not.

Page 270

1          Q.     Okay.  Are there any credit
2    denials or any sort of damages that you
3    attribute specifically to TransUnion during
4    that period of re-reporting?
5          A.     Yes.  I think there was a
6    Capital One account, I did get approved for it
7    but I believe at a high interest rate.
8          Q.     Is that this account that
9    you're showing me here, sir?
10         A.     Yes.
11         Q.     Why do you believe that this
12   was based upon a TransUnion report?
13         A.     Because they pulled from
14   TransUnion.
15         Q.     And did you end up getting this
16   account?
17         A.     Yes.
18         Q.     Okay.  And it looks like here,
19   this is for a Capital One Spark business card;
20   is that correct?
21         A.     That's correct.
22         Q.     And it was for a $5,000 limit;
23   is that correct?
24         A.     That's correct.

1          Q.      And is that the balance that
2    you sought or did you ask for a higher
3    balance?
4          A.      Yeah, I believe I asked for a
5    higher balance, but I guess that was the
6    minimum for that.  But they gave me the
7    highest interest rate, which I provided you a
8    copy of the interest rate range between that
9    time frame and it shows that that was the
10   highest.
11         Q.      Okay.  And that was for a
12   business card; is that correct?
13         A.      Correct.
14         Q.      So when you did your
15   application did they ask you for specific
16   business information?
17         A.      No.
18         Q.      What was your intention with
19   this card?
20         A.      Probably business expenses and
21   stuff.
22         Q.      What sort of business expenses
23   are you referring to?
24         A.      I am not 100 percent sure

Page 272

1  without actually looking at my expenses again.

2  Maybe gas mileage and some other stuff, maybe.

3  Yeah, I don't know 100 percent without ...

4          Q.     But this card was not intended

5  for personal use?

6          A.     No.

7          Q.     How much in charges have you

8  incurred on this account?

9          A.     I don't recall.

10          Q.     Would you say that the account

11  is close to being maxed out?

12          A.     No.

13          Q.     Is there a balance on the card?

14          A.     I believe the balance is

15  $1,000, maybe $1,200.

16          Q.     Do you intend to make payments

17  until this is at a zero balance, i.e., do you

18  intend to pay off this card yourself?

19          A.     It would be paid pretty much.

20          Q.     And please explain to me why

21  you didn't just answer yes or no.  Please

22  explain.

23          A.     Because the question kind of

24  seems vague.

Page 273

1          Q.     Okay.  Do you intend, Nelson
2    Bruce, the individual, to pay from the
3    individual accounts this money or are you
4    going to rely on a third party to make these
5    payments?
6          A.     The business will pay for the
7    account.
8          Q.     And what business is that?
9          A.     I think that's just the -- I am
10   trying to think how to explain that one.  It's
11   an asset recovery, almost like unclaimed
12   funds.
13         Q.     And is that a business that you
14   own?
15         A.     Yes.
16         Q.     What is the name of that
17   business?
18         A.     LB Global Technologies.
19         Q.     And when all the other
20   attorneys asked you about businesses, why is
21   this the first you're bringing it up now?
22         A.     Because I am not really making
23   any income off this business.  They asked me
24   about income.  I am not making any income.

Page 274

1          Q.     Do you own LB Global

2    Technologies?

3          A.     Yes.

4          Q.     Are you the sole owner of LB

5    Global Technologies?

6          A.     Yes.

7          Q.     What assets does LB Global

8    Technologies own?

9          A.     None.

10         Q.     What debts does LB Global

11   Technologies hold?

12         A.     I believe it's just this card.

13         Q.     Did Nelson Bruce sign a

14   personal guarantee to get this card?

15         A.     I believe they did do a

16   personal guarantee.

17         Q.     Do you, Nelson Bruce, intend to

18   pay off any and all debts associated with this

19   card?

20         A.     The business will pay.

21         Q.     And if the business doesn't

22   have any assets to pay on the day that the

23   bill is due will that payment be made?

24         A.     More likely, yes.

Page 275

```
 1          Q.      Now, that doesn't seem to fit
 2   with your other history, where you don't pay
 3   your bills, correct?  So why would you pay
 4   this bill on behalf of your business when
 5   Nelson Bruce doesn't pay for Nelson Bruce's
 6   debts?  What's different about this account?
 7          A.      Well, I mean, the other ones
 8   are still being paid as well.  It's how you're
 9   trying to form the impression of how they
10   being paid.
11          Q.      If LB Global Technologies does
12   not pay this debt, will Nelson Bruce send a
13   check out of Nelson Bruce's personal account
14   or will Nelson Bruce expect the Federal
15   Reserve to step in and pay for the debt?
16          A.      I don't recall right now.
17          Q.      It's not recall, sir.  It's
18   what is your intention with this card.
19          A.      It's being paid, so the
20   intention is that it be paid.
21          Q.      Okay.  But not necessarily by
22   you personally?  Maybe on your behalf?
23          A.      Yeah.  I don't think it matters
24   as to them as long as they get paid.
```

Page 276

1          Q.     Okay.  But your intention is to
2     make sure it gets paid and that pay is likely
3     going to come from either the company or from
4     a third party guarantor; is that correct?
5          A.     I can't recall where it going
6     to come from.
7          Q.     It's not a recall, sir.  It's
8     your intention.  When you signed this credit
9     card agreement and you issued a personal
10    guarantee did you disclose to Capital One your
11    theory about that the Federal Government would
12    act as a co-signer and essentially backstop
13    your personal guarantee?
14         A.     My agreement was that they
15    would get paid and they are currently getting
16    paid.
17         Q.     Okay.  So do you think in any
18    way you misrepresented to Capital One that you
19    never intended on paying on this card
20    personally?
21         A.     No, because they being paid.
22    Personal guarantee is the only one you
23    default.
24         Q.     Okay.  So you did not tell them

Page 277

1  in any way about your theory that your

2  personal guarantee is really just that the

3  Federal Government will personally guarantee

4  the funds?  You didn't mention that to them

5  when you applied online, did you?

6         A.    No.

7         Q.    Don't you think that that's a

8  little bit misleading?

9         A.    How is that misleading?

10        Q.    Because you are not personally

11 guaranteeing anything.  You don't pay your

12 debt, sir.

13        A.    Have they said that they

14 haven't been paid?

15        Q.    You don't pay your debts, do

16 you?

17        A.    The business is paying them.

18 That's who is the first line to make the

19 payments, correct?

20        Q.    Okay.  Correct.

21        A.    They got a note.  The only

22 personal is when they default.

23        Q.    Okay.  But you are not the

24 business, correct?

Page 278

```
1              A.      Correct.
2              Q.      So on the PenFed accounts did
3    you tell PenFed before you signed up that -- I
4    assume there is a guarantee on those accounts
5    as well; is that correct?
6              A.      Yes.
7              Q.      Okay.  And did you tell them
8    before signing up with those accounts that you
9    were not going to personally pay those, that
10   you said in the case of default that you would
11   rely on the Federal Government to backstop
12   your personal guarantees?
13             A.      Well, I didn't find out about
14   that, like I said before, until later, that
15   they were already been paid.
16             Q.      Have you defaulted on any other
17   loans in the last 12 months?
18             A.      Twelve months, no.
19             Q.      Have you defaulted on any other
20   loans in the past 24 months?
21             A.      Not that I can recall.
22             Q.      Okay.  If we were to find
23   evidence that you have defaulted on other
24   loans in the past 12 months what would you say
```

Page 279

1   to that?

2           A.      Like I said, I don't recall.

3   My consumer report probably shows everything,

4   so ...

5           Q.      And what interest rate on the

6   Capital One account do you believe you should

7   have gotten?

8           A.      I can't answer that because I'm

9   not the agency, but it's based off the

10  information being reported and since these

11  certain information has been reported of

12  course they going to give me whatever interest

13  rate that they feel based on that information.

14          Q.      And do you have any

15  documentation from Capital One as to what

16  interest rate they would have given you if

17  certain information was not reported on your

18  credit report?

19          A.      No.

20          Q.      So it's all speculation that

21  you think you deserved a better interest rate?

22          A.      I guess you can say that.  I

23  don't know.  I can't tell you what they would

24  have approved me for.  All I can see is that

Page 280

1    the information reported has played a part in

2    what I got.

3            Q.      But that's your opinion?

4            A.      That's usually how it goes.

5            Q.      But you have no specific

6    evidence?

7            A.      I don't have specific evidence

8    of how they do they process, no.

9            Q.      And you are alleging various

10   emotional damages, stress, those sort of

11   things here.  My colleagues earlier

12   established that you're not really able to

13   tell in this lawsuit between how to attribute

14   those to which parties; is that correct?

15           A.      Correct.  I think it's a

16   mixture of both, but for TransUnion, I don't

17   think I have included that with TransUnion.  I

18   don't think I did.  I believe I might have,

19   but I don't 100 percent know.

20           Q.      Where would I look for evidence

21   that you don't intend to claim any emotional

22   damages against TransUnion in this case?

23           A.      Look in the discovery presented

24   to you.  Like I said I am not 100 percent sure

Page 281

1    if I did or if I didn't.

2            Q.      But if you did?

3            A.      I don't believe I did.

4            Q.      If you did what was the

5    calculation as to what percentage of your

6    emotional damages attributed to TransUnion?

