**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| _____ ) | |
| Nelson L. Bruce, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO.: 2:22-cv-02211-BHH-MGB |
| ) | |
| Pentagon Federal Credit Union; *et al.* ) | |
| ) | |
| Defendants. ) | |
| _____) | |

**PENTAGON FEDERAL CREDIT UNION'S REPLY BRIEF**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pentagon Federal Credit Union's ("PenFed") opening brief relies on admissible evidence to establish that Nelson Bruce borrowed substantial sums from PenFed and then failed to repay those debts. (PenFed's Br. [ECF 413-1] at 2-4.) Bruce's opposition does not directly dispute those critical facts, and it does not cite any evidence suggesting Bruce ever repaid PenFed. (*See* Opp'n [ECF 432].) As such, it is undisputed that Bruce borrowed money and failed to repay it.

Nevertheless, Bruce argues that it was inaccurate for PenFed to report unpaid balances after it "charged off" the accounts. (*Id.* at 9.) He is wrong. "[A] 'write off' or 'charge off' is an internal accounting practice and does not have the legal effect of discharging a debtor from the underlying debt." *In re Washington*, 581 B.R. 150, 159 n.15 (Bankr. D.S.C. 2017) (citing *South Carolina Dep't of Revenue v. Anonymous Co. A*, 678 S.E.2d 255, 257 n. 2 (S.C. 2009)); *cf. Portfolio Recovery Assocs., LLC v. Campney*, 892 S.E.2d 321, 327-28 (S.C. Ct. App. 2023) (holding that a charged off credit card balance was recoverable against the debtor); *Helvering v. State-Planters Bank & Tr.*

1

*Co.*, 130 F.2d 44, 46 (4th Cir. 1942) (recoveries on charged off loans are taxable as income). The fact that PenFed charged off the accounts had zero impact on the amounts Bruce owed.

Bruce also argues that PenFed deviated from industry guidelines by not using codes to indicate that it used a third-party debt collector or that Bruce had raised credit reporting disputes. (Opp'n at 9-10.) Those arguments fail for several reasons explained below. In a nutshell, the industry guidelines are not binding, Bruce has not established that PenFed deviated from the guidelines, Bruce did not raise the issues in a qualifying dispute under the Fair Credit Reporting Act ("FCRA"), and Bruce has not demonstrated that any alleged deviations from industry guidelines rendered the information PenFed reported inaccurate or misleading in any way.

The bottom line is that Bruce refuses to pay valid debts, and no law precludes PenFed from sharing that fact with credit reporting agencies ("CRAs"). Accordingly, the Court should enter summary judgment in favor of PenFed as to all claims asserted against PenFed by Bruce

## II.     ARGUMENT

### A.     Bruce's FCRA Claim Fails.

Bruce's opposition identifies three categories of "facts" that Bruce claims PenFed either reported inaccurately or omitted despite an affirmative duty to report. First, Bruce claims it was inaccurate to report unpaid balances after charging off the accounts. (Opp'n at 9.) Second, he claims PenFed was required to report the accounts as "'Transferred,' 'Assigned,' or 'Sold'" after engaging a third-party debt collector. (*Id.*) Third, he claims PenFed was required to use "Compliance Condition Code[s]" to indicate that Bruce disagreed with the outcome of credit reporting disputes. (*Id.* at 10.) None of those supposed "facts" establish a violation of the FCRA.

1. It Is Not Inaccurate to Report the Unpaid Balance of a Charged Off Account.

Bruce argues that it was inaccurate for PenFed to report "active balances after the accounts had been charged off[.]" (Opp'n at 9.) On the contrary, courts throughout the country have uniformly held that it is not inaccurate to list the unpaid balance of an account after the account has been charged off. *Makela v. Experian Info. Sols., Inc.*, No. 6:21-cv-00386-MC, 2021 WL 5149699, at *3 (D. Or. Nov. 4, 2021); *Artemov v. TransUnion, LLC*, No. 20-CV-1892 (BMC), 2020 WL 5211068, at *5 (E.D.N.Y. Sept. 1, 2020); *Christian v. Equifax Info. Servs.*, LLC, No. 18-13862, 2020 WL 2087869, at *4 (E.D. Mich. Apr. 30, 2020); *cf. Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1297 (11th Cir. 2016); *Kelly v. Wolpoff & Abramson, L.L.P.*, 634 F. Supp. 2d 1202, 1210 (D. Colo. 2008).[1] Bruce does not cite any legal authority that holds otherwise.

