**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

Nelson L. Bruce,           )
                                  )
         Plaintiff,       )     Civil Action No. 2:22-cv-02211-BHH-MGB
                                  )
     v.                )            **ORDER**
                                  )
Pentagon Federal Credit Union, *et. al.*,   )
                                  )
         Defendants.    )
_____)

      Nelson L. Bruce ("Plaintiff" or "Bruce"), proceeding *pro se* and *in forma pauperis*, filed this civil action on July 12, 2022, asserting claims pursuant to the Fair Credit Reporting Act ("FCRA"), among others. (ECF No. 1.) Before the Court is a motion for summary judgment filed by Defendant Pentagon Federal Credit Union ("PenFed"). (ECF No. 413.) For the reasons discussed below, the Court **GRANTS** PenFed's motion.

## BACKGROUND

      This action arises from allegedly inaccurate and misleading information that Defendant PenFed provided to consumer reporting agencies ("CRAs") about three discrete accounts that were charged off after Plaintiff ceased payments, which information the CRAs published in consumer reports. (ECF No. 291.) These CRAs are also Defendants in this action: Experian Information Solutions, Inc ("Experian"); Trans Union, LLC ("Trans Union"), and Equifax Information Services, LLC ("Equifax").[1] At the outset, the Court notes that Plaintiff has amended his complaint four times, including within the past year. (ECF Nos. 31; 98; 171; 291.) The docket reflects the

_____

[1] LexisNexis Risk Solutions Inc., LexisNexis Risk Solutions Florida Inc., and LexisNexis Risk Data Management Inc. are also named as Defendants in this civil action; however, pursuant to a Notice of Settlement filed with the Court on January 21, 2025, "the matters at issue" between Plaintiff and these Defendants "have been settled." (ECF No. 377.)

Court's efforts to grant Plaintiff every reasonable opportunity to develop his claims in this action. Four separate summary judgment motions have been filed, to which Plaintiff has responded with hundreds of pages of memoranda including lengthy sur-replies. Plaintiff has also submitted hundreds of pages of largely irrelevant exhibits with his briefings.

With this background, the Court turns to the allegations specific to PenFed, as stated in Plaintiff's fourth amended complaint ("FAC").[2] According to Plaintiff, PenFed, a furnisher of consumer credit information, reported "inaccurate" and "misleading" information to CRAs, giving "the false impression that a debt and/or account balance is owed or still owed to PenFed" and "that the accounts are paid or not paid as the information reported does not match what the other reporting agencies are or were reporting." (ECF No. 291 at 19.)

Plaintiff alleges that "[a]ccounts are required to be reported to the credit reporting agencies in Metro 2 Format, which the bureaus have all adopted. The reported accounts are considered inaccurate, incomplete, incorrect if not in compliance with Metro 2 Standard Format." (*Id*. at 24.) Plaintiff alleges that to comply with "Metro 2 reporting standards," PenFed must accurately report "balance information, open date, date of first delinquency, [and] whether an account is sold." (*Id*. at 23–24.) Plaintiff further alleges that the Metro 2 reporting standards require that any accounts that have been sold or transferred are reported with a "zero balance." (*Id*. at 24.)

According to Plaintiff, the CRAs "have been reporting the . . . PenFed accounts and information through the issuance of false, incomplete, untrue, incorrect and inaccurate credit information and consumer reports that it has disseminated to various third parties, persons and

---

[2] Plaintiff's FAC is verified. (*See generally* ECF No. 291.) "A complaint is 'verified' if it is 'signed, sworn, and submitted under penalty of perjury.'" *Goodman v. Diggs*, 986 F.3d 493, 495 (4th Cir. 2021) (quoting *James v. Hale*, 959 F.3d 307, 314 (7th Cir. 2020)). A *pro se* litigant's verified submission must be considered as an affidavit and may create a genuine issue of fact to defeat a summary judgment motion. *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991). However, a verified complaint is only sufficient to create a genuine issue of fact where the allegations upon which that issue of fact relies are based on personal knowledge. *Id*.

credit grantors." (*Id*. at 12–13.) Plaintiff alleges he "notified both the [CRAs] and data furnishers that he disputed the accuracy, completeness, correctness of the information the [CRAs] were reporting." (*Id*. at 13.)

According to Plaintiff, PenFed "understood the consumer's disputes because" it used a "standardized system for receiving and processing consumer disputes from the CRAs." (*Id*. at 18.) Plaintiff alleges that PenFed "ignored the information in the reporting system and 'simply regurgitated the same information it had previously reported to' the CRAs." (*Id*.) Plaintiff further alleges that PenFed:

> failed [to] consistently update its reporting to the CRAs, and failed to []permanently and lawfully correct its own internal records to prevent re-reporting of the inaccurate and incomplete information for the disputed accounts. There [] are numerous discrepancies in the reporting across all the CRAs as each credit reporting is inconsistent with the other CRAs, for example, Experian and LexisNexis are reporting the PenFed Auto and Line of Credit accounts with Zero balances but Trans Union and Equifax have been reporting the accounts with a balance. [PenFed has] failed to report an accurate investigative/reinvestigation outcome to the CRAs that notified the parties of [Plaintiff's] disputes.

(*Id*. at 18–19.)

Plaintiff alleges that PenFed "intended not to furnish accurate . . . information related to the current status of the accounts to the reporting agencies because their internal records prior to about January 22, 2018, show that": (1) PenFed "knew that the credit card account being reported and published on [Plaintiff's] consumer reports . . . allegedly belonging to the Plaintiff, was sold and transferred by PenFed to United Holding Group"; and (2) PenFed "knew the line of credit account being reported and published on [Plaintiff's] consumer reports . . . allegedly belonging to the Plaintiff was assigned and transferred to National Credit Corporation." (*Id*. at 19–20.) According to Plaintiff, these accounts "all were charged off/written off therefore no accounts nor

debts existed as an asset of PENFED that could have been validated and/or verified by PENFED."

(*Id*. at 20.) He continues, verbatim:

> After January 22, 2018, the date of sale, assignment and or transfer of the credit card and line of credit accounts, PenFed to be in compliance with the FCRA and Metro 2 reporting standard for maximum possible accuracy, they are required to report the accounts as sold, transferred, charged-off with a zero balance and zero amount past due to be accurate, complete, true, correct and not misleading regardless of whether the third party is reporting it or not.

(*Id*.)

The FAC includes the following claims against PenFed: (1) violation of § 1681s-2(b) of the FCRA; (2) defamation, and (3) violation of the Uniform Commercial Code ("UCC"), as adopted in South Carolina under S.C. Code Ann. § 36-9-210.[3] (*Id*. at 29–40.) PenFed filed the instant motion for summary judgment on April 11, 2025, seeking summary judgment on each of Plaintiff's claims. (ECF No. 413.) On April 14, 2025, the Court issued an Order pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the dismissal procedure and the possible consequences if he failed to adequately respond to the motion. (ECF No. 416.) Plaintiff filed a response in opposition on July 18, 2025 (ECF No. 432), to which PenFed filed a reply on July 24, 2025 (ECF No. 439). Plaintiff filed a sur-reply on August 8, 2025.[4] (ECF No. 452.) As such, the motion before the Court has been fully briefed and is ripe for disposition.

## RELEVANT FACTUAL SUMMARY

In February 2016, Plaintiff became a member of PenFed. (ECF No. 413-3.) Shortly thereafter, Plaintiff opened three separate accounts with PenFed: a personal line of credit

---

[3] To the extent Plaintiff attempts to assert claims against PenFed based upon disputes submitted directly to PenFed, he cannot do so because such claims are explicitly barred under the FCRA. (*See generally* ECF No. 291.) *See also Saunders v. Branch Banking & Tr. Co. of VA*, 526 F.3d 142, 149 (4th Cir. 2008) ("[The] FCRA explicitly bars private suits for violations of § 1681s–2(a).").

[4] Plaintiff moved for leave to file a sur-reply on August 7, 2025, and the Court granted his motion. (ECF Nos. 448; 452.)

("PLOC"); a credit card account; and a vehicle loan (collectively, the "PenFed Accounts"). (ECF Nos. 413-4; 413-6; 413-7; 413-8.) Specific to the vehicle loan, Plaintiff signed a promissory note in April 2016 with a security agreement establishing a PenFed account to finance Plaintiff's purchase of a BMW. (ECF No. 413-4.) PenFed issued a cashier's check payable in the amount of $33,478.00 to Chapman BMW to fund Plaintiff's vehicle loan. (ECF No. 413-5.) Plaintiff endorsed, and Chapman BMW cashed, the check PenFed issued to fund the vehicle loan, resulting in a $33,478.00 debit from PenFed's account with the Federal Reserve Bank through which the check was negotiated. (*Id.*; ECF No. 413-13 at 4.)

On July 9, 2016, Plaintiff sent PenFed documents, including a notarized "Promissory Note" that Plaintiff drafted and signed, which purported to unilaterally modify the terms of the vehicle loan by reducing the amount of Plaintiff's monthly payments and the total amount due during the term of the loan. (ECF No. 413-9.) Plaintiff was advised by PenFed that the documents he provided "are not sufficient to serve as payment for the account," and Plaintiff is "responsible for making payment in United States Dollars." (ECF No. 413-10.) On May 9, 2017, Plaintiff sent three documents to PenFed that he labeled as "money orders" to pay off his PenFed accounts, which were purported to be issued by "The Nelson Bruce Estate a foreign state." (ECF No. 413-11.) Plaintiff was advised that the documentation submitted on May 9, 2017, "is not an acceptable form of payment to satisfy the subject obligations to PenFed."[5] (ECF No. 413-12.)