7            A.      I haven't really calculated

8    that.  Hard to kind of calculate, that's why I

9    just kind of threw out an estimate.  I think I

10   might have put 60 if I did put down there for

11   TransUnion.

12           Q.      So there is no rhyme or reason

13   to the emotional damages that you're claiming

14   here in this case; is that correct?

15           A.      For TransUnion, correct.

16           Q.      Okay.  But there is for the

17   other defendants?

18           A.      More likely.  Theirs lasted

19   longer, basically.

20           Q.      So it's a time calculation that

21   you have used?

22           A.      That's kind of how I

23   calculated, in a way.

24           Q.      And in all your other lawsuits

Page 282

1    that you have had pending in the last five

2    years have you also claimed emotional damages?

3              A.      I believe I did.

4              Q.      Okay.  And some of those cases

5    have settled; is that correct?

6              A.      Correct.

7              Q.      And do some of those time

8    frames in which you were suffering from

9    emotional damages, do those overlap with some

10   of those other lawsuits?

11             A.      Different time frames.

12             Q.      So none of the lawsuits in any

13   way overlap by even a day?

14             A.      I can't say that it does, if it

15   doesn't.  I think -- yeah, I can't say whether

16   it does or if it doesn't, because I think the

17   one for TransUnion versus Rev, I think that

18   was, what, 2021, but that's related to the

19   information that TransUnion is reporting.  So

20   possibility, yes, as relates to the TransUnion

21   versus Rev case.

22             Q.      So over the past five years

23   when you have suffered emotional stress,

24   anxiety and all that, are you able in your

Page 283

1    mind to specifically link what lawsuit or what

2    credit or what that's associated with on that

3    given day?

4           A.     Not specifically.

5           Q.     Okay.  So if it turns out that

6    PenFed did not sell these accounts, then do

7    you have any issue with the 2018

8    reinvestigation by TransUnion?

9           A.     Probably more so of the balance

10   still, would still be the issue.  So they will

11   have to not only just prove that it hasn't

12   been sold but they got to prove they didn't go

13   to the Federal Reserve either.

14          Q.     So because the reinvestigation

15   occurred in 2018 and your suit was filed in

16   2022, correct, you are making the argument

17   that you only recently discovered that the

18   2018 reinvestigation wasn't reasonable; is

19   that correct?

20          A.     Yeah, it wasn't reasonable.  It

21   wasn't reported with maximum possible

22   accuracy.

23          Q.     Okay.  But the reinvestigation

24   itself is what you take issue with, correct,

Page 284

1    in 2018?

2           A.     Yes.

3           Q.     Okay.  You're not arguing today

4    that in 2018 it was inaccurate?  You are not

5    submitting a claim based on the reporting that

6    stopped in 2019, are you?

7           A.     No.

8           Q.     Okay.  So we agree that the

9    issue with whether or not TransUnion's

10   reinvestigation in 2018 was reasonable or not,

11   correct?

12          A.     Correct.

13          Q.     Okay.  And if the basis of that

14   is because you believe that when TransUnion

15   did that reinvestigation in 2018 that they

16   essentially checked with the wrong party; is

17   that correct?

18          A.     How do you mean by check with

19   the wrong party?

20          Q.     Well, a reinvestigation, your

21   argument is that you learned when TransUnion

22   reinvestigated by going back to the furnisher,

23   PenFed, that PenFed no longer owned that

24   account; therefore, any reinvestigation

Page 285

1    through PenFed could not be reasonable.  Am I

2    doing a fair job of summarizing your argument?

3            A.      Yeah, basically.

4            Q.      Okay.  So if it is determined

5    that in 2018 PenFed did own that account, then

6    would you agree that that argument is down in

7    flames?

8            A.      Most likely, yes.

9            Q.      Okay.  What would make it less

10   likely?

11           A.      There's still the issue with

12   whether or not they received the funds from

13   the Federal Reserve or not, because they are

14   still disputing the balance and the balance is

15   still part of the same issue.  So if they can

16   disclose that to me around that time frame,

17   that's still just like them not doing a

18   reasonable investigation or not applying

19   whatever to the account as they required to.

20           Q.      But that's taking issue with

21   the accuracy of the reporting in 2018,

22   correct?

23           A.      Yes, accuracy in some of the

24   information.

Page 286

1          Q.      And we agree that that

2    reporting stopped in 2019, correct?

3          A.      Correct.

4          Q.      And that portion of reporting

5    is clearly barred by the statute of

6    limitations here because it's more than three

7    years ago, correct?

8          A.      Yeah, I can't admit that.

9          Q.      Why not?

10         A.      There is no evidence.  As it

11   relates to the dispute, possibly, but the

12   requirement of the reporting with the maximum

13   possible accuracy is a little bit different.

14         Q.      But we agreed that this

15   account, no matter inaccurate or how

16   inaccurate, stopped reporting in 2019,

17   correct?

18         A.      Correct.

19         Q.      Okay.  And the only reason that

20   you think that we need to start looking at

21   this again is because you have since learned

22   when TransUnion did its reinvestigation in

23   2018 that that reinvestigation was

24   unreasonable?

Page 287

1          A.     Correct.

2          Q.     Do you agree that if it is
3     accurate that PenFed owned the account in 2018
4     when TransUnion did its reinvestigation that
5     that reinvestigation was reasonable?

6          A.     If you just referring to the
7     fact that it's being sold or transferred to a
8     third party, I would respond yes to that.

9          Q.     If it turns out that the PenFed
10    account was always reporting accurately by
11    TransUnion, do you agree that you have no
12    liability under the FCRA?

13         A.     As it relates to the same thing
14    I just specified, yes.

15         Q.     This one has to do with
16    accuracy.  If it turns out that the accounts
17    were reported accurately, do you agree you
18    have no claims under the FCRA against
19    TransUnion?

20         A.     Yes.

21              MR. PIETRZAK:  I have no
22         further questions.

23              MS. JAMES:  I have a couple of
24         follow-up.  I am not sure if anybody

Page 317

```
 1              C E R T I F I C A T E
 2                    - - -
 3
 4              I do hereby certify that I am a
        Notary Public in good standing, that
 5      the aforesaid testimony was taken
        before me, pursuant to notice, at the
 6      time and place indicated; that said
        deponent was by me duly sworn to tell
 7      the truth, the whole truth, and
        nothing but the truth; that the
 8      testimony of said deponent was
        correctly recorded in machine
 9      shorthand by me and thereafter
        transcribed under my supervision with
10      computer-aided transcription; that the
        deposition is a true and correct
11      record of the testimony given by the
        witness; and that I am neither of
12      counsel nor kin to any party in said
        action, nor interested in the outcome
13      thereof.
14              WITNESS my hand and official
        seal this 19th day of July 2024.
15
16
17
18
19              _____
20              Kimberly A. Rue
                Notary Public
21
22
23
24
```

# EXHIBIT B-2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| Nelson L. Bruce, | ) | Civil Act. No. 2:22-cv-02211-BHH-MGB |
| | ) | |
| Plaintiff, | ) | |
| | ) | PLAINTIFF'S 2nd Supplemental RESPONSE |
| v. | ) | AND OBJECTIONS TO DEFENDANT |
| | ) | TRANS UNION FIRST SET OF |
| PENTAGON FEDERAL CREDIT UNION | ) | INTERROGATORIES TO PLAINTIFF |
| ("PENFED"), et al. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF Nelson L. Bruce 2nd Supplemental RESPONSES AND OBJECTIONS TO DEFENDANT TRANS UNION FIRST SET OF INTERROGATORIES TO PLAINTIFF

Plaintiff, Nelson L. Bruce, hereby serves his 2nd Supplemental responses and objections to

Defendant first of request for interrogatories to Plaintiff.

## GENERAL OBJECTIONS

1.      In responding to Defendant's Discovery Requests, Plaintiff has interpreted Defendant's words and phrases in accordance with their usual definitions and usages. To the extent Defendant intends any word to have a meaning other than that which is generally accepted, Plaintiff Objects because the discovery containing those words are vague and ambiguous, and they cannot be understood, even in context.

2.      Plaintiff objects to each of the Defendant's Discovery Requests to the extent they ask for information, documents, or other materials that concern, reflect, embody, or constitute confidential or competitively sensitive information and do not hold any merits or are irrelevant to the claims presented in this case. Information, documents, and other materials that have been determined to be confidential will be disclosed only in the event of the entry of an appropriate protective order that governs the dissemination of such information in this case.

3.      Inadvertent production of privileged information and documents by Plaintiff that are irrelevant and meritless shall not constitute a waiver of any applicable privilege.

4.      Plaintiff objects to each of Defendant's Discovery Requests to the extent they ask for communications between the Plaintiff and Defendant which they already have in their possession and have already been filed on the record as Exhibits.

5.     Plaintiff objects to Defendant's Discovery Requests to the extent the requests are vague, ambiguous, overly broad, unduly burdensome, and/or are irrelevant and meritless to the claims presented in this case by Plaintiff.

6.     Plaintiff objects to Defendant's Discovery Requests to the extent that they seek documents or things not within Plaintiff's possession, custody, or control or that are easily available to the Defendant.

7.     Plaintiff objects to Defendant's Discovery Requests to the extent that the numbered requests are duplicative of each other or of other discovery propounded by Defendant. Subject to the foregoing objections, which are specifically incorporated by reference into each of the following responses, Plaintiff hereby respond to Defendant's Discovery Requests as follows:

## INTERROGATORIES

**INTERROGATORY NO. 1:** State Plaintiff's full name (including middle name and previous names), social security number, date of birth and addresses where plaintiff has resided or received mail, including the dates for each such address, from ten (10) years preceding the filing of the Lawsuit to the present.