This Court should also hold that it is not inaccurate to report the unpaid balance of a charged off account. As noted above, "a 'write off' or 'charge off' is an internal accounting practice and does not have the legal effect of discharging a debtor from the underlying debt." *In re Washington*, 581 B.R. at 159 n.15 (Bankr. D.S.C. 2017) (citing *South Carolina Dep't of Revenue*, 678 S.E.2d at 257 n. 2); *cf. Portfolio Recovery Assocs., LLC*, 892 S.E.2d at 327-28; *Helvering*, 130 F.2d at 46. This Court acknowledged that fact in *Burns*, describing a charged off account as follows: "a monthly payment is no longer due, but the total amount of the loan remains due and owing." 2019 WL 3890833, at *1. Since a balance remains due after an account is charged off, it cannot be inaccurate or misleading to report the amount that remains due to a CRA. In fact, it would be inaccurate to report the balance as "zero" because it would suggest the debt is no longer owed.

---

[1] Some courts have held that it can be inaccurate to report ongoing monthly obligations, as opposed to unpaid balances, on charged off accounts. *See Burns v. TransUnion, LLC*, No. 4:18-03120-MGL, 2019 WL 3890833, at *4 (D.S.C. Aug. 19, 2019). That issue is not relevant to PenFed's motion because Bruce's own exhibits show that PenFed was not reporting monthly payment amounts. (Pl.'s Ex. 58-6 [ECF 432-11]; Pl.'s Ex. 59-7 [ECF 432-10]; Pl.'s Ex. 59-7 [ECF 432-9].)

Bruce appears to suggest his debts magically disappeared based on PenFed's internal policies and procedures applicable to charge-offs. (Opp'n at 9-10.) He argues as follows:

> PenFed's Own internal transactions evidence that when they deducts [*sic*] full or partial charge-offs of financial assets from the allowance for loan losses, that any recoveries are credited to the Allowance account evidence that there is an internal transaction that offsets the charged-off account balance and the balance in [*sic*] now associated with the allowance account which is a totally separate account from what's being reported and that there is no balance to offset once this transaction takes place otherwise the charged-off account would be the account credited to offset the alleged balance.

(*Id.*)

Bruce's argument about "internal transactions" is incoherent. (*Id.*) The manner in which PenFed accounts for charge-offs and recoveries internally has no bearing on whether Bruce's debts remain due and owing. The policies and procedures Bruce cites simply explain how PenFed tracks losses and recoveries to ensure compliance with generally accepted accounting principles, federal regulations, and tax law. (Pl.'s Ex. 59-5 [ECF 432-5].) If anything, the fact that PenFed's policies and procedures directly address recoveries received after a charge-off confirms that it treats unpaid balances as still due after it charges off the balance for accounting and tax purposes. (*Id.*)

### 2. PenFed Did Not Violate the FCRA By Reporting Unpaid Balances After It Engaged a Third-Party Debt Collector

Bruce argues that "furnishers must report zero balances on transferred accounts as the code for fedrl [*sic*] regulations appear to treat them[.]" (Opp'n at 9.) He does not, however, cite a federal regulation that actually requires furnishers to report transferred accounts with "zero balances." Instead, he cites a document known as the Credit Reporting Resource Guide ("CRRG"). (Opp'n at 9.) The CRRG is a guide that was published by a non-governmental entity and establishes an electronic data reporting format known as "Metro 2." (*See* Pl.'s Ex. 43 [ECF 421-2].)

As an initial matter, the CRRG is not legally binding, and technical non-compliance with Metro 2 does not constitute a *per se* violation of the FCRA. *Ferrin v. Experian Info. Sols., Inc.*, 617 F. Supp. 3d 998, 1006 (D. Minn. 2022) (collecting cases). Rather, Bruce must prove three elements: (1) he "submitted a dispute over the accuracy of information on a credit report to a consumer reporting agency; (2) the agency notified the furnisher of that dispute; and (3) the furnisher failed to conduct a reasonable investigation to determine whether the disputed information can be verified." *Roberts v. Carter-Young, Inc.*, 131 F.4th 241, 249 (4th Cir. 2025) (quotation omitted). "An essential element … is that the information in question was actually inaccurate or incomplete[,]" *i.e.*, it was "patently incorrect or … misleading in such a way and to such an extent that it can be expected to have an adverse effect." *Id.* (quotation omitted).