Relevant here, Plaintiff's credit card statements show that the credit card account went delinquent in January 2017 and no payment was made on the account thereafter. (ECF No. 413-8

---

[5] Plaintiff argues that these "money orders/negotiable instruments . . . are irrelevant to the FCRA and state law claims" and "were improperly introduced by [PenFed] as a character attack." (ECF No. 432 at 4–5.) The Court finds Plaintiff's objection without merit. It is undisputed that Plaintiff submitted these documents to PenFed in relation to the PenFed accounts he claims to have disputed, and they appear relevant to Plaintiff's allegation that he was not obligated to pay the balances owed on those accounts.

at 34, 36–54). The credit card account showed a balance of $13,777.36 before the account was charged off in July 2017. (*Id.* at 52.) Plaintiff's combined account statements show that the last full payment on the vehicle loan was made in September 2016 (ECF No. 413-7 at 15); the account went delinquent in October 2016 (*id.* at 17); and on October 24, 2017, PenFed reduced the balance by waiving accumulated finance charges, leaving only the principal balance of $13,794.99. (*Id.* at 48–67.) Plaintiff's combined account statements further show: the last full payment on the PLOC was made in December 2016 (*id.* at 22); the account went delinquent in January 2017 (*id.* at 25); and, on September 27, 2017, PenFed closed Plaintiff's share account and transferred the remaining $5.00 to the PLOC, and then further reduced the balance by waiving accumulated finance charges, leaving only the principal balance of $4,427.20. (*Id.* at 46–67.)

On January 28, 2021,[6] Plaintiff submitted to PenFed a notarized document he labeled "Affidavit-Verified Cardholder Billing Error Dispute." (ECF No. 1-2 at 23–27.) In this document, Plaintiff identified the PenFed Accounts and stated:

> [t]he monthly statements are inaccurate and a possible violation of the GAAP[7] for refusing to credit my account because it should reflect a bank asset and liability (funds owed to me) per GAAP, and not a debt. . . . This Billing Error is limited to your failure to credit my account for credits received, as explained herein, and is not to be construed as alleging anything else. . . . PenFed accepted my signed promises to pay, receipts, notes or other similar instruments as bank money, creating and issuing new credits to my account that resulted in a bank asset and liability (funds owed to me) per GAAP. . . . ANY RESPONSE REGARDING THIS BILLING ERROR SHALL BE LIMITED TO THE ERROR ASSERTED AND MAY NOT EXTEND TO MATTERS WHICH THIS DISPUTE DOES <u>NOT</u> INVOLVE.

(*Id.* at 23–25.)

---

[6] Prior to sending this correspondence to PenFed, Plaintiff filed disputes with Trans Union regarding his PenFed Accounts in June of 2018 and June of 2019. (ECF Nos. 414-1 at 4; 414-2 at 5–6.) However, these disputes cannot support the claims raised against PenFed in the FAC for the reasons set forth in the Court's Order granting Defendant Trans Union's summary judgment motion. (ECF No. 414.) Accordingly, the 2018 and 2019 disputes are not relevant here.

[7] GAAP refers to "Generally Accepted Accounting Principles." (ECF No. 1-2 at 26.)

PenFed responded to the above correspondence on February 8, 2021, and explained that PenFed had previously investigated Plaintiff's disputes and had "provided evidence substantiating the obligations." (ECF No. 1-4 at 2.) PenFed advised Plaintiff that the PenFed Accounts "are legally established debts for which you are liable to repay" and stated, "your accounts are now charged off." (*Id.*)

During his deposition, Plaintiff testified that he "called PenFed" in December of 2021, wherein "they" stated the PenFed Accounts had been "transferred to a third party," and that prior to this point, he "thought that PenFed still was servicing and still held those loans." (ECF No. 415-2 at 230–31.)

On April 4, 2022, Plaintiff sent another letter to PenFed briefly stating that he is "disputing the alleged debts and all alleged balances" on the PenFed Accounts and purporting to request an authenticated record of the accounting pursuant to the UCC. (ECF No. 1-2 at 53–54.) PenFed responded to Plaintiff on April 11, 2022, stating that Plaintiff's PenFed Accounts "with PenFed are legally established debts for which you are liable to repay." (ECF No. 1-4 at 3.) In this letter, PenFed further stated that the PenFed Accounts "are now charged off," that the credit card account "has been sold to UHG [United States Holdings Group, LLC]," that the PLOC "has been assigned to Nationwide Credit Corporation [("NCC")] for resolution," and that the vehicle loan "is still owned and serviced by PenFed." (*Id.*)

PenFed has provided two declarations from Craig Olson,[8] who avers that he has been employed by PenFed since February 2009, including, most recently, as the Vice President of Legal Operations. (ECF No. 413-13 at 2.) Mr. Olson further avers:

---

[8] While these declarations are not notarized, they have been signed and include statements swearing their truth under penalty of perjury. *See* 28 U.S.C. § 1746 (allowing declarations to have full force and effect if the writer subscribes the statement as true under penalty of perjury).

> 6. As part of its regular business activities, PenFed creates, receives, and keeps records related to accounts opened by its members, including but not limited to signature cards, account agreements, promissory notes, checks and other financial instruments, account statements, and communications related to collections activities, including communications involving third-parties PenFed engages to collect past due debts owed by members.

(*Id*.) Mr. Olson, who is also PenFed's 30(b)(6) representative in this action, asserts that he has "access to the records described . . . above" in connection with his current and past positions at PenFed.[9] (*Id*. at 3; *see also* ECF No. 421-13.)

In his November 1, 2024 declaration, Mr. Olson provides certain clarifications about the statements made by PenFed in its April 11, 2022 letter to Plaintiff. Mr. Olson avers that "[a]s of the date of this declaration, "PenFed has retained sole legal ownership over" the PenFed Accounts, and "PenFed has never sold, assigned, or transferred its ownership rights with respect to any of the" disputed PenFed Accounts. (ECF No. 413-13 at 3.) He continues, "[w]hile PenFed planned to sell Bruce's credit card account to UHG, the sale was never completed, and PenFed still owns the credit card account as of the date of this declaration." (*Id*.) "In general, when a loan account becomes the subject of a lawsuit, PenFed's routine practice is to refrain from selling the loan account while the lawsuit is pending." (*Id.*) Mr. Olson references and attaches to his declaration a subpoena Plaintiff served on UHG in this action seeking, *inter alia*, all documents in its possession "associated with any and all [of the PenFed Accounts] assigned transferred and/or sold to you . . . from January 1, 2017 to present," to which UHG responded, "[a]fter a thorough search of all records, UHG is unable to locate an account with the information provided." (*Id*. at 10–16.) Specific to NCC, Mr. Olson avers his "understanding is that NCC is a debt collection agency that

---

[9] *See Sanchez Carrera v. EMD Sales, Inc*., 402 F. Supp. 3d 128, 141 (D. Md. 2019) ("Affidavits 'contain sufficient information . . . to establish that the affiants' statements [a]re made based on personal knowledge' where the affidavits contain 'a description of the affiants' job titles and duties' and there is no evidence the 'affiants were not competent to testify.'" (quoting *Bryant v. Bell Atl. Md., Inc*., 288 F.3d 124, 135 n.9 (4th Cir. 2002))).

specializes in recovering past-due accounts for others." (*Id.* at 4.) According to Mr. Olson, "PenFed 'assigned' the PLOC to NCC so that NCC could collect the past due debt on behalf of PenFed," and "PenFed did not assign its ownership rights with respect to the PLOC to NCC." (*Id.*)

Here, the Court notes that Mr. Olson referenced and submitted with his August 19, 2024 declaration certain letters sent by NCC to Plaintiff in April of 2018, stating that balances owed on the disputed PenFed Accounts are "marked unpaid on the creditor's records and sent to us for collection" and providing ways for Plaintiff to make payment. (ECF Nos. 413-2 at 4–5; 459-1; 459-2.) In these letters, PenFed is listed as the "creditor." (ECF Nos. 459-1; 459-2.) Additionally, the record includes a letter sent by NCC to Plaintiff on November 3, 2022, wherein NCC provides "information [Plaintiff] requested" pertaining to the PLOC account, which lists PenFed as the "creditor" and states that "[t]his communication is from a debt collector attempting to collect a debt." (ECF No. 421-1 at 2–3.) On December 14, 2022, NCC sent another letter to Plaintiff "confirm[ing] that [the PLOC account] . . . has been closed and returned to our client." (*Id.* at 7; *see also* ECF No. 413-2 at 5.)

On September 24, 2021, Plaintiff submitted a letter to Equifax disputing PenFed's failure to report the "charged-off/written off" PenFed Accounts with a zero balance and asked "that these alleged accounts be removed/deleted [by Equifax] from [Plaintiff's] credit report immediately." (ECF No. 1-2 at 2–6.) In this letter, he essentially claimed the accounts were not legitimate and did not belong to him, so he had no obligation to repay the balances owed on the accounts. (*Id.*) Plaintiff further stated, *inter alia*, that the "charge-offs/write-offs are to be reported with a '0' balance (zero) as paid in full" because "they [PenFed] apply for and receive tax credits in the year they determine the alleged account is an uncontrollable business bad debt, thereby paying off the remaining balance in full on this alleged account." (*Id.* at 3–5.) In this letter, Plaintiff further

disputed the accuracy of the PLOC and the vehicle loan because they were inconsistent with the zero balance reported by Experian Information Solutions, Inc. ("Experian"). (*Id.*) On May 3, 2022, Plaintiff sent another letter to Equifax stating he is "not 100 percent sure" whether the reporting of PenFed Accounts is "right or wrong" and requesting that Equifax "re-investigate if every piece of information" reported for the PenFed Accounts "is correct." (ECF No. 1-2 at 48.)[10]

Notably, Plaintiff admitted during his deposition that he had "stopped making payments to PenFed" on the three PenFed Accounts. (ECF No. 413-14 at 13–14, 16–17.) Thus, Plaintiff's failure to repay his debts to PenFed is not in dispute here.