> **Answer:**        **Plaintiff objects to this interrogatory as being overly broad, unduly burdensome, and vague in nature as plaintiff is unaware of the dates for each addresses and to the extent defendant request for dates and addresses outside of the 2-5 year statute of limitation. Plaintiff also objects to the extent information related to this request such as a full social security number is already in Trans Union's possession, to the information can be obtained by providing the last 4 digits of plaintiff's social security number which is provided below. Subject to and without waiving any such objections, Plaintiff states that his full name is Nelson Leon Bruce, that his date of birth is ███████, that the last 4 digits of his social security number is 7185, and that he has resided and or received mail at ███████████████, P.O. Box ████ Summerville South Carolina 29484, ████████████████████████████ ████████████████████████████ ████ at some point between 2013 – Present.**

**INTERROGATORY NO. 2:** For each item or category of damage You claim to have suffered because of some action or inaction by Trans Union, identify and describe the nature and amount of the damages sought, how the damages were calculated, and the facts supporting Your claim that the damages resulted from some action or inaction of Trans Union.

**Answer:**    **Plaintiff objects to this interrogatory as being overly broad, unduly burdensome, and vague in nature. Plaintiff objects to this interrogatory because the answer to this interrogatory can clearly be found in plaintiff's 3rd amended complaint and any amended complaints filed and accepted by the court there after. Plaintiff further objects to the extent that Trans Union is asking plaintiff to provide damages which is up to the Jury to decide and cannot be calculated. Subject to and without waiving any such objections, Plaintiff has provided the following calculations:**

## COMPUTATION OF DAMAGES OF PLAINTIFF'S PENDING CLAIMS FCRA CLAIMS OF DAMAGES

FCRA 1681n et seq.    $94,268.99    Actual damages related to failure to do a reasonable reinvestigation of plaintiff's 6-11-2018 dispute related to the 3 PenFed Accounts as plaintiff received material evidence By PenFed in the form of documentation signed by a member of PenFed notifying him around April 11, 2022 that they sold, assigned/transferred the referenced accounts to third parties (see...Plaintiff's Exhibit C) evidencing that Trans Union failed to reasonable investigate the referenced dispute as this information effects how the account should be reported in order to be accurate, complete and not misleading information. These accounts were required to be reported with a zero balance, zero amount past due, and sold and or transferred to a third party as required by the industry standards for reporting with maximum possible accuracy, Metro 2 reporting standard. A requirement which Trans Union adopted as their standard policies and procedures that must be followed for furnishers reporting information to them with accuracy as it relates to the account and the consumer thereby complying with the compliance requirement under 1681e(b) to follow for reporting consumer information with maximum possible accuracy under the FCRA. Also willfully re-inserting the Penfed Line of credit account in November of 2022 after it was deleted on or about July 2019 without notifying plaintiff within 5 business days as they had knowledge this account was deleted (see...Plaintiff's Exhibit B) in violation of 1681i(a)(5)(B)(i),(ii), 1681i(a)(5)(B)(iii)(I), (II), (III) and 1681i(a)(5)(C) ($4,427 (line of credit balance) multiplied by 6 violations which is each section of the law referenced above = $26,562) plus $17,708 which the line of credit balance multiplied by 4 which is the 4 months (from November 2022 to February 2023) of this inaccurate, incomplete, misleading information being re-inserted on my consumer report without maximum possible accuracy which the information was used to determine plaintiff's credit score and ultimately used to determine plaintiff's interest rate and amount to loan plaintiff based on the debt amount reported as plaintiff applied for a Capital One Credit Card. Willful non-compliance

with the FCRA (3 PenFed Accounts: $13,777 (credit card balance reported) + $4,427 (line of credit balance reported) + $31,794.99 (auto loan balance reported) = $49,998.99 (for failure to do a reasonable re-investigation from June 2018 to July 2019). Plus $26,562 re-insertion violations Plus $17,708 related to the 4 months of reporting without following the compliance procedures for maximum possible accuracy.

| | | |
|---|---|---|
| FCRA 1681n et seq. | $16,000 | Statutory damages related to failure to do a reasonable reinvestigation of plaintiff's 6-11-2018 dispute related to the 3 PenFed Accounts as plaintiff received material evidence By PenFed in the form of documentation signed by a member of PenFed notifying him around April 11, 2022 that they sold, assigned/transferred the referenced accounts to third parties (see…Plaintiff's Exhibit C) evidencing that Trans Union failed to reasonable investigate the referenced dispute as this information effects how the account should be reported in order to be accurate, complete and not misleading information. These accounts were required to be reported with a zero balance, zero amount past due, and sold and or transferred to a third party as required by the industry standards for reporting with maximum possible accuracy, Metro 2 reporting standard. A requirement which Trans Union adopted as their standard policies and procedures that must be followed for furnishers reporting information to them with accuracy as it relates to the account and the consumer thereby complying with the compliance requirement under 1681e(b) to follow for reporting consumer information with maximum possible accuracy under the FCRA. Also willfully re-inserting the Penfed Line of credit account in November of 2022 after it was deleted on or about July 2019 without notifying plaintiff within 5 business days as they had knowledge this account was deleted (see…Plaintiff's Exhibit B) in violation of 1681i(a)(5)(B)(i),(ii), 1681i(a)(5)(B)(iii)(I), (II), (III) and 1681i(a)(5)(C). $1,000 per violation = $6,000 (6 violations which is $1,000 in damages for each section of the law referenced above) plus $4,000 which is $1,000 multiplied by 4 which is the 4 months (from November 2022 to February 2023) of the inaccurate, incomplete, misleading information being re-inserted on plaintiff's consumer report without maximum possible accuracy which the information was used to determine plaintiff's credit score and ultimately used to determine plaintiff's interest rate and amount to loan plaintiff based on the debt amount reported as plaintiff applied for a Capital One Credit Card. $1,000 in damages for each month of reporting the 3 PenFed account after the dispute, for failure to do a reasonable re-investigation from June 2018 to July 2019 and for reporting without following the compliance procedures for maximum possible accuracy totaling $12,000 for months. |
| FCRA 1681o et seq. | $94,268.99 | Actual damages related to failure to do a reasonable |

reinvestigation of plaintiff's 6-11-2018 dispute related to the 3 PenFed Accounts as plaintiff received material evidence By PenFed in the form of documentation signed by a member of PenFed notifying him around April 11, 2022 that they sold, assigned/transferred the referenced accounts to third parties (see…Plaintiff's Exhibit C) evidencing that Trans Union failed to reasonable investigate the referenced dispute as this information effects how the account should be reported in order to be accurate, complete and not misleading information. These accounts were required to be reported with a zero balance, zero amount past due, and sold and or transferred to a third party as required by the industry standards for reporting with maximum possible accuracy, Metro 2 reporting standard. A requirement which Trans Union adopted as their standard policies and procedures that must be followed for furnishers reporting information to them with accuracy as it relates to the account and the consumer thereby complying with the compliance requirement under 1681e(b) to follow for reporting consumer information with maximum possible accuracy under the FCRA. Also willfully re-inserting the Penfed Line of credit account in November of 2022 after it was deleted on or about July 2019 without notifying plaintiff within 5 business days as they had knowledge this account was deleted (see…Plaintiff's Exhibit B) in violation of 1681i(a)(5)(B)(i),(ii), 1681i(a)(5)(B)(iii)(I), (II), (III) and 1681i(a)(5)(C) ($4,427 (line of credit balance) multiplied by 6 violations which is each section of the law referenced above = $26,562) plus $17,708 which the line of credit balance multiplied by 4 which is the 4 months (from November 2022 to February 2023) of this inaccurate, incomplete, misleading information being re-inserted on my consumer report without maximum possible accuracy which the information was used to determine plaintiff's credit score and ultimately used to determine plaintiff's interest rate and amount to loan plaintiff based on the debt amount reported as plaintiff applied for a Capital One Credit Card. Willful non-compliance with the FCRA (3 PenFed Accounts: $13,777 (credit card balance reported) + $4,427 (line of credit balance reported) + $31,794.99 (auto loan balance reported) = $49,998.99 (for failure to do a reasonable re-investigation from June 2018 to July 2019). Plus $26,562 re-insertion violations Plus $17,708 related to the 4 months of reporting without following the compliance procedures for maximum possible accuracy.

| | | |
|---|---|---|
| FCRA § 1681n(a)(2) | $471,344.95 | To be determined by the Jury. Conservative Estimate of Punitive damages that may be allowed (actual damages multiplied by 5 ($94,268.99 x 5 = $471,344.95). |
| FCRA § 1681n(a)(2) | $425,600 | To be determined by the Jury. Punitive damages Calculated at a Ratio of 26:6 for statutory damages which is conservatively a smaller ratio than the allowable ratio amount of 80:1 as determined in ***Daugherty v. Ocwen Loan Servicing, LLC,* 701** |

F. App'x 246 (4th Cir. 2017), also see… *Younger v. Experian Info. Sols., Inc.,* No. 2:15-cv-00952, 2019 WL 1296256, at *13 (N.D. Ala. Mar. 21, 2019); *Saunders v. Branch Banking & Tr. Co.,* 526 F.3d at 154-55 (4th Cir. 2008), to punish and deter the defendant. ($16,000 x 26:6 = $425,600).