This Court has already noted that Bruce must do more than establish a technical deviation from industry standards. (3/20/2024 Op. [ECF 154] at 23.) "To prove his case, Plaintiff will need to establish through admissible evidence that updating the status of a charged off account as sold or assigned with a zero balance is in fact the industry standard, that PenFed deviated from it, and that this particular deviation might adversely affect credit decisions." (*Id.* (quotation omitted).) Bruce's opposition fails to establish a violation of the FCRA for at least three reasons.

First, as explained in PenFed's opening brief, Bruce did not raise the issue of whether the accounts were transferred, assigned, or sold in a qualifying dispute that PenFed received from a CRA. (PenFed's Br. at 10-11.) Bruce's opposition confirms that Bruce was not even aware of the issue until after he sent the dispute letters dated September 2021. (Opp'n at 6.) Bruce claims he "uncover[ed] that accounts have been assigned" during a phone call on December 27, 2021. (*Id.*) Needless to say, he could not have raised that issue in the letters he sent three months before the phone call in September of 2021. (Pl.'s Ex. A [ECF 1-2] at 2-6, 36-39.)

5

Bruce points to the Court's finding that a letter dated May 3, 2022, could qualify as a dispute for purposes of a claim he asserted against Equifax. (Opp'n at 6.) Bruce omits, however, that the Court's decision was based on a finding that Equifax could have construed the May 3, 2022, letter as "'part and parcel' of the specific disputes raised in Plaintiff's September 24, 2021 letter[.]" (9/26/2024 Op. [ECF 292] at 20.) If the new letter simply renewed the specific disputes Bruce raised in September of 2021, then it also did not raise the issues that Bruce claims to have "uncover[ed]" three months later during a phone call on December 27, 2021. (Opp'n at 6.)

Second, Bruce's opposition does not establish that PenFed did, in fact, deviate from the CRRG. Bruce relies on paragraph 46 in the "Frequently Asked Questions and Answers" section of the CRRG ("Question No. 46.") (Opp'n at 9.) On its face, Question No. 46 applies only when an account is transferred to another department or company "that will be reporting the ongoing account." (Pl.'s Ex. 43 [ECF 421-2] at 6-60 to 6-61.) The apparent purpose of the procedures set forth in that section is to ensure that certain information, including the amount of an unpaid balance, is not double counted due to being listed by both the transferor and transferee. (*See id.*)

There is no evidence that PenFed transferred the responsibilities for reporting the relevant accounts to any other entity. The mere fact that PenFed engaged a third-party to attempt to collect past due debts on behalf of PenFed does not mean that PenFed "transferred" the accounts for credit reporting purposes. (*See* PenFed's Br. at 6-7.) Since PenFed did not transfer the accounts for credit reporting purposes, there was no need for PenFed to follow the procedures outlined in the answer to Question No. 46 in the CRRG. (Pl.'s Ex. 43 [ECF 421-2] at 6-60 to 6-61.)

Moreover, the procedure that the CRRG refers to as the "Preferred Option" for reporting transferred accounts does not require reporting "zero balances." (*Id.*) The "Preferred Option" is for the CRA "to retain all prior account history" in a single tradeline subject to verification by the

6

transferee. (Pl.'s Ex. 43 [ECF 421-2] at 6-60 to 6-61.) Since unpaid balances are part of "all prior account history[,]" they do not change when the "Preferred Option" is employed, which makes sense because transferring an account does not eliminate the unpaid balance altogether. (*See id.*)

The other option described in the answer to Question No. 46 "results in two tradelines on a consumer's file; the first as transferred and the second for the ongoing account." (*Id.*) In that scenario, the tradeline account for the transferred account does not show a current balance since that information should be included in the second tradeline for the ongoing account. (*See id.*) In other words, the unpaid balance is still reported but only in the second tradeline. (*Id.*)

Bruce does not claim any of the PenFed accounts appeared in more than one tradeline in his credit reports. Since the third-party debt collector PenFed hired did not report a second tradeline, the optional, non-preferred procedure that requires a transferor to report the current balance as "zero" did not apply. (*See id.*) Therefore, the fact that PenFed reported the unpaid balances of Bruce's accounts did not deviate from any requirements in the CRRG. (*See id.*)