## LEGAL STANDARDS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In ruling on a motion for summary judgment, "'the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor.'" *Id.* (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)); *see also Sedar v. Reston Town Center Prop., LLC*, 988 F.3d 756, 763 (4th Cir. 2021) ("The requirement to construe the facts, and all reasonable inferences therefrom, in the light most favorable to the non-moving party does not require [a court] to accept cherry-picked snippets of the testimony divorced from their context."). Conclusory allegations or

---

[10] Plaintiff sent similar letters to Experian regarding his PenFed credit card account. (ECF No. 1-2 at 36–39, 50.)

denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

Because Plaintiff is representing himself, these standards must be applied while liberally construing his filings in this case. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).[11]

## DISCUSSION

### I.     FCRA Claims

#### A.  Legal Framework

The FCRA is "a comprehensive statutory scheme designed to regulate the consumer reporting industry." *Ross v. F.D.I.C.*, 625 F.3d 808, 812 (4th Cir. 2010). Relevant here, the FCRA imposes distinct requirements on the different entities within the consumer reporting industry. As the Fourth Circuit recently summarized:

> Under [the FCRA], a consumer reporting agency creates and provides credit reports. Consumer reporting agencies "compile . . . data [about consumers] into a comprehensible format," which allows providers of credit, landlords and other entities to evaluate individuals and make informed decisions. *Denan v. Trans Union LLC*, 959 F.3d 290, 294 (7th Cir. 2020). The data contained in those reports comes from furnishers like "banks, credit lenders, and collection agencies." *Id.* "Consumer reporting agencies and furnishers, though interrelated, serve discrete functions: furnishers report data to incentivize the repayment of debts, while consumer reporting agencies compile and report that data for a fee." *Id.* Consumer reporting agencies and furnishers thus work together as the two primary components of our credit reporting system to "produc[e] a vast flow and store of consumer information." *Id.*
>
> The FCRA requires furnishers to ensure that the information they provide to consumer reporting agencies is accurate. *See* 15 U.S.C. § 1681s-2(a). If a consumer believes information in her credit report is inaccurate or incomplete, she can dispute

---

[11] Although the Court must liberally construe Plaintiff's filings in light of his *pro se* status, it is worth noting that Plaintiff is a seasoned *pro se* litigant who has filed over fifteen civil actions in this Court.

the information directly with the furnisher. *See id.* § 1681s-2(a)(8). But she can also dispute the accuracy of information in her report indirectly by notifying a consumer reporting agency rather than the furnisher. *See id.* §§ 1681i(a)(2), 1681s-2(b); *see also Ingram v. Experian Info. Sols., Inc.*, 83 F.4th 231, 237 (3d Cir. 2023) (explaining that direct disputes are made with the "person or entity that furnished the incorrect or incomplete information," while indirect disputes "are when a consumer instead disputes information with the consumer reporting agency . . . ."). If a consumer notifies a consumer reporting agency "that [she] disputes the accuracy of an item in [her] file, [the] FCRA requires the [consumer reporting agency] to notify the furnisher of the dispute." *Saunders v. Branch Banking And Tr. Co. Of VA.*, 526 F.3d 142, 148 (4th Cir. 2008).

Once the consumer reporting agency notifies the furnisher of the consumer's dispute, it must "conduct an investigation with respect to the disputed information." § 1681s-2(b)(1)(A). The furnisher must also review "all relevant information provided by the consumer reporting agency" related to the dispute. *Id.* § 1681s-2(b)(1)(B). And it must "report the results of the investigation to the consumer reporting agency." *Id.* § 1681s-2(b)(1)(C). If the investigation reveals that the information is "incomplete or inaccurate," the furnisher must report those findings to the pertinent credit reporting agencies. *See id.* § 1681s-2(b)(1)(D). What's more, if part of the information disputed by the consumer is either (1) found to be inaccurate or incomplete, or (2) cannot be verified after the required reasonable investigation, the furnisher must "modify," "delete" or "permanently block" the reporting of the information. *Id.* § 1681s-2(b)(1)(E).

Further, the FCRA gives consumers a private right of action for violations of this obligation.[12] *See id.* §§ 1681n(a), 1681o; *see also Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 500 (4th Cir. 2007). Stated differently, a consumer can sue a furnisher for willfully or negligently failing to reasonably investigate an indirect dispute over the accuracy or completeness of information in her credit report.

*Roberts v. Carter-Young, Inc.*, 131 F.4th 241, 245–46 (4th Cir. 2025).

As noted above, Plaintiff alleges that PenFed failed to reasonably investigate an indirect

dispute over the accuracy or completeness of information in his credit report in violation of §

---

[12] Notably, the FCRA provides no "private right of action for a credit furnisher's alleged *failure to report accurate information*." *Harrell v. Caliber Home Loans, Inc.*, 995 F. Supp. 2d 548, 554 n.4 (E.D. Va. 2014) (citation omitted) (emphasis added). Rather, consumers have a private right of action only under § 1681s–2(b), which "imposes duties on furnishers, upon receiving a dispute of accuracy from a consumer reporting agency, to conduct a reasonable investigation of the dispute, report its results to the consumer reporting agency, and modify or delete incorrect information." *Wilson v. Wells Fargo Bank, N.A.*, No. 2:20-cv-2780-BHH-MHC, 2021 WL 2003524, at *4 (D.S.C. Apr. 30, 2021) (referencing *Akalwadi v. Risk Mgmt. Alts., Inc.*, 336 F. Supp. 2d 492, 509 (D. Md. 2004); 15 U.S.C. § 1681s–2 (b); *White v. Fannie Mae*, No. CIV. A. 1:13-29923, 2014 WL 5442970, at *6 n.4 (S.D.W. Va. Oct. 24, 2014)), *adopted*, 2021 WL 2003184 (D.S.C. May 19, 2021).

1681s-2(b) of the FCRA. (ECF No. 291 at 32–35.) To prevail on this claim, Plaintiff must show: "(1) [he] submitted a dispute over the accuracy of information on a credit report to a consumer reporting agency; (2) the agency notified the furnisher of that dispute; and (3) the furnisher failed to conduct a reasonable investigation to determine whether the disputed information can be verified." *Roberts*, 131 F.4th at 249 (4th Cir. 2025) (cleaned up). "An essential element of a claim that a furnisher has violated its duty to investigate indirect disputes of information in a consumer's credit report is that the information in question was actually inaccurate or incomplete." *Id*. at 253. "[I]n the context of an indirect dispute against a furnisher," the inaccuracy or incompleteness must be "objectively and readily verifiable." *Id*. at 250–53. "[I]n the context of a claim against a consumer reporting agency . . . a report is inaccurate when it is patently incorrect or when it is misleading in such a way and to such an extent that it can be expected to have an adverse effect." *Id.* at 250 (quotation marks and citation omitted).

As for what constitutes a "reasonable" investigation by a furnisher, the Fourth Circuit recently confirmed that "[f]urnishers are not tribunals." *Id*. at 251. In other words, "a dispute [] involv[ing] complex fact-gathering and in-depth legal analysis of the sort that courts would typically perform is not objectively and readily verifiable," nor is "a dispute that implicates unsettled questions of law and requires credibility determinations and quasi-discovery . . . ." *Id*. However, "the scope of an investigation into objectively and readily verifiable information is not limited to confirming accurate transcription of a debt's amount or the name of the debtor." *Id*. at 251–52 (referencing *Sessa v. Trans Union, LLC*, 74 F.4th 38, 42 (2d Cir. 2023)). Rather, a furnisher may, in some instances, be able to objectively and readily verify "[w]hether a debt has been paid," or a claim that "alleged debts never occurred." *Id*. at 252. Further, "while many legal disputes will not involve objectively and readily verifiable information, some disputes that implicate legal

questions and legal doctrines will." *Id.* (referencing *Guthrie v. PHH Mortg. Corp.*, 79 F.4th 328, 345 (4th Cir. 2023) (reporting a delinquent balance on a plaintiff's credit report created an actionable inaccuracy because plaintiff was compliant under his bankruptcy plan)).

### B. Analysis

In its motion for summary judgment, PenFed argues that Plaintiff's FCRA claim fails as a matter of law because Plaintiff cannot prove that there was some inaccuracy or incompleteness with respect to PenFed's reporting of the PenFed Accounts. (ECF Nos. 413-1 at 13–14; 439 at 3–9.) After careful review, the Court agrees.

At the outset, the Court notes that Plaintiff's FAC is premised upon Plaintiff's mistaken belief that his PLOC was sold and/or that PenFed relinquished its right to recover Plaintiff's credit card debt by enlisting a third-party debt collector. (*See generally* ECF No. 291 (detailing factual allegations centered around the sale, assignment, and/or transfer of Plaintiff's accounts and specifying the "basis for [] liability" under the FAC as "knowing that PENFED accounts [were] sold, assigned and/or transferred").) In light of these allegations, Plaintiff must, at base, provide evidence indicating that PenFed received, yet failed to reasonably investigate, a dispute regarding PenFed's ownership of the PenFed Accounts. *Roberts*, 131 F.4th at 249. Throughout his briefings, Plaintiff spends much time trying to identify precise reporting deficiencies by PenFed and the other Defendants, yet he fails to point the Court to any admissible evidence indicating that PenFed received a dispute regarding its ownership of the relevant accounts but failed to conduct a reasonable investigation to determine whether its ownership of such accounts could be verified.

Next, to the extent Plaintiff relies on his September 2021 letters to substantiate his claims against PenFed, he cannot do so because the record evidence plainly shows that Plaintiff did not yet know that PenFed intended to sell and/or assign his accounts in September of 2021. Indeed,

Plaintiff testified that he "called PenFed" in December of 2021, wherein "they" stated the PenFed Accounts had been "transferred to a third party," and that prior to this point, he "thought that PenFed still was servicing and still held those loans." (ECF No. 415-2 at 230–31.) The record also clearly indicates that Plaintiff did not receive written confirmation that his PLOC would be sold until he received a letter from PenFed in April of 2022.[13] (ECF No. 1-4; 415-2 at 230.) Thus, Plaintiff could not have disputed the purported sale and/or transfer of the relevant accounts until December of 2021.