**Total Estimated FCRA Actual damages**      =      **$659,882.93**

**Total Estimated FCRA Statutory damages**      =      **$441,600**

## COMMON LAW DEFAMATION ("LIBEL")

Defamation      $80,000      To be determined by the Jury. Conservatively Estimated at $80,000 to be in line with damages amount in the above cases. And as presented in plaintiff's Amended Complaint to include emotional distress also from the time spent in dealing with this situation in and outside of court, drafting documents for court, etc.

**Grand Total of all Damages with "Actual" FCRA damages**    =    **$739,882.93**

**Grand Total of all Damages with "Statutory" FCRA damages**    =    **$521,600**

**INTERROGATORY NO. 3:** If You contend that Trans Union reported inaccurate information regarding You, Identify and describe the person or entity to whom Trans Union reported such information, the dates on which such information was reported, and what was inaccurate about the information.

      **Answer:**      **Plaintiff objects to this interrogatory as it is overbroad, vague and overly burdensome and to the extent that Trans Union is already in possession of the information they are requesting which include the dates they reported information related to plaintiff to third parties. Subject to and without waiving any such objections, plaintiff states that Trans Union provided inaccurate, incomplete, unverified information to Capital One who provides credit products like credit cards which plaintiff was approved for with the highest interest rate possible (see…NLB2211 – 756) at that time and CreditKarma who uses the information to determine if plaintiff is eligible to apply for other financial services from third parties based on the information Trans Union is reporting on a daily basis therefore damaging plaintiff on a daily basis from being eligible to receive offers for credit products based. The information reported by Trans Union is inaccurate and incomplete because Trans Union allowed PenFed to report an incorrect**

current status of the accounts that is required to be reported once an account has been sold ore assigned/transferred to a third party. Plaintiff's call to PenFed on December 27, 2021 is material evidence that plaintiff received notifying and confirming to him that his alleged debts and accounts with PenFed did get sold and assigned/transferred to third parties in early 2018.  Plaintiff received further material evidence By PenFed in the form of documentation signed by a member of PenFed notifying him around April 11, 2022 that they sold, assigned/transferred the referenced accounts to third parties and referencing the third parties (see…Plaintiff's Exhibit C) evidencing that  Trans Union failed to reasonable investigate the referenced dispute as this information effects how the account should be reported in order to be accurate, complete and not misleading information and has affected plaintiff from June 2018 to July 2019 when the accounts was deleted.   These accounts were required to be reported with a zero balance, zero amount past due, and sold and or transferred to a third party as required by the industry standards for reporting with maximum possible accuracy, Metro 2 reporting standard and therefore are inaccurate and incomplete information as claimed in this case. A requirement which Trans Union adopted as their standard policies and procedures that must be followed for furnishers reporting information to them with accuracy as it relates to the account and the consumer thereby complying with the compliance requirement under 1681e(b). By re-inserting the inaccurate, incomplete information regarding the Penfed Line of credit account in November of 2022 after it was deleted on or about July 2019 without notifying plaintiff within 5 business days as they had knowledge this account was deleted (see…Plaintiff's Exhibit B) in violation of 1681i(a)(5)(B)(i),(ii), 1681i(a)(5)(B)(iii)(I), (II), (III) and 1681i(a)(5)(C). The inaccurate, incomplete information was used to determine plaintiff's credit score and ultimately used to determine plaintiff's interest rate and amount to loan plaintiff based on the debt amount reported as plaintiff applied for a Capital One Credit Card on 1-20-2023.   Under Trans Unions own procedures that they have adopted under Metro 2 the following is inaccurate and incomplete information: The balance of the PenFed accounts, the paste due amounts of these accounts and also the Line of Credit account close date was not 11-30-2022 between 11-2022 to 2-2023 and therefore this is evidence of re-aging. On top of the above referenced inaccuracies, between 6-18-2018 to 7-2019 the Penfed Line of credit had the following inaccuracies: the date open showed opened 3-15-2018 but the other 2 bureaus as of 4-22-2022 showed opened 3-1-2018, Date of last payment showed 9-27-2017, Equifax showed 2-1-2017 and Experian showed 6-13-2017 as of 4-22-2022 and on top of that, between 11-2022 to 2-2023, the date of last payment changed to 4-2017, the closed date is wrong, it showed 9-30-2017 but it was closed before the bankruptcy was filed in 6-2017.  For the Credit Card (Between 6-2018 to 7-2019):  Date closed

**is wrong, there was a payment documented on 12-6-2016 and no late payment until 1-2017 and could not be closed for a 30 day alleged late payment. For the Auto account (Between 6-2018 to 7-2019): date closed is wrong, there was before the bankruptcy was filed in 6-2017. Between 11- to 7-2019 the Penfed Line of credit had the following inaccuracies:**

**INTERROGATORY NO. 4:** For each person or entity with which You have applied for credit or that has otherwise reviewed Your Consumer Report or Credit Report from five (5) years preceding the filing of the Lawsuit to the present, identify and describe the date that You applied for credit or other transactions, the type of transaction involved, and the terms offered and/or received.

> **Answer:**    **Plaintiff objects to this interrogatory as it is overbroad, vague and burdensome and to the extent it is outside of the claims presented in this case and to the extent defendant is already in possession of this information and each item on plaintiff's consumer report from 2018 along with the information reported on plaintiff's consumer report as Trans Union is the source of the information on plaintiff's consumer credit file to which Trans Union is required to maintain a complete record of and to the extent that a party is not required to identify and describe the credit applied for as it is irrelevant to a claim for damages. To the extent that plaintiff has not been denied credit when the PenFed accounts were inserted and reported in his consumer file and to the extent that plaintiff did not apply for credit nor other transactions nor get approved for credit or other transactions as a result of the PenFed accounts being reported on his consumer file therefore the disclosure of would be irrelevant to and would not support any claims or defenses related to this matter against Trans Union. Subject to and without waiving any such objections, Plaintiff states that the terms of the Capital One card approved for, interest rate ranges for this card and the current balance of this card can be found in plaintiffs exhibits labeled as NLB2211-739, NLB2211-757 and NLB2211-758.**

**INTERROGATORY NO. 5:** If You contend any application for credit or other transaction identified in response to the previous interrogatory was affected in any way by any action and/or inaction of Trans Union, identify and describe what effect such action and/or inaction allegedly had and any damage You claim to have suffered.

> **Answer:** Plaintiff objects to this interrogatory as being overbroad, vague and ambiguous in nature to the extent it asks for information that is already placed on the record in this case as evidenced by plaintiff's amended complaint. Subject to and without waiving any such objections, Plaintiff's damages are subject but not limited to being approved for with a high interest rate on a credit card limiting on where he could go and get approved for credit, limited on credit amounts granted and or granted versus applied for from Capital One and not receiving offers based in what is being rated from the information Trans Union is reporting to third parties such as CreditKarma.com.

**INTERROGATORY NO. 6:** Identify and describe each and every inaccuracy You contend exists or ever existed in any Consumer Report, Credit Report, or Credit File disclosure that forms the basis of this suit or any claims You believe You have against Trans Union, including how and when You first became aware of the alleged inaccuracy.

> **Answer:** Plaintiff objects to this interrogatory as being overbroad, vague and ambiguous in nature to the extent it asks for information that is already placed on the record in this case as evidenced by plaintiff's 3rd amended complaint. Subject to and without waiving any such objections, plaintiff states that the answer this Interrogatory is the same as provided in Interrogatory No. 3.

**INTERROGATORY NO. 7:** State all of the facts, describe all relevant action or inaction on the part of Trans Union, and relate the substance of any statement made by Trans Union or any of its employees on which You rely in support of Your allegations that Trans Union violated the FCRA.

> **Answer:** Plaintiff objects to this interrogatory as being overbroad, vague and ambiguous in nature to the extent it asks for information that is already placed on the record in this case as evidenced by plaintiff's amended complaint and to the extent the answers to this interrogatory can be found above in Interrogatory No. 2 through 6. Subject to and without waiving any objections, plaintiff refers Trans Union to his 3rd amended complaint and exhibits, and the production of documents produced with plaintiffs answer to this discovery (see...NLB2211-97 and NLB2211-756).

**INTERROGATORY NO. 8:** Identify and describe all contacts and communications, between You (or anyone acting on Your behalf) and any consumer reporting agency, credit reporting

agency, or reseller, including but not limited to Trans Union.

> **Answer:** **Plaintiff objects to this interrogatory as it is overbroad, vague and burdensome to the extent Trans Union is already in possession of all disputes by the plaintiff and all requests for plaintiff's consumer report within the timeframe of all injuries and damages to the plaintiff. Subject to and without waiving any objections, plaintiff refers Trans Union to the production of document produced with plaintiffs answer to this discovery which provides the contacts and communications between me and any consumer reporting agency, credit reporting agency, or reseller, including Trans Union. (see…Exhibits A - J and NLB2211 – 1 to NLB2211-756)**

**INTERROGATORY NO. 9:** Identify and describe all contacts and communications, between You (or anyone acting on Your behalf) and any furnisher of information that forms the basis of Your claims against any of the Defendants or former Defendants in this action or the furnisher of any other information that was reported as adverse in any of Your Consumer Reports, Credit Reports, or Credit File disclosures.