Third, Bruce cannot prove that any alleged non-compliance with the CRRG rendered the information PenFed furnished to the CRAs "patently incorrect or … misleading in such a way and to such an extent that it can be expected to have an adverse effect." *Roberts*, 131 F.4th at 249 (quotation omitted). Under the "Preferred Option" for reporting a transferred account, the only changes are to the name of the creditor and the account number, and "all prior account history" remains the same. (Pl.'s Ex. 43 [ECF 421-2] at 6-60 to 661.) Since PenFed retained ownership of the accounts at all relevant times, replacing PenFed's name with the name of the debt collector would not have been any more accurate than continuing to report the accounts in a single tradeline with PenFed listed as the creditor. In any event, there is no reason to believe that listing the name of the creditor instead of the debt collector would have an adverse effect on credit decisions.

### 3.     PenFed Was Not Required to Use Compliance Condition Codes.

Bruce's final argument is also based on the CRRG. (Opp'n at 10.) Bruce argues that PenFed deviated from the CRRG because it did not use "Compliance Condition Code 'XE' to indicate an open investigation or 'XG' to indicate that the consumer disagrees with the outcome." (*Id.*) Bruce's argument fails for at least three reasons.

First, "[t]he FCRA does not require the use of—or even mention—these codes." *Jordan v. M & T Bank Corp.*, 772 F. Supp. 3d 921, 942 (N.D. Ind. 2025) (quotation and other citation omitted). The specific duties the FCRA imposes on furnishers upon receiving a dispute from a CRA are delineated in 15 U.S.C. § 1681s-2(b)(1). While the FCRA requires furnishers to investigate disputes and report the results, it does not state or imply that furnishers are required to report whether the consumer agrees with that outcome. 15 U.S.C. § 1681s-2(b)(1).

Second, Bruce has not established that PenFed deviated from the CRRG. The relevant section expressly states that it applies to the "direct dispute provisions" of the FCRA and that the "Compliance Condition Codes should <u>not</u> be reported in response to a consumer dispute investigation request from the consumer reporting agencies[.]"[2] (Pl.'s Ex. 43 [ECF 421-2] at 5-32 (emphasis in original).) The distinction makes sense for an obvious reason: a CRA already knows about a dispute if the CRA itself notified the furnisher. The CRRG, therefore, does not require PenFed to use Compliance Condition Codes in response to disputes it receives from CRAs.[3]

---

[2] There is an exception for disputes that are subject to the Fair Debt Collection Practices Act ("FDCPA"). (Pl.'s Ex. 43 [ECF 421-2] at 5-32.) The exception does not apply here because the Court has already held in a final judgment that PenFed is not subject to the FDCPA with respect to the credit it extended to Bruce. *Bruce v. Pentagon Fed. Credit Union*, No. 2:17-CV-2170-BHH, 2018 WL 4476129, at *3 (D.S.C. Sept. 19, 2018), *aff'd*, 765 F. App'x 30 (4th Cir. 2019).

[3] The FCRA "explicitly bars private suits" for violations of the provision that governs direct disputes, *i.e.*, 15 U.S.C. § 1681s-2(a). *Saunders v. Branch Banking & Tr. Co. of VA*, 526 F.3d 142, 149 (4th Cir. 2008). Accordingly, Bruce cannot assert a claim for any alleged failure to use Compliance Condition Codes in connection with a direct dispute.

8

Third, omitting the fact that Bruce raised a dispute was not "patently incorrect or … misleading in such a way and to such an extent that it can be expected to have an adverse effect." *Roberts*, 131 F.4th at 249 (quotation omitted). The alleged omission could not have misled the CRAs since they knew about the disputes. Moreover, Bruce's disputes were meritless, and there is nothing misleading about omitting a meritless dispute. *Jordan*, 772 F. Supp. 3d at 943 (citation omitted). "[R]eporting an actual debt without noting that it is disputed is unlikely to be material[ly] misleading. It is the failure to report a bona fide dispute, a dispute that could materially alter how the reported debt is understood, that gives rise to a furnisher's liability under § 1681s–2(b)." *Levine v. JPMorgan Chase & Co.*, 46 F. Supp. 3d 871, 876 (E.D. Wis. 2014) (quotation omitted).