Further, as this Court has previously explained, Plaintiff's subsequent letters cannot support his FCRA claims against PenFed because those letters did not independently trigger a duty to investigate.[14] (ECF No. 131 at 10–12; ECF No. 154 at 14.) Accordingly, the record does not lend any support to Plaintiff's claims that he specifically disputed the sale, transfer, and/or assignment of his PenFed Accounts, and the Court, therefore, finds that PenFed is entitled to summary judgment on Plaintiff's FCRA claims under § 1681s-2(b).

What is more, the record plainly shows that PenFed owned and maintained a right to recover Plaintiff's debts under his PLOC and credit card account at all times relevant to this case. (*See supra* at 8.) Because Plaintiff's claims regarding the sale, transfer, and/or assignment of his accounts are based solely upon unsupported assumptions and misconceptions that are belied by the record evidence, PenFed is entitled to summary judgment on all such claims. (*See, e.g.*, ECF Nos. 413-2 at 4–5; 413-13 at 3–4, 10–16; 421-1 at 2–3, 7; 459-1; 459-2); *see also Peoples v.*

---

[13] As noted *supra*, Plaintiff's PLOC account was never actually sold. (*See supra* at 8.)

[14] Upon a request for reconsideration filed by Plaintiff following Defendants' motions to dismiss but in advance of his FAC, this Court previously acknowledged that Plaintiff's May 2022 letter to Equifax could have, theoretically, been viewed as "part and parcel" of the disputes raised in Plaintiff's September 2021 letter to Equifax. (ECF No. 292 a 20.) However, with the benefit of a complete record, it is clear that Plaintiff could not have disputed any alleged sale, transfer, and/or assignment of his PenFed accounts in September of 2021. As such, Plaintiff cannot rely on this May 2022 letter to support his FCRA claims against PenFed. Plaintiff also cannot rely on the letters he sent to Experian for the same or similar reasons he cannot rely on the letters he sent to Equifax, as described in greater detail in the Court's Order granting Experian's summary judgment motion. (ECF No. 415.)

*Equifax Info. Sols.*, No. 3:23-cv-495-MOC-DCK, 2023 WL 6883650, at *2 (W.D.N.C. Oct. 18, 2023) (noting that the plaintiff's "subjective belief is not sufficient to plead an inaccuracy" because the FCRA evaluates accuracy under an objective standard).

Nonetheless, in light of Plaintiff's *pro se* status, the Court considers Plaintiff's other discernable arguments below. Before doing so, however, the Court notes that Plaintiff is not permitted to use his briefings to raise claims omitted from his FAC. As noted, Plaintiff has been afforded every reasonable opportunity to develop his claims throughout this litigation, and it is well settled that "[a] plaintiff may not argue a new claim in response to a motion for summary judgment." *Haggwood v. Magill*, No. 5:15-cv-3271-RMG, 2016 WL 4149986, at *6 (D.S.C. Aug. 3, 2016) (citing *White v. Roche Biomedial Labs., Inc.*, 807 F. Supp. 1212, 1216 (D.S.C. 1992)); *see also S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 185 (4th Cir. 2013) (stating that parties cannot amend their complaints through briefing or oral advocacy); *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312 (11th Cir. 2004) (exaplaining that plaintiff may not amend complaint through argument in brief opposing summary judgment); *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) (noting that a party may not expand its claims to assert new theories in response to summary judgment); *Bryan v. Def. Tech., U.S.*, No. 1:10-cv-2834-TLW-SVH, 2011 WL 4435597, at *4 (D.S.C. Aug. 10, 2011) ("A plaintiff may not amend his pleadings to avoid summary judgment."), *adopted*, 2011 WL 4435579 (D.S.C. Sept. 23, 2011), *aff'd*, 466 F. App'x 208 (4th Cir. 2012). Thus, although the Court has— in an abundance of caution—reviewed and contemplated certain arguments developed throughout Plaintiff's briefings, the Court's consideration of such arguments should not be misconstrued as expanding on, or adding to, the claims set forth in Plaintiff's FAC.

Turning to Plaintiff's specific arguments, the Court now understands—with the benefit of a developed record—that Plaintiff's initial dispute was largely based upon Plaintiff's misconception that the underlying debts in the PenFed Accounts had been extinguished through PenFed's own conduct. More specifically, despite failing to complete the payments owed on the PenFed Accounts, Plaintiff argued that the PenFed Accounts should have been reported by PenFed with a zero balance because those debts were nevertheless extinguished through: (1) PenFed's purported pledge of Plaintiff's "signed promises to pay, receipts, [and] notes" to the Federal Reserve Bank in exchange for a loan to PenFed, which resulted in "new credits" issued to Plaintiff's "account that resulted in . . . funds owed to [Plaintiff]" (ECF No. 1-2 at 24 (cleaned up)); and/or (2) PenFed's accounting procedures whereby the PenFed Accounts were "paid in full" through tax credits PenFed received once the accounts were "charged-off" and reported as "uncollectable business bad debt." (*Id*. at 2–6.)[15]

Specific to Plaintiff's first theory, he is essentially asserting that financial institutions can create new money by issuing loans to consumers and then seeking reimbursement from the Federal Reserve Bank. (ECF No. 1-2 at 24; *see also* ECF No. 434 at 19 (arguing "that PenFed pledges promissory notes/consumer loans, that FRB [Federal Reserve Bank] accepts promissory notes/consumer loans as collateral and security for loan credits and the issuance of Federal Reserve Notes").) This argument is akin to the vapor money theory, which federal courts have consistently found frivolous. *See*, *e.g.*, *Nunez v. D.T.C.*, No. 4:13-cv-244, 2013 WL 5409219 (D.S.C. Sept. 25, 2013) (collecting cases); *Mosley–Sutton v. MacFayden*, No. RBD 10-cv-1130, 2011 WL 2470083, at *3 (D. Md. Jun. 17, 2011) ("[A]ll claims based upon any variation of the vapor money theory

---

[15] In his briefing, Plaintiff appears at times to disclaim these arguments as a basis for inaccuracy under the FCRA. (ECF No. 421 at 18, 22-23; 432 at 10–11.) However, his convoluted prose renders it difficult to understand what arguments he has abandoned completely.

must be dismissed."); *Gallant v. Deutsche Bank Nat. Trust Co*., 766 F. Supp. 2d 714, 722 (W.D. Va. 2011) (holding that complaints based on vapor money, unlawful money, and ultra vires theories fail to state a cognizable claim against defendant, and such claims are subject to dismissal); *Tonea v. Bank of Am., N.A*., 6 F. Supp. 3d 1331, 1344–45 (N.D. Ga. 2014) (dismissing claims based on the "vapor money" theory, calling it a "convoluted and nonsensical argument that a plaintiff does not owe the money advanced by the lender on his loan because the indebtedness was not funded by the lender with actual money.").[16]

As for Plaintiff's second theory, a debt is not extinguished merely because the lending institution has charged off the account. A charge-off is "a declaration by a creditor that an amount is unlikely to be collected." *Frost v. Resurgent Cap. Servs., L.P*., 2016 WL 3479087, at *1 n.1 (N.D. Cal. June 27, 2016) (quoting *Hanks v. Talbots Classics Nat'l Bank*, C-12-2612-SI, 2012 WL 3236323, at *2 n.2 (N.D. Cal. Aug. 6, 2012)). Black's Law Dictionary explains that to charge off an account is "[t]o treat (an account receivable) as a loss or expense because payment is unlikely; to treat as a bad debt." Black's Law Dictionary (11th ed. 2019). "Bad debt," in turn, is defined as "[a] debt that is uncollectible and that may be deductible for tax purposes."[17] *Id.*

The act of charging off "does not diminish the legal right of the original creditor to collect the full amount of the debt." *Hinkle v. Midland Credit Mgmt., Inc*., 827 F.3d 1295, 1297 (11th Cir.

---

[16] In fact, Plaintiff is aware that he cannot bring a valid claim based upon any iteration of the "vapor money" theory. In an unrelated case that Plaintiff filed in 2018, this Court informed Plaintiff that claims based upon the "vapor money" and/or "no money lent" theory lack legal basis and are, therefore, frivolous. *Bruce v. Wilmington Sav. Fund Soc'y, FSB, Tr. of Stanwich Mortg. Loan Tr. C*, No. 2:18-cv-2555-BHH-BM, 2019 WL 1293718, at *2 (D.S.C. Jan. 15, 2019), *adopted*, 2019 WL 2281364 (D.S.C. May 29, 2019).

[17] To the extent Plaintiff is asserting that PenFed submitted Internal Revenue Service Forms 1099-C specific to the disputed PenFed Accounts, it is well established that "a Form 1099–C does not itself operate to legally discharge a debtor's liability." *F.D.I.C. v. Cashion*, No. 1:11-cv-72, 2012 WL 1098619, at *7 (W.D.N.C. Apr. 2, 2012), *aff'd*, 720 F.3d 169 (4th Cir. 2013) (collecting cases). "A Form 1099–C is issued to comply with IRS reporting requirements," and "[t]he IRS itself does not view a Form 1099–C as an admission that the creditor has discharged the debt and can no longer pursue collection thereon." *Id.* (finding "the fact that [creditor] may have issued a Form 1099–C in relation to the Defendant's indebtedness does not, standing alone, raise a genuine issue of material fact regarding the Defendant's liability on the Note") (citing I.R.S. Ltr. Rul.2005–0207, 2005 WL 3561135 (Dec. 30, 2005)).