> **Answer:** **Plaintiff objects to this interrogatory as it is overbroad, vague and burdensome and to the extent Trans Union is already in possession of all the information requested by the plaintiff. To the extent the information requested as already been answered by any of the previous answers to defendants interrogatories and requests for discovery. Subject to and without waiving any objections, plaintiff refers Trans Union to the production of documents produced with plaintiffs answer to this discovery which provides the communications sent to Trans Union and PenFed which plaintiff is able to locate at this time. (see…NLB2211 – 1 to NLB2211 – 756).**

**INTERROGATORY NO. 10:** If Plaintiff has sought medical treatment, mental health, or psychiatric treatment, advice, or counseling of any type, identify and describe every medical, psychiatric or mental health practitioner, therapist, counselor or professional You have seen or any medical or mental health facility to which You have been admitted from ten (10) years preceding the filing of the Lawsuit to the present.

> **Answer:** **Plaintiff objects to this interrogatory as it is overbroad and vague to the extent it asks plaintiff to prove emotional mental harm by identifying some sort of medical treatment, the provider of the**

**treatment/counsel/therapist or professional past the 2-5 year statute of limitations prescribed under the FCRA section 1681p. Subject to and without waiving any objections, Plaintiff states that he does not have any medical records of treatment.**

**INTERROGATORY NO. 11:**   Identify and describe each Person or Entity that You believe has knowledge of facts relating to the claims that were or are asserted in this case and describe the facts of which You believe they have knowledge.

> **Answer:**      **Plaintiff believes that PenFed (has information related to the PenFed Accounts, disputes directly by the plaintiff), Trans Union (has information related to investigations and or reinvestigations, Metro 2 reporting standards and the accuracy, completeness of the information being reported), CreditKarma (has information related to matching plaintiff to offers of credit), and Capital One (has information related to the interest rate provided to plaintiff on credit approved).**

**INTERROGATORY NO. 12:**   Identify and describe Plaintiff's work history from ten (10) years preceding the filing of the Lawsuit to the present, including name of employer, address, dates of employment, and rate of pay.

> **Answer:**      **Plaintiff objects to this entire interrogatory as being overly broad, unduly burdensome and vague in nature, irrelevant to this matter and would not lead to any facts, nor derive from a violation of any laws presented in plaintiff's amended complaint related to any inaccurate, incompleteness, unverified reporting of the accounts and information that would constitute as a defense, and is further objected to, to the extent that it request information that is outside of the claims in this complaint which are outside of the 2-5 year statute of limitations. Subject to and without waiving any objections, plaintiff states that he has worked for his self within the past 2-5 years working on legal matters in court related to the actions and or inactions of the defendants. Plaintiff does not have an established rate of pay because he does not work for anyone and does not receive payment on a constant daily, weekly, or monthly basis as a result of having to focus on the cases he is involved in which takes the majority of his time.**

**INTERROGATORY NO. 13:**   Identify and describe Plaintiff's total income for each year from five (5) years preceding the filing of the Lawsuit to the present, including the amount of income derived from each source.

**Answer:**     Plaintiff objects to this entire interrogatory as being overly broad, unduly burdensome and vague in nature, irrelevant to this matter and would not lead to any facts, nor derive from a violation of any laws presented in plaintiff's 3rd amended complaint related to any inaccurate, incomplete, unverified reporting of the accounts, and bankruptcy by Trans Union in this case that would constitute as a defense, to the extent that there were no denials of credit, and is further objected to, to the extent that it request information that is outside of the claims in this complaint which are outside of the 2-5 year statute of limitations. To the extent this interrogatory has been answered in the response to interrogatory no. 12.

**Supplemented Answer:**     Plaintiff objects to this entire interrogatory as being overly broad, unduly burdensome and vague in nature, irrelevant to this matter and would not lead to any facts, nor derive from a violation of any laws presented in plaintiff's 4th amended complaint related to any unreasonable reinvestigations and reporting with maximum possible accuracy claims. Is irrelevant to and will not constitute as a defense, to the extent that there were no denials of credit with Trans Union, and is further objected to, to the extent that it request information that is outside of the claims in this complaint which are outside of the 2-5 year statute of limitations. Subject to and without waiving any such objections, plaintiff refers defendant to the "AFFIDAVIT OF NELSON L. BRUCE which references his total income for the referenced years.

**INTERROGATORY NO. 14:** If you have settled Your claims with any Defendant or former Defendant in this action, identify and describe the settlement, including all monetary and non-monetary terms.

**Answer:**     Plaintiff has not settled any claims against any defendants in this matter.

**INTERROGATORY NO. 15:** Identify and describe in detail Your relationship to, use of, and payment for the account(s) or other information made the basis of Your claims in the Lawsuit.

**Answer:**     Plaintiff objects to this interrogatory as it is overbroad, vague and unduly burdensome, to the extent they are answered in plaintiff's amended complaint to the extent it has been answered by plaintiff's response to the other interrogatives and is duplicative in nature. Plaintiff objects to the extent that his claims in this case are not related to the use of the credits allegedly loaned to plaintiff. Subject to and

**without waiving any objections, plaintiff states that Trans Union is already in possession of this information. That it is believed that PenFed acted as servicer to the alleged loans as there is no evidence that PenFed actually is the one who funded the alleged loans to plaintiff. That PenFed had opened an account in plaintiff's name where they receive credits that should be have been used to offset any alleged debt balances and therefore should not have been any late payments nor remaining balances. That there is no further business relationship with PenFed once they have received credits in the amount allegedly loaned to the plaintiff, when they have received credits on behalf of the plaintiff by the deposit, pledge and or transfer of his notes to the federal reserve and or treasury, that once PenFed charged-off the plaintiff's accounts to their allowance for loan and lease losses reserve account (the "ALLL" account) which is a debiting and crediting process from multiple accounts this transaction extinguishes any and all remaining balances on the account being reported and the debts are associated with another account that is not the account being reported. There is no agreement that exist where plaintiff agreed to be held liable for another account that consists of multiple consumer financial/credit charge-offs.**

**INTERROGATORY NO. 16:** Identify and describe each method of payment used by You to pay the account(s) made the basis of Your claims in the Lawsuit, including the name of the bank or account issuer used to make the payment, account number, and the dates on which payments were made using each such method of payment.

**Answer:**     **Plaintiff objects to this interrogatory as it is overbroad, vague and unduly burdensome and vague in nature, irrelevant to this matter and would not lead to any facts, nor derive from a violation of the laws presented in plaintiff's amended complaint. Nor would constitute as a defense as plaintiff does not recall any methods of payment used by plaintiff to pay any accounts that are the basis of plaintiff's claims in this lawsuit, nor does plaintiff recall the dates of such payments. The name of the Bank is PenFed who is a party to this lawsuit and is the party in possession of such information.**

Plaintiff, Nelson L. Bruce reserves the right to supplement its objections, production, and written response to the request upon the identification of additional information and non-privileged, responsive materials during discovery. Dated this 18<u>th</u> day of November, 2024. Respectfully Presented,

"Without Prejudice"

_Nelson L. Bruce_

Nelson L. Bruce, Propria Persona, Sui Juris
"All Natural Rights Explicitly Reserved and Retained"
U.C.C.1-207/ 1-308, 1-103.6
c/o P.O. Box ████, Summerville, South Carolina 29484
Phone: ████████
Email: ████████████████

## **Verification**

I, Nelson L. Bruce, hereby swear under oath as follows as required by Federal Rules of

Civil Procedure Rule 33(b) 3 & 4:

1. I am a Plaintiff in the present case, a consumer, and a resident of the State of South Carolina and I am of the age of the Majority, over the age of 18;

2. I have read the 2nd Supplemental RESPONSE, AND OBJECTIONS TO DEFENDANT Trans Union, LLC FIRST SET OF INTERROGATORIES in its entirety and have personal firsthand knowledge of the facts presented to be true and correct to the best of my knowledge, information and belief and do so under penalty of the United States of America Constitution and the State of South Carolina Constitution as such so help me god.

Dated this 18th day of November, 2024.

_____
Nelson L. Bruce

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the **PLAINTIFF Nelson L. Bruce**

**2nd SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT TRANS**

**UNION LLC'S FIRST SET OF REQUESTS FOR INTERROGATORIES TO PLAINTIFF**

has been mailed and emailed electronically to **TRANS UNION, LLC via the: UNITED**

**STATES POSTAL SERVICE by the UNITED STATES POST OFFICE via First Class**

**Mail.**

**<u>SENT TO:</u>**
Clement Rivers LLP
Attention: Wilbur Eugene Johnson
25 Calhoun Street, Suite 400
Charleston, South Carolina 29401
*Counsel for Trans Union, LLC*

Quilling Selander Lownds Winslett and Moser PC
Attn: Kyle Pietrzak
6900 N Dallas Parkway, Suite 800
Plano, TX 75024
*Attorney for Trans Union, LLC*

Dated this 18th day of November, 2024.

"Without Prejudice"

*Nelson L. Bruce*

Nelson L. Bruce, Propria Persona, Sui Juris
"All Natural Secured Rights Explicitly Reserved and Retained"
c/o P.O. Box ███, Summerville, South Carolina 29484
Phone: ████████
Email: ████████████

# EXHIBIT B-3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| Nelson L. Bruce, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Act. No. 2:22-cv-02211-BHH-MGB |
| | ) | |
| v. | ) | |
| | ) | |
| PENTAGON FEDERAL CREDIT UNION | ) | |
| ("PENFED"), et al. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S RULE 26(a)(1) INITIAL DISCLOSURES

Pursuant to Fed. R. Civ. P. 26(a)(1), plaintiff Nelson L. Bruce in the above-captioned case,

hereby makes its Initial Disclosures.