### B.   Bruce's Defamation Claim Fails.

In support of Bruce's defamation claim, he essentially rehashes his arguments that it was inaccurate to report the unpaid balances of his accounts after charging them off and engaging a third-party debt collector. (Opp'n at 11-13.) Those arguments fail for the reasons explained above.

Bruce argues that there is a genuine dispute with respect to whether PenFed "retained ownership" of the accounts. (Opp'n at 13.) On the contrary, the Second Declaration of Craig Olson establishes that PenFed never sold the accounts. (Def.'s Ex. B [ECF 413-3].) Bruce does not cite any evidence that contradicts the statements in the declaration. (*See* Opp'n at 13.)

Finally, Bruce's defamation claim is "preempted by the FCRA absent an allegation of malice or willful intent to injure Plaintiff." (9/25/2023 Order [ECF 131] at 19 (citing 15 U.S.C. § 1681h(e) ("[N]o consumer may bring any action or proceeding in the nature of defamation . . . with respect to the reporting of information . . . except as to false information furnished with malice or willful intent to injure such consumer."); *Ross v. F.D.I.C.*, 625 F.3d 808, 814 (4th Cir. 2010)).) Bruce's opposition does not cite any evidence that suggests PenFed acted with malice.

9

### C.     The Court Should Dismiss Bruce's Section 36-9-210 Claim.

Bruce argues that Section 36-9-625 "does not excuse noncompliance" with a request for an accounting "based on subjective beliefs or prejudgments about a debtor's intent." (Opp'n at 14.) The statute may not use that precise language, but it clearly states that a debtor can recover only if the secured party acted "without reasonable cause[.]" S.C. Code Ann. § 36-9-625(f).

PenFed had "reasonable cause" to believe Bruce was not making a serious request based on the prior history between the parties, which included Bruce passing fake money orders and other phony financial instruments, filing a prior frivolous lawsuit, and then falsely claiming PenFed owed him money. (PenFed's Br. at 3-7.) Indeed, the request itself states that Bruce was "disputing the alleged debts" and offers to settle for $10.00. (Pl.'s Ex. A [ECF 1-2] at 53-55.) Bruce does not challenge the evidence PenFed cited. Instead, he argues that it is "irrelevant[.]" (Opp'n at 14.) To the contrary, the fact that Bruce employed multiple failed schemes to try to avoid paying his debts before burying a request for an accounting in a largely incoherent document with an offer to settle for $10.00 is not "irrelevant"; it confirms that Bruce's request was not a good faith effort to obtain information to which he was not already privy.

Finally, if the Court finds that summary judgment is warranted as to Bruce's FCRA and defamation claims but not his Section 36-9-210 claim, then the Court should dismiss the Section 36-9-210 claim on jurisdictional grounds. A bare procedural violation of Section 36-9-210 without any concrete harm is not actionable in federal court. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 440 (2021). Either way, the Court should decline to exercise supplemental jurisdiction over Bruce's Section 36-9-210 claim if it dismisses Bruce's other claims. *See* 28 U.S.C. 1367(c)(3).

Dated: July 25, 2025.

                        Respectfully submitted,

                        **PENTAGON FEDERAL CREDIT UNION**

                        */s/ G. Troy Thames*
                        G. Troy Thames (Federal ID No.: 07713)
                        WILLSON JONES CARTER & BAXLEY, P.A.
                        4922 O'Hear Avenue, Suite 301
                        North Charleston, SC 29405
                        Telephone: (843) 284-0832
                        Facsimile: (843) 606-3300
                        Email: tthames@wjcblaw.com

                        Michael A. Graziano (*pro hac vice*)
                        Sarah A. James (*pro hac vice*)
                        ECKERT SEAMANS CHERIN & MELLOTT, LLC
                        1717 Pennsylvania Avenue, N.W., Suite 1200
                        Wahington, D.C. 20006
                        Telephone: 202.659.6671
                        Facsimile: 202.659.6699
                        E-mail: mgraziano@eckertseamans.com
                                  sjames@eckertseamans.com

                        *Attorneys for Pentagon Federal Credit Union*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 25th day of July, 2025, I served the foregoing via e-mail and first class mail on:

>Nelson L. Bruce
>P.O. Box 3345
>Summerville, SC 29484
>*Pro Se Plaintiff*

>*/s/G. Troy Thames*