2016); *Towle v. TD Bank USA, N.A.*, 2023 WL 3018665, at *3 (D. Minn. Apr. 20, 2023) ("The fact that a creditor 'charges off' an account does not mean that the debtor is no longer legally obligated to pay the amount 'charged off'; it simply means that the creditor does not expect the debtor to fulfill that legal obligation."); *Ostreicher v. Chase Bank USA, N.A.*, No. 2020 WL 6809059 (S.D.N.Y. Nov. 19, 2020) ("[A] creditor charging off or writing off a debt is simply an internal accounting action by which the creditor stops carrying the debt as a receivable because the chances of collecting it are so low."); *In re Washington*, 581 B.R. 150, 159 n.15 (Bankr. D.S.C. 2017) (finding that the Supreme Court of South Carolina's definition of a charge off, which relied on Black's Law Dictionary, "supports the proposition that a 'write off' or 'charge off' is an internal accounting practice and does not have the legal effect of discharging a debtor from the underlying debt") (citing *South Carolina Dep't of Revenue v. Anonymous Co. A*, 678 S.E.2d 255, 257 n. 2 (S.C. 2009)). Thus, as one federal court explained, "[c]reditors . . . could attempt to collect the debt themselves—either by utilizing internal collections staff or by contracting with a third-party agent willing to collect the debt on their behalf." *Artemov v. TransUnion, LLC*, 2020 WL 5211068, at *4 (E.D.N.Y. Sept. 1, 2020) (citing *Hinkle*, 827 F.3d at 1297–98). "Alternatively, they could sell the debt to a third-party purchaser at a discounted price based on the reduced likelihood of collection." *Id*. In short, the Court finds no merit to any assertion that PenFed changed the legal enforceability of the debt owed by Plaintiff when it charged off the accounts at issue. *See also Towle v. TD Bank USA, N.A.*, 2023 WL 3018665, at *3 (D. Minn. Apr. 20, 2023) (rejecting as "frivolous" the claim that "if a creditor who is stuck with a bad debt either receives payment from an insurer or deducts the bad debt on its tax returns, the debtor is somehow absolved of his legal responsibility to pay the debt").

Related to Plaintiff's argument that charging off an account extinguishes the debt, Plaintiff asserts that PenFed's purported transfer of "the account receivable balances to its loss reserve account via a transaction on the account" required PenFed to report the PenFed Accounts with zero balance. (ECF No. 434 at 3). According to Plaintiff, PenFed's accounting practices "eliminat[ed] the balance on the original account[s] to zero" once the PenFed Accounts were charged off and that it is this "account receivable balance" of zero that PenFed must report to CRAs. (ECF No. 421 at 6–7.) More specifically, Plaintiff asserts that:

> [PenFed's] own annual reports show that they deduct the charged-off balances (account receivables balance) from their Allowance for Loan and Lease Loss ["ALLL"] ("reserve account" for charged-off debts) which absorbs the accounts receivables balances (balance reported as being owed and charged off) that are transactions offsetting and eliminating the balance on the original account to zero.

(*Id*. at 6, citing ECF Nos. 421-2; 421-10; 421-11.) According to Plaintiff, this alleged accounting practice is essentially "an internal transaction that took place resulting in a credit being applied to the charged-off account receivable by way of debit from the ALLL account which absorbed the charge-off account receivable balance bringing the balance to zero and the receivables being transferred to a completely separate account." (*Id*. at 9.) Plaintiff asserts that "PenFed, after the charge-off and transfer to its allowance account, . . . no longer had a valid account receivable for the Plaintiff" and, therefore, "any continued reporting of a non-zero balance on the charged off accounts" by PenFed "does not reflect the current status of the account as required by federal law." (*Id*. at 9.)

The evidence offered by Plaintiff on this issue, however, does not create a genuine issue of material fact that PenFed's internal accounting action rendered the PenFed Accounts inaccurate or incomplete because they were not reported with a zero balance. In his various briefings, Plaintiff relies on Mr. Olson's 30(b)(6) deposition testimony (ECF No. 421-13), documents memorializing

20

PenFed's various policies and procedures (ECF Nos. 432-5; 432-6; 432-7; 432-8), and PenFed's letters to Plaintiff dated February 8, 2021, and April 11, 2022. (ECF No. 1-4.) Notably, the policies and procedures to which Plaintiff cites simply explain how PenFed tracks losses and recoveries to ensure compliance with generally accepted accounting principles, federal regulations, and tax law; they do not independently indicate that it is inaccurate or incomplete to report an unpaid balance on a charged off account. Nor do the letters cited by Plaintiff (in which PenFed informed him that the accounts at issue were charged off) create a genuine issue of material fact as to this alleged inaccuracy. Rather, the record makes clear that Plaintiff's arguments on this point are misguided. As Mr. Olson explained during his deposition, "it would not [be misleading to report a balance on the original account when the balance has already been deducted internally to the allowance account] . . . based on policy because that's how a loan actually works. Even though it's charged off, the loan amount is still owed. The loan amount is not forgiven at charge-off." (ECF No. 421-13 at 31–32.) Mr. Olson further explained: "that movement of the balance from a loan receivable to an allowance account" is "an accounting transaction that doesn't impact the balance of the loan." (*Id*. at 39.)

In sum, as numerous courts have found, "consumer reporting agencies may lawfully report accurate information regarding closed accounts, discontinued lines of credit, or debts marked as charged off." *Lensendro v. TransUnion LLC*, 2025 WL 1104611, at *7 (D. Conn. Apr. 14, 2025) (citing *Ciment v. TransUnion, LLC*, No. 24-cv-212(CS), 2025 WL 307871, at *6 (S.D.N.Y. Jan. 27, 2025) ("FCRA allows charged-off accounts to be reported for seven years . . . ." (quoting *Shelton v. AmeriCredit Fin. Servs., Inc*., 2023 WL 2761702, at *3 (E.D. Mich. Apr. 3, 2023))); *Boyer v. TransUnion, LLC*, 2023 WL 1434005, at *6 (D. Conn. Feb. 1, 2023) ("Plaintiff does not attempt to distinguish the instant case from the numerous others in which courts have determined

that reporting historical account data on closed accounts is neither inaccurate nor misleading."); *Artemov,* 2020 WL 5211068, at *4–5 ("[I]t should be obvious that, even though the banks labeled plaintiff's accounts as charged off, they had no obligation to zero out the overall or past due balance. . . . At any moment, BOA could decide to collect the charged off debt and seek the delinquent amount."); *Ostreicher*, 2020 WL 6809059, at *5 ("Chase here reported exactly what it should have: that Plaintiff had failed to pay on four accounts (which a potential future creditor would want to know) but had no monthly obligation on those accounts because Chase had written the accounts off (which Plaintiff would want the potential creditor to know)."). As the court explained in *Artemov v. TransUnion, LLC*:

> If I were to adopt plaintiff's reasoning—that a charge off categorically precludes a creditor from reporting the total past due amount—it would vitiate the entire existence and purpose of credit reporting companies: to present an evenhanded and fair representation of a particular consumer's ability and willingness to pay off debt, so as to encourage a creditor to take a risk and extend a line of credit to a particular consumer.

2020 WL 5211068, at *6.

With the benefit of a developed record, the Court cannot find that here, where Plaintiff clearly failed to complete the payments owed on the PenFed Accounts, it was "actually inaccurate or incomplete" for PenFed to report the unpaid balance on those accounts simply because they had been charged off through PenFed's internal accounting action. Critically, where PenFed reported a balance on the PenFed Accounts, the accounts were clearly marked as charged off and there was no amount listed for the scheduled monthly payment line item. (ECF Nos. 1-2 at 7–8, 13–18; 31-1 at 5–6.) Under such circumstances, PenFed's internal accounting action did not render its reporting inaccurate or incomplete under the FCRA.

Plaintiff further argues that PenFed's reporting of the PenFed Accounts was inaccurate or incomplete based on its alleged noncompliance with technicalities of industry standards for credit

reporting and based on alleged inconsistencies with how the PenFed Accounts were reported. (ECF Nos. 421 at 7; 432 at 6.) The Court addresses these issues in turn. First, the industry standards relied on by Plaintiff are detailed in the Consumer Data Industry Association's Credit Reporting Resource Guide ("CRRG"). According to Plaintiff, when an account is transferred "internal[ly] (to a separate collection department within PenFed) or external[ly] (to a third-party collector outside of PenFed)," the CRRG requires PenFed to update the "original tradeline . . . to reflect a $0 balance, $0 past due and the appropriate status code (such as 'transferred' or 'sold')." (ECF No. 421 at 7.) The CRRG is published by the Consumer Data Industry Association ("CDIA"). The CDIA states, "If your company furnishes consumer credit account data on a regular basis to credit reporting agencies, you have duties under the . . . [FCRA] to correct and update that consumer credit history information. To assist data furnishers in this process, the credit reporting industry has adopted a standard electronic data reporting format called the Metro 2® Format." *See* CDIA, https://www.cdiaonline.org/metro-2/ (last visited Sept. 26, 2025).

In another of Plaintiff's shifting sands of arguments, Plaintiff now argues that PenFed failed to report the PenFed Accounts in accordance with its "legal and reporting duties under" 12 C.F.R. part 1022 ("Regulation V"). (ECF No. 452 at 2.) Regulation V is the federal regulation implementing the FCRA. Notably, Plaintiff does not mention this regulation anywhere in his FAC, despite having every opportunity to amend his claims in this action, and the Court is not aware of any legal authority indicating this regulation establishes a private right of action. *See Lewis v. Navient Corp.*, 2020 WL 10142125, at *7 (N.D. Ga. Apr. 2, 2020) ("[T]here is no private right of action under [Regulation V]."), *adopted*, 2020 WL 10141225 (N.D. Ga. Apr. 21, 2020); *Humphrey v. Trans Union LLC*, 2017 WL 1379405, at *4 (W.D. Wis. Apr. 17, 2017) ("Humphrey has not

demonstrated how this claim under [12 C.F.R. § 1022.42(a) and § 1022.43] is actionable."), *aff'd*, 759 F. App'x 484 (7th Cir. 2019).