**(A)      Each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses:**

1.  **Nelson L. Bruce**
    **PO Box ▮▮▮**
    **Summerville, SC 29484**

Nelson L. Bruce, the Plaintiff in this matter, is believed to have knowledge of the facts

relating to the allegations made in this case, his dealings with creditors, his dealings with Trans

Union and other consumer reporting agencies, and his alleged damages.

2.  **Pentagon Federal Credit Union**
    **P.O. Box 456**
    **Alexandria, VA 22313**
    **(800) 247-5626**

Pentagon Federal Credit Union and its employees and representatives, are believed to

have knowledge of the facts relating to the allegations made by Plaintiff in this case, the

damages claimed by Plaintiff, its dealings with Plaintiff, and its dealings with Trans

Union and other consumer reporting agencies.

3. **James Schenck**
   **Pentagon Federal Credit Union**
   **2930 Eisenhower Ave.**
   **Alexandria, VA 22314**
   **(800) 247-5626**

James Schenck, in his capacity as CEO and the President of Pentagon Federal Credit Union

(PenFed Credit Union) has knowledge of all the Activities, Policies, Procedures, Associations

with the Federal Reserve, PenFed's accounting , loans, transactions, collateral, assets, pledges to

the Federal Reserve, accounts, credits received on behalf of electronic endorsements and

Transactions of PenFed.

4. **Jay Ferrin**
   **Pentagon Federal Credit Union**
   **2930 Eisenhower Ave.**
   **Alexandria, VA 22314**
   **(800) 247-5626**

Jay Ferrin, in his capacity as Senior Manager, Financial Reporting at Pentagon Federal

Credit Union and or VP, Corporate Controller at Pentagon Federal Credit Union.  Has knowledge

and information related to PenFed's accounting , loans, transactions, collateral, assets, pledges to

the federal reserve, accounts, credits received on behalf of electronic endorsements and required

call reports filed with the National Credit Union Association ("NCUA").

5. **John Dorn**
   **Pentagon Federal Credit Union**
   **2930 Eisenhower Ave.**
   **Alexandria, VA 22314**
   **(800) 247-5626**

John Dorn, in his capacity as Vice President of Collections for Pentagon Federal Credit

Union (PenFed Credit Union).  Has firsthand knowledge of plaintiff's Exhibit C which is a letter

That he sent as an employee of PenFed evidencing that plaintiff's alleged debts have been sold,

assigned/transferred to third parties and the transactions supporting.

6. **Unknown Name 1**

**Pentagon Federal Credit Union**
**2930 Eisenhower Ave.**
**Alexandria, VA 22314**
**(800) 247-5626**

Unknown Name 1, in her capacity as Member/Employee and or representative of Pentagon

Federal Credit Union (PenFed Credit Union). Has knowledge of the first call to PenFed by

plaintiff on December 27, 2021 and the information that she pulled up in PenFed's system at the

time to inform the plaintiff that his alleged debts have been sold, assigned and transferred to a third

party associated with the PenFed accounts in question.

7. **Unknown Name 2**
   **Pentagon Federal Credit Union**
   **2930 Eisenhower Ave.**
   **Alexandria, VA 22314**
   **(800) 247-5626**

Unknown Name 2, in her capacity as Member/Employee and or representative of Pentagon

Federal Credit Union (PenFed Credit Union). Has knowledge of the second call to PenFed on

December 27, 2021 and the information that she pulled up in PenFed's system at the time to inform

the plaintiff that his alleged debts have been sold, assigned on transferred to a third party and the

3rd call where she called plaintiff to inform him of information related to the sale,

assignment/transfer of the alleged debts associated with the PenFed accounts in question.

8. **Nationwide Credit Corporation**
   **5503 Cherokee Ave, Suite 100**
   **Alexandria, VA 22312**
   **(800) 882-7271 or 703-642-7513**

Nationwide Credit Corporation and its employees and representatives, are believed to have

knowledge of the facts relating to the allegations made by Plaintiff in this case, the damages

claimed by Plaintiff, its dealings with Plaintiff, its dealings with Pentagon Federal Credit Union

and its dealings with Trans Union and other consumer reporting agencies and plaintiff's discovery

labeled NLB2211-740 to 756.

9. **United Holdings Group, LLC**
   **6400 Sheridan Dr., Ste. 138**
   **Williamsville, NY 14221**
   **844-511-2047**

United Holdings Group and its employees and representatives, are believed to have knowledge of the facts relating to the allegations made by Plaintiff in this case, the damages claimed by Plaintiff, its dealings with Plaintiff, its dealings with Pentagon Federal Credit Union and its dealings with Trans Union and other consumer reporting agencies.

10. **REV FEDERAL CREDIT UNION**
    **PO Box 118000**
    **Charleston, SC 29423**
    **(843) 832-2699**

Employees and representatives of REV Federal Credit Union are believed to have knowledge of the facts relating to the allegations made by Plaintiff in this case, the damages claimed by Plaintiff, its dealings with Plaintiff, its dealings with Plaintiff's other creditors, and its dealings with Trans Union, if any.

11. **Clerk of U.S. Bankruptcy Court for the District of South Carolina**
    **1100 Laurel Street**
    **Columbia, SC 29201**
    **(803) 765-5436**

The Clerk of the U.S. Bankruptcy Court for the District of South Carolina and other employees and representatives of the Court are believed to have knowledge of the Bankruptcy case brought by Plaintiff, bearing file number 17-02941, the proceedings relating thereto, the Court's file, and their interactions with Plaintiff.

12. **LexisNexis Risk Solutions Inc.**
    **1000 Alderman Drive**
    **Alpharetta, GA 30005**
    **(678) 694-6000**

Employees and representatives of LexisNexis Risk Solutions, Inc. are believed to have knowledge of the facts relating to the allegations made by Plaintiff in this case, the damages

claimed by Plaintiff, its dealings with Plaintiff, its dealings with Plaintiff's other creditors, and its dealings with Trans Union, if any.

**13. Trans Union LLC**
**555 West Adams**
**Chicago, Illinois 60661**
**(312) 258-1717**

Trans Union LLC, and its employees and representatives, have knowledge regarding Trans Union's computer system and database, communications and correspondence between Trans Union and Plaintiff, communications and correspondence between Trans Union and Plaintiff's alleged creditors/prospective creditors also known as data furnishers, Trans Union's dispute handling and reinvestigations, and Trans Union's policies, procedures, and training. The names of the processors who handled each of Plaintiff's disputes are contained in Trans Union's documents produced and labeled TU 1 – TU 119.

**14. Don Wagner**
**Trans Union LLC**
**2 Baldwin Place**
**1510 Chester Pike**
**Crum Lynne, PA 19022**
**(610) 546-4600**

Mr. Wagner, in his capacity as Specialist I in the Litigation Support Department with Trans Union, has knowledge regarding Trans Union's computer and database, communications and correspondence between Trans Union and Plaintiff, communications and correspondence between Trans Union and the Plaintiff's creditors/prospective creditors, Trans Union, Trans Union's dispute handling and reinvestigations, Trans Union's policies, account maintenance rules, procedures, training, Plaintiff's credit file and documents produced by Trans Union labeled TU 1 – TU 119.

**15. Experian Information Solutions, Inc.**
**P.O. Box 2002**
**Allen, TX 75013**
**(888) 397-3742**

Experian Information Solutions, Inc., and its employees and representatives, are believed to have knowledge of the facts relating to the allegations made by Plaintiff in this case, the damages claimed by Plaintiff, its dealings with Plaintiff, and its dealings with Plaintiff's creditors.

**16. Equifax Information Services LLC**
**P.O. Box 105518**
**Atlanta, GA 30374**
**(800) 685-1111**

Equifax Information Services LLC, and its employees and representatives, are believed to have knowledge of the facts relating to the allegations made by Plaintiff in this case, the damages claimed by Plaintiff, its dealings with Plaintiff, and its dealings with Plaintiff's creditors.

**17. Reserve Bank of Richmond, the Federal Reserve Bank**
**701 E Byrd St.**
**Richmond, VA 23219**
**Atlanta, GA 30374**
**(804) 697-8000**

Reserve Bank of Richmond, the Federal Reserve Bank its employees and representatives are believed to have knowledge of the facts relating to the allegations made by Plaintiff in this case, the damages claimed by Plaintiff, its dealings with PenFed that are associated with plaintiff including credits, drafts, collateral, security, pledges, deposits, transfers, wires, who is the real creditor that funded the alleged loan related to the plaintiff.

**18. LexisNexis Risk Solutions FL Inc.**
**1000 Alderman Drive**
**Alpharetta, GA 30005**
**(678) 694-6000**

Employees and representatives of 18.LexisNexis Risk Solutions FL Inc. are believed to have knowledge of the facts relating to the allegations made by Plaintiff in this case, the damages claimed by Plaintiff, its dealings with Plaintiff, its dealings with Plaintiff's other creditors, and its dealings with Trans Union, if any.

**19. LexisNexis Risk Data Management Inc.**

**1000 Alderman Drive**
**Alpharetta, GA 30005**
**(678) 694-6000**

Employees and representatives of LexisNexis Risk Data Management Inc. are believed to have knowledge of the facts relating to the allegations made by Plaintiff in this case, the damages claimed by Plaintiff, its dealings with Plaintiff, its dealings with Plaintiff's other creditors, and its dealings with Trans Union, if any.