In his briefing, Plaintiff relies on Appendix E to 12 C.F.R. pt 1022 ("Regulation V), which discusses the "Interagency Guidelines Concerning the Accuracy and Integrity of Information Furnished to [CRAs]."[18] (ECF Nos. 432 at 4; 452 at 2.) According to Plaintiff, "the Metro 2/CRRG guidelines and Regulation V Appendix E require the account be: [1] Reported as 'Transferred' (Status Code 05 or 93); [2] Reported with a zero balance, zero amount past due; [and 3] Updated with Special Comment Code 'O' (Transferred to another company/servicer)." (ECF No. 452 at 2.) As an initial matter, Appendix E to Regulation V contains no such express requirements. Rather, Appendix E indicates that one of the objectives of the furnisher's policies and procedures should be "[t]o update the information it furnishes as necessary to reflect the current status of the consumer's account or other relationship, including, for example[,] . . . [a]ny transfer of an account (e.g., by sale or assignment for collection) to a third party[.]"

According to Plaintiff, "[t]he CRRG and Metro 2 Guidelines carry regulatory force through incorporation into Regulation V and contractual obligations." (ECF No. 452 at 2–4, citing ECF No. 441-1.) Plaintiff also cites PenFed's various policies and procedures for support on this issue. (*See* ECF Nos. 432-5; 432-6; 432-7; 432-8). Numerous courts, however, have held that a failure to comply with the CDIA guidelines does not render a consumer report inaccurate or incorrect, and that alleged noncompliance with industry practices and/or the CDIA guidelines is an insufficient basis to state a claim under the FCRA." *Fisher v. Equifax Info. Servs., LLC*, 2021 WL 2481852, at *5 n.3 (N.D. Ga. Jan. 22, 2021) (collecting cases). While a court in this district has

---

[18] *See* Appendix E to Part 1022-Interagency Guidelines Concerning the Accuracy and Integrity of Information Furnished to Consumer Reporting Agencies, CFPB, https://www.consumerfinance.gov/rules-policy/regulations/1022/e/ (last visited Sept. 26, 2025).

found that "inaccuracies . . . which derive from purported deviations from the Metro 2 Guidelines[]
fall" under the "category" of "those inaccuracies that are . . . misleading in such a way and to such
an extent that they can be expected to adversely affect credit decisions," the court emphasized that
the plaintiff would still need to establish that the "particular deviation *might adversely affect credit
decisions*." *Arriaza v. Experian Info. Sols., Inc*., No. 20-cv-3073, 2021 WL 1019937, at *4 (D.
Md. Mar. 17, 2021) (quoting *Dalton v. Capital Associated Indus., Inc*., 257 F.3d 409, 415 (4th Cir.
2001) (internal quotation marks omitted) and *Nissou-Rabban v. Capital One Bank (USA), N.A*.,
2016 WL 4508241, at *5 (S.D. Cal. June 6, 2016) (emphasis in *Arriaza*)); *see Nissou-Rabban*,
2016 WL 4508241, at *5 ("To prove her case [based on deviations from Metro 2], Plaintiff will
likely need to establish through admissible evidence that this is in fact the industry standard, that
[Defendant] deviated from it, and that this particular deviation might adversely affect credit
decisions.").

Here, Plaintiff asserts that the CRRG "provides explicit guidance for reporting accounts
that have been transferred—either internally within the creditor's organization (transferred to the
reserve account) or externally to a third-party collection agency." (ECF No. 421 at 7.) In support,
Plaintiff has submitted portions of the CRRG, including Question No. 46 in the "Frequently Asked
Questions and Answers" section. (ECF No. 421-2.) Question No. 46 asks "How should accounts
that have been transferred be reported?" (*Id*. at 12.) According to PenFed, "Question No. 46 applies
only when an account is transferred to another department or company 'that will be reporting the
ongoing account," and "[t]he apparent purpose of the procedures set forth in that section is to
ensure that certain information, including the amount of an unpaid balance, is not double counted
due to being listed by both the transferor and transferee." (ECF No. 439 at 6.)  PenFed asserts that

there was no need for it to follow the procedures outlined in Question No. 46 because "PenFed did not transfer the accounts for credit reporting purposes." (*Id*.)

Question No. 46 of the CRRG states that the "Preferred Option" for "reporting accounts that are being transferred internally or to a server" is for the CRA to "retain all prior account history" in a single tradeline subject to verification by the transferee. (ECF No. 421-2 at 12.) PenFed argues that "[s]ince unpaid balances are part of 'all prior account history[,]' they do not change when the "Preferred Option is employed." (ECF No. 439 at 7.) The other option described in the answer to Question No. 46 "results in two tradelines on a consumer's file; the first as transferred and the second for the ongoing account." (ECF No. 421-2 at 12.) Under this scenario, the tradeline account for the transferred account does not show the current balance since that information should be included in the second tradeline for the ongoing account. (*Id*.) In this scenario, the transferor must report the current balance and amount past due as zero. (*Id*.) According to PenFed, Plaintiff "does not claim any of the PenFed accounts appeared in more than one tradeline in his credit reports," and "[s]ince the third-party debt collector PenFed hired did not report a second tradeline, the optional, non-preferred procedure that requires a transferor to report the current balance as 'zero' did not apply." (ECF No. 439 at 7.)

Plaintiff disputes PenFed's characterization of Question No. 46 as it relates to the disputed accounts, and in support he presents a "copy of another member's report showing the transfer status of an account to third parties." (ECF Nos. 452 at 3; 452-1.) However, without any context as to the particulars of this non-party's "report," there is nothing within it that inherently contradicts PenFed's assertion that it adhered to the CRRG. (*See* ECF No. 452-1.) For example, it is possible that the non-party's account was also reported by the transferee on a second tradeline, thereby rendering the optional, non-preferred option applicable to PenFed's reporting of that

account. Additionally, even construed in the light most favorable to Plaintiff, the evidence does not show that PenFed sold or assigned its ownership rights of the PenFed Accounts to any third party. As noted *supra*, Mr. Olson's declaration testimony and UHG's subpoena response demonstrate that UHG did not actually acquire the credit card account, (ECF No. 413-13 at 3, 10–16), and Mr. Olson's declaration testimony and NCC's direct communications to Plaintiff demonstrate assignment of the disputed accounts to NCC for collection purposes only, (ECF Nos. 413-3 at 3; 421-1; 459-1; 459-2).

Even assuming PenFed deviated from the industry guidelines, however, there is no genuine issue of material fact that these deviations might adversely affect credit decisions. As discussed above, the admissible evidence shows that Plaintiff failed to pay the reported unpaid balances on the PenFed Accounts, and there is no evidence that any internal collections agency or third-party collections agency was reporting a separate tradeline on those accounts. *Cf. Arriaga v. Logix Fed. Credit Union*, 2021 WL 4459759, at *3 (C.D. Cal. May 21, 2021) ("Plaintiff's evidence created a genuine issue of material fact regarding whether *the reporting by both* Logix and Fidelity of the balance Plaintiff owed to Logix and the amount Fidelity was assigned to collect for the same debt was misleading.") (emphasis added). In fact, the record evidence conclusively shows that no collections agency reported a separate tradeline on any of Plaintiff's PenFed accounts. (ECF No. 427-1 at 3, 7.) Thus, there is no basis to find that failing to report these charged off accounts with a zero balance and as transferred with the applicable status codes would have an adverse effect on credit decisions.[19]

---

[19] Plaintiff relies on Experian's declaration for further support on this issue. However, there is nothing within the cited records indicating that, where the account is clearly marked as charged off and there is no evidence of double reporting, the failure to include the status codes cited by Plaintiff would have an adverse effect on credit decisions.

As for the alleged inconsistencies in reporting, a consumer report published by Experian reported the PLOC and the vehicle loan with an overall balance and past due amount of zero while balances were reported on those accounts by Equifax and Trans Union. (ECF Nos. 1-2 at 9–10, 15–18; 31-1 at 5.) According to Plaintiff:

> [i]f one major credit bureau (Experian) reports a PenFed account as having a $0 balance presumably based on furnisher data consistent with the account's charge-off or transfer status while another (Equifax) continues reporting a delinquent balance with past-due amounts, this creates a material inconsistency in the credit data available to third-party lenders.

(ECF No. 421 at 29.) However, PenFed's reporting of the unpaid balances on the PenFed Accounts occurred only where the accounts were clearly marked as charged off and without any indication of a scheduled monthly payment amount. Accordingly, the Court finds this argument without merit for the reasons explained *supra*. *See*, *e.g.*, *Artemov*, 2020 WL 5211068, at *4-5 ("[I]t should be obvious that, even though the banks labeled plaintiff's accounts as charged off, they had no obligation to zero out the overall or past due balance. . . . At any moment, BOA could decide to collect the charged off debt and seek the delinquent amount.").

Plaintiff also asserts in his various filings that there were discrepancies in the "Date of First Delinquency" ("DOFD") and "Date of Last Payment" ("DLP") as reported on certain PenFed Accounts, which rendered this reporting inaccurate or incomplete. (ECF No. 421 at 32–34.) According to Plaintiff, it was incorrect or incomplete for PenFed to report a DLP that post-dated the DOFD because Plaintiff had not made a "consumer-initiated transaction . . . toward the balance owed," which is how a payment is defined by Metro 2 guidelines, after the PenFed Accounts became delinquent.[20] (*Id*. at 33.) According to Plaintiff, the reported DLP "risks misleading creditors into believing that the consumer voluntarily resumed payments, restarting the

---

[20] Here, the caselaw cited by Plaintiff in support of his position can be easily distinguished and does not warrant finding the reporting of the PenFed Accounts as inaccurate or incomplete.

delinquency clock." (ECF No. 427 at 18–19; *see also* ECF No. 421 at 33–34.) However, by Plaintiff's own account, "[t]he DOFD determines when a delinquent account will age off a consumer's credit report." (ECF No. 421 at 33.) Thus, the mere fact that a DLP post-dates a DOFD would not "artificially extend [the] negative impact" of the tradelines, as Plaintiff suggests. (*Id.*)

Further, while Plaintiff has submitted various "credit denials" (ECF No. 432-1), these denials do not specify a single tradeline as a reason behind any creditor's decision. Notably, when Plaintiff was asked in his deposition whether he had "loans that you have been delinquent on, you have failed to pay, or you have defaulted on in the last ten years," Plaintiff indicated "the mortgage" met that description, as well as two other accounts in addition to the PenFed Accounts. (ECF No. 415-2 at 68–69.) Given that Plaintiff clearly defaulted on the PenFed Accounts, and the record reflects no evidence of double reporting of these accounts on a consumer report, Plaintiff takes it an inference too far in claiming that creditors were misled by any purported discrepancies between these dates.[21]

Finally, Plaintiff asserts that "PenFed failed to apply required dispute codes . . . as mandated by Metro 2 standards" (ECF No. 432 at 10), and that it was misleading for PenFed to report the PenFed Accounts without marking the accounts as under dispute. (ECF No. 452 at 5–7). As an initial matter, "[c]ompliance codes are not required by the FCRA." *Llewellyn v. Carrington Mortg. Servs., LLC*, WL 3734965, at *7 (W.D. Mo. Mar. 31, 2023). Further, though the Fourth Circuit has recognized situations in which a plaintiff can recover pursuant to § 1681s-2(b) for a failure to report a dispute, *see Saunders*, 526 F.3d at 149–50, the instant case does not present such a situation.