**20. The persons, entities or creditors who extended Plaintiff credit or other opportunities with higher rates and denied plaintiff credit or other opportunities to receive and benefit from credit.**

The persons or entities that have extended with higher interest rates and or denied Plaintiff credit or other opportunities are believed to have knowledge regarding Plaintiff's credit history, the decision on Plaintiff's credit history, and any communications or correspondence between them and Plaintiff. The names, addresses and telephone numbers, if known, of the persons, entities or creditors who have extended or denied credit to Plaintiff and are contained in Plaintiff's documents produced and labeled NLB2211 – 1 to 758, NLB2211 - 1PC [1st call to PenFed Dec. 27. 2021], NLB2211 - 2PC [2nd call to PenFed Dec. 27. 2021], NLB2211 - 3PC [3rd call from PenFed Dec. 27. 2021], Plaintiff's Exhibits A – K, and Trans Union's documents produced and labeled TU 1 – TU 119, LexisNexis Documents produced labeled as LNRS_BRUCE000001 - LNRS_BRUCE0 00821.pdf, LNRS_BRUCE0001823.wav, LNRS_BRUCE0001822.WAV.wav, LNRS_BRUCE0001824.wav, LNRS_BRUCE0001825.wav, LNRS_BRUCE0001827.wav, LNRS_BRUCE0001826.wav, Experian documents produced labeled as (has not been produced), Equifax documents produced labeled as EIS-BRUCE-000001-000084, and 50 PenFed documents produced consisting of account statements, alleged promissory notes, Preapproval draft, Signed card agreement, SIGNED MEMBERSHIP APP 2.12.2016, 286 - Charge-Off and Recovery Processing Policy 2024, 286_23 -Charge-Off and Recovery Processing Policy 11.2023, policies,

procedures, and ACDV's.

Plaintiff further incorporates by reference the individuals identified by TransUnion, Experian, Equifax, LexisNexis and PenFed.

**(B) A description by category and location of all documents, electronically stored information, and tangible things that are in the possession, custody, or control of the party and that the disclosing party may use to support its claims or defenses:**

Plaintiff reserves the right to use any or all documents produced or identified by all defendants in this case and Plaintiff has made available all documents including confidential documents identified as NLB2211 – 1 to 758, NLB2211 - 1PC  [1st call to PenFed Dec. 27. 2021], NLB2211 - 2PC [2nd call to PenFed Dec. 27. 2021], NLB2211 - 3PC [3rd call from PenFed Dec. 27. 2021], Plaintiff's Exhibits A – K and all documents produced by any other party to this action identified as TU 1 –TU 119, LNRS_BRUCE000001 - LNRS_BRUCE000821.pdf, LNRS_BRUCE0001823.wav, LNRS_BRUCE0001822.WAV.wav, LNRS_BRUCE0001824.wav, LNRS_BRUCE0001825.wav, LNRS_BRUCE0001827.wav, LNRS_BRUCE0001826.wav, Experian documents produced labeled as (has not been produced), EIS-BRUCE-000001-000084, and 50 PenFed documents produced consisting of account statements, alleged promissory notes, Preapproval draft, Signed card agreement, SIGNED MEMBERSHIP APP 2.12.2016, 286 – Charge-Off and Recovery Processing Policy 2024, 286_23 -Charge-Off and Recovery Processing Policy 11.2023, policies, procedures, and ACDV's including information obtained by subpoenas issued by plaintiff.

**(C) A computation of each category of damages claimed by the disclosing party who must also make available for inspection and copying the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered.**

Plaintiff is seeking statutory damages in the amount of $441,600 against defendant Trans Union, LLC or Actual Damages in the amount of $659,882.93 for violations of the FCRA.

Plaintiff is seeking $333,847.43 in estimated defamation claims which are all computed as follows:

## COMPUTATION OF DAMAGES OF PLAINTIFF'S PENDING CLAIMS
## FCRA CLAIMS OF DAMAGES

| | | |
|---|---|---|
| FCRA 1681n et seq. | $94,268.99 | Actual damages related to failure to do a reasonable reinvestigation of plaintiff's 6-11-2018 dispute related to the 3 PenFed Accounts as plaintiff received material evidence By PenFed in the form of documentation signed by a member of PenFed notifying him around April 11, 2022 that they sold, assigned/transferred the referenced accounts to third parties (see...Plaintiff's Exhibit C) evidencing that Trans Union failed to reasonable investigate the referenced dispute as this information effects how the account should be reported in order to be accurate, complete and not misleading information.  These accounts were required to be reported with a zero balance, zero amount past due, and sold and or transferred to a third party as required by the industry standards for reporting with maximum possible accuracy, Metro 2 reporting standard. A requirement which Trans Union adopted as their standard policies and procedures that must be followed for furnishers reporting information to them with accuracy as it relates to the account and the consumer thereby complying with the compliance requirement under 1681e(b) to follow for reporting consumer information with maximum possible accuracy under the FCRA. Also willfully re-inserting the Penfed Line of credit account in November of 2022 after it was deleted on or about July 2019 without notifying plaintiff within 5 business days as they had knowledge this account was deleted (see...Plaintiff's Exhibit B) in violation of 1681i(a)(5)(B)(i),(ii), 1681i(a)(5)(B)(iii)(I), (II), (III) and 1681i(a)(5)(C) ($4,427 (line of credit balance) multiplied by 6 violations which is each section of the law referenced above = $26,562) plus $17,708 which the line of credit balance multiplied by 4 which is the 4 months (from November 2022  to February 2023) of this inaccurate, incomplete, misleading information being re-inserted on my consumer report without maximum possible accuracy which the information was used to determine plaintiff's credit score and ultimately used to determine plaintiff's interest rate and amount to loan plaintiff based on the debt amount reported as plaintiff applied for a Capital One Credit Card.  Willful non-compliance with the FCRA (3 PenFed Accounts:  $13,777 (credit card balance reported) + $4,427 (line of credit balance reported) + $31,794.99 (auto loan balance reported) = $49,998.99 (for failure to do a reasonable re-investigation from June 2018 to July 2019).  Plus $26,562 re-insertion violations Plus $17,708 related to the 4 months of reporting without following the compliance procedures for maximum possible accuracy. |
| FCRA 1681n et seq. | $16,000 | Statutory damages related to failure to do a reasonable reinvestigation of plaintiff's 6-11-2018 dispute related to the 3 PenFed Accounts as plaintiff received material evidence By |

PenFed in the form of documentation signed by a member of PenFed notifying him around April 11, 2022 that they sold, assigned/transferred the referenced accounts to third parties (see…Plaintiff's Exhibit C) evidencing that Trans Union failed to reasonable investigate the referenced dispute as this information effects how the account should be reported in order to be accurate, complete and not misleading information. These accounts were required to be reported with a zero balance, zero amount past due, and sold and or transferred to a third party as required by the industry standards for reporting with maximum possible accuracy, Metro 2 reporting standard. A requirement which Trans Union adopted as their standard policies and procedures that must be followed for furnishers reporting information to them with accuracy as it relates to the account and the consumer thereby complying with the compliance requirement under 1681e(b) to follow for reporting consumer information with maximum possible accuracy under the FCRA. Also willfully re-inserting the Penfed Line of credit account in November of 2022 after it was deleted on or about July 2019 without notifying plaintiff within 5 business days as they had knowledge this account was deleted (see…Plaintiff's Exhibit B) in violation of 1681i(a)(5)(B)(i),(ii), 1681i(a)(5)(B)(iii)(I), (II), (III) and 1681i(a)(5)(C). $1,000 per violation = $6,000 (6 violations which is $1,000 in damages for each section of the law referenced above) plus $4,000 which is $1,000 multiplied by 4 which is the 4 months (from November 2022 to February 2023) of the inaccurate, incomplete, misleading information being re-inserted on plaintiff's consumer report without maximum possible accuracy which the information was used to determine plaintiff's credit score and ultimately used to determine plaintiff's interest rate and amount to loan plaintiff based on the debt amount reported as plaintiff applied for a Capital One Credit Card. $1,000 in damages for each month of reporting the 3 PenFed account after the dispute, for failure to do a reasonable re-investigation from June 2018 to July 2019 and for reporting without following the compliance procedures for maximum possible accuracy totaling $12,000 for months.

| | | |
|---|---|---|
| FCRA 1681o et seq. | $94,268.99 | Actual damages related to failure to do a reasonable reinvestigation of plaintiff's 6-11-2018 dispute related to the 3 PenFed Accounts as plaintiff received material evidence By PenFed in the form of documentation signed by a member of PenFed notifying him around April 11, 2022 that they sold, assigned/transferred the referenced accounts to third parties (see…Plaintiff's Exhibit C) evidencing that Trans Union failed to reasonable investigate the referenced dispute as this information effects how the account should be reported in order to be accurate, complete and not misleading information. These accounts were required to be reported with a zero balance, zero amount past due, and sold and or transferred to a third party as required by the industry standards for reporting with maximum possible accuracy, Metro 2 reporting standard. A requirement which Trans Union |

adopted as their standard policies and procedures that must be followed for furnishers reporting information to them with accuracy as it relates to the account and the consumer thereby complying with the compliance requirement under 1681e(b) to follow for reporting consumer information with maximum possible accuracy under the FCRA. Also willfully re-inserting the Penfed Line of credit account in November of 2022 after it was deleted on or about July 2019 without notifying plaintiff within 5 business days as they had knowledge this account was deleted (see…Plaintiff's Exhibit B) in violation of 1681i(a)(5)(B)(i),(ii), 1681i(a)(5)(B)(iii)(I), (II), (III) and 1681i(a)(5)(C) ($4,427 (line of credit balance) multiplied by 6 violations which is each section of the law referenced above = $26,562) plus $17,708 which the line of credit balance multiplied by 4 which is the 4 months (from November 2022 to February 2023) of this inaccurate, incomplete, misleading information being re-inserted on my consumer report without maximum possible accuracy which the information was used to determine plaintiff's credit score and ultimately used to determine plaintiff's interest rate and amount to loan plaintiff based on the debt amount reported as plaintiff applied for a Capital One Credit Card. Willful non-compliance with the FCRA (3 PenFed Accounts: $13,777 (credit card balance reported) + $4,427 (line of credit balance reported) + $31,794.99 (auto loan balance reported) = $49,998.99 (for failure to do a reasonable re-investigation from June 2018 to July 2019). Plus $26,562 re-insertion violations Plus $17,708 related to the 4 months of reporting without following the compliance procedures for maximum possible accuracy.