---

[21] Although Plaintiff cites to other caselaw to support his position here, all such caselaw is again easily distinguished.

In support of his position, Plaintiff relies on *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142 (4th Cir. 2008), and *Hansen v. Mountain Am. Fed. Credit Union*, 2023 WL 4160572 (D. Utah June 23, 2023). (ECF No. 452 at 5–6.) Upon careful review, however, these cases do not indicate that PenFed's reporting was inaccurate for its failure to mark the PenFed Accounts as disputed, as they can be distinguished from the evidence in the instant case.

First, in *Saunders*, the plaintiff purchased a car from a dealer, which thereafter assigned the plaintiff's loan to BB&T. After experiencing mechanical issues, the plaintiff traded in the car for a new car at the same dealership. The dealer paid the remaining debt on the original car loan, such that the plaintiff had no obligation on that loan. The loan for the replacement car was also assigned to BB&T. When the plaintiff did not receive a payment book for the second loan, he contacted BB&T, and a BB&T employee informed him that he did not owe any money on the loan. The plaintiff contacted BB&T several more times inquiring regarding the money owed, and each time was informed that he did not owe any money. Later, the plaintiff received a letter from BB&T informing him that his loan was seriously delinquent. After receipt of the delinquency letter, the plaintiff again went to BB&T to discuss the issue. At that time, a BB&T loan officer acknowledged that BB&T erred in failing to acknowledge the existence of the loan prior to the letter. The plaintiff agreed to meet his obligations under the loan but refused to pay the penalties and late fees. Ultimately, the car was repossessed and reported in repossession status to the CRAs. The plaintiff submitted Automated Credit Dispute Verification Forms ("ACDVs") to the CRAs to lodge a dispute over the reported information. BB&T responded to the ACDV to update the record as a profit and loss write-off, which further reduced the plaintiff's credit score. Despite the verification form providing BB&T with "two opportunities to indicate that [the plaintiff] had contested the legitimacy of the debt with BB&T," BB&T failed to report the ongoing dispute.

The Fourth Circuit found that the failure to report the ongoing dispute was a violation of § 1681s-2(b). The court emphasized the following:

> BB&T documented numerous communications from [the plaintiff] and [the plaintiff's] attorney. BB&T records entirely accord with [the plaintiff's] testimony. The bank records reveal that [the plaintiff] sought to resolve the dispute, informed BB&T of its error in failing to communicate with him earlier, and told BB&T that he had not paid earlier because BB&T had not provided him with an account number for the loan.

*Id*. Given that BB&T's own records indicated the dispute and its error, the Fourth Circuit found that a "jury could reasonably conclude that BB&T's decision to report the debt without any mention of a dispute was 'misleading in such a way and to such an extent that it can be expected to have an adverse effect.'" *Id*. at 150 (citation omitted). As a result, the Fourth Circuit found the district court did not err in so holding. *Id.* at 151 (assuming without deciding "that a furnisher incurs liability . . . only if it fails to report a meritorious dispute"); *cf. Roberts,* 131 F.4th at 250 (stating that in *Saunders*, "[the Fourth Circuit] held that failing to report the fact that a debt is disputed renders the reporting of the debt inaccurate").

As aptly summarized by another court in this district,

> *Saunders* [recognized that] there are situations in which a plaintiff can recover pursuant to § 1681s-2(b) for a failure to report a dispute. Specifically, if the furnisher's records indicate that there is an ongoing dispute with the debtor, the furnisher fails to report the dispute, and the failure to report the dispute renders the report "materially misleading." *See Saunders*, 526 F.3d at 149 ("The second subsection [§ 1681s-2(b)] thus requires furnishers to review their prior report for accuracy and completeness; it does not set forth specific requirements as to what information must be reported, because these requirements have already been set forth in the first subsection [§ 1681s-2(a)]."). Thus, for liability to attach, the failure to report the dispute must "create a materially misleading impression." *Id*. at 148. Stated differently, "[a] furnisher is not liable for inaccurate reporting for merely failing to report a meritless dispute, 'because reporting an actual debt without noting that it is disputed is unlikely to be materially misleading." *Wood [v. Credit One Bank]*, 277 F. Supp. 3d [821], 853 [(E.D. Va. 2017)].

*Timms v. USAA Fed. Sav. Bank*, No. 3:18-cv-01495-SAL, 2020 WL 12618897, at *15 (D.S.C. Aug. 20, 2020).

Here, however, the evidence shows that Plaintiff clearly failed to complete the payments owed on the PenFed Accounts that were reported as charged off based on his own misguided belief that he could unilaterally alter the terms of his loan payments and that PenFed pledged Plaintiff's "signed promises to pay, receipts, [and] notes" to the Federal Reserve Bank in exchange for a loan to PenFed, which resulted in "new credits" issued to Plaintiff's "account that resulted in . . . funds owed to [Plaintiff]." (ECF Nos. 1-2 at 2–6, 24; 413–9; 413–11.) As discussed above, the evidence demonstrates that Plaintiff's disputes, as communicated to PenFed and to the CRAs, pertained to his incorrect belief that he was not obligated to repay the balances reported on the PenFed Accounts—a dispute that obviously lacks merit. Thus, in accordance with the above findings, the undersigned cannot conclude that the disputes otherwise communicated in Plaintiff's letters to the CRAs were such that PenFed's decision to report the PenFed Accounts without noting Plaintiff's dispute was materially misleading and therefore incomplete. *See Wood*, 277 F. Supp. 3d at 853 ("A furnisher is not liable for inaccurate reporting for merely failing to report a meritless dispute, 'because reporting an actual debt without noting that it is disputed is unlikely to be materially misleading. It is the failure to report a bona fide dispute, a dispute that could materially alter how the reported debt is understood, that gives rise to a furnisher's liability under 15 U.S.C. § 1681s–2(b).'" (quoting *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1163 (9th Cir. 2009))).[22]

*Hansen* is similarly unhelpful to Plaintiff on this issue. In *Hansen*, the plaintiff had "an outstanding and delinquent debt for a Visa credit card in an account that she maintain[ed] with"

---

[22] Similarly, any attempt by Plaintiff to raise claims against the CRAs under based on this theory of liability are misguided. Indeed, the FAC does not allege that a CRA failed to indicate disputed information in a published consumer report after being notified of a bona fide dispute *by a furnisher*. *See* 15 U.S.C. §§ 1681s-2(a)(3), 1681c(f).

the defendant creditor. After the defendant assigned this debt "to a third-party debt collector," Plaintiff's credit report "include[d] two tradelines that both show[ed] a balance: $18,340 for [defendant] and $20,875 for [third-party debt collector]." 2023 WL 4160572, at *1. Where the plaintiff alleged "that her credit reports were inaccurate because the inclusion of both balances resulted in double reporting," the court found that she had stated a claim for relief under § 1681s-2(b) sufficient to survive Rule 12(b)(6). Here, there is no evidence of double reporting of the PenFed Accounts on Plaintiff's credit reports.

Ultimately, the record before the Court does not support a finding that PenFed furnished inaccurate, incomplete, or misleading information regarding the PenFed Accounts, and Plaintiff's arguments to the contrary lack merit. Accordingly, Defendant PenFed is entitled to summary judgment on all of Plaintiff's FCRA claims against it and PenFed's motion is therefore granted as to all such claims.

## II.     State Law Claims

Defendant PenFed is similarly entitled to summary judgment on Plaintiff's state law claims against it. As such, and for the following reasons, the Court grants PenFed's motion for summary judgment (ECF No. 413), and Plaintiff's claims against PenFed are **DISMISSED IN FULL**.

### A.  Defamation

With respect to Plaintiff's defamation claim against PenFed, this claim fails for two reasons. First, it is preempted by the FCRA because Plaintiff has failed to demonstrate that PenFed acted with malice or willful intent to injure Plaintiff. *See* 15 U.S.C. § 1681h(e) ("[N]o consumer may bring any action or proceeding in the nature of defamation . . . with respect to the reporting of information . . . except as to false information furnished with malice or willful intent to injure such consumer."); *Ross*, 625 F.3d at 814 ("The only exception to this bar is a narrow one, requiring

proof of 'malice or willful intent to injure [the] consumer.'"). Under South Carolina law, "'[m]alice' is established only if 'the defendant acted with ill will toward the plaintiff or acted recklessly or wantonly, meaning with conscious indifference toward the plaintiff's rights.'" *Beattie v. Nations Credit Fin. Servs. Corp.*, 69 F. App'x 585 (4th Cir. 2003) (citing *Murray v. Holnam, Inc.*, 542 S.E.2d 743, 750 (S.C. 2001)).