| | | |
|---|---|---|
| FCRA § 1681n(a)(2) | $471,344.95 | To be determined by the Jury. Conservative Estimate of Punitive damages that may be allowed (actual damages multiplied by 5 ($94,268.99 x 5 = $471,344.95). |
| FCRA § 1681n(a)(2) | $425,600 | To be determined by the Jury. Punitive damages Calculated at a Ratio of 26:6 for statutory damages which is conservatively a smaller ratio than the allowable ratio amount of 80:1 as determined in *Daugherty v. Ocwen Loan Servicing, LLC,* **701 F. App'x 246 (4th Cir. 2017)**, also see… *Younger v. Experian Info. Sols., Inc.,* **No. 2:15-cv-00952, 2019 WL 1296256, at \*13 (N.D. Ala. Mar. 21, 2019)**; *Saunders v. Branch Banking & Tr. Co.,* **526 F.3d at 154-55 (4th Cir. 2008)**, to punish and deter the defendant. ($16,000 x 26:6 = $425,600). |

**Total Estimated FCRA Actual damages**       =       **$659,882.93**

**Total Estimated FCRA Statutory damages**       =       **$441,600**

## COMMON LAW DEFAMATION ("LIBEL")

| | | |
|---|---|---|
| Estimated Defamation | $667,694.86 | To be determined by the Jury. Calculated by multiplying the amounts reported that are required to be reported as a zero balance when sold and or |

assigned/transferred to a third party from June 2018 to June 2019 which is 12 months ($49,998,99 x 13 = $649,986.87). Plus when the line of credit was re-inserted with a balance of $4,427 when it was required to be reported with a zero balance when sold and or assigned/transferred to a third party from November 2022 to February 2023 which is 4 months ($4,427 x 4 = $17,708) to include emotional distress also from the time spent in dealing with this situation and the emotions of litigation, drafting documents for court, etc. The total amount divided by 2 ($667,694.86 ÷ 2 = $333,847.43).

Plaintiff reserves the right to amend should there be other findings that require amendment.

Date this 1st day of **August, 2024**.

RESPECTFULLY PRESENTED,

"Without Prejudice"

*Nelson L. Bruce*

Nelson L. Bruce, Propria Persona, Sui Juris
"All Secured Natural Rights Explicitly Reserved and Retained"
c/o P.O. Box ▮▮▮, Summerville, South Carolina [29484]
Phone: ▮▮▮▮▮▮▮
Email: ▮▮▮▮▮▮▮▮▮▮

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the **PLAINTIFF'S RULE 26(a)(1)**

**INITIAL DISCLOSURES** has been mailed and emailed electronically to **TRANS UNION, LLC.**

via the: **UNITED STATES POSTAL SERVICE by the UNITED STATES POST OFFICE via**

**First Class Mail.**

**SENT TO:**
Clement Rivers LLP
Attention: Wilbur Eugene Johnson
25 Calhoun Street, Suite 400
Charleston, South Carolina 29401
*Counsel for Trans Union, LLC*

Quilling Selander Lownds Winslett and Moser PC
Attn: Kyle Pietrzak
6900 N Dallas Parkway, Suite 800
Plano, TX 75024
*Attorney for Trans Union, LLC*

Dated this 1ˢᵗ day of August, 2024

"Without Prejudice"

*Nelson L. Bruce*

Nelson L. Bruce, Propria Persona, Sui Juris
"All Secured Natural Rights Explicitly Reserved and Retained"
c/o P.O. Box ███, Summerville, South Carolina 29484
Phone: ███
Email: ███

# EXHIBIT B-4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| NELSON L. BRUCE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CASE NO.: 2:21-cv-03603-BHH-MGB |
| EQUIFAX INFORMATION SERVICES, LLC, EXPERIAN INFORMATION SOLUTIONS, INC., TRANS UNION, LLC, and UNKNOWN DOES 1-100, | ) ) ) ) | |
| Defendants. | ) | |
| | ) | |

## CONFIDENTIAL SETTLEMENT AND RELEASE AGREEMENT

### I.

### RECITATIONS

WHEREAS, Nelson L. Bruce (hereinafter "Plaintiff") brought a civil action in the United States District Court for the District of South Carolina, Charleston Division, Civil Action No. 2:21-cv-03603-BHH-MGB (hereinafter the "Lawsuit") against Trans Union LLC ("Trans Union"). Plaintiff and Trans Union may hereinafter be referred to individually as a "Party" or collectively as the "Parties."

WHEREAS, it is the desire of the Parties to this Confidential Settlement and Release Agreement (hereinafter this "Agreement") to resolve all disputes arising out of, or in any way related to any acts, failures to act, omissions, facts, events, misrepresentations, transactions, occurrences, or other matters that occurred prior to Plaintiff's signing this Agreement with the exception of the claims already presented in case numbers 2:22-cv-01292-BHH-MGB and 2:22-cv-02211-BHH-MGB.

1

NOW THEREFORE, in consideration of the covenants, promises and agreements contained in this Agreement, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree to the terms set forth in section II below.

## II.
## TERMS OF AGREEMENT

A.      In consideration for the covenants, promises, and agreements granted herein, as of the date of Plaintiff's execution of this Agreement, Plaintiff does hereby compromise, settle, fully release, and forever discharge Trans Union, its attorneys, insurers, officers, directors, stockholders, agents, servants, representatives, employees, successors, predecessors, assigns, parents, affiliates and subsidiaries, whether named herein or not, of and from any and all claims, demands, controversies, actions, or causes of action of whatever kind or character which Plaintiff has held for alleged damages or relief of any kind, that may have arisen or exist based on any acts, failures to act, omissions, facts, events, misrepresentations, transactions, occurrences, or other matters that have occurred as of the date of Plaintiff's execution of this Agreement with the exception of the claims already presented in case numbers 2:22-cv-01292-BHH-MGB and 2:22-cv-02211-BHH-MGB.  Plaintiff further agrees not to initiate any complaint, investigation, or proceeding against Trans Union with the Federal Trade Commission, Consumer Financial Protection Bureau, South Carolina Attorney General, Better Business Bureau, or any other federal, state or local law enforcement, regulatory or administrative commission, group, board or person, whether public or private, regarding any acts, failure to act, omissions, facts, events, misrepresentations, transactions, occurrences or other matters which are the subject of this Agreement with the exception of the claims already presented in case numbers 2:2022cv01292 (Bruce v. REV FEDERAL CREDIT UNION and 2:2022cv02211 (Bruce v. Pentagon Federal Credit Union et al.).

6079960.1

2

B.      Excluded from the scope of this Agreement are the claims and causes of action relating to Trans Union's: 1) alleged reporting of Plaintiff's alleged private information without consent, 2) alleged selling of Plaintiff's consumer report without a permissible purpose and allegedly without consent 3) alleged preparation and issuance of consumer reports that included allegedly inaccurate, incomplete, untrue, incorrect, misleading and unverified information about Plaintiff, 4) alleged failure to conduct reasonable and lawful reinvestigations of Plaintiff's disputes and 5) alleged failure to provide specific procedures used to verify disputed accounts or public records when requested by Plaintiff, such claims having been previously asserted by Plaintiff in Cases 2:22-cv-01292-BHH-MGB and 2:22-cv-02211-BHH-MGB in the U.S. District Court for the District of South Carolina.  Any other claims and causes of action not yet asserted by Plaintiff in the aforementioned Cases are covered by this Agreement.

C.      Plaintiff promises, covenants, and agrees to never bring suit against, assert a claim against, or make demand on Trans Union, directly or indirectly, relating to the claims and causes of action hereby released, or alleged damages, acts, failures to act, omissions, facts, events, misrepresentations, transactions, occurrences, and the credit files or credit reports maintained or prepared by Trans Union, as alleged in Plaintiff's Amended Complaint.

# REDACTED

# REDACTED

# REDACTED

I.      Plaintiff understands and agrees that an Order of Dismissal with Prejudice will be entered in the Lawsuit, disposing of claims asserted against Trans Union.  Plaintiff shall execute and deliver any and all further documents as may be reasonably necessary to effectuate the terms of this Agreement.

# REDACTED

6079960.1

# REDACTED

*Nelson L. Bruce*

**NELSON L. BRUCE,** *Plaintiff Pro Se*

Dated: 6-26-23

**TRANS UNION LLC**

By: *Laura K. Rang*

Printed Name: Laura K. Rang

Title: Senior Director

Date: 7/05/2023

6079960.1