As support for his defamation claims against PenFed, Plaintiff relies exclusively upon his belief that PenFed reported inaccurate information to the CRAs. Plaintiff contends that PenFed acted willfully and/or maliciously because it reported information it knew was inaccurate. More specifically, the FAC alleges:

> 139. The defendants are guilty of defamation per se, in that defendants intentionally reported and/or allowed third parties to submit inaccurate information which was published and sold to third parties evidenced by plaintiff's inquiries showing on his consumer report . . . that showed account information that they knew or should have known was false, misleading, inaccurate, unverified, and/or the correct nature of the accounts as it relates to the plaintiff and his rights. Defendants by reporting the accounts inaccurately, unverified and/or without the written consent of the plaintiff was intended to harm and defame plaintiff's reputation when published to third parties who request for reports to qualify or approve Plaintiff based off of his credit and credit worthiness; . . .

> 141. Defamation of Plaintiff was willful, done with malice, willful intent to injure the plaintiff;

> 142. Defendants did not have any reasonable basis to believe that the Plaintiff was responsible for the account reported to Trans Union, Experian, [] and Equifax nor that there should be a balance reported. Defendants also had substantial evidence by which to have verified that the Plaintiff's debt was sold, assigned and/or transferred therefore no longer due or owing to the person reporting the accounts [i.e., PenFed];

> 143. Further, PENFED cannot plead ignorance, because it knew, evidenced by its own internal records that Plaintiff's accounts were sold and who they were sold to, assigned and/or transferred to external collections and what external collection it was assigned and/or transferred to; . . . .

(ECF No. 291 at 35–36.)

However, as described in greater detail above, PenFed did not inaccurately report to the CRAs that "Plaintiff's debt was sold, assigned and/or transferred therefore no longer due or owing to [PenFed]." (*Id.*) In fact, as PenFed correctly notes, it is now clear that "PenFed retained ownership of the [disputed accounts] at all relevant times," so "publishing that fact to the CRAs was not defamatory as a matter of law." (ECF No. 413-1 at 16.) What is more, the record before the Court does not support a finding that PenFed otherwise acted with ill will or conscious indifference toward Plaintiff's rights; rather, the record indicates that PenFed corresponded with Plaintiff at length regarding the disputed accounts, despite Plaintiff's misguided insistence that he was not required to repay his debts. As such, Plaintiff cannot prevail on his defamation claim. *See also Beattie*, 65 F. App'x at 898 ("NationsCredit did not report the alleged foreclosure 'with malice' because, as we have noted, such a report was, at least in NationsCredit's view, accurate."); *White v. Trans Union LLC*, No. 1:24-CV-324 (RDA/LRV), 2025 WL 409660, at *3–4 (E.D. Va. Feb. 5, 2025) ("[B]ecause Plaintiffs failed to plead malice or willful intent, Plaintiffs' defamation claim is preempted by Section 1681h(e)); *Schmidt v. Fair Collection & Outsourcing, Inc.*, 2018 WL 445434, at *2 (E.D. Va. Jan. 12, 2018) (dismissing defamation, libel, and slander claims as preempted by FCRA); *Englert v. Nationstar Mortg., Inc.*, 2015 WL 9275662, at *5 (E.D. Va. Dec. 18, 2015) ("If a defendant makes a statement believing that it is true, the defendant does not act with malice.").

## B.  South Carolina Commercial Code

Plaintiff also alleges that Defendant PenFed violated Article 9 of the UCC,[23] as adopted in South Carolina. (ECF No. 291 at 39.) More specifically, Plaintiff claims that Defendant PenFed

---

[23] "Article 9 of the UCC is a comprehensive statutory scheme governing the rights and relationships between secured parties, debtors, and third parties." *McCullough v. Goodrich & Pennington Mortg. Fund, Inc.*, 644 S.E.2d 43, 49 (S.C. 2007).

violated S.C. Code Ann. § 36-9-210 by failing to comply with "plaintiff's 4-4-2022 request for an authenticated . . . accounting related to the alleged outstanding debt." (*Id.*) Plaintiff claims PenFed is therefore "liable to Plaintiff for damages . . . as provided under . . . [S.C. Code Ann. §] 36-9-625." (*Id.*) As support for this claim, Plaintiff points the Court to Exhibit A of his initial complaint. (*Id.*) Exhibit A includes a letter from Plaintiff to PenFed dated April 4, 2022, in which Plaintiff requests "an authenticated record of accounting" within 14 calendar days. (ECF No. 1-2 at 53–54.) In this letter, Plaintiff states that this "authenticated record must include all tax filings . . . any and all trades and/or investments and/or interests associated with this account of which I am alleged to be a party." (*Id.* at 54.)

Section 36-9-210 of the South Carolina Code defines a "[r]equest for an accounting" as "a record authenticated by a debtor requesting that the recipient provide an accounting of the unpaid obligations secured by collateral and reasonably identifying the transaction or relationship that is the subject of the request." Plaintiff attempts to recover damages for PenFed's alleged noncompliance with his request under this statute through Section 36-9-625, which states, in relevant part:

> (b) Subject to subsections (c), (d), and (f), a person is liable for damages in the amount of any loss caused by a failure to comply with this chapter. Loss caused by a failure to comply may include loss resulting from the debtor's inability to obtain, or increased costs of, alternative financing. . . .

> (f) A debtor or consumer obligor may recover damages under subsection (b) and, in addition, five hundred dollars in each case from a person that, *without reasonable cause*, fails to comply with a request under Section 36-9-210. A recipient of a request under Section 36-9-210 which never claimed an interest in the collateral or obligations that are the subject of a request under that section has a reasonable excuse for failure to comply with the request within the meaning of this subsection.

> (g) If a secured party fails to comply with a request regarding a list of collateral or a statement of account under Section 36-9-210, the secured party may claim a security interest only as shown in the list or statement included in the request as against a person that is reasonably misled by the failure.

S.C. Code Ann. § 36-9-625 (emphasis added).

In its summary judgment motion, PenFed acknowledges that its response to Plaintiff's request for an authenticated accounting "may not have technically complied with Section 36-9-210 because it did not state 'the aggregate unpaid secured obligation' associated with the vehicle loan," but explains that it should not be held liable for its technical noncompliance because "PenFed had 'reasonable cause' to believe that Bruce was not making a serious request for that information based on the prior history between the parties." (ECF No. 413-1 at 16.) In the alternative, PenFed argues that "the Court should dismiss the Section 36-9-210 claim on jurisdictional grounds," noting that Plaintiff "does not have standing to pursue a standalone claim under Section 36-9-210 because he cannot prove that he suffered any concrete harm. (*Id*. at 17.)[24]

With the benefit of a developed record, the Court agrees with PenFed. As discussed at length *supra*, Plaintiff's history with PenFed reflects that Plaintiff consistently opposed his financial obligations to PenFed based on various misguided economic theories and an unfounded belief that he could unilaterally forgive his debts. For example, Plaintiff: (1) stopped making payments on his PenFed accounts because he thought the Federal Reserve would create new money to reimburse PenFed for his debts; (2) submitted an artificial note to PenFed attempting to modify the terms of his vehicle loan; and (3) tried to pay his debts using documents labeled as "money orders," which were purportedly issued by "The Nelson Bruce Estate a foreign state." (ECF Nos. 1-2, 413-9, 413-11, 413-12.) Then, in his April 4, 2022 letter, Plaintiff stated he was "disputing the alleged debts and all alleged balances" on the PenFed Accounts. (ECF No. 1-2 at 53–54.) PenFed responded that such accounts "are legally established debts for which you are

---

[24] Because the Court finds that PenFed is entitled to summary judgment on this claim for the reasons set forth herein, the undersigned declines to address PenFed's argument that the Court could alternatively decline to exercise supplemental jurisdiction over Plaintiff's state law claims. (ECF No. 413-1 at 17.)

liable to repay." (ECF No. 1-4 at 3.) Plaintiff's April 4, 2022 letter also contained a "Settlement Offer" in which Plaintiff conceded that he "possibly" owed "$10" and was "willing to settle the account for that amount without admitting liability," informed PenFed that he would "be assessing a $33 per day penalty for [] failure to comply and/or $1000 per month," and explained "under the right to property clause of the Bill of Rights for the State and for the United States of America, these are my possessions, my property, my interest, and I do not wish to be libeled by any other attempts to seizure what is mine by right." (ECF No. 1-2 at 53–54.) Against the background and circumstances described above, no rational factfinder could conclude that PenFed unreasonably determined Plaintiff's April 4, 2022 letter was not a serious request for an authenticated accounting.

Regardless, Plaintiff has provided no evidence to suggest that he was harmed by PenFed's failure to provide him with an authenticated accounting of the disputed accounts. At this stage of the proceedings, the Court cannot conclude, based on nothing more than Plaintiff's unsupported allegations, that PenFed's technical noncompliance with Section 36-9-210 caused him harm such that he has an actionable claim under the statute. *See Ross*, 759 F.2d at 365 (noting that conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 440 (2021) (explaining that "bare procedural violation[s], divorced from any concrete harm" are insufficient grounds upon which to base "a lawsuit in American courts"). In fact, PenFed's response to Plaintiff explicitly stated that Plaintiff's "dispute of this and other obligations to PenFed were previously investigated, and [PenFed] promptly responded to prior correspondence . . . provid[ing] evidence substantiating the obligations," and directed Plaintiff to call for further information regarding his accounts. (ECF No. 1-4 at 3.) Thus, as PenFed notes in its briefings, "all [Plaintiff] had to do was call." (ECF No.

38

413-1 at 17.) As such, the Court finds that PenFed is entitled to summary judgment on Plaintiff's claim under Section 36-9-625 and therefore grants PenFed's motion for summary judgment (ECF No. 413) as to this claim.

## **CONCLUSION**

For the foregoing reasons, the Court **GRANTS** PenFed's motion for summary judgment (ECF No. 413) and dismisses Plaintiff's claims against PenFed, in full.

**IT IS SO ORDERED**.

<u>/s/Bruce H. Hendricks</u>
United States District Judge

September 29, 2025
Charleston, South Carolina